```
                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF MARYLAND
                           SOUTHERN DIVISION

- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA      :
                              :   Criminal No. 19-00096-GJH
     v.                       :
                              :
CHRISTOPHER PAUL HASSON,       :
                              :
         Defendant.           :
                              :
- - - - - - - - - - - - - - - x   February 21, 2019
```

                              Greenbelt, Maryland

**DETENTION HEARING**

BEFORE:   THE MAGISTRATE JUDGE CHARLES B. DAY

APPEARANCES:                 JENNIFER SYKES, Esq.
                             Office of the United States Attorney
                             6500 Cherrywood Lane
                             Greenbelt, Maryland  20770

                             JULIE STELZIG, Esq.
                             Office of the Federal Public Defender
                             100 S. Charles Street
                             Suite 900, Tower II
                             Baltimore, Maryland  21201


Audio Operator:              Jessica Ionetz

Transcription Company:       CompuScribe
                             P.O. Box 789
                             Cheltenham, Maryland   20623-9998
                             (301) 577-5882




Proceeding recorded by electronic sound recording, transcript
produced by transcription service.


*CompuScribe*
*301-577-5882*

# I N D E X

Page

Comments by Jennifer Sykes, Esq.
On Behalf of the Government    4

Comments by Julie Stelzig, Esq.
On Behalf of the Defendant    10

Rebuttal by Jennifer Sykes, Esq.    21

Ruling - Judge Day    23

| EXHIBITS For the Government: | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 1 | 6 | -- |
| 2 | 9 | -- |

1                              P R O C E E D I N G S

2           (Whereupon, at 12:58 p.m., the hearing began.)

3                 THE CLERK:  All rise.  The United States District

4    Court for the District of Maryland is now in session, the

5    Honorable Charles B. Day presiding.

6                 THE COURT:  Good afternoon.  Please be seated.

7                 THE CLERK:  The matter now pending before this Court

8    is Criminal Case Number GLS19-MJ-063, the United States of

9    America versus Christopher Paul Hasson.  The matter now comes

10   before this Court for a detention hearing.  Counsel, please

11   identify yourselves for the record.

12                MS. SYKES:  Good afternoon, Your Honor.  Jennifer

13   Sykes, on Behalf of the United States.  Also at counsel table

14   and directly behind counsel table are the case agents.  This

15   is FBI Special Agent Alexandria Thoman, as well as FBI Special

16   Agent Rachid Harrison, and Coast Guard Investigative Service

17   Special Agent James Burkett.  Good afternoon, sir.

18                THE COURT:  Good afternoon.  Welcome.

19                MS. STELZIG:  Good afternoon, Your Honor.  Julie

20   Stelzig, on behalf of Mr. Hasson.

21                THE COURT:  Good afternoon.  Welcome all.  Give me a

22   moment.

23        (Pause)

24                THE COURT:  Okay.  This matter is set in for a

25   detention hearing.  The Government has the right to proceed

feb                                                                            4

1  first.  So I will hear first and last from the Government.

2       (Pause)

3            MS. SYKES:  May it please the Court.

4            THE COURT:  Yes.

5            MS. SYKES:  Your Honor, the Government seeks

6  detention and agrees with the recommendation of the United

7  States Pretrial Services Office, that there are no conditions

8  that could be fashioned to assure the safety of the community

9  based upon the danger that the Defendant poses.

10           And that is outlined in the Government's filing on

11 Tuesday of this week, which outlines, based upon the evidence

12 to date, that it reveals that the Defendant is a domestic

13 terrorist and that even though he is charged in a two-count

14 complaint for a firearms offense and the possession of a

15 controlled substance, that that is just the tip of the iceberg

16 on what has occurred within the investigation by multiple law

17 enforcement agencies.

18           And what we have seen and what the investigation has

19 revealed is that the two writings contained in the motion

20 submitted by the Government show that there is an intent to

21 murder innocent civilians.  There is also letters stated --

22 which he sent to himself shortly after the Charlottesville

23 Neo-Nazi Rally; that he identified himself as a white

24 nationalist for over 30 years and advocated for "focused

25 violence" to establish a white homeland.

