IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CASE NO. GJH-19-96** |
| | * | |
| **CHRISTOPHER PAUL HASSON,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

********

## OPPOSITION TO MOTION FOR RECONSIDERATION OF DETENTION ORDER

The defendant continues to pose a serious danger and must be detained pending trial. His motion for reconsideration should be denied.

### Introduction and Background

The Government previously filed a Motion for Detention outlining some of the many reasons the defendant should be detained. *See* ECF No. 9. After a hearing on February 21, 2019, the Court ordered the defendant's detention. *See* ECF No. 12. Thereafter, a federal grand jury for the District of Maryland returned a four-count indictment charging the defendant with illegal possession of unregistered and unmarked silencers, illegal possession of seventeen firearms by an unlawful user or addict of controlled substances, and simple possession of a controlled substance (Tramadol, an opioid). *See* ECF No. 16.

### The Defendant Must Be Detained

As the Court well knows, certain statutory factors must be considered in determining whether conditions of release exist that will reasonably assure the defendant's appearance or the safety of the community or any individual: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger posed by the defendant's

release.  *See* 18 U.S.C. § 3142(g)(1)-(4).  In its Motion for Detention and at the previous detention hearing, the Government discussed facts relevant to each factor.  Below, the Government sets forth certain additional relevant information.

**Nature and Circumstances of the Offense Charged**

At the previous detention hearing, consistent with the plain language of 18 U.S.C. § 3142(f)—which allows the defendant to seek to reopen the detention hearing at any point prior to trial in certain situations—the Court offered the defendant the opportunity to move to reconsider the detention order if the Government did not charge the defendant with "any of the assorted criminal activity that they allude to and have argued here today about."  ECF No. 24 (quoting transcript of hearing).  The two silencer counts brought by the grand jury are directly related to the conduct outlined in the Government's prior detention motion.  The silencers serve one purpose: to murder quietly.  The defendant intended to do so on a mass scale, and his detention has thwarted his unlawful desire.

In the original Motion for Detention, the Government set forth evidence that the defendant had begun the process of targeting certain specific victims.  The Government now adds to that list two Supreme Court justices and two executives of social media companies, for whose home addresses the defendant conducted Internet searches in March 2018—within minutes before and after searching firearm sales websites.[1]

**Weight of the Evidence Against the Defendant**

*Silencers***:**  According to e-mails and banking records, on July 30, 2017, the defendant bought certain known metal parts from a company in California for $202.55.  Those parts

---

[1] The defendant conducted an Internet search for "are supreme court justices protected" approximately two weeks prior to searching for the home addresses of the two Supreme Court justices.  *See* ECF No. 9 at 10.

contained pre-indexed holes—ready to be drilled and assembled into unlawful silencers. The defendant owned an appropriate drill press, which was found in his residence during the execution of the search warrant on February 15, 2019. Some of the silencer parts were found drilled out, and one silencer was fully assembled. According to the ATF expert examiner, "[t]he absence of manufacturer's markings and a serial number indicate clandestine manufacture . . . ." More troubling, the defendant had fired the assembled silencer: When an ATF expert examined it, the internal components were covered with a gray residue, indicative of gunpowder and thus use.

*Firearms and Narcotics*: The defendant clearly possessed the firearms charged in the indictment. The firearms all were located within the defendant's small residence, many of them in a closet in his bedroom. According to tracing records, the defendant personally purchased many of the firearms outside the State of Maryland, including the Remington shotgun (June 21, 2009, in California); Stag Arms rifle (October 1, 2009, in California); H&K handgun (January 25, 2015, in Virginia); Glock handgun (May 7, 2016, in Virginia); Springfield handgun (October 1, 2017, in Virginia); and Bergara rifle (December 30, 2017, in Virginia).[2]

The defendant also clearly purchased, used, and was addicted to Tramadol, thereby making possession of the firearms illegal. The Government previously set forth the defendant's then-known Tramadol purchase history and his use of the narcotic while at work. ECF Nos. 1 & 9. Over the years, the defendant has conducted Internet searches for information regarding his Tramadol addiction. For example, on July 12, 2017, the defendant conducted an Internet search for "How long does it take to get off tramadol?" and visited an article titled "I[']m addicted to

---

[2] The Government continues to trace the origins of several of the firearms identified in the indictment.

tramadol." Of course, as previously detailed, the defendant continued to purchase and use Tramadol through the date of his arrest on February 15, 2019.

