IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

```
- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA      :
                              :       Criminal No. 19-00096-GJH
     v.                       :
                              :
CHRISTOPHER PAUL HASSON,       :
                              :
          Defendant.          :
                              :
- - - - - - - - - - - - - - - x       April 25, 2019

                                      Greenbelt, Maryland
```

**BAIL REVIEW HEARING**


BEFORE:   THE MAGISTRATE JUDGE CHARLES B. DAY

APPEARANCES:                  THOMAS P. WINDOM, Esq.
                              Office of the United States Attorney
                              6500 Cherrywood Lane
                              Greenbelt, Maryland  20770

                              ELIZABETH G. OYER, Esq.
                              Office of the Federal Public Defender
                              100 S. Charles Street
                              Suite 900, Tower II
                              Baltimore, Maryland  21201


Audio Operator:               Tahshia Singletary

Transcription Company:        CompuScribe
                              P.O. Box 789
                              Cheltenham, Maryland  20623-9998
                              (301) 577-5882


Proceeding recorded by electronic sound recording, transcript
produced by transcription service.

feb                                                                    2

<u>I N D E X</u>

                                                                   <u>Page</u>

Comments by Elizabeth Oyer, Esq.
On Behalf of the Defendant                                          4

Comments by Thomas Windom, Esq.
On Behalf of the Government                                         28

Rebuttal by Elizabeth Oyer, Esq.                                   38


Ruling - Judge Day                                                 40


<u>EXHIBITS</u>                        <u>FOR IDENTIFICATION</u>   <u>IN EVIDENCE</u>
<u>For the Government</u>:

    1                                         30                 30

KEYNOTE:  "*" indicates phonetically spelled in transcript.

feb                                                                                      3

1                              P R O C E E D I N G S

2              (Whereupon, at 2:00 p.m., the hearing began.)

3                    THE CLERK:  The United States District Court for the

4       District of Maryland is now in session, the Honorable Charles

5       B. Day presiding.

6                    THE COURT:  Good afternoon.  Please be seated.

7              (Chorus of "Good Afternoon.")

8                    THE CLERK:  Calling the Case of the United States

9       versus Christopher Paul Hasson, Criminal Action GJH19-096.

10       The matter now comes before the Court for a bail review

11       hearing.  Counsel, please identify yourselves for the record.

12                    MR. WINDOM:  Good afternoon, Your Honor.  Thomas

13       Windom, for the United States.  With me at counsel table is

14       FBI Special Agent Thoman.

15                    THE COURT:  Good afternoon.  Welcome.

16                    MS. OYER:  Good afternoon, Your Honor.  Liz Oyer,

17       Assistant Federal Public Defender, for Christopher Hasson, who

18       is present to my left.

19                    THE COURT:  Good afternoon.  And welcome, sir.  Give

20       me a moment, please.

21              (Pause)

22                    THE COURT:  Okay.  I have received the letter

23       request from the Defense seeking bail review.  I have reviewed

24       that, as well as the Government's opposition thereto, and

25       there have been some additional submissions from the Defense

1    with respect to, I guess, proceedings in other cases and other

2    jurisdictions, as well as a submission from a relative of

3    Mr. Hasson with respect to conditions of release.

4              With that being said, it is the Defendant's request.

5    So I will hear first from the Defense.

6              MS. OYER:  Thank you, Your Honor.

7              Your Honor, I fear that through the vivid

8    imaginations and colorful writing of these prosecutors this

9    case has developed a profile that simply does not match up

10   with the facts.  The rhetoric in this case has gotten ahead of

11   the facts and in some instances has even been contradictory to

12   the facts.

13             And so what I would like to do today, Your Honor, is

14   to focus on the facts, and I want to begin by looking at some

15   of the representations that were made at the last hearing

16   before Your Honor, which took place on February the 21st, just

17   over two months ago.

18             Your Honor, at the last detention hearing in this

19   case the Government made two rather sweeping representations.

20   The first was that they had evidence that the Defendant is a

21   domestic terrorist.  Those are the words they used.

22             And the second is they claimed that the firearms

23   charges that they brought were, in their words, "just the tip

24   of the iceberg."  Again, that is a direct quote.

25             Now the Court at the initial hearing credited the

1   Government's proffer on those points, and the Court ordered

2   Lieutenant Hasson detained.  But the Court also gave the

3   Government a timeframe to back up their assertions, and it

4   invited the Defense to come back if the Government failed to

5   do so.

6           We are back before Your Honor today because the

7   Government has failed to deliver.  They have not come forward

8   with evidence that Lieutenant Hasson is a domestic terrorist

9   because he is not.

10          Your Honor, during the past two months since we were

11  last before this Court the Government has continued to

12  investigate, and the only additional charges that have

13  resulted from their continued investigation are two alleged

14  violations of licensing and registration provisions of the

15  National Firearms Act.

16          The indictment returned on February the 27th added

17  those two charges to the original two charges in the

18  complaint.  A firearms charge and a misdemeanor drug

19  possession offense.

20          We had a status call with Judge Hazel, the presiding

21  District Court judge, on April the 3rd, and during that call

22  the Government represented that they do not at this point

23  intend to supersede.  Essentially they have represented to the

24  Court that no domestic terrorism charges are coming.

25          Now, Your Honor, the Government made a filing

1  earlier this week, on Tuesday, that contained some additional

2  bits and pieces of evidence that they have uncovered, but

3  there is still not evidence that Lieutenant Hasson had any

4  plan to commit any actual attack.

5          Eight weeks ago, Your Honor, before this Court the

6  Government proffered that Lieutenant Hasson was planning a

7  mass attack on civilians.  The words that were used were, "He

8  was planning a murder on a scale rarely seen in this country."

9          Now the theory has shifted a little bit in their

10  most recent filing.  In their most recent filing they say that

11  he is planning a "quiet murder aided by a silencer."  Either

12  way, the details of this supposed plan that he has hatched are

13  all missing.

14          What was he planning to do?  When was he planning to

15  do it?  Where was he planning to do it?  How was he planning

16  to carry out this plan?  All of these questions are unanswered

17  because there was no plan.

18          This case has been investigated exhaustively at this

19  point, Your Honor.  Now I want to be clear.  They didn't start

20  investigating Lieutenant Hasson just when they arrested him in

21  February.  Extensive investigation was done in the months

22  preceding his arrest.  And the discovery that has been

23  produced to date has shed some light on what type of

24  investigation was done, and I want to review that with the

25  Court.

1              Now in November last year the Coast Guard's

2    Investigative Service flagged Lieutenant Hasson's computer use

3    on his work computer.  And as a result of that, the Coast

4    Guard started monitoring Lieutenant Hasson's ongoing computer

5    use in real time.

6              They also started doing historical research.  They

7    dug into all of his past computer use over the two years that

8    he had been at the Coast Guard and reviewed that.  They

9    started reporting back their findings to the FBI.

10             In addition, they started conducting video

11   surveillance of Lieutenant Hasson's work space at the Coast

12   Guard.  A camera was placed right at his desk.  In January of

13   2019 law enforcement then started conducting physical and

14   video surveillance of Lieutenant Hasson's residence in Silver

15   Spring, Maryland.  This included installing a pole camera

16   outside his home.  There are hundreds of hours of video

17   footage that were captured.

