IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. GJH-19-96 |
| | * | |
| CHRISTOPHER PAUL HASSON, | * | |
| | * | |
| Defendant | * | |
| | * | |

********

## SECOND MOTION FOR DETENTION PENDING TRIAL

The Government has no doubt that the defendant's arrest on February 15, 2019, prevented a mass casualty event.  His continued detention is imperative.

### Procedural History

On February 14, 2019, United States Magistrate Judge Gina L. Simms authorized a criminal complaint charging the defendant with violations of 18 U.S.C. § 922(g)(3) (possession of firearm by unlawful user or addict of controlled substance) and 21 U.S.C. § 844 (simple possession of Tramadol, a Schedule IV opioid).  The following day, after the defendant's arrest, the court held an initial appearance and the Government requested a detention hearing.  Thereafter, the Government filed a Motion for Detention outlining some of the many reasons the defendant should be detained.  *See* ECF No. 9.  The detention hearing was held on February 21, 2019, and United States Magistrate Judge Charles B. Day entered an order detaining the defendant, finding by clear and convincing evidence that no release conditions would reasonably assure community safety.  *See* ECF No. 12.

On February 27, 2019, a federal grand jury for the District of Maryland returned an indictment charging the defendant with violations of 26 U.S.C. §§ 5861(d) (unlawful possession of unregistered firearm silencers) and 5861(i) (unlawful possession of firearm silencers

unidentified by serial number), in addition to the counts charged previously by criminal complaint. On April 21, 2019, the defendant moved to re-open the detention hearing before Magistrate Judge Day, *see* ECF No. 24, and the Government filed an opposition brief, *see* ECF No. 25. At the re-opened hearing on April 25, 2019, Magistrate Judge Day found the defendant releasable, so long as the defendant could meet certain requirements. After additional briefing, *see* ECF Nos. 29 & 36, and another hearing, Magistrate Judge Day entered an order releasing the defendant to a location in Virginia at least 190 miles from this Court, in the custody of tag-team third-party custodians, with three properties posted as bond, and with additional conditions.

On the Government's motion, Magistrate Judge Day stayed the release order pending the Government seeking relief in this Court under 18 U.S.C. § 3145(a). Under the controlling *de novo* standard of review, the Court gives plenary consideration to the Government's detention motion. The Government is confident the Court will have reviewed the FTR audio of the prior hearings and the parties' numerous filings, and seeks here not to repeat what was said before but rather to expand on it and to specifically address certain issues noted by Magistrate Judge Day.

## Discussion

This is a case study in the adage, "When someone shows you who they are, believe them the first time." Through years of research and purchases, the defendant made plain his intentions, though he kept them quiet so as not to attract attention:[1]

- "I am a long time White Nationalist, having been a skinhead 30 plus years ago before my time in the military."

---

[1] This is clear from the defendant's own words: "why would you announce to the world your intentions and expect anything but push back?"

- "I was and am a man of action[.] [Y]ou cannot change minds protesting like that. However you can make change with a little focused violence."

- "I am dreaming of a way to kill almost every last person on earth.  I think a plague would be most successful but how do I acquire the needed [ ] Spanish flu, botulism, anthrax not sure yet but will find something.  Interesting idea the other day.  Start with biological attacks followed by attack on food supply. . . .  Two pronged attack seems it might be more successful.  Institute a bombing/sniping campaign.  What can I do, I cannot do nothing…."

- "Have way to get out and start hitting back.  Use [L]ines of [Drift] [manifesto of the Atlanta Olympic bomber].  Have to take a serious look at appropriate individual targets, to bring greatest impact.  Professors, DR's, Politi[ci]an's, Judges, leftists in general."

- "Please send me your violence so that I may unleash it onto their heads.  Guide my hate to make a lasting impression on the world. . . .  I can't just strike to wound[,] I must find a way to deliver a blow that cannot be shaken off.  Maybe many blows that will cause the needed turmoil."

The defendant's main argument below was that the Magistrate Judge should not credit these written admissions, denominating them as unshared, private thoughts that should not be criminalized.  But the manifestos of those who came before the defendant—those who attacked children in Norway, tourists at the Atlanta Olympics, and worshippers in the Pittsburgh synagogue and New Zealand mosques—also were unshared, private thoughts until those plans turned to action.

