**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **Criminal No.  GJH-19-0096** |
| **CHRISTOPHER PAUL HASSON** | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MOTION TO DISMISS COUNTS ONE AND TWO OF THE INDICTMENT ON SECOND AMENDMENT GROUNDS

Defendant Christopher Hasson, through undersigned counsel, hereby moves this Honorable Court for an order dismissing Counts One and Two of the indictment because the statutes charged in those counts infringe his Second Amendment right to keep and bear arms.

## I.     PROCEDURAL BACKGROUND

On February 27, 2019, a grand jury returned an indictment charging Mr. Hasson with one count of possessing an unregistered firearm silencer, under 26 U.S.C. § 5861(d) (Count One); one count of possessing a firearm silencer unidentified by serial number, under 26 U.S.C. § 5861(i) (Count Two); one count of possession of a firearm by an unlawful user and addict of a controlled substance, under 18 U.S.C. § 922(g)(3) (Count Three); and one count of possessing a controlled substance, under 21 U.S.C. § 844(a) (Count Four).  ECF No. 16.

## II.     LEGAL BACKGROUND

### A.     Statutory Scheme

The National Firearms Act (NFA) sets out "an interrelated statutory system for the taxation of certain classes of firearms." *Haynes v. United States*, 390 U.S. 85, 87 (1968). Relevant here, the NFA and its implementing regulations impose two requirements on any "manufacturer, importer, or maker" of firearms.  First, manufacturers must "identify" every

firearm by "plac[ing] on the frame or receiver thereof an individual serial number," as well as "certain additional information" (e.g., the model of the firearm and its "caliber or gauge"). 27 C.F.R. § 479.102(a)(1), (2)(i)-(ii).

Second, the NFA instructs the secretary of the treasury to "maintain a central registry of all firearms in the United States which are not in the possession or under the control of the United States," known as the National Firearms Registration and Transfer Record (NFRTR). 26 U.S.C. § 5841(a). Any firearm manufacturer is required to "register each firearm he manufactures, imports, or makes" in the NFRTR. *Id.* § 5841(b). To register a firearm, a manufacturer must file a notice "set[ting] forth the name and address of the manufacturer, . . . the date of manufacture, the type, model, length of barrel, overall length, caliber, gauge or size, serial numbers, and other marks of identification." 27 C.F.R. § 479.103; *see also* 26 U.S.C. § 5841(a).

Once a firearm is registered in the NFRTR, it "shall not be transferred" until its current possessor has filed, and the secretary has approved, an application "for the transfer and registration of the firearm" in the name of the transferee. *Id.* § 5812(a), (b). The new registration is then recorded in the NFRTR. *See* 27 C.F.R. § 479.101(b). The NFA defines a transfer to include "selling, assigning, pledging, leasing, loaning, giving away, or otherwise disposing of." 26 U.S.C. § 5845(j). In addition to completing the registration paperwork, the transferor must pay a $200 tax for every firearm he wishes to transfer. *Id.* § 5811(a), (b).

The NFA makes it "unlawful for any person . . . to receive or possess a firearm" that (1) "is not registered to him in the National Firearms Registration and Transfer Record," or (2) "is not identified by a serial number." *Id.* § 5861(d), (i). Under the NFA, a firearm includes "any firearm muffler or firearm silencer," which is defined as "any device for

silencing, muffling, or diminishing the report of a portable firearm." *Id.* § 5845(a)(7); 18 U.S.C. § 921(a)(3)(C), (24). "In this context, the word 'report' refers to the sound of a gunshot." *Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 18 n.1 (D.D.C. 2014).

### B.    The Second Amendment

The Second Amendment provides that "[a] well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held the Second Amendment codified a pre-existing individual right to keep and bear arms. 554 U.S. at 595. The "central holding" of *Heller*, the Court later explained, was that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010); *see also Kolbe v. Hogan*, 849 F.3d 114, 131 (4th Cir. 2017) (en banc) ["*Kolbe II*"] ("The Second Amendment's 'core protection,' the *Heller* Court announced, is 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" (quoting *Heller*, 554 U.S. at 634-35)).

Following *Heller*, the Fourth Circuit has employed a two-step inquiry to determine whether a statute violates the Second Amendment. First, a court must determine "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Kolbe II*, 849 F.3d at 133. If the answer is no, "the challenged law is valid." *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). If the answer is yes, the court must "apply an appropriate form of means-end scrutiny," i.e., "select between strict scrutiny and intermediate scrutiny." *Kolbe II*, 849 F.3d at 133. The level of scrutiny "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the [Second Amendment] right." *Id.* at 133.

3

III.    ARGUMENT

Based on the evidence cited below and the testimony Mr. Hasson expects to elicit at an evidentiary hearing in this case, this Court can conclude that (1) silencers are "arms" for Second Amendment purposes, and (2) the NFA's silencer-registration requirement burdens lawful gun owners' Second Amendment rights.  In light of that evidence and anticipated testimony, including from an expert in firearm use and registration, the government will be unable to bear its burden of showing the NFA satisfies the appropriate level of means-end scrutiny.

A.    **The NFA's Prohibition on Possessing Unregistered and Unserialized Silencers Regulates Conduct Within the Scope of the Second Amendment.**

The Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  *Heller*, 554 U.S. at 582.  It excludes, however, weapons that are "not typically possessed by law-abiding citizens for lawful purposes."  *Id.* at 625.  Under this rubric, silencers are entitled to Second Amendment protection because they (1) qualify as "arms" that are (2) most frequently possessed by law-abiding citizens for lawful purposes.

1.    **Silencers are "arms" within the meaning of the Second Amendment.**

Silencers receive the *explicit* protection of the Second Amendment because they constitute "arms" (or accessories to arms).  And even if they did not, silencers would still fall within the scope of the Second Amendment's *implicit* guarantee because their use is indispensable to exercise of the core second Amendment right, i.e., the use of a gun for self-defense in the home.

a.      **Explicit protection**

*Heller* defined "arms" to include "weapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* at 581.  To "bear arms," in turn, means to "wear, bear, or carry . . . for the purpose . . . of being armed and ready for offensive or defensive action in case of conflict with another person." *Id.* at 584 (ellipses in original).