1        While he was employed with the United States Coast

2   Guard, he was logging onto his government computer under his

3   identity, his user name and password, and during work hours,

4   as verified under that profile; that he was doing a number of

5   concerning searches, internet searches, Google searches, and

6   there were a number of manifestos that were on his work

7   computer that also corroborate what was contained within those

8   writings by the Defendant.

9        Manifestos including those of Anders Breivik, Ted

10  Kaczynski, as the Court is aware, the Unabomber, the April

11  2007 Virginia Tech shooter, Mr. Cho, and Eric Rudolph, also

12  known as the Olympic Park Shooter, and the bomber who

13  conducted attacks in the southern part of the United States

14  back in the late '90s.  Specifically, 1996 and 1998.

15       But he spent most of his time pursuing and searching

16  within the manifestos for Breivik and Rudolph.  And what we

17  know from Breivik's manifesto is that he was a far right

18  domestic terrorist who committed two coordinated attacks in

19  Norway leading to the death of 77 Norwegian civilians back a

20  few years ago.

21       Prior to that incident Breivik spent about three

22  years producing a detailed manifesto where he embraced the

23  ideology of crusader in nationalism to counteract what he

24  termed to be the Islamization of Europe, and he believed that

25  the immigration of those individuals was a threat to European

feb                                                                          6

1    countries and that it was facilitated by certain individuals.

2              And this manifesto is very detailed.  It goes

3    through phases that people who want to conduct these type of

4    attacks should follow, and we saw that this manifesto

5    paralleled the activity and the conduct of the Defendant.  We

6    know that there are -- frankly, for over several years.

7              He was reading the manifesto at work.  He was

8    conducting internet searches for hours during work in support

9    of what was outlined in the manifesto.  He was preparing and

10   planning attacks in line with the ideology articulated in this

11   manifesto, one of the phases being the material acquisition

12   phase to conduct these types of attacks.

13             And the Defendant -- based upon not only search

14   warrant evidence, which I will show a picture of in a moment,

15   but also from financial records, the Defendant acquired

16   firearms, firearms equipment and ammunition for over a

17   two-year period, the lion's share of it occurring in early

18   2017 into early 2018.  And that was evidenced by the search

19   results.

20             And this was contained within the motion, Your

21   Honor, but at this time I would like to show Government

22   Exhibit 1.

23                                 (The photograph referred to was

24                                 marked for identification as

25                                 Government's Exhibit 1.)

1              MS. SYKES:  Law enforcement executed a search

2     warrant at the Defendant's residence in February, earlier this

3     month, and this was a basement apartment in Silver Spring.  He

4     was residing there for about two and a half years with his

5     wife, and within that apartment law enforcement found all of

6     these items.

7              There were 15 firearms.  As shown in this

8     photograph, we have some that would be able to take extended

9     magazines.  We have everything from handguns to rifles.  There

10    are also military boxes containing, conservatively, 1,000

11    rounds of ammunition.  And tactical gear.  And that is also

12    part of the manifesto, is how to survive after the attack too.

13             So we have survival gear.  We have ballistic vests.

14    We have plates that could go into these tactical type vests as

15    well.  So we have a number of items that are concerning and

16    show that the Defendant is in fact a danger to the community.

17             He spent over $14,000 in gear and equipment and sent

18    it to his home in Silver Spring, Maryland over that time

19    period.  And this was also to further that manifesto, that

20    ideology that he had been searching at work.

21             Consistent with the directions of this manifesto,

22    the Defendant began the process of targeting specific

23    individuals, including current and former elected officials.

24    And this is outlined in the motion, how there were different

25    categories of individuals, category A, B and C.  And a review

1   of the Defendant's activity since January 2017 revealed

2   targeting indicators consistent with the Breivik instructions.

3          He did internet searches back on -- as outlined in

4   the motion, earlier this year, and that was in conjunction

5   with the purchases and additional research on how to conduct a

6   sniper attack, and these were individuals within the media,

7   politicians.  There was a number of concerning Google searches

8   that also show the danger that he poses, and those are

9   outlined specifically on page 12 of the Government's motion.