Moreover, while in custody, the defendant has repeatedly admitted to relatives that he has been using drugs for years. Those admissions include:

- March 12, 2019: "I'm off drugs for a month now almost, thinking how much I fucked everything up . . . ."

- March 13, 2019: "I was on drugs, as you know. . . ."

- March 14, 2019: "I'm sorry for getting involved with drugs."

**History and Characteristics of the Defendant**

In its original Motion for Detention, the Government identified a September 2017 letter authored by the defendant to a known American neo-Nazi leader, in which the defendant stated:

> While I fully support the idea of a white homeland, my friends who still play at being a skinhead at 40 plus years old say that you are an informant. That is neither here nor there it is not an accusation the person who told me this served a 12 year prison sentence and never ratted me out so I will not dispute him nor will I accuse you.

The identity of the person the defendant references as having "never ratted [the defendant] out" is known to the Government; the defendant refers to the person as "Missouri" and the Government will so too.

The defendant and Missouri have a long history with one another. Late at night on February 11, 1995, the defendant and Missouri went to a private residence in Hampton, Virginia.[3] When the homeowner arrived by car and inquired as to the reason for their presence,

---

[3] The defendant and Missouri were joined by a third man, also a "skinhead" according to the police report. At the time of the 1995 conduct, the third man was pending sentencing for a weapons conviction and for defacing a predominantly black church with spray paint that read "Leave now or else" and "White power." As late as 2014, the third man continued to hold a leadership position in a white supremacist organization in the United States.

the defendant and Missouri—according to the police report—"called [the owner] several names, stated it was none of his business and walked toward the victim." The victim identified the defendant and Missouri as "skinheads."[4] According to the police report, Missouri—wearing a black jacket with Swastika patches—pulled a handgun from his jacket, "aimed the firearm to the victim['s] face and pulled the trigger[.]  When the firearm did not discharge[,] the suspect beat the victim with the firearm.  Chris Hasson was standing there with the suspect when this occurred."  In September 1995, Missouri was convicted at trial in Virginia state court of attempted murder, maiming, and firearms charges, after which he served a considerable period of incarceration.

In March 2019, an FBI agent interviewed Missouri, who gave limited information about his relationship with the defendant.  The same day of the interview, Missouri caused one of the defendant's relatives to learn that the FBI had stopped by to speak to Missouri.  When that relative passed the information to the defendant, the defendant's first words were:  "Oh shit." After professing that "I didn't put them that way"—apparently concerned that Missouri would think the defendant directed law enforcement toward Missouri—the defendant stated that he thought the Government "would try to get me to inform.  I wouldn't do that, but I'm just saying . . . I had this thing in my head where they'd offer me."  The defendant's relative quickly interrupted: "There's nothing there to inform and they could never prove anything."  The defendant agreed that it was "good for you and I" that Missouri "shut that door down" during the FBI interview.

---

[4] The defendant's Internet search history lays bare his views on race, which in turn inform his criminal conduct.  For example, on August 16, 2017, the defendant searched for "white homeland" and "when are whites going to wake up."  On November 30, 2017, the defendant searched for "please god let there be a race war."  And on March 16, 2018, the defendant searched for "best nigger killing gun," after which he visited various firearm sales websites.

**Nature and Seriousness of the Danger Posed by the Defendant's Release**

As shown throughout this brief, the defendant poses a substantial risk of danger to the community. It cannot go unnoticed that the terrorist who perpetrated the New Zealand attacks in March 2019 was a devotee of far-right Norwegian domestic terrorist Anders Breivik—from whom, as discussed in the Motion for Detention, the defendant also took criminal direction.

**Conclusion**

The Government respectfully submits that the defendant's motion for reconsideration should be denied. The defendant must be detained pending trial.

Respectfully submitted,

Robert K. Hur
United States Attorney


/s/
Thomas P. Windom
Assistant United States Attorney