18             Search warrants were also issued in January for two

19   email accounts that were used by Lieutenant Hasson, as well as

20   a search warrant for cell site location data so that they

21   could track his cell phone.  Also, a tracking device was

22   placed on his vehicle, on his Subaru car.

23             So, Your Honor, since that time, since at least

24   January and to some extent back to November of last year, they

25   have had eyes on him at all times.  Since those initial search

1    warrants were issued they have gotten search warrants for more

2    email accounts associated with Lieutenant Hasson, for email

3    accounts of two individuals that he corresponded with, they

4    have got search warrants that were executed on the day of his

5    arrest, for his home in Silver Spring, for his vehicle, and

6    also, to take a sample of his blood.

7            So the investigation that has been done prior to the

8    date of his arrest on February 15th was extensive.  Now since

9    his arrest two and a half months ago they have continued to

10   investigate.  Now they have reviewed his personal electronic

11   devices, which were seized from his home.  This included a

12   cell phone and tablet.

13           They have analyzed all the evidence that was seized

14   during the search of his home.  They have conducted ballistics

15   analysis, laboratory analysis.  They have interviewed people

16   in all parts of the country who have known Lieutenant Hasson

17   during various stages of his life.

18           They have had multiple law enforcement agencies

19   continuing to investigate and all this investigation has

20   yielded, Your Honor, is the four charges in the February 27th

21   indictment.  The original firearms charge, the misdemeanor

22   drug possession offense and two additional firearm charges.

23   No terrorism charges, no murder charges, no attempted murder,

24   no conspiracy to commit murder or terrorism.  None of the

25   types of charges that you would expect to see based on the

1    representations that were published in the brief that the

2    Government filed seeking Mr. Hasson's detention two and a half

3    months ago.

4          But despite all of this, Your Honor, the Government

5    persists in arguing that Lieutenant Hasson is planning some

6    sort of terrorist attack.  The charges don't reflect that.

7    The evidence doesn't reflect that.

8          Essentially what the Government has here is a lot of

9    dots on a page, and they are trying mightily to connect those

10   dots into a sinister picture, but the dots just don't connect.

11   The picture is not there.  So I want to go through some of

12   these dots, and I am going to ask the Court to look closely at

13   each of these dots that the Government has put on paper hoping

14   that they will connect into this picture of terrorism.

15         The first one, Your Honor, is Lieutenant Hasson's

16   firearm collection.  Now the Government has created this

17   artfully staged photograph that has been widely reprinted by

18   the media showing all the firearms that were seized from the

19   residence, but let's put a little bit of context around this

20   staged photograph.

21         Lieutenant Hasson is a 30-year military veteran.  He

22   has always owned guns.  He has bought and sold different guns

23   at different times throughout his life lawfully.  He has used

24   them recreationally for hunting and for target practice.  He

25   even had an informal shooting range at his home in North

1  Carolina.  The Government is no doubt aware of all of this

2  through its extensive investigation.

3         Lieutenant Hasson's firearms collection, the one in

4  this staged photograph, it may be unusual here in the

5  Washington, D.C. suburbs, but it is not unusual where

6  Lieutenant Hasson came from.  Keep in mind he only moved to

7  the D.C. area in 2016 for his new post with the Coast Guard.

8  Previously he lived for years in North Carolina with his wife

9  and his children where they owned a home, and the cultural

10 norms there, Your Honor, are simply different.

11        In many parts of this country, and in many circles,

12 the firearm collection that the Government has seized from

13 Lieutenant Hasson's home would be considered unremarkable.

14 But there is this sort of cultural bias that is infusing the

15 Government's arguments here.

16        Now the Government's most recent filing makes a lot

17 out of the addition of these silencer charges.  The Government

18 states, in their most recent filing, that silencers, and this

19 is a quote, "serve one purpose, to murder quietly."

20        Well, with all due respect, with respect to these

21 AUSAs handling this case, that statement is just ignorant of

22 the facts.  Your Honor, first of all, as anyone with any

23 knowledge of firearms would tell you, the term silencer is

24 something of a misnomer because the device really only

25 fractionally reduces the noise that the gun makes when it

1   fires.  So it doesn't make the gun silent.

2          In fact, it doesn't even really make it that quiet.

3   Science shows that, depending on the type of firearm, it

4   shoots with a silencer at about 120 to 130 decibels.  Now,

5   Your Honor, that is associated with the sound that an

6   ambulance siren makes or the sound that a jackhammer makes.

7   Those are common comparisons that people use to describe how

8   loud a gun is when it fires with a silencer attached.

9          So that is not really that great of an aide in

10  committing a quiet murder.  And as a result, silencers in fact

11  are not used very often in murders.  Anyone who thinks they

12  are going to be able to murder somebody quietly like in the

13  movies using a silencer just doesn't know anything about what

14  the device actually does.  They are very rarely used for that

15  purpose.

16         Now the second thing that the Government has wrong,

17  this assertion that they are only used for murders, is this,

18  Your Honor.  Among hunters and sport shooters silencers are

19  widely regarded as serving the important purpose of providing

20  hearing protection.  They are used by many sport shooters, in

21  addition to those earmuffs that you see them wearing, to

22  provide an additional layer of protection for the shooter's

23  hearing.

24         And because of this important application in

25  protecting hearing, the regulation of silencers is actually

1   very controversial.  There is legislation, Your Honor, pending

2   right now in the U.S. Senate that is called the Hearing

3   Protection Act, and that act would significantly deregulate

4   silencers.  That act is cosponsored by 13 United States

5   senators, all of whom agree that silencers should be more

6   readily available.

7        And just to be clear, Your Honor, silencers can be

8   obtained lawfully now, and many people own them.  There is

9   just a complex and costly licensing process to go through to

10  get one, which does discourage some gun owners from acquiring

11  them or from doing so through lawful channels.

12        But, Your Honor, the ATF maintains statistics

13  regarding the lawfully registered silencers in the United

14  States, and the ATF publishes these statistics every year.  I

15  am just going to display an example of these reports that the

16  ATF publishes on the screen.

17        The most recent one is from 2018, and those

18  statistics say that as of 2018, 1,489,791 people had lawfully

19  registered silencers in the United States.  Now are all of

20  them planning to commit murder quietly?  I doubt it.

21        The statistics from just two years earlier, Your

22  Honor, in 2016, state that in that year 902,805 people

23  lawfully owned silencers in the United States.  So there has

24  been quite a jump over the last couple of years in the

25  interest and popularity of these devices, and for that reason,

1    among others, some officials at the ATF, the agency that

2    regulates these devices, has suggested that they should be

3    deregulated.

4            And I want to show Your Honor another document.

5    This is a White Paper that was drafted by Ronald Turk*, who

6    was then the number two official at the ATF.  This was drafted

7    in 2017.  And this report, written by a high-ranking official

8    at the ATF, suggests that silencers are completely

9    misunderstood and should be deregulated.  And I just want to

10   read Your Honor an excerpt from this report.