And here there is no question the defendant intended and planned to turn his thoughts into action. His conduct corroborates his statements. Per court records, he was a skinhead in 1995 ("I am a long time White Nationalist"). He did not go to the streets to protest for white rights, instead choosing to quietly purchase urban and woodland combat gear—small arms, long guns, tactical gear, chest armor, ammunition, camping gear, MRE food provisions ("I was and am a man of action."). He researched how to make homemade bombs and mortars, studied sniper training and bullet trajectory manuals,[2] and fashioned a firearm silencer. ("Institute a bombing/sniping campaign."). He compiled information on victims—Supreme Court justices,

---

[2] An FBI sniper reviewed the written materials and information acquired by the defendant related to sniper tradecraft, and reported the following:

- "The general purpose of captioned worksheet is to enable the reader to use a rifle scoped with an appropriate reticle to precisely engage targets at distances out to many hundreds of yards. Having the equipment and the skills to precisely engage targets from distance is a principal capability enhancement of a sniper; it allows a sniper to remain far enough from a target to remain unnoticed until a shot is made."
- "The captioned queries all reference methods that a trained sniper will employ to quickly determine their distance from a certain target. By way of example, a trained sniper will know the average height of an exterior door in the United States, and thus when observing a door through a rifle scope, the sniper will be able to determine the distance of the door from their position by noting how large the door appears when measured against a scale built into the reticle of the rifle scope. This example is a field expedient method of determining distance, and thus enables a skilled sniper to correctly adjust their sighting mechanism and produce a precise shot in a short period of time."
- "[T]he query appears to be research into a precision rifle wherein suppression capability comes built into the rifle. The suppression of the sound of a rifle is desirable feature for snipers as a means of disguising the noise report of firing the rifle, which could otherwise be used to identify the location of the sniper. Thus, the sniper is able to retain their concealment and therefore potentially continue to engage targets."
- "The referenced search appears to be an attempt to learn how to paint a portion of a rifle called the stock. Snipers commonly paint their rifles to aid in concealment."
- "This search appears to be an effort to determine whether a [particular] bullet when fired and subsequently broken into pieces upon impact, would be traceable by forensic means. This search could indicate an effort to subvert the ability of law enforcement from being able to show that a particular bullet was fired by a particular rifle."

members of Congress, and journalists.  ("Have to take a serious look at appropriate individual targets, to bring greatest impact.  Professors, DR's, Politi[ci]an's, Judges, leftists in general.").  He was going to murder many, and only the diligent work of federal law enforcement prevented that from happening.  His release from pre-trial custody would re-introduce the threat that law enforcement quelled when the defendant was arrested quickly on a criminal complaint on February 15, 2019.

### *The Court Should Consider Uncharged Conduct Proving Dangerousness.*

At the detention hearings below, Magistrate Judge Day made comments suggesting that the dangerous conduct outlined in the Government's prior filings would be accorded less weight (and possibly no weight) since the conduct had not been charged by complaint or indictment.  However, in considering whether the defendant is a danger to the community under 18 U.S.C. § 3142(e), there is no requirement that the evidence of dangerousness relate to the charged conduct.  Indeed, courts routinely hold that uncharged conduct can and should be considered at detention hearings.  *See United States v. Stone*, 608 F.3d 939, 953 (6th Cir. 2010) (considering "evidence of dangerousness although it does not relate to the offenses charged" and vacating district court's release order); *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991) (vacating district court's release order and stating, regarding the relationship between evidence of dangerousness and the charged conduct, "We have never required such a nexus, nor do we impose such a requirement today."); *United States v. Quartermaine*, 913 F.2d 910, 917 (11th Cir. 1990) (considering uncharged conduct and detaining defendant on dangerousness grounds); *United States v. Lee*, 206 F. Supp. 3d 103, 131 (D.D.C. 2016) ("While the D.C. Circuit does not appear to have addressed the issue, other courts have found that a court may consider a variety of

sources of evidence of the defendant's danger to the community, separate and apart from evidence relating to the crime charged.").

### *The Defendant's Intentions Matter.*

As discussed above, the defendant argued below that the Court should not hold his private thoughts against him. But intentions matter—when deciding whether a crime has been committed, considering matters of detention, and imposing an ultimate sentence.

There is no sharper proof of this axiom than when courts in this District are called upon to impose sentence on defendants convicted of 18 U.S.C. § 922(g)(1) where the conduct involves only the unlawful possession of a firearm in the defendant's home without indication that the defendant planned to use the weapon proactively to commit other criminal conduct. In those situations, defense attorneys routinely implore courts to find mitigation—suggesting, perhaps, that the weapon was for home protection, self-defense in a dangerous neighborhood, or some other innocent-sounding reason. Outside of the drug trafficking context, it is rare that the Government can counter those defendants' arguments. Here, the Government brings ample evidence that the defendant intended to use his firearms to murder innocent civilians, whether "Jews,"[3] "n_gg_rs,"[4] media personalities,[5] Senators,[6] Congressmen,[7] or Supreme Court Justices.[8]

---

[3] On February 17, 2018, the defendant searched for "how to rid the us of jews."

[4] On March 16, 2018, the defendant searched for "best n_gg_r killing gun."

[5] On December 28, 2018, the defendant searched for the home address of a media figure.

[6] On February 26, 2018, the defendant searched for "most liberal senators," "where do most senators live in dc," and "do senators have ss [secret service] protection."

[7] On January 17, 2019, the defendant compiled a list of prominent Democratic Congressional leaders.

[8] On February 26, 2018, the defendant searched for "are supreme court justices protected" and then two weeks later searched for the home addresses of two Supreme Court justices.