Inasmuch as a bullet must pass through an attached silencer in order to arrive at its intended target, silencers are "useth" for an offensive purpose to the same degree as a firearm itself. *Id.*  Silencers are an integral part of a firearm, used to "cast . . . or strike" a bullet at another person. *Id.*  Consequently, silencers are "[w]eapons of offence" deserving of Second Amendment protection. *See id.* at 582; *cf.* 26 U.S.C. § 5845(a)(7) (defining "firearm," for NFA purposes, to include firearm silencers); 18 U.S.C. § 921(a)(3) (defining "firearm," for purposes of Gun Control Act of 1968, to include firearm silencers).

Even if silencers do not qualify as protected "arms" in and of themselves, they are nevertheless eligible for protection as a modern-day analog to the various firearm accessories historically considered to be arms.  The Fourth Circuit has held that "historical meaning enjoys a privileged interpretative role in the Second Amendment context." *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011).  That history indicates that "arms," for Second Amendment purposes, include not just a firearm itself, but also the "proper accoutrements" that render that firearm useful and functional. *United States v. Miller*, 307 U.S. 174, 182 (1939).  In *Miller*, the Supreme Court surveyed founding-era state laws and explained that many required militia members to carry—in addition to a "musket" or "rifle"—such items as "ammunition," "one pound of powder," "twenty bullets," a box "contain[ing] not less than Twenty-four Cartridges," a "proper Quantity of Powder and Ball,"

5

and "one pound of good powder, and four pounds of lead, including twenty blind cartridges." *Id.* at 180-82.  Indeed, at the time the Second Amendment was adopted, "[t]he possession of arms also implied the possession of ammunition."  *Id.* at 180.

The Fourth Circuit has also noted "strong historical support" for the proposition that "'arms' should be read to protect all those items necessary to use . . . weapons effectively." *Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016) ["*Kolbe I*"].  As the court explained:

> Early American provisions protecting the right to "arms" were . . . crafted partly in response to British measures that, while not taking away guns entirely, drastically impaired their utility—suggesting "arms" should be read to protect all those items necessary to use the weapons effectively.  In short, magazines and ammunition have long been recognized as arms.

*Id.* at 175.[1]

Other courts have reached the same conclusion.  The Third Circuit has held, for instance, that "[b]ecause magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment."  *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. of N.J.*, 910 F.3d 106, 116 (3d Cir. 2018).  And the Ninth Circuit has concluded that hollow-point ammunition falls within the Second Amendment's ambit because, "without bullets, the right to bear arms would be meaningless."  *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 967 (9th

---

[1] The en banc Fourth Circuit subsequently overruled the holding in *Kolbe I*, i.e., that Maryland's Firearm Safety Act "implicate[d] the core protection of the Second Amendment" and was therefore subject to strict scrutiny.  813 F.3d at 168; *see Kolbe II*, 849 F.3d at 121 (holding that "weapons that are most useful in military service," such as "assault weapons and large-capacity magazines," are not protected by the Second Amendment and, even if they are, Maryland's statute is subject to intermediate scrutiny).  But nothing in *Kolbe II*'s holding, reasoning, or mode of analysis casts doubt on *Kolbe I*'s statement that "arms" encompass more than simply firearms themselves.

Cir. 2014); *see also id.* ("A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose.").

The "necessary to use" rule compels the conclusion that silencers are "arms" within the meaning of the Second Amendment because they improve the safety and efficacy of lawful firearms use.

***First,*** scientific research establishes firearms generate sound pressure levels that can permanently damage a user's hearing.  The World Health Organization recommends that peak sound pressure levels ("SPLs") not exceed 140 decibels for adults and 120 decibels for youth,[2] while the U.S. Occupational Safety and Health Administration and the National Institute for Occupational Safety and Health USA incorporate a peak limit of 140 decibels SPL for occupational noise exposures.[3]  "Peak sound pressure levels . . . from firearms," meanwhile, "range from ~140 to 175 [decibels]"—well above the recommended thresholds.[4] As a result, exposure to gunfire, particularly over time, "not only lead[s] to hearing loss and tinnitus"—a ringing in the ear that can become permanent—"but also contribute[s] to the development of numerous other health issues, including sleep disturbance, cardiovascular

---

[2] Andrew W. Smith, *The World Health Organisation and the Prevention of Deafness and Hearing Impairment Caused by Noise*, Noise Health 1:6-12 (1998).

[3] 29 C.F.R. § 1910.95; Fed. Reg. 198348469738–9744.

[4] Deanna K. Meinke et al., *Prevention of Noise-Induced Hearing Loss from Recreational Firearms*, Semin Hear. 38(4): 267–281 (Nov. 2017).

disease, and diabetes,"[5] as well as "stress, anxiety, high blood pressure, gastro-intestinal problems, and chronic fatigue."[6]

Silencers are recognized as one of "several strategies [that] can be employed to reduce the risk" of hearing damage and other health problems resulting from firearm noise exposure.[7]   Indeed, the Centers for Disease Control, in two separate reports, has recommended the use of silencers to reduce the unacceptably high levels of noise exposure at shooting ranges.[8]   "Modern muzzle-level suppression," one study concluded, is "the *only*

---

[5] Jay M. Bhatt et al., *Epidemiology of Firearm and Other Noise Exposures in the United States*, Laryngoscope, 127:E340–E346 (March 2017).

[6] Chucri A. Kardous, MS, PE, *Solutions for Preventing Lead Poisoning and Hearing Loss at Indoor Firing Ranges*, cdc.gov (May 2009), https://blogs.cdc.gov/niosh-science-blog/2009/05/18/firingrange/ (last visited June 7, 2019); *see also* U.S. Department of Veterans Affairs, Veterans Health Administration: Office of Research and Development, *Fact Sheet: VA Research on Hearing Loss* 1 (Sept. 2016), *available at* https://www.research.va.gov/pubs/docs/va_factsheets/HearingLoss.pdf (last visited June 7, 2019) ("Hearing problems — including tinnitus — are by far the most prevalent service connected disability among American Veterans.").

[7] Michael Stewart et al., *National Hearing Conservation Association Position Statement: Recreational Firearm Noise* 1 (March 2017), *available at* https://www.hearingconservation.org/assets/docs/NHCA_position_paper_on_firea.pdf (last visited June 7, 2019); *see also* Ronald Turk, *White Paper: Options To Reduce Or Modify Firearms Regulations* 6 (January 2017) ("[Silencers'] use to reduce noise at shooting ranges and applications within the sporting and hunting industry are now well recognized.").