10         And within these government searches we are seeing,

11  back on January 17, 2019, the best places to see -- the best

12  place in D.C. to see congresspeople.  Where in D.C. do

13  congresspeople live.  This is also coupled with searches on do

14  certain people have protection.  The whole part of the

15  manifesto is to attack those targets that don't have

16  protective details or protective services protecting them day

17  in and day out, and that was also something that he was

18  preparing for and researching and trying to understand.

19         So we have the preparation, we have the buying of

20  the firearms, we have these searches within the manifestos,

21  the constant reading.  This is not an isolated activity.  This

22  is something that is being done for hours on end while he is

23  at work.

24         This manifesto also talks about steroids and using

25  steroids as one is preparing for the attacks to build up not

1   only the mental fortitude to conduct the attack but also how

2   to get through the attack itself, and this was evidence based

3   upon when law enforcement searched his residence.  They found

4   a locked container which contained over 30 bottles of HGH or

5   Human Growth Hormone, a steroid.

6           I would like to show Government Exhibit Number 2.

7   This was also contained with the Government's motion.  But it

8   shows the level that the steroid accumulation was occurring.

9                             (The document referred to was

10                            marked for identification as

11                            Government Exhibit 2.)

12          MS. SYKES:  And he also had mapped out different

13  steroid cycles.  They were listed on an Excel workbook within

14  his government computer.  And so, we have firearms purchases,

15  we have the constant reading and researching of the manifestos

16  and the ideology, we have this discovery of the steroids and

17  the steroid use.

18          But then the last part of this is the Tramadol

19  purchases, and those occurred since at least October 2016.

20  And this stems from the possession of the controlled

21  substance, Tramadol, which is a Schedule 4 controlled

22  substance under the Controlled Substances Act, and those times

23  when he purchased them online are summarized in the motion.

24  But at least 4,200 Tramadol 100 milligram pills were purchased

25  during this time.  Most likely from an individual located in

1   Mexico; brought it from California and then here to his

2   residence.

3        And not only do we have the purchases of these items

4   and the tracking of them, but we also have video recording

5   while he was at work.  He was taking pills while seated at his

6   desk, and when law enforcement arrested him, they were able to

7   find suspected Tramadol in a bag that he was carrying at the

8   time of his arrest.  And when they searched his workplace they

9   also found Tramadol, which tested positive for Tramadol

10  preliminarily with a field kit.

11       And then, as outlined also within the Government's

12  motion, we have those clean kits that were found.  He had

13  purchased synthetic urine on two occasions back in 2018.  So

14  we have those as showing that he was in fact a user of those.

15       And I would also like to note that in the pretrial

16  services reported he refused to answer pretrial services'

17  questions pertaining to any type of substance abuse or

18  treatment.  So again, we are seeing an individual who is a

19  danger, and based upon all these reasons, Your Honor, we are

20  seeking his detention pending trial in this matter.

21       THE COURT:  Thank you.  I will hear from the

22  Defense.

23       MS. STELZIG:  Thank you, Your Honor.  Earlier this

24  week the Government filed its motion for detention and, Your

25  Honor, that was rather an extraordinary document.  And it was

1   extraordinary both for the histrionic characterization of

2   Mr. Hasson, accusing him, in its first sentence, of intending

3   to murder innocent civilians on a scale rarely seen in this

4   country.  That was the opening line, Your Honor.  Those are

5   very serious words.  Even more extraordinary was the lack of

6   actual substance backing up these broad, sweeping assertions.

7            Now, Your Honor, it seems to me that the Government

8   filed this very inflammatory document in order to bring

9   enormous media attention to this case.  It has obviously

10  worked.  And to bring pressure on this Court to detain

11  Mr. Hasson.

12           And while I will say that as a citizen it is

13  disquieting to see how the media has taken this one single

14  document filed by the Government and skewed its contents in

15  various ways, that was presumably part of the purpose.  But

16  fortunately for Mr. Hasson, what is going to decide whether he

17  gets detained or released while he fights these charges is the

18  rule of law in this courthouse.

19           And this Court, as I know it will, needs to assess

20  the standards under the Bail Reform Act, and here the burden

21  is on the Government to prove, by clear and convincing

22  evidence, that there is no set of conditions that can

23  reasonably assure the safety of the community.  And I want to

24  pause here because this is significant.  This is not a

25  presumption case for the Government.