11       (Pause)

12           MS. OYER:  Your Honor, this White Paper, on page six

13   states -- and I am not going to read the whole thing, but it

14   states, "In the past several years opinions about silencers

15   have changed across the United States.  They are used to

16   reduce noise at shooting ranges and applications within the

17   sporting and hunting industry are now well recognized."

18           It goes on to say that 42 states generally allow

19   silencers to be used for sporting purposes, and it goes on to

20   describe the substantial surge in demand over the last several

21   years for these types of devices.  It goes on to explain that

22   the ATF's processing time for licenses for silencers has

23   significantly slowed, to the point where it takes

24   approximately eight months to get a license for one of these

25   devices.

1          This has resulted in complaints to Congress and

2    requests to speed up the process, and now it is perhaps that

3    what is appropriate at this point is to deregulate these

4    entirely.  Or not entirely, but to take them off of the

5    National Firearms Act list of regulated weapons.

6          The report states, "The change in public acceptance

7    of silencers arguably indicates that the reason for their

8    inclusion in the NFA is archaic and historical reluctance to

9    removing them from the NFA should be evaluated."  The NFA is

10   the National Firearms Act, which is the same statute that

11   Lieutenant Hasson is charged under in these two silencer

12   counts.

13         It goes on to state in this report that "silencers

14   are very rarely used in criminal shootings, and given the lack

15   of criminality associated with silencers, it is reasonable to

16   conclude that they should not be viewed as a threat to public

17   safety necessitating the NFA classification."

18         So, Your Honor, the point that I am trying to make

19   with that longwinded presentation is that the facts just don't

20   support the Government's theory.  They are making sweeping

21   assertions in their public filings in this case that are not

22   supported by fact, and the assertion that the only purpose for

23   a silencer is to murder someone quietly is counterfactual.

24         Now, Your Honor, the next thing that the Government

25   has highlighted, the next dot that they have put on paper that

1   they are trying to connect, is some of Lieutenant Hasson's

2   reading habits, and they have made much out of the fact that

3   he was reading manifestos written by individuals like Anders

4   Breivik, who committed a mass shooting in Norway in 2011.

5          Their last filing in this case, their motion for

6   detention, talked extensively about Breivik.  Now Lieutenant

7   Hasson had apparently downloaded Breivik's manifesto onto his

8   Coast Guard computer and was reading from it at work.  So

9   let's try to put that in perspective too.

10         Breivik's 1,500 page manifesto is readily available

11  on the internet.  It can be downloaded for free.  It is not

12  hard to find.  It is available on multiple sites.  Sections of

13  this manifesto have been reprinted and published by mainstream

14  news outlets, including *Reuters*, the *BBC News* and others.

15         And, Your Honor, *The Washington Post*, which is

16  regarded by some as a liberal news outlet, offers a link to

17  the full text of the manifesto on its website.

18         Now many people of all persuasions are interested in

19  this stuff.  Sadly perhaps, these sorts of grim tales of mass

20  shootings and serial killers have cemented a place for

21  themselves in our popular culture.  In fact, Your Honor,

22  Anders Breivik, the Norwegian shooter, he is the subject of a

23  Hollywood movie, a critically acclaimed Hollywood movie that

24  was released in 2018.

25         It was made by the director who directed the Jason

feb                                                                     16

1   Bourne series of movies starring Matt Damon.  So this is a pop

2   culture interest that they are pointing to here.

3          And I think, Your Honor, that we need to dig deep

4   here and ask why it doesn't even raise an eyebrow when the

5   Washington Post publishes a link to this manifesto or when a

6   Hollywood director makes a movie about it, but it raises a

7   code red when somebody like Lieutenant Hasson reads it.

8          Again, Your Honor, there is some political bias

9   baked in here that should not carry the day in this courtroom.

10          THE COURT:  Let me slow you down.  I certainly do

11   want to hear the rest of argument.  But surely, you are not

12   reducing this discussion to something simply as a man reading

13   a manifesto?

14          MS. OYER:  Your Honor, I think the Government's

15   theory is that Lieutenant Hasson is trying to follow

16   instructions by Breivik in his manifesto, and there is simply

17   no evidence that supports that.  And I want to give an example

18   of that.  One of the things I want to talk about is this idea

19   of steroid use.

20          THE COURT:  Well, this is exactly what would be

21   helpful to me, in terms of attacking the Government's

22   association of conduct and his reading.  But to merely reduce

23   it to talk about a manifesto being available to the public and

24   that being the sole reason why the Government has made its

25   argument I think is a little thin.

1              MS. OYER:  Your Honor, I don't think that the

2    Government has pointed to anything that Lieutenant Hasson was

3    doing that actually indicates that he was following any

4    instructions set out by Breivik in this manifesto, and the

5    steroid use is an example of how they have sort of got it

6    wrong.

7              They suggest that Lieutenant Hasson was reading

8    about steroids in the manifesto and was using steroids to try

9    to gear up to commit some sort of attack.

10             THE COURT:  It is not just steroids.  That was not

11   the sole basis of their argument.  There were layers of things

12   involved.  I am going to certainly give you an opportunity to

13   talk about the steroids, but again, it is not simplistic

14   either.

15             So feel free to make good argument with respect to

16   steroids and/or money and/or investments in properties and all

17   the other things that the Government went through great

18   efforts to lay out before.

19             MS. OYER:  Yes.  Well, Your Honor, regarding the

20   steroids, I will start there.  The Government has suggested

21   that he was using steroids to follow this plan by Breivik.

22   Now the Government did a drug test when they arrested him.

23   They took a blood sample.

24             They tested him for narcotics and for controlled

25   substances, for a wide array of them, and as far as I can see,

1   as far as what has been provided to me in discovery, the only

2   controlled substance that his blood work tested positive for

3   was Tramadol, this substance that he is charged with

4   possessing unlawfully.  No steroids.

5           The lab work does not show that he was using

6   steroids, and the Government doesn't have any evidence that he

7   was actively using them at that time.  There may have been

8   times in the past where he used steroids, and it is very

9   common in the military.  It is common in a lot of different --

10  you know, in bodybuilders.  There are a lot of populations

11  that use steroids for reasons that are completely unrelated to

12  terrorism.

13          And I think that there may have been reasons in the

14  past, but there is no evidence that Lieutenant Hasson was

15  using steroids at the time that he was arrested, at or around

16  the time that he was arrested, or that his use of steroids had

17  anything -- in the past, in the distant past, had anything to

18  do with what Anders Breivik had written in this manifesto.

19          So, Your Honor, he may have been using them before,

20  but he wasn't using them at the relevant timeframe, which is

21  the timeframe when he was arrested, because the Government

22  said he was planning this terrorist attack.  It is a lot of

23  speculation, and it is a lot of connecting together of dots

24  that don't actually form a picture.

25          The only controlled substance that they have

1  evidence that he was using is Tramadol.  Tramadol is a

2  Schedule 4 narcotic.  It is on the same schedule as Xanax and

3  Ambien and Valium and other fairly commonly used controlled

4  substances, and there is nothing about Tramadol in Breivik's

5  manifesto.