In addition to the many examples described in prior filings, the Government submits the following as emblematic of the defendant's desire and intention to put his criminal thoughts into action:

| Date | Time | Event |
|---|---|---|
| **Thursday, February 15, 2018** | (throughout work day) | From Coast Guard computer, searches for information on Hitler and Nazis, and search for "how many jews in us" |
| | 7:37 p.m. – 7:42 p.m. | From personal device, searches and site visits to firearm-related websites |
| | 7:48 p.m. | From personal device, search for "most influential jews in usa" |
| | 7:50 p.m. – 7:57 p.m. | From personal device, searches and site visits to firearm sales websites |
| | 8:16 p.m. – 8:30 p.m. | From personal device, searches for "how far can 22lr rifle kill" and "suppressed 17 hmr" |
| **Friday, February 16, 2018** | 7:52 a.m. – 8:01 a.m. | From Coast Guard computer, search for "influential jews in academia usa," which led to various lists |
| | 8:18 a.m. – 8:25 a.m. | From Coast Guard computer, search for "jews in us gov" |
| | 8:23 a.m. | From personal device, visit to firearm trading forum |
| | 10:42 a.m. – 10:53 a.m. | From Coast Guard computer, search for specific white supremacist and site visit to white supremacist online magazine |
| | 2:20 p.m. – 2:33 p.m. | From Coast Guard computer, searches and site visits to firearm-related websites |
| | 3:01 p.m. | Purchased book on "white advocacy" |
| | 3:18 p.m. – 4:27 p.m. | From Coast Guard computer, searches for information on Jewish populations and "list of rabbis by state" |
| | 4:35 p.m. | Purchased book on "white identity" |
| | 5:05 p.m. – 6:01 p.m. 7:33 p.m. – 8:37 p.m. | From personal device, searches and site visits to firearm-related websites, firearm trading forum, and night vision monocular information |
| **Saturday, February 17, 2018** | 7:14 a.m. | From personal device, searches for firearm-related websites |
| | 7:34 a.m. – 7:39 a.m. | From personal device, searches for "how can white people rise against the jews" and related site visits |
| | 7:41 a.m. – 8:01 a.m. | From personal device, searches for firearm-related websites and firearm trading forum |
| | 8:11 a.m. – 8:24 a.m. | From personal device, searches for "jews in communism," "how to rid the us of jews," and "jews enemy of the world" |

| Date | Time | Event |
|---|---|---|
|  | 8:58 a.m. | From personal device, searches for "rifle ranges near me" |
|  | 9:57 a.m. | From personal device, search for firearm-related information |
|  | 10:23 a.m. | From personal device, search for "rifle ranges near me" |
|  | 11:34 a.m. | Departed residence in Silver Spring, Maryland |
|  | 12:35 p.m. | Arrived at shooting range in Quantico, Virginia |
|  | 5:17 p.m. | From personal device, searches for firearm-related websites |
| **Tuesday, February 20, 2018** | (throughout work day) | From Coast Guard computer, accessed over 100 web pages related to rifles and long-distance shooting, including the most accurate ammunition for a particular rifle and whether a certain bullet was "untraceable" |

Proof of the defendant's criminal plan is also evident from the manner in which he purchased some of the firearms found in his residence. In order to acquire the firearms most expeditiously at a gun show in Virginia, the defendant lied on federal ATF forms, claiming residency in Virginia rather than Maryland. For example, the defendant lived in a rented apartment in Maryland as of mid-2017 and by that time was stationed with the Coast Guard in Washington, D.C. Yet on two occasions later that year—October 1 and December 30, 2017—the defendant signed Firearms Transaction Records (ATF Forms 4473) affirming under legal penalty that he was a resident of Virginia—and that he specifically lived at his father-in-law's address to which Magistrate Judge Day recently authorized his release.[9]

*The Proposed Release Package Is Not Viable.*

The Court tasks Pretrial Services every day with making important decisions regarding detention and release. If a defendant is released, a Pretrial Services Officer is responsible for ensuring a defendant complies with his release conditions. Here, Pretrial Services unequivocally believes that this defendant should be detained, citing to safety and logistical challenges. A

---

[9] On the same form, the defendant falsely averred that he was not an unlawful user of, or addicted to, any controlled substance.

rotating cast of third-party custodians, at a location distant from this Court and Pretrial Services, offers no reasonable assurance of community safety. Even elaborate conditions of home detention cannot substitute for incarceration where, as here, the defendant cannot be trusted to abide by the release conditions. Nothing—nothing—could stop the defendant from cutting his GPS monitor, leaving behind his custodians, and executing his intentions.

## **Conclusion**

The defendant poses a serious danger and must be detained pending trial. No conditions of release could reasonably assure the safety of any other person or the community, within the meaning of 18 U.S.C. § 3142(e)(1).

Respectfully submitted,

Robert K. Hur
United States Attorney

/s/
Thomas P. Windom
Assistant United States Attorney