[8] Brueck SE, et al., National Institute for Occupational Safety and Health ("NIOSH"), *Health Hazard Evaluation Report: Measurement of Exposure to Impulsive Noise at Indoor and Outdoor Firing Ranges During Tactical Training Exercises* 14, HHE Report 2013-0124-3208, *available at* http://www.cdc.gov/niosh/hhe/reports/pdfs/2013-0124-3208.pdf (last visited June 7, 2019) ("If feasible and legally permissible, attach noise suppressors to firearms to reduce peak sound pressure levels."); Lilia Chen, MS, CIH, et al., NIOSH, *Noise and Lead Exposures at an Outdoor Firing Range – California* 5, NIOSH HETA No. 2011-0069-3140 (Sept. 2011), *available at* https://www.cdc.gov/niosh/hhe/reports/pdfs/2011-0069-3140.pdf (last visited June 7, 2019) ("The *only* potentially effective noise control method to reduce students' or instructors' noise exposure from gunfire is through the use of noise suppressors that can be attached to the end of the gun barrel." (emphasis added)).

*available form of suppression* capable of making certain sporting arms safe for hearing."[9]  A lawful firearm owner cannot use his weapon for self-defense in the home—the "core" right recognized by *Heller*, *see* 554 U.S. at 630—if to do so exposes him to serious and long-term health consequences.

      **Second,** silencers improve firearm owners' ability to practice self-defense in other ways.  Silencers can improve accuracy by reducing recoil (the backwards force that results from firing the gun) and muzzle rise (the tendency of the barrel to move up when the gun is fired).[10]  And they can reduce hearing loss and disorientation immediately after firing, providing a victim additional time to defend against an attack.[11]

      In recognition of the historically broad scope of protected "arms," and given that silencers are "necessary to use . . . weapons effectively," this Court should conclude that silencers are "arms" within the scope of the Second Amendment's explicit guarantees.  *Kolbe I*, 813 F.3d at 174.[12]

---

[9] Matthew Parker Branch, M.D., *Comparison of Muzzle Suppression and Ear-Level Hearing Protection in Firearm Use*, Otolaryngology – Head and Neck Surgery, 144(6):950-53 (Feb. 2011) (emphasis added).

[10] Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 33, 69 (2016) [hereinafter *Firearm Sound Moderators*].

[11] A.J. Peterman, *Second Amendment Decision Rules, Non-Lethal Weapons, and Self-Defense*, 97 Marq. L. Rev. 853, 892 n.221 (2014).

[12] It appears only one federal court of appeals has confronted the question whether silencers are Second Amendment "arms."  In *United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018), the Tenth Circuit held a silencer is not a "bearable arm" because it "is a firearm accessory; it's not a weapon in itself."  906 F.3d at 1186.  The defendant in *Cox* apparently did not argue that "items that are not themselves bearable arms but are necessary to the operation of a firearm (think ammunition) are also protected" under the Second Amendment, and the Tenth Circuit therefore believed it "had no occasion to consider that question."  *Id.* at 1196 (Hartz,

### b.      Implicit protection

The Second Amendment, like all enumerated constitutional provisions, contains both explicit and implicit guarantees.  *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579 (1980) ("[T]he Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees.").[13]  If an unarticulated right is "indispensable to the enjoyment of [a] right[] explicitly defined," it will "share constitutional protection in common with [the] explicit guarantee[]."  *Id.*

Several circuits have applied this principle to Second Amendment claims.  In *Ezell*, for instance, the plaintiffs challenged a Chicago ordinance that prohibited private citizens from using shooting ranges within city limits.  651 F.3d at 691-92.  Applying the same two-step framework the Fourth Circuit does, the Seventh Circuit began by asking "whether range

---

J., concurring).  As explained above, *Heller* and *Miller* teach that the Second Amendment does in fact extend to "all those items necessary to use [a] weapon[] effectively," *Kolbe I*, 813 F.3d at 175—an established legal principle that the *Cox* court treated as unsettled.  This Court is therefore free to disregard *Cox*.

[13] Although *Richmond Newspapers* is a First Amendment case, it is well-established that the Supreme Court's First Amendment jurisprudence provides the appropriate framework for addressing claims under the Second Amendment.  *Chester*, 628 F.3d at 682 ("[W]e agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment."); *see also, e.g.*, *United States v. Marzzarella*, 614 F.3d 85, 89 n.4 (3d Cir. 2010) ("Because *Heller* is the first Supreme Court case addressing the scope of the individual right to bear arms, we look to other constitutional areas for guidance in evaluating Second Amendment challenges.  We think the First Amendment is the natural choice. . . . [T]he structure of First Amendment doctrine should inform our analysis of the Second Amendment."); *Ezell v. City of Chicago*, 651 F.3d 684, 706-07 (7th Cir. 2011) ("[W]e and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context."); *Jackson*, 746 F.3d at 960 (laying out two-step analysis for Second Amendment claims and noting, "[a]s other circuits have recognized, this inquiry bears strong analogies to the Supreme Court's free-speech caselaw"); *McDonald*, 561 U.S. at 799-802 (Scalia, J., concurring) (noting similarities between the scope of the First Amendment and the Second Amendment); *Heller*, 554 U.S. at 595 (same).

training is categorically unprotected by the Second Amendment." *Id.* at 704. The court concluded it was not, since the ability to own a gun for self-defense in the home would be worthless if an owner lacked the concomitant ability to practice using it: "The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Id.* Likewise, the Ninth Circuit held in *Jackson* that an ordinance banning the sale—but not possession—of hollow-point bullets infringed a gun owner's Second Amendment rights because "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." 746 F.3d at 967. If a gun owner is unable to purchase the bullets she needs to practice self-defense in the home, it is irrelevant that she may possess the gun she would use to do so. A prohibition on selling ammunition therefore falls within "the historical understanding of the scope of the Second Amendment right." *Id.* at 968.