1           This is a case in which the Bail Reform Act says

2    there is a presumption of release for Mr. Hasson, and that is

3    because, if we look at the crimes for which he is actually

4    charged, he is charged with possession of a firearm by someone

5    who is either an addict or an unlawful user of a controlled

6    substance.

7           Now, this is a very little used provision of the Gun

8    Control Act.  The act contains no definition of what an

9    unlawful user of a controlled substance is, and this is a

10   provision of the Gun Control Act that the Supreme Court has

11   not had an opportunity to review since issuing its decision in

12   Heller.

13          But be that as it may, that offense carries a

14   10-year maximum penalty, and Mr. Hasson's guidelines, if he

15   were convicted of that offense, would only be 10 to 16 months

16   because he has no prior criminal history at all.

17          The other charge that he has by complaint, not by

18   indictment, the other charge that he has is a misdemeanor

19   possession of Tramadol, which is a synthetic opioid

20   prescription pain killer.  Those are the charges.  Neither of

21   those carry a presumption of detention.

22          And if we look at Mr. Hasson and his history, he is

23   49 years old.  He has dedicated his entire life to serving his

24   country.  He was active duty in the Marines, he served in the

25   Army National Guard and he has been in the Coast Guard for 28

1    years, and he has consistently risen in the ranks and he has

2    earned -- he has gone from an enlisted to the highest rank of

3    junior officer available in the Coast Guard, the title of

4    lieutenant.

5            And throughout his life, in all of the communities

6    where he has lived, he has volunteered in the community, he

7    has helped out others and he has been a loving and supportive

8    husband and father.  So, if we were looking at Mr. Hasson and

9    looking at the charges that he has actually been charged with,

10   there is no way that he would be detained under those

11   standards in the Bail Reform Act, and that is why the

12   Government filed this document on Tuesday.

13           Now, this 15-page document is throwing a whole bunch

14   of stuff up against the wall and hoping that something sticks.

15   But I want us to take a few minutes and slow down and look at

16   the actual acts that the Government is alleging.  Now, these

17   are things that the Government is alleging.  These are not

18   sworn statements like the charges in the complaint.

19           So the Government first asserts that Mr. Hasson has

20   "espoused extremist views for years."  In support of that the

21   Government cites at length, but not completely but at length,

22   two documents that it says it found on Mr. Hasson's work

23   computer.

24           One it says is a deleted draft email.  So even by

25   the Government's account, this is a document that they say

1    Mr. Hasson drafted two years ago and then deleted.  They are

2    not saying he sent it to anybody, posted it to anyone, did

3    anything with it.

4            And this document, Your Honor -- Your Honor has it.

5    It is quoted extensively in the motion.  It goes on about a

6    variety of topics, including a task list of things to do in

7    the next four years that includes things such as get out of

8    debt, buy a van, get land.  I don't know.  That is the level

9    of specificity we are seeing in that particular document.

10           The other document the Government cites to is a

11   draft letter that they say is from September 2017, and they

12   are saying this was a letter that was drafted to a now

13   deceased white separatist, Harold Covington.  Now, the

14   Government focuses on a single line from that, a sort of

15   secondhand reference to focused violence.

16           Omitted from the Government's lengthy citation

17   though are discussions about either running for sheriff or

18   becoming a member of town council as a way to effect change in

19   the community.  So they have those two draft documents that

20   they say Mr. Hasson wrote at some point.

21           Then the Government cites online searches and

22   "thousands of visits" to cites that they characterize over a

23   period of two years as being "pro-Russian, neo-fascist and

24   neo-Nazi literature."  Now, Your Honor, I don't know what that

25   is supposed to mean.  The Government doesn't explain exactly

1   what those websites mean or how they are defining those terms,

2   but that is it.