6          The facts just don't support the theory.  This is a

7  person with a lifelong interest in firearms.  This is a person

8  with a military background.  This is a person who had an array

9  of interests and may have been reading this manifesto.  But

10 everyone who reads it is not planning an attack, and I don't

11 see the dots leading toward any sort of plan in this case.

12         THE COURT:  Was there not a discussion in the

13 manifesto with respect to hard targets and soft targets?  Was

14 there not other materials that the Government relied upon to

15 support its theory, whether I accept it or not, whether you

16 knock it down or not?

17         MS. OYER:  Yes.  I do want to talk about the other

18 specified materials that the Government relies on.  I want to

19 talk about his writings, the things that the Government quoted

20 from extensively at the last hearing and in their initial

21 detention motion.

22         They cite two documents that were apparently drafted

23 on the work computer in 2017.  So approximately a year and a

24 half ago.  And those documents were private writings.  They

25 weren't shared with anybody.  They weren't posted online.  At

1  least one of them was deleted and they were his private

2  thoughts that were written down, and that is a long ways off

3  from planning a terrorist attack.

4           There was no plan.  It was simply a private writing

5  that was shared with no one.  If it had been shared, you can

6  be sure that the Government would have the emails or other

7  documentation reflecting that it was shared.

8           But instead, one of them at least, and perhaps both

9  of them, I am not sure, was recovered from deleted documents

10  on Lieutenant Hasson's computer.  So these are private

11  thoughts at best, and there is no indication of any planning

12  of any type of coordinated attacked.  Your Honor, if you can

13  be held in jail simply for writing down your thoughts, then

14  our society really is becoming a scary place.

15           They also point to some computer activity, and some

16  of it is more recent than those writings.  He did some

17  internet searches that have been discussed in their filings,

18  some from his work computer.  Many of these were done during

19  the recent government shutdown when many federal workers were

20  sitting idle in their offices and unpaid.

21           And one of the things he did was he typed out some

22  names of liberal politicians and journalists, and in some

23  cases he used derogatory epithets to describe them.

24           Now, Your Honor, the Government wants to attach the

25  most sinister possible connotation to this list.  They want to

1    call it a target list.  To me, frankly, Your Honor, this looks

2    like the sort of list that our Commander and Chief might have

3    compiled while watching Fox News in the morning.  It looks

4    like he is planning his tweets for the day.

5           Is some of the language used offensive?  Yes.  And

6    is it legitimately frustrating that offensive language and

7    ideology has now become part of our national vocabulary?

8    Yes, it is very frustrating.

9           But let's pump the brakes for a second before we

10   jump to the conclusion that this is some sort of hit list.

11   There is no factual support for that conclusion, and really,

12   it is hard to differentiate it from the random musings of

13   someone like Donald Trump who uses similar epithets in his

14   everyday language and tweets.

15          Your Honor, certainly nobody would fault the Coast

16   Guard and the FBI for investigating this case as they did.

17   They did so diligently and they did so thoroughly, and they

18   got to the bottom of it.  Their investigation revealed the

19   absence of any plan by Lieutenant Hasson to cause anyone harm,

20   and now that it is clear that there was no plan, it is time to

21   deescalate this situation.

22          Your Honor, what we are seeing here is the problem

23   of confirmation bias, which frankly, is not a new problem in

24   law enforcement.  What happens is the Government pours a ton

25   of time and resources into an investigation, and it is only

1    natural that when it is done they want it to amount to

2    something big.

3            They want to be able to say, look, we caught a

4    domestic terrorist before he attacked.  So they are putting

5    the pieces together in a way that fits this appealing

6    narrative.  But if we take a step back and look at all the

7    pieces with fresh eyes, the picture is just not there.  The

8    dots don't connect.

9            Lieutenant Hasson is not a domestic terrorist, and

10   he was not planning an attack.  Your Honor, the Government has

11   had a ton of time at this point to marshal the facts, and they

12   have done a ton of investigation and the facts just don't

13   support their theory.

14           And I want to ask the Court not to lose sight of

15   Lieutenant Hasson's background and history.  He is 50 years

16   old as of yesterday.  He has a 30-year record of honorable

17   military service.  He has a strong and supportive family.  His

18   wife is present in court today.  He has got two children with

19   whom he is close.

20           He has parents who support him who live in Arizona.

21   He has a brother who is very supportive of him and who wrote a

22   letter to this Court expressing his support and his

23   willingness to serve as a third party custodian if Lieutenant

24   Hasson is released.  Lieutenant Hasson has no criminal

25   history.  He has no history of violence.

1          The Government's most recent filing dredges up an

2    incident from 1995.  That was nearly 25 years ago.  And

3    honestly, Your Honor, I am not sure what the significance of

4    this incident is.  It appears, from what they filed, that

5    Lieutenant Hasson was present when a violent incident

6    occurred.  He didn't commit the attack.  He wasn't charged

7    with anything.  He wasn't arrested.

8          Dredging up this incident from 25 years ago is a way

9    to tarnish his otherwise upstanding reputation.  It seems like

10   grasping at straws.  It is another dot that doesn't connect to

11   anything.

12         Your Honor, Lieutenant Hasson may have interests

13   that are not common in the D.C. suburbs, he may hold

14   viewpoints that many of us here in this courtroom would

15   condemn, but the right to express one's viewpoints freely in

16   private writings and thoughts is a shared value that we all

17   hold dear.  We don't punish people for thinking thoughts or

18   for expressing ideas in writing, no matter how outlandish or

19   offensive they may seem.

20         This is a case in which we need to remove our

21   political lenses and focus on the actual actions taken by

22   Lieutenant Hasson, and in this case they don't support

23   detention.  They don't show that he was planning a domestic

24   terrorist attack.

25         I want to just discuss briefly the applicable legal

feb                                                                        24

1   standard.  Under the Bail Reform Act it is the Government's

2   burden to prove that Lieutenant Hasson should be detained.

3   The Bail Reform Act creates, in this case, a presumption in

4   favor of release, and it directs the Court to fashion the

5   least restrictive set of conditions that will reasonably

6   assure that Lieutenant Hasson is not a danger to the

7   community.

8           To order him detained the Government must prove that

9   there are no conditions that will reasonably assure that he is

10  not a danger to the community, and that is not the case here

11  in this case, Your Honor.

12          I want to cite as examples for the Court two recent

13  cases in which defendants who engaged in conduct that was much

14  more specific and targeted were released on conditions.  Those

15  are the Kluss* case and the Chain case that were cited in the

16  letter that I filed with the Court yesterday evening.  One was

17  from Southern Florida, and the other was from the Central

18  District of California, as well as the District of

19  Massachusetts.

20          And in those cases the defendants are alleged to

21  have made targeted threats to cause bodily harm to other

22  individuals.  One in one case to members of congress, and in

23  the other case to journalists.  The language that was used in

24  those cases was graphic and offensive.  It reflected extremist

25  viewpoints that are similar to what the Government is accusing

1  Lieutenant Hasson of holding here, and in both of those cases

2  the defendants owned firearms.  In one case the defendant had

3  one in his backpack when he was arrested.