The same logic applies here. As explained above, using silencers improves accuracy, reduces disorientation after firing, and helps prevent substantial and irreversible damage to users' health. If, as *Heller* holds, the Second Amendment protects the right to use a gun for self-defense in the home, it must also protect the "corresponding right" to do so without incurring serious health risks. *Ezell*, 651 F.3d at 704; *Jackson*, 746 F.3d at 967. Regulation of the use of silencers therefore "imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Kolbe II*, 847 F.3d at 133.

## 2. Silencers are in common use and typically possessed by law-abiding citizens.

In accordance "with the historical understanding of the scope of the right," the Second Amendment protects those arms that are (1) commonly possessed by law-abiding citizens (2)

for lawful purposes. *Heller*, 554 U.S. at 624-25; *Chester*, 628 F.3d at 676. Silencers satisfy both of these requirements.

### a. Common use

"[W]hat line separates 'common' from 'uncommon' ownership is something the [Supreme] Court did not say" in *Heller*. *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 409 (7th Cir. 2015). The Second Circuit, however, has said that this "common use" requirement is based on "an objective and largely statistical inquiry." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015). Indeed, "[e]very post-*Heller* case to grapple with whether a weapon is 'popular' enough to be considered 'in common use' has relied on statistical data of some form." *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016).

Silencers are a burgeoning industry in the United States. Consumer demand for these accessories—and the attendant hearing protection and other benefits they provide—has been growing exponentially over the past several years. Nearly one-and-a-half million silencers have been registered with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) as of February 2018,[14] an increase of almost one-and-a-quarter million since 2010:

| Number of Registered Silencers in the United States, 2010–2018 | |
|---|---|
| **Year** | **Number of Registered Silencers** |
| 2010 | 285,087 |
| 2012 | 360,534 |
| 2013 | 494,452 |
| 2014 | 571,750 |
| 2015 | 792,282 |

---

[14] U.S. Dep't of Justice, ATF, Firearms Commerce in the United States: Annual Statistical Update 2018 at 15 (February 2018); *see also* Chris Eger, *ATF: 1.5 Million Suppressors in Circulation, All-Time High*, Guns.com (Aug. 10, 2018, 10:00), https://www.guns.com/news/2018/08/10/atf-1-5-million suppressors-in-circulation-all-time-high.

| 2016 | 902,805 |
| 2017 | 1,360,023 |
| 2018 | 1,489,791 |

U.S. Dep't of Justice, ATF, Firearms Commerce in the United States: Annual Statistical Updates 2010-2018.  By almost any measure, and despite their heavy regulation, silencers are now in "common use" in the United States.

### b.    Lawful purposes

As discussed in greater detail above, silencers' usefulness in "reduc[ing] noise at shooting ranges and applications within the sporting and hunting industry are now well recognized."[15]  Currently, silencers are legal to possess in 42 states, and legal to use in hunting in 40 states.[16] This overwhelming majority of states suggests "the national consensus is that firearm suppressors are not a threat to society worth heavily regulating."[17]  Given silencers' utility for hearing protection and the exponential grown in demand, the federal government, too, is currently considering legislative proposals to remove silencers from the

———————————————————

[15] Ronald Turk, *White Paper: Options to Reduce or Modify Firearms Regulations* 6 (January 2017) [hereinafter *White Paper: Firearms Regulations*].

[16] *American Suppressor Association*, Education, https://americansuppressorassociation.com/education/ (last visited June 7, 2019).

[17] Justin Stevens, *Reloading the Second Amendment: The Undue Burdens of the National Firearms Act and Their Remedies*, 49 Tex. Tech L. Rev. Online Edition 148, 175 (2017); *see also* Steve Chapman, *Gun Silencers are Nothing to Fear*, Chicago Tribune (January 14, 2017, 2:38 PM), http://www.chicagotribune.com/columns/steve-chapman/ct-gun-silencer-legalize-perspec-0115-md-20170113-column.html ("Chicago has a lot of bloodshed, including 762 homicides and more than 3,500 shootings, last year, but silencers figure in little or any of it.  Anthony Guglielmi, a spokesman for the Chicago Police Department, told me, 'We seldom recover silencers.  Sometimes you may get a gun with a makeshift silencer, but even that is rare.'"); Bob Owens, Opinion, *Gun Silencers are Useful, not Scary*, L.A. Times (Feb 29, 2016, 7:01), https://www.latimes.com/opinion/op-ed/la-oe-0229-owens-silencers-20160229-story.html.

NFA's definition of "firearm" and to preempt states laws related to taxing, marking, recordkeeping, and registration requirements for silencers.[18]  If enacted, these laws would eliminate the federal regulation of firearm silencers entirely.

These legislative advances reflect the fact that the use of silencers to commit crimes is exceedingly rare.[19]  Between 2012 and 2015, only 390 silencers were recovered from crime scenes where an ATF trace was requested—compared to more than 600,000 pistols in the same period.[20]  Indeed, only 0.003 percent of silencers are used in crimes each year,[21] and the ATF recommended an average of only "44 defendants a year for prosecution on a silencer-related violations" in the past ten years.[22]  The infrequency of silencers' use in crime may be a product of their cumbersomeness: "[a] silencer always extends the length of the overall weapon, as well as increasing the barrel diameter.  The increased difficulty of concealment may make silencers less appealing to criminals than they might be otherwise

---

[18] *See, e.g.*, *White Paper: Firearms Regulations* at 6 (discussing basis for deregulation). Several bills have been introduced concerning the NFA's regulation of firearm silencers in the 116th Congress.  *E.g.*, Hearing Protection Act, H.R. 155, 116th Cong. (2019); Silencers Help Us Save Hearing (SHUSH) Act, H.R. 775, 116th Cong. (2019); Silencers Help Us Save Hearing (SHUSH) Act, S. 202, 116th Cong. (2019).

[19] *White Paper: Firearms Regulations* at 6 ("[S]ilencers are very rarely used in criminal shootings.").

[20] Nathan Rott, *Debate Over Silencers: Hearing Protection or Public Safety Threat?*, All Things Considered (NPR Mar. 21, 2017), http://www.npr.org/2017/03/21/520953793/debate-over-silencers-hearing-protection-or-public-safety-threat.

[21] Gutowski, *ATF: 1.3 Million Silencers in U.S. Rarely Used in Crimes*, Washington Free Beacon (Feb. 17, 2017).