3           And then the last thing that they say to support its

4   view that Mr. Hasson espouses extremist views is that he was

5   routinely perusing this 1,500-page manifesto of Anders

6   Breivik.  Now, Your Honor, the Government spends about a

7   quarter of its 15 pages talking about the ideology of Anders

8   Breivik.

9           He is not in this courtroom, and so, whatever Anders

10  Breivik wrote in his 1,500 pages is, frankly, beside the

11  point.  But there is a lot of stuff in that 1,500 pages, and

12  in spite of the Government saying that Mr. Hasson was

13  routinely perusing it, the only two instances that they

14  actually cite in their motion are two searches on a single

15  date.  January 3rd, 2019.

16          The Government yet grabs on to that and says that

17  Mr. Hasson has been following this manifesto and using it as a

18  guidebook for how to conduct, I guess, what they are going to

19  characterize as a lone wolf attack.  So they are trying to

20  say, okay, here is this guidebook and we are going to find a

21  couple of things in these 1,500 pages that we think Mr. Hasson

22  has been doing and try to say that he is somehow following

23  this manifesto.

24          What of the three things that they are saying he is

25  doing according to Mr. Breivik?  Well, number one is they are

1   saying he is stockpiling weapons, and you see the Government

2   -- they attach this picture in their motion, and they showed

3   it here again in court today.

4           There are 15 guns, they are mostly rifles, and

5   about, they are saying conservatively, 1,000 rounds of

6   ammunition.  Now, I suppose the size of that gun collection is

7   in the eye of the beholder.  Perhaps here in the suburbs of

8   Washington, D.C. that seems like a large number of guns.

9           But given that the most recent statistics show that

10  there are approximately 363 million firearms in this country

11  that are owned by approximately 42 percent of the households,

12  that means that the average gun owner has eight guns in his or

13  her possession.  And I can assure Your Honor that there are

14  people in many, many parts of this country for whom this

15  collection of guns would be, you know, modest at best.

16          And as for the 1,000 rounds of ammunition, Your

17  Honor, for people who are in the military, for people who are

18  members of law enforcement or for people who are simply gun

19  enthusiasts, it is easy to go through 1,000 rounds of

20  ammunition in a day or two at the shooting range.  So there is

21  not anything I am seeing in here that shows that he was

22  stockpiling weapons.

23          The Government says over a period of time ending

24  more than a year and a half ago.  I am sorry.  Ending sometime

25  last year, that he was accumulating a number of firearms.

feb                                                                    17

1   Again, no connection to Mr. Breivik, other than the

2   Government's speculation.

3          The second thing that the Government tries to tie to

4   this manifesto is targeting individuals.  Now, they cite to

5   the fact that he searched for this category A of individuals

6   that Mr. Breivik again wrote in this 1,500 pages, and they say

7   that because there was an Excel spreadsheet that had a list of

8   names of individuals, that somehow that was, I guess, is

9   supposed to be a hit list.

10          Your Honor, at best there are very -- the searches

11   that the Government cites in its motion, where do members

12   live, where are the best places to see members of congress in

13   D.C., these are not the type of plans that you would expect to

14   see from someone who the Government is accusing of planning a

15   terrorist attack.  This isn't even close.

16          This list of individuals doesn't have particulars

17   about the person.  It doesn't say where they live, it doesn't

18   have routes they travel to work, it doesn't have any plans.

19   There is no communication with others.  There is no schedule.

20   There is nothing.

21          And for all the specificity that they are saying is

22   in Mr. Breivik's manifesto, we see nothing even close to that

23   in the motion that the Government has filed.

24          Now, the last thing, Your Honor, that the Government

25   cites as evidence that Mr. Hasson is supposedly following this

1   manifesto is this reference to steroids.  And again, one of

2   the two searches that they are alleging Mr. Hasson made is for

3   the word steroids.

4          Now, the Government then pulls out this -- again,

5   there are other pictures.  This box that has some bottles

6   that, at least as far as I can tell, have expiration dates

7   that were two years before the date of this supposed search

8   and the manifesto.  But even setting that aside, human growth

9   hormone is not a steroid, Your Honor.  So I am not sure what

10  point they are trying to make, but this is certainly -- there

11  is no evidence that this is in any way connected to whatever

12  Mr. Breivik had to say about steroids.

13         Even more attenuated, Your Honor, is their

14  suggestion that somehow Mr. Hasson's alleged possession of

15  Tramadol is in any way connected to this manifesto.  The

16  Government tries to assert that this is evidence of the

17  Government -- I am sorry.  Of Mr. Hasson stockpiling resources

18  to begin the process of taking narcotics in order to increase

19  his ability to conduct attacks.  That is the Government's

20  assertion.