4       Both of those defendants were released on

5  conditions.  The conditions included cash bonds and travel

6  restrictions and firearms restrictions and location

7  monitoring, and those were cases that involved much more

8  specific and targeted action than anything the Government has

9  been able to identify here.

10      THE COURT:  Well, I applaud your effort and your

11  research on that.  I suspect, if the Government wanted to look

12  in that direction, they too would cast out not only two but

13  legions of instances where detention was very much the result.

14  I am not getting much guidance, if you will, from these other

15  jurisdictions.

16      I applaud the effort, but my ruling here will be

17  based upon the resident facts here and whether or not they

18  connect the dots, as you say, and make a picture that is

19  worthy of detention, with the burden being upon the Government

20  or not.  And the dynamic was really laid out clearly in our

21  last time together on this case.

22      MS. OYER:  Your Honor, I understand that precedent

23  in this context has limited value because every case is so

24  fact specific.  But what I am encouraging the Court to do is

25  to look past the way some of these allegations have been

1   characterized and focus on what specific instances of conduct

2   show that Lieutenant Hasson is a danger to the community and

3   show that he is so dangerous that release conditions can't be

4   fashioned in this case.

5            THE COURT:  I agree with you.

6            MS. OYER:  And in this case we have Lieutenant

7   Hasson's brother, who also has an honorable career of military

8   service, who stated in his letter that he does not agree with

9   the viewpoints that his brother is alleged to have held, and

10  he does not agree with the things that he is alleged to have

11  said and written, who is willing to serve as a third party

12  custodian in this case.

13           His wife is also very supportive of him, and she is

14  present in court today.  He has got a strong and supportive

15  family network.  He has got nothing in his history that

16  suggests that he was on the path toward committing some sort

17  of attack.  On the contrary.  He served honorably in the

18  military.

19           And his brother discusses very eloquently how

20  remarkable it was that he came up from an enlisted man to a

21  commissioned officer without even a bachelor's degree.  He was

22  very good at his job.  He was a loyal servant of this country.

23  He is a dedicated family man.  He is a father to two children

24  with whom he has nice relationships, and he has not done

25  anything at any point in his life that suggests that he was on

1   this path towards violence that the Government is claiming.

2              I think, Your Honor, that there are release

3   conditions that can be set for somebody like this, and that we

4   should try hard to find those release conditions.  I will note

5   that Lieutenant Hasson, up until today, has been held

6   essentially on this almost solitary confinement, like status

7   of the jail, where he is not allowed to come out of his cell

8   when anyone else comes out because he is perceived to be

9   unable to associate with others.

10             He has got a cell mate, but he was doing all of his

11  recreation time alone, and the jail has changed that, after

12  our repeated requests, today.  But it has been very difficult

13  confinement conditions for him.  The issue is he gets along

14  with everybody, but he is perceived as something that he is

15  not as a result of how this case has been portrayed in the

16  media.

17             I think this is a case, Your Honor, in which a third

18  party custodian and location monitoring confining him to the

19  residence would be good places to start.  I think there are

20  additional conditions that can be imposed that would mitigate

21  any risks that he might pose, including a restriction on

22  owning or possessing any firearms, a restriction on using any

23  controlled substances and a restriction on computer use.

24             He doesn't need to use a computer or the internet,

25  and if he is locked up at home on location monitoring under

1   the supervision of his brother, who agreed to take that on, or

2   his wife, there is no reason to believe that he would pose any

3   threat to the community during the pendency of this case.  And

4   the Bail Reform Act suggests that the burden is on the

5   Government to prove otherwise.

6          And unless the Court has any questions for me, I

7   think I will sit down.  Thank you.

8          THE COURT:  Okay.  Thank you.  I will hear from the

9   Government.

10          MR. WINDOM:  Thank you, Your Honor.  Your Honor, as

11   you already heard much of the Defendant from the filings the

12   Government has made in this case and from the last detention

13   hearing, I am going to focus my discussion on the factors

14   under 3142 that are relevant for Your Honor, noting that Your

15   Honor already has found those factors met and that the

16   Defendant is a danger to the community by clear and convincing

17   evidence.

18          So the Defendant has been charged by indictment to

19   four counts.  Two silencer counts, the gun counts for being an

20   unlawful possessor of firearms as a drug user or addict, and

21   then the drug count.  The statutory maximum for those four

22   counts combined is 31 years.  The Defense is asking us to put

23   more charges that provide more statutory maximum possibilities

24   than the 31 years.

25          In the last hearing Your Honor said certain things

1   about coming back to the Court, which were quoted by the

2   Defense.   But Your Honor also said -- made some comments along

3   the lines of this is all about the Defendant's state of mind

4   and intentions.   He had a lot of weapons, most of which do not

5   appear to be hunting weapons, but I cannot say that his

6   possession of those weapons is otherwise illegal.

7            Enter the indictment.   The silencers that he made

8   himself clandestinely in his home with a drill press are

9   purely illegal.   They have the intended use that the

10  Government said in its papers.   He intended to use them in a

11  sniper attack.

12           These are not dots that the Government is attempting

13  to throw on a piece of paper and connect.   The dots were

14  connected directly by the Defendant with his own writings.

15  The silencers are not gun collector items.   They are pure

16  killing devices, and they were used by the Defendant.

17           The internal baffles of the assembled silencer was

18  covered in gun powder residue, and this isn't just for some

19  hunting or going to the range or something.   He bought them in

20  July of 2017 when he moved to a basement apartment in

21  Maryland.   He bought the metal components for it.   He bought

22  the drill press.   These are not serialized.   These are not

23  registered in any way.   They intended to be hidden.   He made

24  them.

25           The Defense also spoke of a photograph, and I have

 1  handed a collection of photographs up to the Court.  I believe

 2  there are 11 of them.  I am going to just mark them all as

 3  Government's Exhibit 1.

 4          THE COURT:  Okay.

 5                          (The photographs referred to

 6                           were marked for identification

 7                           as Government's Exhibit 1.)

 8          MR. WINDOM:  This was shown at the last detention

 9  hearing.  The silencers are actually visible; a completed

10  silencer and some of the silencer components over here.  But I

11  want to step back and show how the Defendant actually had

12  these items in his apartment.  He had these ready to go.

13  Ready for use.

14          The second photograph is a photograph of the

15  Defendant's apartment bedroom.  It is the foot of the bed and

16  there are three closets there.  The one on the left, when

17  opened, reveals the third photograph that Your Honor has, and

18  I will show some closeups of this in a moment.  But the two

19  standing long guns on the bottom, a bunch of ammunition,

20  tackle bags, load carrying bags, ammunition belts.  There were

21  some handguns, knives and solvents in here.

22          So open the closet and begin.  Pick up your long

23  guns, which are specialized by himself.  There are optics on

24  there that he has placed on them.  He has customized these

25  devices with individual pieces of equipment that he bought

1    over time.

2           Take the long guns out.  There is your thousands of

3    rounds of ammunition in canisters.  There is your ammunition

4    belts.  There is your load carrying vests.  Just above that an

5    outfit further, a couple of handguns, a knife.