[22] *White Paper: Firearms Regulations* at 6.

sound."[23]  It is perhaps unsurprising, therefore, that "[s]urveys of inmates show that they prefer concealable, large caliber guns."[24]

Regardless, the only comprehensive, data-driven study on the issue concluded that "use of silenced firearms in crime is a rare occurrence, and is a minor problem."[25]  This study revealed that in comparison with non-silenced firearms conviction data, silencer-equipped guns are "only one-third as likely to be used to kill or injure, one-half as likely to be actively employed, and one-half as likely to be used by someone with a prior record."[26]  As the report put it, "Guns equipped with a silencer, rather than being more dangerous and more likely to be used by professional criminals or repeat offenders, are far less dangerous and less likely to be employed by professional criminals."[27]

The use of silencers fits comfortably within the Second Amendment right "to keep and bear arms for lawful purposes."  *McDonald*, 561 U.S. at 780.

---

[23] P. Clark, *Criminal Use of Firearm Silencers*, 8 W. Crim. Review 44, 53 (2007) [hereinafter *Criminal Use*].

[24] Marianne W. Zawitz, U.S. Dep't of Justice, Guns Used in Crime 1 (1995), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/GUIC.PDF (last visited June 7, 2019).

[25] *Criminal Use* at 53.

[26] *Id.*

[27] *Id.*; *see also State v. Langlois*, 2 N.E. 3d 936, 957 (Ohio Ct. App. 2013) ("[T]he use of suppressors in gun crimes generally and in homicides specifically is extremely infrequent, and the criminal use of a registered suppressor is virtually nil relative to their widespread ownership.").

**B.   The NFA's Prohibition on Unregistered and Unserialized Silencers Burdens Second Amendment Rights and Cannot Survive Heightened Scrutiny.**

Both the NFA requirements at issue in this case—that silencers be registered, and that they bear a serial number—impose a burden on the right of law-abiding citizens to possess silencers for lawful purposes.  Because neither requirement is narrowly tailored to achieve a significant government interest, they do not pass intermediate scrutiny.

**1.   The registration requirement**

**a.   The NFA's registration scheme burdens the right to possess silencers.**

The NFA's registration requirement imposes a burden on the Second Amendment right to possess silencers for lawful purposes.  Although the exact period of time varies from case to case, it takes the ATF, on average, approximately eight months to process an individual's application to transfer a silencer to a lawful owner.[28]  An application for permission to build a silencer is usually pending for a similar period of time.[29]  When a transfer application is submitted in the name of a trust, rather than an individual, as is true in many cases, wait times can be even longer, averaging roughly ten months.[30]

In *Murphy v. Guerrero*, 2016 WL 5508998 (D.N.M.I. Sept. 28, 2016), the court considered a statute that prohibited law-abiding citizens from possessing guns unless they held a valid weapon identification card (WIC).  2016 WL 5508998, at *6.  The statute permitted the Department of Public Safety to issue WICs no fewer than 15, and no more than 60, days after receipt of an application.  *Id.*  The statute therefore "completely prevent[ed] a

---

[28] *White Paper: Firearms Regulations* at 6.

[29] *ATF Wait Times*, Silencer Shop, https://www.silencershop.com/atf-wait-times (last visited June 17, 2019).

[30] *Id.*

law-abiding citizen from using a firearm in exercise of his or her right to self-defense—at least while their first WIC application [wa]s pending." *Id.* at *8. Although the Second Amendment deprivation persisted only for "a limited time," the court recognized that "[c]ompletely preventing an individual from exercising his right to keep and bear arms" nevertheless "represent[ed] a serious imposition." *Id.*

The deprivation effected by the NFA is much more substantial than in *Murphy*. Rather than two weeks or two months, applicants for an NFA registration must wait an average of eight months before they can obtain the silencers they have a constitutional right to possess. They must also pay a purchase price that has been artificially inflated by the NFA's mandatory $200 tax on silencer transfers. *Cf. Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 578, 585-92 (1983) (holding Minnesota infringed First Amendment freedom of the press when it imposed a "use tax on the cost of paper and ink products consumed in the production of a publication").

The Supreme Court's opinion in *Miller* suggests that regulations of this kind, though not amounting to a permanent or categorical prohibition, impose a cognizable burden on the Second Amendment right to bear arms. In *Miller*, the Supreme Court considered whether requiring the registration of a short-barreled shotgun under the NFA was consistent with the Second Amendment. 307 U.S. at 178. Based on "the absence of any evidence" that such a weapon was "ordinary military equipment" or had "some reasonable relationship to the preservation or efficiency of a well-regulated militia," the Court held it could not "say that the Second Amendment guarantees the right to keep and bear such an instrument." *Id.* The *Heller* Court deduced from this holding that the Second Amendment confers an individual, rather than merely a collective, right to bear arms: "[h]ad the [*Miller*] Court believed that the

Second Amendment protects only those serving in the militia, it would have been odd to examine the character of the weapon rather than simply note that the two crooks were not militiamen." 554 U.S. at 622.

By the same token, had the *Miller* Court believed that registration does not impose a burden on Second Amendment rights, it would have been odd to examine the character of the weapon rather than simply note that registration poses no Second Amendment problem. As then-Judge Kavanaugh observed:

> The Court's approach [in *Miller*] suggested that the government could require registration only of guns that were outside the protection of the Second Amendment—namely, those classes of guns that the government had traditionally banned and that were not in common use, such as machine guns and sawed-off shotguns. After all, if registration could be required for all guns, the Court could have just said so and ended its analysis; there would have been no need to go to the trouble of considering whether the gun in question was the kind protected under the Second Amendment.

*Heller v. District of Columbia*, 670 F.3d 1244, 1293-94 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) [*Heller II*].

The NFA's registration requirement burdens the Second Amendment right to possess silencers for lawful purposes.