21         Your Honor, first of all, narcotics, the definition

22  of a narcotic, is a drug that has sleep inducing properties.

23  So if someone is really planning a mass terrorist attack,

24  stockpiling narcotics and taking narcotics would seem to be at

25  odds with that goal.

1              Now, notably absent from the Government's motion,

2      Your Honor, is any actual indication of a plan of any sort,

3      and even if we take everything that the Government says is

4      true, which we don't, but even if we were, it is not a crime

5      to think negative thoughts about people.  It is not a crime to

6      write hostile things about other people, and it is not a crime

7      to write about doomsday scenarios.

8              And, Your Honor, we are not yet a country that

9      criminalizes people for their thoughts.  Even darkest

10     thoughts.  We are not a country that arrest people for

11     expressing beliefs, even if they are disfavored, and we are

12     not yet a country that detains people for their internet

13     searches or deleted documents.

14             Now, this motion was drafted to create attention.

15     Make no mistake about it.  And perhaps that attention was to

16     deflect some of the criticism the FBI has faced for targeting

17     its terrorism investigations on Muslim Americans.  Perhaps now

18     they can say, look, we are not targeting only Muslims anymore.

19     Perhaps this attention was sought to poison the well for

20     Mr. Hasson so the media could judge before he is even indicted

21     for any crimes, let alone terrorism charges, or to poison the

22     well for any future jury pool.

23             Because again, make no mistake about it, even though

24     the headlines are saying that he has been charged with crimes

25     of domestic terrorism, he has not.  He has been charged with a

1   gun offense and a misdemeanor drug offense.  That is all.

2            Mr. Hasson denies each and every one of the

3   Government's allegations.  But even if everything in the

4   Government's motion were true, the Government still would not

5   have met its burden, its heavy burden under the Bail Reform

6   Act, to detain Mr. Hasson.

7            Now, the Government -- the threats the Government

8   outlines as the reasons for detaining Mr. Hasson are the guns,

9   his internet searches and his possession of drugs.  All of

10  those can be addressed.  If the Court finds that those are

11  concerns, they can all be addressed with fashioning

12  conditions.

13           The guns that were in the apartment were seized.

14  There can be an order not to obtain any firearms.  That is

15  routinely done in this court.  As for the internet, if we are

16  concerned about his internet searches, again, as we often do

17  in cases, we can say no access to the internet.  If we are

18  concerned about possession of prescription drugs without a

19  prescription, it is easy enough to say don't possess any drugs

20  without a prescription and we are going to submit you to drug

21  testing.

22           Those conditions are adequate to address any

23  legitimate concerns the Government has about safety to the

24  community.

25           And flight risk.  The Government doesn't even rely

feb                                                                    21

1   on flight risk, nor could it.  So really, we are just talking

2   about the danger to the community, and again, those can be

3   addressed adequately by conditions and that is what the Bail

4   Reform Act requires.

5          Mr. Hasson has been a committed public servant his

6   entire adult life.  He has never before been charged with a

7   crime, and the actual crimes that he has been charged with are

8   not crimes of violence and they do not carry significant jail

9   time.  So any perceived danger that Mr. Hasson might impose on

10  the community has to be based on the actual facts, not on

11  inuendo that is contained in the Government's motion.

12         We are asking that Mr. Hasson be released back home

13  to his wife and that the Court set conditions along the lines

14  that we discussed.

15         Now, the pretrial services report doesn't provide

16  much in the way of detail, but I am happy to address the

17  particular issues there.  But it is pretty much -- it seems to

18  be relying on the nature of the -- not of the charges, but of

19  the allegations laid out in the motion.

20         THE COURT:  Fair enough.  Thank you.

21         MS. STELZIG:  Thank you, Your Honor.

22         THE COURT:  The Government has the burden.  I will

23  give the Government the last opportunity.