6           In the closet next to this one is the body armor,

7    and I want to talk about the body armor for a minute.  This

8    isn't like a Kevlar vest.  It is body armor.  It is designed

9    to take, on impact, multiple rifle rounds from 30 feet.

10          You see the magazines, also ready to be loaded.

11   Here are -- here is the armor pulled out of the vest.  This is

12   just one of the vests.  The weight alone -- and I am happy to

13   hand it up to Your Honor to test it.  This is combat gear.

14   There is no reason to have this except for the purpose that

15   the Government has said in its motions; that the Defendant

16   intended to take this equipment, to take his weapons, and go

17   and conduct the attacks that were planned.

18          Further ammunition belts; interior.  Back in the

19   original closet with the long guns you have got a go bag with

20   anything that you need for the road, including your silencers.

21   And there is the drill press.

22          So in addition to those guns, the Defendant also

23   repeatedly searched over the years for homemade explosives,

24   homemade mortars, high impact weapons, which makes sense

25   because, in his own words, as we quoted in ECF No. 9, he was

1  "dreaming of a way to kill almost every last person on the

2  earth."  It involved a bombing and sniper campaign.

3       And there is no daylight between the Government's

4  statements that he wants to kill a lot of people and he also

5  had a silencer.  You can kill lots of people quietly.  That is

6  kind of the point of the silencer, is to get away with it.

7       The Defendant said, he wrote, that he believed that

8  much blood will have to be spilled to get whitey off the

9  couch.  He was just the man to do it in his mind.  These are

10  not -- well, they were at the time private thoughts written

11  privately, but so were Anders Breivik's and so were the guy in

12  New Zealand who conducted the attacks.  They were private

13  thoughts written privately, until they acted and until they

14  published.

15       Now the second factor for Your Honor involves the

16  weight of the evidence, and as charged, simply with the

17  charges in the indictment, it is a search warrant case.  It is

18  extremely strong evidence, as Your Honor found the last time

19  around.

20       These are guns that he bought personally.  In many

21  instances, kept feet from where he lays his head at night.

22  There are the repeated admissions on phone calls he has made

23  while detained that the Government put in its filing from the

24  other day.  And as the Defense just noted, he had Tramadol in

25  his blood when the Government took that blood draw on the date

1   of his arrest, on February 15th of this year.

2              I have put in much of each of the factors in the

3   different writings, and there is no need to go over those

4   again.  So I am kind of adding a little bit more discussion of

5   this.

6              With respect to the history and characteristics of

7   the Defendant, the Defendant's 30 years in the service mean

8   nothing because he turned on his country.  He turned on the

9   beliefs and the ideals of his country over the last several

10  years.

11             And he has been 40 years a skinhead.  He called

12  himself in his letter a longtime white nationalist.  The

13  reason that the Government put in the information regarding

14  Missouri in the filing from the other day is that it

15  corroborates everything that the Defendant said.

16             The Defendant and a couple of other skinheads were

17  driving around in eastern Virginia in 1995 and one of them

18  pulled a gun on an individual and was later convicted of

19  attempted murder.  So the point of that information is simply

20  to corroborate what the Defendant himself said, which is also,

21  of course, corroborated by all of the different internet

22  searches that the Government has put into its brief.

23             Now in terms of the nature and seriousness of the

24  danger to the community, as the Government has stated several

25  times, the Defendant wanted to kill on a mass scale.  He

1   wanted to spark internal strife, and he named the types of

2   people that he wanted to kill in his letter:  Politicians,

3   judges, leftists in general, which are almost verbatim words

4   from Breivik, and we put some of this in the latest filing.

5           So on February 26 of 2018, just by way of an

6   example, while at work he conducts an internet search for "Are

7   Supreme Court justices protected?"  Two weeks later, it is a

8   Tuesday, March 13 of 2018, maybe he was at work that day.  He

9   comes home, gets cleaned up, starts surfing the internet, but

10  not out of some sort of idle curiosity, given the specificity

11  of his searches.

12          At 5:15, for a half hour he does many dozens of

13  searches on AR-15s, and then he turns his attention to the

14  Supreme Court justices, who he just has presumably found out

15  are not protected on the scale that many other constitutional

16  officers are.

17          So at 5:50, "How often does the U.S. Supreme Court

18  meet?"  At 5:51 p.m., "U.S. Supreme Court justices, liberal or

19  conservative."  At 5:55 p.m., "Where does Justice, blank,

20  live?"  At 5:55 p.m. also, a justice goes house hunting

21  articles.  At 5:59 p.m., another article regarding a

22  particular justice.

23          At 6:01 p.m., another article regarding a particular

24  justice; 6:01 p.m., again another article regarding where that

25  justice has been spotted dining.  At 6:02 p.m., a search of

1  the location, the locality, where that previous article had

2  said the justice had been spotted dining.

3           At 6:04 p.m., a search for justice number two.  Also

4  at 6:04 p.m., another search for that same justice.  At 6:07

5  p.m., where does justice number two live?  Also at 6:07 p.m.,

6  an article regarding the specific locality, neighborhood, in

7  which that justice number two lived.  And then he is back to

8  the firearms. 6:38 p.m., a firearm blog, and continues

9  throughout the night.

10          Now it is important to note that from the -- as well

11 in terms of the nature of the danger to the community, from

12 the various search warrants that were done in this case, in

13 emails the Defendant sent a few photographs of different long

14 guns.  Two of the long guns in pictures that were taken by the

15 Defendant in his residence during the course of the email

16 search warrant, so in the 2017/2018 time period, two of those

17 guns have not been found by the Government.  They were not

18 present at his home when the Government searched on February

19 15 of 2019.

20          So one plausible possibility is that he still would

21 have access to those weapons wherever they may be, whether at

22 the home he owns in North Carolina or at some other location,

23 a location consistent with everything that Breivik said about

24 having multiple stash locations.

25          Now I am just going to briefly discuss the few cases

1  that the Defense put in last night.  We can't possibly know

2  every fact that was laid out in the detention hearing or even

3  if there was a detention hearing in some of those cases.  Or

4  in two of those cases.

5        But the larger picture, you know, is we also could

6  go back and search and find any number of things, but these

7  are not comparable.  They are in *absit* because here the

8  Defendant wasn't calling somebody from a couple of thousand

9  miles from the comfort of his house spouting off.  He was

10 planning a strike, and he was going to strike when ready

11 without advanced warning.

12       And that is not me telling you.  That is the

13 Defendant telling you; writing it down and then the Government

14 finding it later.  He said so himself.  The silencers proved

15 that.  And he said he was a man of action, and that was his

16 ultimate intention.

17       Now with respect to Breivik, I mean, we have talked

18 about that in different papers.  Your Honor has signed a

19 search warrant that the Defense has on this case which goes

20 through many different ways in which the Defendant was

21 following the manifesto.  From the research phase, the

22 logistics phase, assembly and implementation.  Basically, how

23 to do it and on whom.  Well, we know he was doing that.

24       The equipment for use:  The guns, the armor, the

25 ammunition, the food, the survival supplies, all of those

1    things which he had.  The assembly of the equipment:  For

2    example, drilling out a silencer and then using it, and then

3    all of the different optics and customizations on the firearms

4    that he did himself.  And so that is the third step.