> **b.     The NFA's prohibition on possessing unregistered silencers does not survive heightened scrutiny.**

If a statute burdens Second Amendment conduct, courts "apply an appropriate form of means-end scrutiny"—either intermediate or strict scrutiny. *Kolbe II*, 849 F.3d at 133. The "level of scrutiny [courts] apply depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the [Second Amendment] right." *Id.* Where a law "severely burden[s] the core protection of the Second Amendment, i.e., the right of law-abiding, responsible citizens to use arms for self-defense in the home," strict scrutiny

is required. *Id.* at 138.  For statutes that impose a less severe burden, intermediate scrutiny is appropriate. *Id.*

Even assuming intermediate scrutiny applies to the NFA, the statute does not pass constitutional muster.[31]  To "survive intermediate scrutiny, a law must be narrowly tailored to serve a significant governmental interest." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017).  The law "need not be the least restrictive or least intrusive means of serving the government's interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014).  "But the government still may not regulate [protected conduct] in such a manner that a substantial portion of the burden on [such conduct] does not serve to advance its goals." *Id.*; *see also Packingham*, 137 S. Ct. at 1736 (explaining that in First Amendment context, a statute fails intermediate scrutiny if it "burden[s] substantially more speech than is necessary to further the government's legitimate interests").  "[I]ntermediate scrutiny places the burden of establishing the required fit squarely upon the government." *Chester*, 628 F.3d at 683.

The government will be unable to carry its burden in this case.

### i.      The registration requirement for silencers does not serve a "significant" governmental interest.

In assessing the weightiness of the government's interest in requiring silencer registration, "it's initially important to distinguish registration laws from licensing laws":

> Licensing requirements mandate that gun owners meet certain standards or pass certain tests before owning guns or using them in particular ways.  Those laws can advance gun safety by ensuring that owners understand how to handle guns safely, particularly before guns are carried in public.  For example, many jurisdictions that permit the carrying of concealed weapons have traditionally imposed licensing requirements on persons who wish to carry such weapons.  Registration requirements, by contrast, require registration of individual guns

---

[31] *Heller* held that statutes burdening Second Amendment conduct are never subject to rational basis review.  554 U.S. at 628 n.27.

> and do not meaningfully serve the purpose of ensuring that owners know how
> to operate guns safely in the way certain licensing requirements can.

*Heller II*, 670 F.3d at 1291 (Kavanaugh, J., dissenting). Thus the NFA's mandate that owners register their silencers—which is not tied to any required safety training or exam—cannot promote some generalized interest in ensuring responsible use of firearms. By itself, a silencer's presence in the NFRTR does nothing to promote safety.

If the registration requirement is permissible, therefore, it must advance some more targeted purpose. In general, the Supreme Court has said the NFA was designed to "'make it more difficult for the gangster element'" of the 1930s "'to obtain certain types of weapons.'" *Haynes*, 390 U.S. at 87 n.4 (quoting H.R. Rep. No. 914, 86th Cong., 1st Sess., 2 (1959)). But the only "certain types of weapons" referenced in the legislative history are high-powered firearms. *See, e.g.*, 78 Cong. Rec. 11400 (daily ed. June 13, 1934) (statement of Congressman Connery) ("[T]he primary purpose of the bill is to stop gangsters from getting hold of machine guns."); H.R. Rep. No. 1780, 73d Cong., 2d Sess., 1 (1934) ("[W]hile there is justification for permitting the citizen to keep a pistol or revolver for his own protection without any restriction, there is no reason why anyone except a law officer should have a . . . sawed-off shotgun.").

In the "extensive hearings" preceding the NFA's passage, "not one word was said about criminal misuse of mufflers or silencers."[32] The basis for classifying silencers on the same level as the other NFA firearms—which today include machineguns, shotguns with barrels under eighteen inches, and destructive devices such as bombs and artillery, 26 U.S.C. §§ 5845(a)(1), (6), (8), 5845(f)—remains unclear. *See, e.g.*, *Innovator Enters., Inc.*, 28 F.

---

[32] *Firearm Sound Moderators* at 48.

Supp. 3d at 29 n.8 ("Discerning a clear Congressional purpose for federal silencer regulation is challenging."). Indeed, following an analysis of the relevant legislative history, one commentator observed:

> What is striking about silencers being subjected to NFA restrictions in 1934, and retained there in the enactments of the [Gun Control Act] in 1968 and [Firearm Owners' Protection Act] in 1986, is that no actual data or information was ever presented as to the use of silencers for either lawful or criminal purposes.[33]

Another scholar put it this way: "there is nothing in the legislative record to indicate the inherent danger of silencers was an issue. . . . No reasons for punishing use of silencers were advanced."[34]

This lack of legislative history is unsurprising. Contrary to popular imagination, silencers do not entirely eliminate, or even substantially reduce, the sound of gunfire. According to "independent tests done on a variety of commercially available suppressors," the "average suppression level" achieved by a firearm silencer is "around 30" decibels.[35] Thus even when equipped with a silencer, "an AR-15 rifle would have a noise equivalent of 132 decibels"—which is "considered equivalent to a gunshot or a jackhammer."[36] Likewise, a ".22-caliber pistol would be 116 decibels, which is louder than a 100-watt car stereo," and

---

[33] *Firearm Sound Moderators* at 63.

[34] *Criminal Use* at 49.

[35] Glenn Kessler, *Are Firearms with a Silencer 'Quiet'?*, Washington Post (Mar. 20, 2017), https://www.washingtonpost.com/news/fact-checker/wp/2017/03/20/are-firearms-with-a-silencer-quiet?.

[36] *Id.*

even these estimates likely overestimate the degree of noise suppression.[37]   It is for this reason that "gun enthusiasts recommend that even with suppressors, other hearing protection"—such as ear buds or over-the-ear muffs—"is necessary."[38] Thus the government cannot—and indeed, Congress did not—attempt to justify the NFA's silencer-registration requirement on the theory that a criminal who can shoot without being heard is more likely to succeed in killing or injuring his targets.

The government's interest in regulating silencers is particularly insubstantial given the infrequency with which they are used in crime.  Despite the presence of roughly 1.5 million registered silencers in the United States—to say nothing of any unregistered silencers—they are exceedingly rare instruments of criminal activity.[39]  Pistols, which the NFA does not require to be registered, are used to commit an exponentially larger number of crimes each year.[40]

The NFA registration scheme is therefore both over- and under-inclusive relative to any public safety rationale that might justify the statute: over-inclusive because it requires registration of an item (silencers) that is almost never used to commit crimes, and under-inclusive because it does not require registration of items (such as pistols) that feature in a far higher number of crimes.  This "patent overinclusiveness and underinclusiveness . . .