24         MS. SYKES:  Thank you, Your Honor.  The Government

25  agrees that it is not a crime to say negative things about

1   people.  But when we look at the totality of the circumstances

2   that are apparent here and the planning and preparation and

3   the detailed research that went into what was found and

4   discovered by law enforcement to date, that is what is

5   concerning.  That is what is dangerous to the Government and

6   from the Government's perspective.

7          And it is rightly so that this gun collection --

8   that many people do have guns in the United States and do have

9   large gun collections in some parts of our country.  But what

10  is concerning is that we have these purchases that are being

11  done mostly in 2017 and 2018.

12         But when you pair that with additional searches that

13  are being done by the Defendant around that same time where he

14  is researching different gun parts, as well as -- this is the

15  chain of Bing searches that he is doing.  Why do liberals vote

16  for more government control?  Where do senators live in D.C.?

17  Do senators have secret service protection?  Are Supreme Court

18  justices protected?  Are rifle scopes illegal?  Are rifle

19  scopes illegal in Europe?  How probable to ban semi-autos?

20  Long range rifle ranges near me.

21         So we are seeing this all embedded in one conduct.

22  This is not a separate and apart type of activity and conduct.

23  This is all in line with the manifesto.  He is following the

24  phases.  It is detailed and it is purposeful, and that is

25  exactly what he is doing over 2017 until earlier this year,

1    until he was arrested.

2         Now, Tramadol is not in the manifesto.  In fact,

3    that is not even included there, and that is why he even wrote

4    in one of his letters that he needs to come off TDL, Tramadol,

5    so that he can clear his head.  That is not a part of what

6    Breivik was communicating to folks that were trying to do

7    these type of violent activities.

8         And lastly, the Government disagrees that the

9    Defendant can be released to his apartment.  That is the same

10   location where he had all of these items amassed and stored,

11   and we believe this is not an appropriate location if the

12   Court is considering release.  We do not believe that is an

13   appropriate location for him to be released to at this time.

14        THE COURT:  Thank you.

15        MS. SYKES:  Thank you, Your Honor.

16        THE COURT:  Give me a moment.  Let me review my

17   notes.

18     (Pause)

19        THE COURT:  The Bail Reform Act requires the Court

20   to look at a number of factors, including the first, which is

21   the nature and circumstance of the offense charged.  The

22   Defense wins that argument because, as we sit here today, as

23   Defense counsel eloquently argued, there are only two

24   allegations.  One being a misdemeanor and the other being a

25   felony.

1          It is not a charge -- neither are charges which

2     carry with it the presumption of detention, which the

3     Government is often the beneficiary of, and as has been

4     stated, the Defense is the beneficiary of the presumption of

5     release.  The second factor is the weight of the evidence.

6     That weight is in favor of the Government as it relates to the

7     charges made, and it is a rather strong weight with respect to

8     uncharged conduct, which the Court is permitted to consider.

9          I do not need to go through the recitation as made

10    by the Government, but this information that has come to the

11    Government has come by way of search warrants of the home,

12    search warrants of computers; an impressive collection of law

13    enforcement work.

14          The third category is a hodge-podge of a number of

15    factors, which I do not have enough information to speak to

16    every one of them, but I do give the benefit to the Defendant

17    of his ties to the community, his longstanding employment and

18    his lack of a criminal history.  I have very little

19    information with respect to his physical and mental condition,

20    but if the Government's version is to be believed, there is

21    some concern here about his use of Tramadol.

22          Also in that same category is the question of

23    whether the accused is under court supervision at this time,

24    and he is not.  That weighs in favor of the accused.

25          And then the fourth category, all of which is

1  written on the presumption of innocence canvas, is the nature

2  and seriousness of the danger to any person or the community.

3  This is where the Government is laying its hat.  The

4  Government rightfully does not seek detention on a risk of

5  flight prong.  It is only a dangerousness question.

6          The Defense's opening remark goes to the

7  Government's opening remark, and both are very spot-on.  The

8  Government files the motion for detention with a very strong

9  opening line.  The Defense says that the Government has

10 nothing to back that up, that it is really an effort to drum

11 up media interest and potentially to influence this Court.  I

12 don't know about the former, but I can assure you the second

13 does not apply here.