5           And the fourth step is implementation, and it is

6    before that step that the Government has intervened with the

7    arrest of the Defendant.

8           Now one other thing for Your Honor to consider is,

9    well, what would be a reasonable accommodation otherwise if he

10   were to be released from custody?  Well, there is no

11   reasonable alternative.  There is no viable third party

12   custodian.  Arizona gives zero comfort.

13          How is the Defendant going to get there?  How is the

14   Defendant going to be monitored there by this Court or by

15   Pretrial out there, when the brother who is so busy -- an

16   unblemished record.  I am not casting aspersions on the

17   brother, as far as has been represented to the Court.  But he

18   is so busy with his work he can't show up here, and he says he

19   works 8:00 a.m. to 5:00 p.m.  What is he going to do?  What is

20   the Defendant going to do all day alone in his brother's

21   house?

22          But, in any event, the Defendant isn't qualified for

23   release.  We noted previously in the last hearing his ability

24   to defeat controls.  Specifically, with respect to searches on

25   the work computer.  Obviously he also was able to purchase

1    illegal drugs from overseas using encrypted foreign email

2    accounts, foreign based email accounts.

3         Attempting to subvert internal testing at the Coast

4    Guard with synthetic urine has been previously discussed.  And

5    he hid his criminal conduct from those around him, including

6    from the very brother that is put up as a third party

7    custodian.  He hid that drug use for years from his brother.

8         So for those reasons, Your Honor, we maintain,

9    consistent with Pretrial, that the Defendant must be detained.

10   I am happy to answer any questions.

11        THE COURT:  No questions.  Thank you.

12        I will give the Defense a final opportunity since

13   this is your request.

14        MS. OYER:  Your Honor, I will be very brief.  I want

15   to just respond to a couple of points.

16        Mr. Windom talked about how this is a very strong

17   case because there were search warrants issued.  The search

18   warrants did not yield charges that reflect any of the

19   offenses that were under investigation in the search warrants.

20   The search warrants stated that the Government was

21   investigating murder, attempted murder, conspiracy to commit

22   murder.

23        There are no murder charges here.  We are many steps

24   away from a murder charge being appropriate, and I think that

25   the fact that the only charges are essentially these firearm

1    offenses and this drug possession offense is something that

2    ought to give the Court serious pause about how strong this

3    case against Lieutenant Hasson actually is.

4           Your Honor, the other point I want to make is

5    Mr. Windom talked about these searches related to Supreme

6    Court justices.  The Government had eyes on Lieutenant Hasson

7    for months.  They had a tracking device on his car.  They had

8    tracking on his cell phone.

9           If there were any evidence that he had gone near any

10   of those locations, Your Honor would have heard about it from

11   the Government.  We all would have heard about it from the

12   Government.  There is no evidence to suggest that he was

13   actively pursuing any of those individuals as targets, and the

14   fact that he did not go anywhere near those locations after

15   searches for them is very strong evidence that in fact he was

16   not.

17          We still have not heard any details from the

18   Government about what this supposed plan was.  What was he

19   planning?  The Government apparently believes he was planning

20   something, but their belief, that they have not come forward

21   with evidence to support, is not sufficient to detain

22   Lieutenant Hasson.

23          The Bail Reform Act puts great weight on what the

24   actual charges are, and the charges in this case are not

25   murder, not attempted murder of Supreme Court justices.  They

1   are not domestic terrorism.

2          They are violations of a provision of the National

3   Firearms Act that the ATF and some of its top officials are

4   considering as possibly obsolete, and they are a misdemeanor

5   drug possession offense and they are the offense of possessing

6   a firearm while using a controlled substance.  In this case, a

7   Schedule 4 narcotic.

8          Those charges, evaluated against Lieutenant Hasson's

9   record, do not merit detention in this case, Your Honor.

10          THE COURT:  Thank you.  Give me a moment.  Let me

11  review my notes.

12      (Long pause)

13          THE COURT:  As part two of the detention process,

14  this hearing is really about what has happened since the

15  initial order of detention.  My reasoning was set forth there.

16  And the question that was in that hearing, as well as in this,

17  is to what extent should uncharged activity influence the

18  Court's detention question as it relates to charged conduct.

19          Looking at my notes from the prior hearing, the

20  needle hasn't moved much at all.  The findings that I made

21  there I think are still consistent here.  The nature of the

22  circumstances of the offense charged, especially if it is

23  certain types of offenses, that one weighed in favor of the

24  accused.

25          The weight of the evidence as to what is charged,

1   that weights in favor of the Government.  And all of the other

2   subcategories that I have spoke to, in terms of family ties

3   and employment and history of drug use and criminal history

4   and conduct while under supervision and the seriousness of

5   danger to the community, is still the same.

6        The only thing that is different now is that there

7   is a more fulsome record as to what is or what will be

8   charged, and that really hasn't changed either.

9        The Defendant is not charged with any terrorist

10  activity, and either there is not enough evidence to charge

11  him or the Government has no interest in charging him, or

12  maybe there was a lack of a showing of probable cause to

13  charge him with something else.  But clearly, as we sit here

14  now, there is no intent by the Government to charge with

15  Mr. Hasson with anything other than what is in the indictment.

16       There are no allegations of attempted criminal

17  conduct above and beyond what is in the indictment.  There is

18  no allegation of a conspiracy to do so.  Mr. Hasson will never

19  be convicted of anything remotely close to terrorism or murder

20  because there are no charges, not even so much as a stalking

21  charge, be it a stalking of a Supreme Court justice.

22       And I mean no disrespect to the Government or law

23  enforcement.  They were faced with a very difficult

24  challenging set of facts.  If I were a law enforcement

25  officer, I probably would have moved, if not when they did,

1   maybe even sooner, based upon the information that has been

2   presented.

3          But the Defendant's status as a skinhead is of no

4   moment in the American court, or his longstanding views,

5   hatred or otherwise, regarding anybody.  It is about the acts

6   or those acts taken in preparation to conduct amounting to

7   criminal conduct.

8          The difficulty, I suspect, for the law enforcement

9   officers here was when to move.  In thinking about this it is

10  pretty easy for all of us to say, well, let's wait until he

11  has got a gun drawn on someone and take him out.  As the

12  Defense would say, in the movies.  That may not be very smart.

13  But clearly, that scenario makes it easy to make the case that

14  there is an attempt to do x, y or z.

15         But how far back from that is where we must

16  struggle, and in that space, that is where I had pause before

17  and I have pause now, in terms of how much is enough.  And as

18  of the last hearing, I was persuaded that there was enough to

19  not only to detain him, but for the Government to have

20  evidence to prosecute him for these most vile crimes that have

21  been argued.  That discussion has been taken off the table.

22         Whether he sits here with criminal ideas while

23  charged with firearm possession charges or whether charged

24  with shoplifting charges, the detention question is still the

25  same.  How much of a shadow should be cast upon the issue of

feb                                                                      43

1    detention when he is faced with shoplifting?

2              Well, this is more serious.  The allegations against

3    the accused are serious even as they sit.  His exposure is

4    significant, as the Government has said, but on this record I

5    do not find that detention is appropriate.