––––––––––––––––––––

[37] *Id.*

[38] *Id.*

[39] *See supra*, Part III.A.1.b.ii and sources cited therein.

[40] Nathan Rott, *Debate Over Silencers: Hearing Protection or Public Safety Threat?*, All Things Considered (NPR Mar. 21, 2017), http://www.npr.org/2017/03/21/520953793/debate-over-silencers-hearing-protection-or-public-safety-threat ("Data from the ATF show that silencers are seldom used in crime.  From 2012-15, 390 silencers were recovered from crime scenes where an ATF trace was requested.  During that same period, more than 600,000 pistols were recovered.").

undermines the likelihood of a genuine governmental interest" in regulating silencers. *F.C.C. v. League of Women Voters of Cal.*, 468 U.S. 364, 396 (1984); *see also The Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) ("[T]he facial underinclusiveness of [a statute] raises serious doubts about whether Florida is, in fact, serving, with this statute, the significant interests which appellee invokes."). The government will therefore be unable to show it has "a significant governmental interest" in regulating silencers. *Packingham*, 137 S. Ct. at 1736.[41]

ii. **The registration requirement is not narrowly tailored.**

Even if the government could demonstrate a "significant governmental interest," it will be unable to show that the NFA is "narrowly tailored" to promote that interest. *Id.* The NFA does not criminalize possession of silencers per se. As long as a would-be purchaser complies with the statute's application and registration procedures, he is entitled to possess a silencer under federal law. It is only the possession of an *unregistered* silencer that is illegal. But even if a silencer could muffle a gunshot to an extent that renders a shooter more dangerous, it would have this ability regardless of whether it is registered or not. Placement on the NFRTR does not somehow decrease (or increase) a silencer's noise-suppressing

---

[41] *League of Women Voters* concerned a First Amendment challenge to a statute that "forbid[] any 'noncommercial educational broadcasting station which receives a grant from the [Corporation for Public Broadcasting]' to 'engage in editorializing.'" 468 U.S. at 366 (quoting 47 U.S.C. § 399). Although the Court did not label its standard of review "intermediate scrutiny," it resolved the case by asking whether the statute was "narrowly tailored to further a substantial governmental interest." *Id.* at 380. This test is materially identical to the Court's articulation of the intermediate-scrutiny standard. *See Packingham*, 137 S. Ct. at 1736 ("In order to survive intermediate scrutiny, a law must be narrowly tailored to serve a significant governmental interest."). *League of Women Voters'* discussion of over- and under-inclusiveness is therefore relevant to Mr. Hasson's case (even assuming that only intermediate scrutiny applies).

capabilities. If federal law permits law-abiding citizens to possess silencers notwithstanding their noise-suppression potential, then a statute justified by the supposed danger of muffled gunfire fails narrow tailoring if it allows silencer possession following registration. The silencer registration requirement impermissibly "regulate[s] [protected conduct] in such a manner that a substantial portion of the burden on [such conduct] does not serve to advance its goals." *McCullen*, 573 U.S. at 486.

Mr. Hasson anticipates the government will argue the registration requirement reasonably fits a public safety rationale because applications to transfer a silencer "shall be denied if the transfer, receipt, or possession of the [silencer] would place the transferee in violation of law." 26 U.S.C. § 5812. Under this provision, the ATF may not approve a transfer to someone who is prohibited from possessing firearms based on, for example, a felony conviction. *See, e.g.*, *United States v. Rivera*, 58 F.3d 600, 601 (11th Cir. 1995) ("[A]ny application for transfer of a firearm to Rivera would have been denied because it would have placed Rivera, the transferee, in violation of the law. Specifically, Rivera would have been in violation of 18 U.S.C. § 922(g), which makes it unlawful for a convicted felon 'to receive any firearm . . . which has been shipped or transported in interstate or foreign commerce.'" (ellipsis in original)).

A prohibition on firearm possession by convicted felons is presumptively lawful under the Second Amendment. *United States v. Pruess*, 703 F.3d 242, 247 (4th Cir. 2012). But that fact is irrelevant to considering Mr. Hasson's as-applied challenge to the silencer-registration requirement. Mr. Hasson has not previously been convicted of a felony, and the application of the NFA to his silencers therefore cannot be justified on the theory that the registration scheme serves the important public purpose of keeping firearms out of the hands

of convicted felons.  A requirement that all silencer possessors—including otherwise lawful owners like Mr. Hasson—undergo the registration process is not "narrowly tailored" to any government interest.  *Packingham*, 137 S. Ct. at 1736.

Nor can the government justify the registration requirement as a kind of prophylactic measure that can reasonably be applied to all would-be possessors because it imposes only a de minimis burden.  Even if such a defense were available in theory, *but see Murphy*, 2016 WL 5508998, at *8 ("Completely preventing an individual from exercising his right to keep and bear arms, even for a limited time, represents a serious imposition."), it would fail in this case.  As explained above, the average wait time between submission of a silencer-registration application and receipt of the ATF's decision is approximately eight months.[42]

It is unclear why processing a transfer application takes so long.  But even if the government can come up with some valid explanation, subjecting otherwise lawful firearms owners to such delay is not "narrowly tailored" to the (hypothetical) interest in what essentially amounts to a background check.  The Brady Handgun Violence Prevention Act requires "licensed importer[s], licensed manufacturer[s], [and] licensed dealer[s]" of firearms to run the name of any unlicensed purchaser through the National Instant Criminal Background Check System (NICS) before transferring a non-NFA firearm.  18 U.S.C. § 922(t)(1)(A), (3)(B).  "The overwhelming majority of gun background checks [through the

---

[42] *White Paper: Firearms Regulations* at 6; *see also ATF Wait Times*, Silencer Shop, https://www.silencershop.com/atf-wait-times (last visited June 17, 2019).

NICS] take just minutes to clear the would-be buyer."[43] According to the Federal Bureau of Investigation, which administers the NICS, the average time the agency needed to process a background check in 2013 was just 71.78 seconds.[44] Indeed, the FBI boasts on its website that in 2013, "[t]he NICS Section achieved a 91.82 percent Immediate Determination Rate, surpassing the U.S. Attorney General-mandated goal of 90 percent or better."[45]

If the FBI can process firearm background checks in a matter of minutes, there is no reason lawful gun owners should have to wait eight months or longer to receive approval to possess NFA firearms. Such a delay is simply unnecessary. The NFA silencer-registration requirement is therefore not narrowly tailored to promoting any government interest.