14         It is unrebutted that Mr. Hasson has served his

15 country for 28 years.  But the Government brings to the table

16 here the question of dangerousness that, standing alone, would

17 entitle the Defendant to release.  But even if this were a

18 state court proceeding, there would the notion of someone

19 taking a substantial step in furtherance of criminal activity,

20 even if it has not occurred.

21         This is all about the Defendant's state of mind and

22 intentions.  He had a lot of weapons, most of which do not

23 appear to be hunting weapons.  But I cannot say that his

24 possession of those weapons is otherwise illegal.  There are

25 gun collectors.  He may be one of them.

1          But what drives the Government's concern is what

2    also gives the Court pause.  The Defense says that basically

3    this is a charge with the absence of a plan.  It is only about

4    potentially negative thoughts.  The Government says the plan

5    is the manifesto issued by Mr. Breivik some time ago.

6          With respect to the Government's filing of the

7    motion itself, it is a double edged sword.  If the Defense is

8    correct, that it is merely being filed here to color the

9    proceedings against the accused, that is one thing.

10          But if the Government had intentions of presenting

11   this information to seek his detention and had not filed this

12   document, it could be accused of trying to blindside the

13   Defense by rolling all of this information out here at this

14   hearing with no opportunity to at least consider and prepare

15   for it, and I admit the Defense has done a good job with

16   respect to arguing against the Government's motion.

17          I do find that the list of individuals that have

18   been identified by the Government and the type of activities

19   involved here is exactly the kind of concern that this Court

20   should have.

21          I am concerned about the Defendant's ability to

22   defeat controls.  That is, he has done that with respect to

23   the use of his computers at work as alleged, his alleged

24   acquisition of substances outside of the United States,

25   contrary to the prescription policies of the United States,

1    the alleged possession of synthetic urine and application

2    device, and I dare say that any of these activities standing

3    alone would not overcome the statutory presumption of release.

4    Here they do.

5            The Government references a letter in which the

6    Defendant supposedly spoke of acquiring residences and places

7    to hide items and a plan of escape according to this

8    manifesto, whatever.  It seems to be going according to

9    script.

10           Even HGH, whether a steroid or not, it is common

11   knowledge that these substances that are so classified for the

12   sole purpose of athletic or physical enhancement, that falls

13   in line with the supposed script that the Government alludes

14   to.

15           So my ruling comes with a caveat.  The ruling is

16   that I find that the Government has met its burden by clear

17   and convincing evidence that Mr. Hasson is a danger.  The

18   caveat is that I am giving the Government 14 days in the

19   absence of charging Mr. Hasson with any of the assorted

20   criminal activity that they allude to and have argued here

21   today about.

22           I invite the Defense to come back, and at that time

23   I very well may limit my consideration of these extra

24   activities to whatever it is that the accused is facing by way

25   of a trial in this court.

feb                                                                           28

1              If I could have your indulgence for a moment.

2         (Long pause.)

3              THE COURT:  Is there anything further from the

4    Government?

5              MS. SYKES:  No, thank you.  Not at this time, Your

6    Honor.

7              THE COURT:  Before I ask the Defense, let me find

8    out.  Since this is a criminal complaint that was filed, I

9    assume we need to set an arraignment date.  Is that correct?

10             MS. STELZIG:  Your Honor, at his initial appearance

11   we received a preliminary hearing date.  So I think that is

12   all we need at this time.  But thank you.

13             THE COURT:  Okay.  Thank you.  Anything further from

14   the Defense?

15             MS. STELZIG:  Nothing.  Thank, Your Honor.

16             THE COURT:  Thank you all.  I wish you well.

17        (Whereupon, at 1:43 p.m., the hearing was concluded.)

18

19

20

21

22

23

24

25

feb                                                                    29

<u>C E R T I F I C A T E</u>

        I hereby certify that the foregoing is a correct

transcript from the duplicated electronic sound recording of

the proceedings in the above-entitled matter.

*Fabiana Barham*    03-12-19
_____
Fabiana E. Barham                Date
Certified Transcriber, CompuScribe
Certification No.: CET**213