6              A more difficult question for the Defense is

7    conditions, if any, of release.  He is entitled to be

8    released, and your starting points were very good.  I also

9    agree with the Government.  Arizona is not in play.  And just

10   returning him to that home under the conditions in which he

11   was arrested, that is not enough.

12             He is going to have to have a whole lot of

13   supervision.  I don't want to use terms such as being shackled

14   to someone that the Court finds comfort in, but he might feel

15   that way.  I have got to have somebody who has got eyes and

16   ears on him like nobody's business.

17             Now, of course, we are talking about home detention,

18   we are talking about third party custodians, we are talking

19   about no computer use, we are talking about no firearms and

20   anything else that sounds reasonable, be it from the

21   Government or from the Defense.

22             And I don't know how you wish to approach this, if

23   you have someone in mind at the moment, but him just going

24   home with the wife and kids will not suffice.  So I will be

25   glad to hear from the Defense first.

1          MS. OYER:  Your Honor, I have a couple of different

2   proposals, anticipating that going home with his wife might

3   not be considered a suitable option by the Court, although she

4   is present in court today and, of course, willing to take him

5   home with her.

6          THE COURT:  And let me be careful.  I don't mean to

7   cast any negative comments upon his wife or family.  But I am

8   also not so warm about him going back to that home.  I am

9   concerned about the breadth of weaponry in that home.

10         While the Government has searched it, I am so

11  concerned about the facts or the contentions made by the

12  Government that I don't know what else may be in that home and

13  whether the Government would ever find such things.  So you

14  can take it from there.

15         MS. OYER:  Well, Your Honor, Mrs. Hasson, who is

16  present today, is no longer living in the home where the

17  search warrant was executed.  That was a rental, and the

18  Hassons are no longer tenants there.

19         She is living in the Virginia Beach area with her

20  mother.  So that would be one option.  I know that Your Honor

21  was not comfortable with Arizona.  Mr. Windom raised the point

22  that Mr. Hasson's brother has a full-time job.

23         His parents have also been screened as third party

24  custodians.  They are also in Arizona, but they are not

25  working and home during the day and also willing and able to

1    supervise him.  So that would be another option that I would

2    ask the Court to consider.

3            And short of that, Your Honor, I think another

4    suitable option could be to place Mr. Hasson in an inpatient

5    residential drug treatment facility.  There is a substance

6    abuse issue here.  Many clients of mine in other cases have

7    done well in the inpatient program at Gaudenzia.  There are

8    also other inpatient programs, I believe, that Pretrial

9    contracts with.  So that would be another option that I would

10   set forth to the Court.

11           I don't know that that would accommodate location

12   monitoring.  So perhaps it wouldn't address the Court's

13   concerns in every respect.

14           THE COURT:  Well, I want to make as clear as

15   possible, while I do not accept the Government's argument with

16   respect to his dangerousness, his level of dangerousness that

17   amounts to detention, I still have grave concerns.  And many

18   of the treatment programs that we have don't provide me the

19   level of comfort about his movements and the ability to walk

20   away and things of that nature.

21           MS. OYER:  Understood, Your Honor.

22           THE COURT:  Okay.

23           MS. OYER:  Then I suppose I would focus on the

24   option of Lieutenant Hasson staying with his parents, who

25   would be in a position to supervise him essentially around the

feb                                                                    46

1  clock.  And I think it would be possible to get the family on

2  the phone now if the Court wanted to do that, to talk with

3  them about what the logistics of the accommodations would be.

4           THE COURT:  I am not inclined to engage in a

5  telephone conversation on this subject.  I am not exactly

6  warmed over about the notion of Virginia, but I will not rule

7  it out.  And I also, of course, will -- I am looking at all

8  kinds of things that can maintain the status quo until this

9  matter is resolved.

10          And I don't know if there are any properties that

11 are available for posting, to the extent that the persons who

12 owns those properties have such a relationship with the

13 accused that he would stay on the straight and narrow.

14          MS. OYER:  Understood, Your Honor.  It sounds like

15 perhaps the best option would be for us to reconvene in a few

16 days, and I could present a more concrete proposal in advance

17 of a further hearing to both the Court and the Government, as

18 well as to Pretrial, so that they can weigh in on it as well.

19          THE COURT:  I think that is a good proposal.  I

20 Would urge you to consider three different options, because I

21 don't want us to spend time looking at just one, in case I am

22 not persuaded it is the right one.

23          I also would require you, when you get some kind of

24 finality of these options, be they two, be they three,

25 whatever, give a head's up to the Government, because I want

feb                                                                    47

1   them to have a fair opportunity to argue that this one is

2   better or none of them are better and here is why.

3           But I don't want a hearing by ambush, not that you

4   would do so intentionally.

5           MS. OYER:  Understood, Your Honor.  I would like to

6   ask the Court.  I believe that some of the family in Arizona

7   would be able to fly out, if the Court would consider that as

8   an option.  I don't want to ask Lieutenant Hasson's parents to

9   fly out if the Court is categorically opposed to him going to

10  their custody.

11          But I believe that they would do that if it is

12  something that would assist the Court in making a

13  determination of whether that is appropriate.

14          THE COURT:  I am opposed to Arizona.

15          MS. OYER:  Okay.

16          THE COURT:  Virginia, not as opposed.

17          MS. OYER:  Okay.  Understood.

18          THE COURT:  And I am sure there are different judges

19  who would feel differently about it, but you are stuck with me

20  today and that is the marker of my degree of comfort at this

21  hour.  I have some reservations.

22          But let me hear from the Government, and I will give

23  you a further opportunity if you wish.  Anything further from

24  the Government?

25          MR. WINDOM:  No, sir.  I guess, just to emphasize

1   what you said a moment ago, if we can have maybe like two

2   days, or something like that, in advance of whatever hearing,

3   whatever options the Defense comes up with; presented to us so

4   that we can also come up with reasonable arguments, which I

5   will tell you right now we are going to oppose all of those

6   grounds.

7            THE COURT:  Understood.  And I think that is a fair

8   comment.  Two days notice should be sufficient.  So whenever

9   you wish to have a hearing, whenever you have made the

10  necessary arrangements, you can contact chambers or file a

11  motion and we can schedule something then.

12           MS. OYER:  Thank you, Your Honor.

13           THE COURT:  Thank you.  Anything further from the

14  Government?

15           MR. WINDOM:  No, sir.  Thank you.

16           THE COURT:  Thank you.  Anything further from the

17  Defense?

18           MS. OYER:  No, Your Honor.  Thank you.

19           THE COURT:  Thank you all.  I wish you well.

20           THE CLERK:  All rise.  This Honorable Court now

21  stands adjourned.

22       (Whereupon, at 3:09 p.m., the hearing was concluded.)

23

24

25

feb                                                                              49

<u>C E R T I F I C A T E</u>

I hereby certify that the foregoing is a correct
transcript from the duplicated electronic sound recording of
the proceedings in the above-entitled matter.

*Fabiana Barham*  05-01-19
_____
Fabiana E. Barham                    Date
Certified Transcriber
Certification No.: CET**213