### 2. The serialization requirement

#### a. The serialization requirement burdens Second Amendment conduct.

Silencers are not cheap. Depending on the model and quality of the product, a new silencer can cost anywhere from $350 to almost $1,400.[46] To avoid paying such exorbitant

---

[43] Miles Kohrman & Jennifer Mascia, *Everything You Need to Know About Federal Background Checks*, The Trace (updated Mar 27, 2018), https://www.thetrace.org/2015/07/gun-background-check-nics-guide/.

[44] Federal Bureau of Investigation, *National Instant Criminal Background Check System (NICS) Operations 2013*, https://archives.fbi.gov/archives/about-us/cjis/nics/reports/2013-operations-report (last visited June 11, 2019).

[45] *Id.*

[46] S*ee, e.g.*, *Silencers*, Silencer Shop, https://www.silencershop.com/silencers.html (last visited June 12, 2019) (listing silencers for prices ranging from $349 to $999); *Silencers and Suppressed Firearms for Sale*, GunBroker.com, https://www.gunbroker.com/Silencers-Suppressed-Firearms/search (last visited June 12, 2019) (listing prices ranging from $350 to $1,350); see also *How much does an inexpensive handgun with a silencer cost?*, Quora, https://www.quora.com/How-much-does-an-inexpensive-handgun-with-a-silencer-cost (last visited June 12, 2019) ("[Silencers] usually run between 400 to well over a 1000 bucks.").

prices, many gun owners build their own silencers, using household items or objects they can obtain for minimal cost at a hardware store, such as an oil filter, Maglite flashlight, PVC pipe, wood, and thick cardboard.[47] Without the ability to build silencers from such materials, possession of silencers in the home for self-defense—including the right to use silencers without incurring serious health risks—would be financially out of reach for many gun owners.

The items described above, however, do not come with serial numbers, as required by the NFA, and many gun owners lack the technological means to "engrav[e], cast[], [or] stamp[]" a serial number on their home-made silencers.  27 C.F.R. § 479.102(a)(1).  For all functional purposes, therefore, the NFA serialization requirement renders otherwise lawful use of silencers unavailable for many gun owners.  Impairing law-abiding citizens' access to firearms in this way burdens Second Amendment conduct.  *See Marzzarella*, 614 F.3d at 94 ("Although there is no categorical protection for unmarked firearms, Marzzarella's conduct may still fall within the Second Amendment because his possession of the Titan pistol in his home implicates his interest in the defense of hearth and home—the core protection of the Second Amendment. . . . [W]e cannot be certain that the possession of unmarked firearms in the home is excluded from the right to bear arms.").

---

[47] *See, e.g.*, *Build Your Own Silencer – Part 1*, TheFirearmBlog.com, https://www.thefirearmblog.com/blog/2016/07/09/build-silencer-part-1/ (last visited June 12, 2019); *How to Make a Suppressor*, wikiHow, https://www.wikihow.com/Make-a-Suppressor (last visited June 12, 2019); *How to Build a Suppressor*, Major Rob Robinette, https://robrobinette.com/suppressor.htm (last visited June 12, 2019); *DIY Plans For A Super Simple DIY Silencer*, ConcernedPatriot.com, https://concernedpatriot.com/simple-diy-silencer/ (last visited June 12, 2019).

**b.      The serialization requirement is not narrowly tailored to serve a significant government interest.**

Mr. Hasson expects the government will argue that requiring silencers to bear serial numbers serves the government's interest in "assist[ing] law enforcement by making it possible to use the serial number of a firearm recovered in a crime to trace and identify its owner and source." *Id.* at 98. Even assuming this interest is "significant," however, it does not follow that the serialization requirement passes intermediate scrutiny.

To carry its burden under intermediate scrutiny, the government must do more than simply hypothesize plausible-sounding justifications for burdening a constitutional right; it must actually substantiate those hypotheses with evidence. In *Chester*, where the defendant raised a Second Amendment challenge to the prohibition on firearm possession by those convicted of a domestic-violence misdemeanor, the Fourth Circuit remanded to the district court for development of a factual record, notwithstanding that the government's proffered interests were facially reasonable:

> We cannot conclude on this record that the government has carried its burden of establishing a reasonable fit between the important object of reducing domestic gun violence and § 922(g)(9)'s permanent disarmament of all domestic-violence misdemeanants. The government has offered numerous plausible *reasons* why the disarmament of domestic violence misdemeanants is substantially related to an important government goal; however, it has not attempted to offer sufficient *evidence* to establish a substantial relationship between § 922(g)(9) and an important governmental goal. . . . [W]e think it best to remand this case to afford the government an opportunity to shoulder its burden and Chester an opportunity to respond.

628 F.3d at 683 (emphasis in original). If the government asks this Court to uphold the NFA's silencer-serialization requirement, it must bring forward real-world evidence that such a requirement actually assists law enforcement in tracing guns and solving crimes. Mr. Hasson must then be allowed to test that evidence through cross-examination and the introduction of other testimony. *Id.* Absent such evidence, the government cannot discharge

its burden of showing the NFA is narrowly tailored to a significant government interest.  *See Packingham*, 137 S. Ct. at 1736.

## IV.     CONCLUSION

Mr. Hasson respectfully requests that this Court conduct an evidentiary hearing at which it can receive testimony from witnesses knowledgeable in the use and registration of firearms.  He expects the testimony at that hearing, in addition to the evidence cited in this motion, will demonstrate that by requiring silencers to bear serial numbers and mandating that gun owners register their silencers, the NFA burdens Second Amendment conduct. Because the statute's prohibitions are not narrowly tailored to promote a significant government interest, they violate the Second Amendment.  This Court should therefore dismiss Counts One and Two of the indictment.


Respectfully submitted,

JAMES WYDA
Federal Public Defender


_____/s/_____
ELIZABETH G. OYER, #95458
CULLEN MACBETH, #810923
Assistant Federal Public Defenders
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland  21201
Telephone:  (410) 962-3962
Facsimile:   (410) 962-0872
Email: liz_oyer@fd.org
            cullen_macbeth@fd.org