**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. GJH-19-96** |
| | * | |
| **CHRISTOPHER PAUL HASSON,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

**\*\*\*\*\*\*\*\***

## CONSOLIDATED OPPOSITION TO DEFENSE MOTIONS

The United States of America, by and through the undersigned counsel, hereby respectfully submits the following consolidated response to the defendant's pretrial motions.  For the reasons set forth below, each motion should be denied.

### Procedural History

On February 14, 2019, United States Magistrate Judge Gina L. Simms authorized a criminal complaint charging the defendant with violations of 18 U.S.C. § 922(g)(3) (possession of firearm by unlawful user or addict of controlled substance) and 21 U.S.C. § 844 (simple possession of Tramadol, a Schedule IV opioid).  On February 27, 2019, a federal grand jury for the District of Maryland returned an indictment charging the defendant with violations of 26 U.S.C. § 5861(d) (unlawful possession of unregistered firearm silencers) and 5861(i) (unlawful possession of firearm silencers unidentified by serial number), in addition to the counts charged previously by criminal complaint.

On June 24, 2019, the defendant filed three motions: (1) a motion to dismiss the silencer counts on Second Amendment grounds (ECF No. 62); (2) a motion to dismiss the § 922(g)(3) count on the ground that the statute is unconstitutionally vague and thus void (ECF No. 63); and (3) a motion to suppress various search warrants (ECF No. 66).  The Government now responds.

## Discussion

The defendant's motions are meritless and should be denied.

**I.      The Second Amendment Does Not Protect the Defendant's Right to Bear Unregistered, Unserialized Silencers.**

The defendant contends that the National Firearms Act ("NFA"), which has been the law of the land for 75 years, unconstitutionally interferes with his supposed Second Amendment right to bear silencers.  The defendant's argument fails at its inception because silencers are not firearms within the meaning of the Second Amendment—as every court to consider the issue has found.  Even if silencers were firearms for Second Amendment purposes, the NFA would not be an unlawful infringement of the defendant's constitutional rights.

To analyze the defendant's claims, this Court undertakes a two-step process:

> The first question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee."….This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification….If it was not, then the challenged law is valid….If the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means-end inquiry.

*United States v. Chester*, 628 F.3d 673,680 (4th Cir. 2010).  In several contexts, including § 922(g)(3) and (g)(9), the Fourth Circuit has determined that the "appropriate form of means-end inquiry" is intermediate scrutiny.  *Id.* at 682-683; *United States v. Carter*, 669 F.3d 411, 416-17 (4th Cir. 2012).  *See also Kolbe v. Hogan*, 849 F.3d 114, 130 (4th Cir. 2017) (en banc) (finding assault weapons and extended magazines not subject to Second Amendment protection, and in the alternative applying intermediate scrutiny to state law banning assault weapons and extended magazines).  Under intermediate scrutiny, the Government must demonstrate a

reasonable fit between the challenged statute and a substantial governmental objective.  *Chester*,

628 F.3d at 683.

**A.      Silencers Are Not Firearms Within The Meaning of the Second Amendment.**

According to the defendant, *District of Columbia v. Heller*, 554 U.S. 570 (2008), compels

the conclusion he asks this Court to make.  But *Heller* does no such thing.  In that case, the

Supreme Court found that the Second Amendment conferred an individual right to keep and bear

arms, and that a statute banning the possession of a handgun in one's home violated the Second

Amendment.  The Supreme Court's opening line shows just how far that case is from this one:

"We consider whether a District of Columbia prohibition on the possession of usable handguns

in the home violates the Second Amendment to the Constitution."  *Id.* at 573.  Here, of course,

the defendant's silencers are not "usable handguns."

The *Heller* court explained that "the most natural reading of 'keep Arms' in the Second

Amendment is to 'have weapons.'"  *Heller*, 554 U.S. at 582.  The Supreme Court further

elaborated on the Second Amendment's phrase "to keep and bear arms": "[p]utting all of these

textual elements together, we find that they guarantee the individual right to possess and carry

weapons in case of confrontation."  *Id.* at 592.[1]

Even the right recognized in *Heller*, though, was not unlimited: "Of course the right was

not unlimited, just as the First Amendment's right of free speech was not. . . .  Thus, we do not

read the Second Amendment to protect the right of citizens to carry arms for *any sort* of

---

[1] The Supreme Court's entire discussion of "weapons of offense, or armour of defence— discussed by the defendant at ECF No. 62 at 5—was to prove the "point in drawing on these historical reference materials . . . to show that the word 'Arms' was not, as the District of Columbia urged, understood by the Framers to be limited to military weaponry."  *United States v. Davis*, 906 F. Supp. 2d 545, 556 (S.D. W. Va. 2012).

confrontation, just as we do not read the First Amendment to protect the right of citizens to speak

for *any purpose*." *Id.* at 595.

Attempting to piggy-back on *Heller*, the defendant contends that "'proper accoutrements'

that render that firearm useful and functional" are protected by the Second Amendment.  ECF

No. 62 at 5 (citing *United States v. Miller*, 307 U.S. 174, 182 (1939)).  But *Heller* did not speak

to the issue the defendant now advances, and neither did *Miller*, which simply found that the

NFA's ban on short-barreled rifles did not contravene the Second Amendment.  Nor can the

defendant's argument find comfort in the other cases he cites, both of which involve access to

and ability to use ammunition.  For example, in *Jackson v. City and County of San Francisco*,

746 F.3d 953, 967 (9th Cir. 2014) (cited at ECF No. 62 at 6-7), the Ninth Circuit <u>affirmed</u> a

district court ruling upholding the constitutionality of a state law banning hollow-point bullets.

In reaching its conclusion, the Ninth Circuit first found that bullets generally (not just hollow-

point bullets) are within the scope of the Second Amendment.  *Id.* at 967 ("[W]ithout bullets, the

right to bear arms would be meaningless.  A regulation eliminating a person's ability to obtain or

use ammunition could thereby make it impossible to use firearms for their core purpose.").

And in *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney General of New

Jersey*, 910 F.3d 106 (3d Cir. 2018) (cited at ECF No. 62 at 6), the Third Circuit <u>affirmed</u> the

district court's order upholding a New Jersey state law banning large capacity magazines, in the

face of a request for a preliminary injunction.  The Third Circuit agreed with *Jackson* and *Miller*

for the proposition that the right to bear arms encompassed the right to shoot bullets from those

guns, because to hold otherwise would be to eliminate the core purpose of the Second

Amendment right.  *Id*. at 116 ("Because magazines feed ammunition into certain guns, and

ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment.").

The other case cited by the defendant, *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) (cited at ECF No. 62 at 11), is simply inapposite. There, the Seventh Circuit held that shooting ranges are not categorically outside the scope of the Second Amendment, because "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Id.* at 704.

In contrast to the movants in *Jackson*, *Rifle & Pistol Clubs*, and *Ezell*, the defendant here has failed to explain how silencers are necessary to make firearms "usable." The failure is understandable, though, since silencers clearly do not make firearms usable; rather, silencers are mere firearm accessories. Taken to its logical conclusion, the defendant's argument would have the Second Amendment subsume and protect all kinds of firearm accessories, whether fore-end grips, infrared scopes, rail guards, or even rifle straps. The defendant's argument sweeps much further than the Second Amendment, which only covers firearms as opposed to accessories.

This is perhaps why ***every court to consider the issue has found that silencers are not firearms within the meaning of the Second Amendment***. *See, e.g.*, *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (silencers are not firearms subject to protection under the Second Amendment), *cert. denied*, 2019 WL 235139 (June 10, 2019); *United States v. Stepp-Zafft*, 733 F. App'x 327, 329-30 (8th Cir. 2018) (on plain error review, finding no plain error and stating that the defendant "cites no supporting authority" for his contention that silencers are subject to Second Amendment protection), *cert denied*, 139 S. Ct. 279 (2018); *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) (silencers are "less common than either short-

barreled shotguns or machine guns" and "are not protected by the Second Amendment"); *United States v. Grey*, 2018 WL 4403979, at *13 (C.D. Cal. Sept. 13, 2018) (following *McCartney* and holding that silencers are not subject to Second Amendment protections); *United States v. Perkins*, 2008 WL 4372821, at *4 (D. Neb. 2008) (finding that silencers are not subject to Second Amendment protection); *United States v. Garnett*, 2008 WL 2796098, at *4 (E.D. Mich. 2008) (nothing in *Heller* "casts doubt on the constitutionality" of NFA regulation of silencers).[2]

The Tenth Circuit recently took up arguments identical to those the defendant raises here. *See Cox*, 906 F.3d at 1170.  For instance, just as here, the defendants in *Cox* contended that the Second Amendment extended to instruments that constitute "bearable arms," even if the instrument did not exist at the "time of the founding."  *Compare Cox*, 906 F.3d at 1186, *with* ECF No. 62 at 4.  The *Cox* defendants also contended that silencers were in common use, rarely used to commit crimes, and protected shooters from hearing loss and disorientation.  *Compare Cox*, 906 F.3d at 1186, *with* ECF No. 62 at 9-15.  The Tenth Circuit rejected the proposition that silencers were Second Amendment firearms:

> A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence').  Accordingly, it can't be a 'bearable arm' protected by the Second Amendment.  Thus, because silencers are not 'bearable arms,' they fall outside the Second Amendment's guarantee.

*Cox*, 906 F.3d at 1186.  This outcome makes sense, since silencers are not integral to the operation of any gun.  In parenting parlance, silencers might be a "nice to have," but they are not

---

[2] The three state courts to have considered the issue also rejected the same argument, both pre- and post-*Heller*. *See also Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 652 (Del. 2017) ("Like the Second Amendment, Delaware's right to public carry for self-defense is fundamental but not absolute.  We have recognized the validity of several restrictions on gun possession, such as statutes prohibiting the possession of a firearm silencer . . . ."); *State v. Dor*, 75 A.3d 1125, 1130 (N.H. 2013); *People v. Brown*, 235 N.W. 245, 246 (Mich. 1931).

a "need to have."  A gun—every gun—works perfectly well without a silencer.[3]  For that simple

reason, silencers are not firearms within the meaning of the Second Amendment.[4]  Indeed, if

silencers were protected by the Second Amendment, then under the defendant's argument the

Second Amendment necessarily would protect an individual's right to bear the constituent parts

of "home-made silencers," "such as an oil filter, Maglite flashlight, PVC pipe, wood, and thick

cardboard."  ECF No. 62 at 27.  It should come as no surprise that neither the Supreme Court nor

the Fourth Circuit has held an oil filter or thick cardboard to constitute "arms" within the

meaning of the Second Amendment.

### B.      The defendant's as-applied challenge fails.

The above discussion conclusively shows that silencers are not a type of instrument

protected by the Second Amendment.  Even if they were, though, *Heller* would not require the

court to strike down the relevant portions of the NFA.

---

[3] The defendant's brief stakes out schizophrenic positions regarding silencers.  On one hand, the defendant justifies silencers as necessary components of guns because silencers "can reduce hearing loss and disorientation immediately after firing."  ECF No. 62 at 9.  On the other hand, the defendant unequivocally states that, "[c]ontrary to popular imagination, silencers do not entirely eliminate, or even substantially reduce, the sound of gunfire," ECF No. 62 at 21, and "'gun enthusiasts recommend that even with suppressors, other hearing protection' – such as ear buds or over-the-ear muffs – 'is necessary,'" ECF No. 62 at 22.  If silencers do not have noise-cancelling benefits, then the defendant's argument that silencers are necessary to the effective use of guns is factually unfounded.

[4] Since *Heller*, enterprising defendants have sought to expand the reach of the Second Amendment.  *See, e.g.*, *Davis*, 905 F. Supp. 2d at 556 (finding that bulletproof vests are not "arms" within meaning of Second Amendment).  Courts have served as the bulwark against those unfounded arguments.

*First*, the NFA's silencer registration and serialization requirements have been on the books for 75 years.  Thus, they fall neatly within the "longstanding prohibitions" that the Supreme Court acknowledged survived *Heller*.  *See Heller*, 554 U.S. at 626-27.[5]

*Second*, the defendant here makes an as-applied challenge to the statutory scheme, claiming that it conflicts with the Second Amendment's protection of "a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home."  ECF No. 62 at 3.  But the defendant does not fall within the class of persons protected by the Second Amendment: Though the defendant correctly notes that he "has not previously been convicted of a felony," ECF No. 62 at 24, he is not a "law-abiding, responsible citizen" attempting to use silencers "in defense of hearth and home."  *Heller*, 554 U.S. at 651.  Contemporaneous with his violation of the silencer laws, the defendant was a felonious user and addict of controlled substances, and a misdemeanant possessor of controlled substances.  He therefore was not law-abiding and was not acting responsibly.  Nor were the silencers for self-defense.  When agents recovered the silencers during the search warrant, neither one was affixed to a weapon.  Indeed, one was disassembled.  The assembled one had evidence of use, which must have occurred outside the home.  Further, if necessary, trial evidence—some of which has been deployed at detention hearings in this case—will show that the defendant possessed the silencers for an offensive purpose outside of the home, not for a defensive purpose within the home.  *See, e.g.*, ECF No. 42 at 4 ("He researched how to make homemade bombs and mortars, studied sniper training and bullet trajectory manuals, and fashioned a firearm silencer. ('Institute a bombing/sniping campaign.')."

---

[5]   Though the Supreme Court did not itemize silencers in that portion of its opinion, the prohibitions listed were demonstrative rather than exhaustive.

_Third_, silencers are not in common lawful use by law-abiding citizens.[6]  Americans, both law-abiders and not, have been exercising the Second Amendment right to bear arms for hundreds of years without possessing silencers or affixing them to firearms.  Nothing the defendant argues can change that historical fact.  Similarly, the defendant's recent statistics are unmoving.  The defendant points to DOJ statistics showing that roughly 1,489,791 million silencers were lawfully registered in 2018.  ECF No. 62 at 13.  That total represents a miniscule fraction of the estimated number of firearms in the United States, and even a small fraction of the number of firearms manufactured in any given year.  For example, an estimated 393 million firearms existed in the United States in 2018. _See_ "There are more guns than people in the United States according to a new study of global firearm ownership," WASHINGTON POST, June 19, 2018.  **_That means there are enough registered silencers to affix to only 0.3% of all firearms._**[7]  And there is no data, or at least no reliable data, on how many of those registered silencers are actually used.  Certainly the defendant did not point to a single example of a homeowner using a silencer-bearing firearm to defend a home from an invader.

Nor is it enough that silencers might be usable for some lawful purposes, such as hunting, which the defendant posits while pointing to the fact that "the use of silencers to commit crimes is exceedingly rare."  ECF No. 13-14.  Rather, silencers not being used by criminals is a sign that the NFA's requirements are effective, by reducing the number of available silencers, keeping silencers

---

[6] The defendant seeks an evidentiary hearing and the opportunity to present expert evidence regarding silencers' commonality and lawful usage.  No hearing is necessary, because silencers are not firearms within the meaning of the Second Amendment.  Even if the Court found that silencers were covered by the Second Amendment, no evidentiary hearing would be required to uphold the NFA.  The district court in _Cox_, when faced with the same arguments the defendant raises here, did not hold an evidentiary hearing.

[7] Also by way of example, in 2016, 11,497,441 firearms were manufactured in the United States and another 5,137,771 were imported into the United States.  _See_ U.S. Dep't of Justice, ATF, Firearms Commerce in the United States: Annual Statistical Update 2018 at 1 and 3 (_available at_ https:www.atf.gov/file/130436/download). That means there are enough registered silencers to affix to only 8.9% of just the firearms that were manufactured in or imported into the United States in 2016 alone.

out of the hands of criminals, and deterring would-be criminals from using silencers because the registration requirement may lead law enforcement back to them if they commit a crime.  This is especially true because some criminals do, in fact, use silencers to murder.  The Court need look no further back than June 2019, when the mass shooter in the municipal buildings in Virginia Beach, Virginia, used a silencer during his murder spree, perhaps lulling soon-to-be victims into not realizing that the sound they heard nearby was that of a gun.

### C.     The NFA Does Not Unconstitutionally Infringe on The Defendant's Second Amendment Rights.

The defendant argues that, if the Second Amendment does apply to silencers, the NFA's registration and serialization requirements impermissibly burden protected Second Amendment activity.  As discussed above, the Second Amendment does not cover silencers.  If it did, the NFA would not impermissibly burden Second Amendment protections, under intermediate scrutiny.

### i.     The silencer registration requirement passes intermediate scrutiny.

The defendant contends that silencer registration is not narrowly tailored to serve a significant government interest.  *See* ECF No. 62 at 16-26.  The defendant asserts that "[t]he government's interest in regulating silencers is particularly insubstantial given the infrequency with which they are used in crime."  *Id.* at 22.  As explained above, however, a low rate of silencer use by criminals today could indicate simply that Congress's attempt to deter the unlawful use of silencers has succeeded.  In any event, whatever the incidence of silencer use by criminals today, Congress concluded 75 years ago (and reaffirmed as recently as 1986) that silencers' connection to criminal enterprise warranted some regulation.  *See* Pub. L. No. 99-308, § 109(b), 100 Stat. 449, 460 (1986) (expanding the definition of silencers to include their

components).  The statute's registration requirement is likewise narrowly tailored.  The statute

does not ban the possession of silencers; it only requires that silencers be registered.

Furthermore, the registration of actual guns is a permissible regulation of activity

protected by the Second Amendment.  In *Heller* on remand, the D.C. Circuit stated that "basic

registration requirements are self evidently de minimis, for they are similar to other common

registration or licensing schemes, such as those for voting or for driving a car, that cannot

reasonably be considered onerous."  *Heller v. District of Columbia*, 670 F.3d 1244, 1254-55

(D.C. Cir. 2011).  If the Second Amendment permits laws requiring gun registration, then it must

also permit laws requiring silencer registration.[8]

## ii.    The silencer serialization requirement passes intermediate scrutiny.

The defendant also contends that silencer serialization is not narrowly tailored to serve a

significant government interest.  *See* ECF No. 62 at 26-29.  The defendant talks about how others

might fashion home-made silencers, instead of discussing the fact that he paid $202.55 for his

silencer parts, ordering and receiving them from a company in California in July/August 2017,

and then himself drilled out pre-indexed holes to create his silencer.  *See* ECF No. 25 at 2.[9]  The

defendant discusses how others might lack the means to serialize silencers, while failing to state

how he himself lacked the means to serialize the silencer that he drilled out.  ECF No. 62 at 26-

---

[8] To get around this transitive proof, the defendant notes various lengthy wait times for gaining
ATF approval to build or transfer silencers.  ECF No. 62 at 16.  But administrative sloth does not
make the implementing law unconstitutional; it only provides a plaintiff a basis for an injunctive
lawsuit.  Also, the wait times others may face is immaterial in this as-applied challenge.  The
defendant never applied to build or transfer a silencer.  Instead, the defendant searched for ATF
silencer transfer wait times on February 20, 2017, and—rather than abiding by the law and
waiting—the defendant opted to violate the law.

[9] For this as-applied challenge, it is unclear why the defendant says that "silencers are not cheap"
and describes prices that others might pay for silencers.

27.  His arguments do not speak to the as-applied challenge he makes.  Quite simply, if the defendant had the ability to cut steel to create silencer, he had the ability to cut steel to engrave numbers into it.

Even generally, the serialization requirement of the NFA is narrowly tailored.  As with guns, the Government has an interest in tracking certain firearm accessories (such as silencers), and the defendant identifies no case in the country in which a court has held that firearm serialization impermissibly burdens the Second Amendment.  To the contrary, the Third Circuit has held that the gun serialization requirement is constitutionally valid.  *See United States v. Marzzarella*, 614 F.3d 85, 94 (3d Cir. 2010) ("Because the presence of a serial number [on a firearm] does not impair the use or functioning of a weapon in any way, the burden on Marzzarella's ability to defend himself is arguably *de minimis*.").

*     *     *

Finding that the NFA requirements at issue here withstand Second Amendment scrutiny would be consistent with the post-*Heller* firearms jurisprudence of many Circuit courts, including the Fourth Circuit.  *See, e.g.*, *United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016) (rejecting Second Amendment challenge to Gun Control Act of 1968's requirement that firearms dealers must obtain license); *Drake v. Fitko*, 724 F.3d 426 (3d Cir. 2013) (rejecting Second Amendment challenge to New Jersey's law regulating the issuance of permits to carry handguns in public); *Heller*, 670 F.3d at 1254 (rejecting Second Amendment challenge to D.C. handgun-registration requirement); *Marzzarella*, 614 F.3d 85 (3d Cir. 2010) (rejecting Second Amendment challenge to federal law requiring that firearms bear serial numbers that are not "removed, obliterated, or altered").[10]  In short, if the Second Amendment does not bar laws

---

[10] The defendant states that "the NFA does not require [pistols] to be registered."  ECF No. 62 at 22.  While it is true that the NFA's intended reach is limited, the cases cited here show that many

requiring actual guns to be registered or serialized, then it also does not bar laws requiring

silencers to be registered or serialized.  Just as with actual guns, there are significant Government

interests served by requiring silencers to be registered and serialized, including knowing who

owns a particular silencer when a crime with one occurs.

## II.        Section 922(g)(3) is Not Void For Vagueness.

In Count Three of the indictment, the federal grand jury charged the defendant as

follows:

> On or about February 15, 2019, in the District of Maryland, the defendant,
> **CHRISTOPHER PAUL HASSON,**
> then being an unlawful user and addict of a controlled substance as defined in 21
> U.S.C. § 802, did knowingly possess, in and affecting commerce, firearms . . . .
> [ECF No. 16 at 3]

The charge tracks the statutory language.  And every court—including the Fourth

Circuit—to have considered whether § 922(g)(3) is void for vagueness has upheld the statute.

*See United States v. Cook*, 914 F.3d 545 (7th Cir. 2019); *United States v. Bramer*, 832 F.3d 908

(8th Cir. 2016); *Carter*, 669 F.3d at 416 (citing *United States v. Dugan,* 657 F.3d 998 (9th Cir.

2011); *United States v. Yancey,* 621 F.3d 681 (7th Cir. 2010) (per curiam); *United States v. Seay,*

620 F.3d 919 (8th Cir. 2010); *United States v. Richard,* 350 F. App'x 252 (10th Cir. 2009);

*United States v. Monroe*, 233 F. App'x 879 (11th Cir. 2007); *United States v. Patterson,* 431

F.3d 832 (5th Cir. 2005); *United States v. Hatches*, 75 F. App'x 188 (4th Cir. 2003) ("We

likewise reject Hatches's alternative argument that the statute is unconstitutionally vague.").[11]

---

states do require pistols to be registered, and those statutes do not contravene the Second
Amendment.

[11] The Fourth Circuit also has addressed the constitutionality of § 922(g)(3) in other
circumstances, consistently rejecting all challenges to the statute.  For example, in an
unpublished opinion, on plain error review of a jury instruction, the Fourth Circuit rejected an
argument similar to one the defendant puts forward now.  *See United States v. Yates*, 746 F.
App'x 162, 165 (4th Cir. 2018) ("Yates also cannot show plain error with regard to the district

### A.      The Defendant Cannot Make a Facial Vagueness Challenge.

The defendant's argument boils down to a request that the Court ignore every case that ever has ruled on the issue and instead focus on a purported sea-change brought about in 2015 by the Supreme Court's decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015).  According to the defendant, *Johnson* now permits a facial vagueness challenge to every statute, even outside the First Amendment context.  ECF No. 62 at 3.  But the Fourth Circuit already has noted the limitations of the *Johnson* holding, stating that "if a law clearly prohibits a defendant's conduct, the defendant cannot challenge, and a court cannot examine, whether the law may be vague for other hypothetical defendants."  *Hosford*, 843 F.3d at 170 (affirming Judge Chasanow's rejection of a facial vagueness challenge to 18 U.S.C. § 922(a)(1)(A)).  *See id.* ("'[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *quoting Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010)).  *See also United States v. Morrison*, 844 F.2d 1057, 1071 (4th Cir. 1988) ("[I]t is settled beyond controversy that if one is not of the rare 'entrapped' innocents but one to whom the statute clearly applies, irrespective of any claims of vagueness, he has no standing to challenge successfully the statute under which he is charged for vagueness.").

While the Fourth Circuit has not applied *Hosford*'s ruling in the § 922(g)(3) context post-*Johnson*, two other Circuits and several district courts have—and all uniformly agreed that defendants who clearly fall within the prohibitions of § 922(g)(3) cannot make a facial vagueness

_____

court's decision not to define the term 'unlawful user,' as she admitted smoking marijuana daily during the period in which she purchased the firearm and evidence showed that she smoked marijuana on the date of the firearm's purchase.").  And in a published opinion, using intermediate scrutiny to review a Second Amendment challenge, the Fourth Circuit affirmed the constitutionality of § 922(g)(3).  *See United States v. Carter*, 750 F.3d 462, 468-470 (4th Cir. 2014).

challenge to the statute.  *See United States v. Cook*, 914 F.3d 545 (7th Cir. 2019); *United States v. Bramer*, 832 F.3d 908 (8th Cir. 2016); *United States v. Kimbrough*, 319 F. Supp. 3d 912 (M.D. Tenn. 2018) (finding that *Johnson* "has no straightforward application to 18 U.S.C. § 922(g)(3) because this statute does not contain the same infirmities identified in *Johnson*"); *United States v. Bell*, 2017 WL 1479376, at \*5 (D. Kan. Apr. 25, 2017) ("[T]he court has searched to see if any case has extended *Johnson* in the fashion [the defendant] urges the court to adopt.  It located none.  Indeed, the court's research has shown just the opposite."); *United States v. Holmes*, 2016 WL 54918, at \*2 (E.D. Wisc. Jan. 5, 2016) ("…Section 922(g)(3) has not created a 'black hole of confusion'" as did the residual clause of the ACCA in *Johnson*); *United States v. Phommaseng*, 2015 WL 5937595, at \*15 (D. Kan. Oct. 12, 2015) ("*Johnson* considered the residual clause in the definition of 'violent felony,' which had previously required courts to use a 'categorical approach' to determine which offenses were captured by the definition.  This approach required courts to look at how the law defined an offense, and not how an individual defendant committed the particular crime at issue.  There is no such categorical approach at issue in construing § 922(g).  Nor has the Court located any case law that has extended *Johnson* as urged by Defendant.").

The decisions from the two sister Circuits are particularly instructive.  In *Cook*, the Seventh Circuit stated:

> Whatever doubt there might be at the margins as to conduct potentially reached by section 922(g)(3), there can be no doubt as to the core of conduct that the statute . . . proscribes: the possession of a firearm by an individual engaged in the regular, non-prescribed use of a controlled substance.  Indeed, it would appear that Cook's conduct—possession of a firearm in the midst of a nearly ten-year period of daily marijuana use—epitomizes that core, which may explain why Cook is so keen to challenge the statute on its face rather than as applied." [*Cook*, 914 F.3d at 551]

Similarly, in a published per curiam opinion in *Bramer*, the Eighth Circuit rejected the

very argument the defendant makes here:

> Bramer argues that § 922(g)(3) is facially unconstitutional, because the terms "unlawful user" of a controlled substance and "addicted to" a controlled substance are vague.  Though we are inclined to think that this argument could be meritorious under the right factual circumstances, it fails here.  Bramer's argument rests in large part on <u>Johnson v. United States</u>, 135 S. Ct. 2551 (2015), which applied a more expansive vagueness analysis than prior case law might have suggested.  Before <u>Johnson</u>, we required defendants challenging the facial validity of a criminal statute to establish that "'no set of circumstances exist[ed] under which the [statute] would be valid.'" <u>United States v. Stephens</u>, 594 F.3d 1033, 1037 (8th Cir. 2010) (quoting <u>United States v. Salerno</u>, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)).  <u>Johnson</u>, however, clarified that a vague criminal statute is not constitutional "merely because there is some conduct that falls within the provision's grasp." <u>Johnson</u>, 135 S.Ct. at 2561.
>
> Though Bramer need not prove that § 922(g)(3) is vague in all its applications, our case law still requires him to show that the statute is vague as applied to his particular conduct. [*Bramer*, 832 F.3d at 909]

Since an as-applied vagueness challenge is the only avenue available to the defendant,

and since the defendant did not make an as-applied challenge—for obvious reasons, given that

the defendant possessed seventeen firearms while Tramadol was in his bloodstream, his home,

his work desk, and the bag he was carrying at the time of his arrest—the Court should deny the

motion.

### B.        Any Later As-Applied Challenge Will Fail.

If the defendant were to make an as-applied challenge, the Court could not take up the

issue now; instead, the Court must take it up on a Rule 29 motion after the close of the

Government's evidence.  Assuming the defendant later makes such a motion, the Government

takes the opportunity to respond to the arguments in the defendant's motion.

### i.        The term "unlawful user" is not unconstitutionally vague.

The defendant's main plaint is that the term "unlawful user" is not statutorily defined.

But that is of no moment, because a vagueness challenge fails if the statutory terms have come to

have a settled legal meaning.  *See, e.g.*, *Humanitarian Law Project*, 561 U.S. at 18-19 ("We have

in the past 'struck down statutes that tied criminal culpability to whether the defendant's conduct

was 'annoying' or 'indecent'—wholly subjective judgment without statutory definitions,

narrowing context, or **settled legal meanings**.'") (emphasis added); *Morrison*, 844 F.2d at 1071

("[T]he statute must be read in its entirety and all vagueness may be corrected by judicial

construction which narrows the sweep of the statute within the range of reasonable certainty.").[12]

And it is clear from ample Fourth Circuit precedent that "unlawful user" has a settled

legal meaning.  *See, e.g.*, *United States v. Sperling*, 400 F. App'x 765, 767 (4th Cir. 2010) ("To

sustain a conviction, the government must prove that the defendant's drug use was 'sufficiently

consistent, 'prolonged,' and close in time to his gun possession to put him on notice that he

qualified as an unlawful user' under the terms of the statute." (quoting *United States v. Purdy,*

264 F.3d 809, 812 (9th Cir.2001)); *United States v. Marsh*, 232 F. App'x 261, 261 (4th Cir.

2007) ("To sustain a conviction under § 922(g)(3), the Government must prove that the

defendant possessed a firearm and that his drug use was sufficiently consistent, prolonged, and

close in time to the gun possession to put him on notice that he qualified as an unlawful user of

drugs under the statute." (citing *Purdy*)); *United States v. Parris*, 111 F. App'x 158, 159 (4th Cir.

2004) ("In order to sustain a conviction under § 922(g)(3), the Government must prove that the

Defendant's drug use was sufficiently consistent, 'prolonged,' and close in time to his gun

possession to put him on notice that he qualified as an unlawful user of drugs under the statute.")

(citing *Purdy*); *United States v. Edwards*, 38 F. App'x 134, 138 (4th Cir. 2002) ("In order to

sustain a conviction under § 922(g)(3), the Government must prove that the Defendant's drug

---

[12] The defendant concedes this point, as he must.  *See* ECF No. 63 at 4 ("When assessing a
vagueness claim, courts should look to both 'the plain language of the contested statute' and 'any
limiting construction that a . . . court or enforcement agency has proffered.'").

use was sufficiently consistent, 'prolonged,' and close in time to his gun possession to put him on notice that he qualified as an unlawful user of drugs under the statute." (citing *Purdy*)).  Thus, in the Fourth Circuit, as elsewhere, an "unlawful user" for purposes of § 922(g)(3) is someone whose drug use is consistent, prolonged, and close in time to the firearm possession.[13]

The defendant complains that each of these terms—"consistent," "prolonged," and "close in time to the firearm possession"—are vague.  They are not.  Though the terms may be imprecise at the margins, they certainly "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  *See United States v. Demott*, 45 F. App'x 230, 233 (4th Cir. 2002) ("In order to survive a vagueness challenge, a statute or regulation need only give fair warning such that people of common intelligence will know whether their contemplated conduct is forbidden.").

Here, there is no question that the defendant's drug use was consistent, prolonged, and close in time to his firearm possession.  Just as in *Jackson*, this is not a "borderline case" but rather one where the defendant violated the "plain meaning" of the statute.  *Jackson*, 280 F.3d at

---

[13] The defendant relies on an old Ninth Circuit case reviewing a different statute with different language for the proposition that § 922(g)(3) is void for vagueness.  *See* ECF No. 63 at 7 (discussing *Weissman v. United States*, 373 F.2d 799 (9th Cir. 1967)).  Even the Ninth Circuit did not think that case bore any relevance to § 922(g)(3), since the Ninth Circuit later expressly rejected the challenge the defendant now brings.  *See United States v. Purdy*, 264 F.3d 809 (9th Cir. 2001).  No court has followed *Weissman*'s interpretation of the language of 18 U.S.C. § 1407 to find 18 U.S.C. § 922(g)(3) unconstitutional.

For similar reasons, the defendant's reliance on *Whatley v. Zatecky*, 833 F.3d 762 (7th Cir. 2016), also is misplaced.  *See* ECF No. 63 at 8.  That case dealt with an Indiana state law regulating different conduct with different statutory language.  Even the Seventh Circuit did not think that case bore any relevance to § 922(g)(3), since the Seventh Circuit subsequently expressly rejected the challenge the defendant now brings.  *See United States v. Cook*, 914 F.3d 545 (7th Cir. 2019).

406.  The defendant purchased substantial amounts of Tramadol over a course of years, per the timeline below:[14]

| Date Order Placed | Order | Payment | Payment Method | Payment Recipient | Recipient Location | Shipper Name | Delivery Service | Tracking Number | Recipient | Recipient Address |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/14/2016 | 100 Tramadol | $215 | MoneyGram #64567959 | Estefany Yesenia Barba Sanchez | Tijuana, Mexico | | UPS | 1zw616060207421422 | HASSON | North Carolina Residence |
| 12/21/2016 | 100 Tramadol | $185 | Sharemoney #16967481622 | Raul Vargas Cuevas | Tijuana, Mexico | | UPS | 1zw616060141390466 | HASSON | North Carolina Residence |
| 2/13/2017 | 100 Tramadol | $215 | Sharemoney #16967709477 | Victor Antonio Velazquez Garcia | Tijuana, Mexico | | UPS | 1zwr9467019393545592 | HASSON | North Carolina Residence |
| 4/2/2017 | 200 Tramadol / 300 Tramadol | $365 | MoneyGram #94355173 | Jose Luis Gutierrez Lopez | Tijuana, Mexico | | UPS | 1za22w970126075864 / 1z7437490190170966 | HASSON | North Carolina Residence |
| 7/13/2017 | 300 Tramadol | $520 | Moneygram #80310911 | Hiran Cortes Benitez | Tijuana, Mexico | | | | HASSON | Maryland Residence |
| 9/13/2017 | 300 Tramadol | $520 | MoneyGram #80310911 | Julia Cesar Duarte Demecio | Tijuana, Mexico | | | | HASSON | Maryland Residence |
| 11/14/2017 | 300 Tramadol | $530 | MoneyGram #74888777 | Manuel de Jesus Escobar Ledesma | Tijuana, Mexico | College Postal Plus/Eden Perez | FedEx | 788474334474 | HASSON | Maryland Residence |
| 1/23/2018 | 300 Tramadol | $520 | MoneyGram #47029758 | Karen Yulissa Garcia Ventura | Tijuana, Mexico | Robert Salas | UPS | 1z37wv821305430219 | HASSON | Maryland Residence |
| 3/25/2018 | 300 Tramadol | $530 | MoneyGram #99457701 | Cynthia Nallely Bautista Roldan | Tijuana, Mexico | Eden Perez | UPS | 1z6r0v451397433272 | HASSON | Maryland Residence |
| 5/7/2018 | 300 Tramadol | $530 | MoneyGram #94267679 | Martha Elena Rivera Torres | Tijuana, Mexico | Fernando Rodriguez | UPS | 1zxx26071397991901 | HASSON | Maryland Residence |
| 6/28/2018 | 300 Tramadol | $530 | MoneyGram #91279653 | Barbara Lizbeth Bravo Vitervo | Tijuana, Mexico | Alejandra Vasquez | UPS | 1zxx26075593567702 | HASSON | Maryland Residence |
| 8/14/2018 | 300 Tramadol | $520 | Western Union #502-656-6717 | Paola Mateo Ramirez | Tijuana, Mexico | Jennifer Rosete | FedEx | 782339404644 | HASSON | Maryland Residence |
| 10/9/2018 | 300 Tramadol | $520 | Western Union #087-842-1528 | Javier Rojas Perez | Tijuana, Mexico | | FedEx | 783186750409 | HASSON | Moss Point, Mississippi, Hotel |
| 11/30/2018 | 300 Tramadol | $520 | Western Union #056-820-2408 | Edgar Maddiel Barron Munoz | Tijuana, Mexico | Jennifer Rosete | FedEx | 784156105470 | HASSON | Maryland Residence |
| 1/8/2019 | 300 Tramadol | $520 | Western Union #433-323-4761 | Raquela Galvez Villalva | Tijuana, Mexico | Fernando Rodriguez | FedEx | 784882778467 | HASSON | Maryland Residence |
| 2/5/2019 | 300 Tramadol | $520 | Western Union #189-269-9061 | Fortino Gonzalez Zunun | Tijuana, Mexico | | FedEx | 785346724130 | HASSON | Maryland Residence |

The purchases were made by sending money through international money transfers to Mexico, to an individual with whom the defendant was in contact through domestic and encrypted foreign email accounts.  The money transfers were sent to different individuals, at the direction of the distributor.  The Tramadol was received by the defendant through UPS and FedEx shipments from California.  The defendant concealed the Tramadol in other packaging at his residence and work.  The defendant possessed the Tramadol in his home, in his work desk, and in the bag he was carrying when he was arrested.  And based on a blood draw taken at the

---

[14]   In terms of prolonged use, on recorded jail calls while in custody, the defendant has repeatedly admitted to relatives that he has been using drugs for years.

time of his arrest, the defendant had Tramadol in his bloodstream at the time he was arrested.

Thus, whatever the precise reach of the statute, the defendant undoubtedly fits within it.[15]

The defendant also complains of supposed inherent and irredeemable vagueness based on

his view that the "imprecise" definition of "unlawful user" means that "a person can drift in and

out of 'unlawful user' status based on how recently and consistently he used drugs."  ECF No. 63

at 6.  The Constitution does not have a problem, however, with an individual self-selecting in

and out of criminal conduct.  Indeed, several other provisions of § 922(g) permit this same

potentially temporary "drift."  *See* 18 U.S.C. § 922(g)(2) (unlawful firearm possession by

someone "who <u>is</u> a fugitive from justice"); § 922(g)(5) (unlawful firearm possession by someone

"who, being an alien, <u>is</u> illegally or unlawfully in the United States"); § 922(g)(8) (unlawful

firearm possession by someone who <u>is</u> subject to a court order" that restrains harassing or

stalking conduct).  Under each of those statutory subsections, an individual could be in violation

of the law one day and not in violation the next (for example, once a fugitive is caught, an alien

gains lawful status, or a court order prohibiting stalking is lifted).

Finally, the defendant contends that the "unlawful" part of "unlawful user" is

unconstitutionally vague.  The defendant seeks to bolster his argument with repeated citation to a

Fifth Circuit vacated, divided panel opinion in *United States v. Herrera*, 289 F.3d 311 (5th Cir.

2002).  But the moment the Fifth Circuit took the case en banc, by law the panel opinion

dissolved and is of no value even within the Fifth Circuit.  *See United States v. Herrera*, 300

F.3d 530 (5th Cir. 2002) (mem. op.); Fifth Circuit Local Appellate Rule 41.3 ("Unless otherwise

---

[15] Even if the Court accepted the *Jackson* defendant's argument that a defendant "must be in possession of a controlled substance *at the same time one possesses a firearm*" (which the Court should not accept, since that strict definition was explicitly rejected in *Jackson*), the defendant here still would have violated § 922(g)(3).  *See Jackson*, 280 F.3d 403, 406 (4th Cir. 2002) (italics in original).

expressly provided, ***the granting of a rehearing en banc vacates the panel opinion and judgment of the court*** and stays the mandate.") (emphasis added).  In the en banc opinion, after the Government conceded that "for a defendant to be an 'unlawful user' for § 922(g)(3) purposes, his 'drug use would have to be with regularity and over an extended period of time," the Fifth Circuit concluded that "the record is *not* devoid of evidence that . . . [the defendant] unlawfully used cocaine while possessing firearms."  *See United States v. Herrera*, 313 F.3d 882, 885 (5th Cir. 2002) (en banc).

The defendant believes the vacated *Herrera* panel opinion is persuasive because "[t]he en banc opinion did not address at all the thorough analysis in the panel opinion."  ECF No. 63 at 13 n.4.  While that bare statement is true as far as it goes, it omits that the Fifth Circuit, in a later case, expressly condemned the language and reasoning of the vacated *Herrera* panel opinion. *See United States v. Patterson*, 431 F.3d 832, 838-39 (5th Cir. 2005) ("[T]he district court misstated the law in its instruction defining 'unlawful user.'  The *Herrera I* standard employed by the district court was rejected by this court in *Herrera II*.  Additionally, it is inconsistent with the definition employed by other circuits.").  *See also United States v. Burchard*, 580 F.3d 341, 346 (6th Cir. 2009) ("[T]he Fifth Circuit's disapproval and abandonment of the *Herrera I* definition was made clear [in *Patterson*].");  *United States v. Parris*, 111 F. App'x 158, at *2 n.1 ("We note that the Fifth Circuit decision relied on by [the defendant] was vacated by that court's grant of en banc rehearing.").

Here, there is no question the defendant was an "unlawful user."  The facts and circumstances of the purchase, shipment, and storage of the Tramadol prove that.  In addition, the defendant did not hold a prescription for Tramadol—and, based on a relative's known prescribed use of Tramadol, the defendant knew that a prescription was necessary.  As in

*Jackson*, this is not some borderline case where there is a question—either objectively or subjectively—that the defendant was unlawfully using Tramadol.

### ii.        The term "addict" is not unconstitutionally vague.

The defendant complains that the statutory term "addict" is unconstitutionally vague. ECF No. 63 at 13.  By its plain terms, § 922(g)(3) imports Congress's definition of "addict" in the Controlled Substances Act: "any individual who habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare, or who is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction."  21 U.S.C. § 802(1).  No Court has found that this defined term is unconstitutionally vague.[16]

The first part of the definition—"any individual who habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare"—is very similar to language that courts have deemed not unconstitutionally vague.  *See, e.g.*, *Howard Opera House Assocs. v. Urban Outfitters, Inc.*, 322 F.3d 125 (2d Cir. 2003) (ordinance prohibiting "loud or unreasonable noise,' with 'unreasonable' noise defined as that which 'disturbs, injures or endangers the peace or health of another or . . . endangers the health, safety or welfare of the community," not unconstitutionally vague).

The second part of the definition—"any individual who . . . is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction"—is neither "tautological" nor "circular," notwithstanding the defendant's drive-by argument to the contrary.  *See* ECF No. 63 at 14.  In ordinary and common terms, whether someone has lost the

---

[16] Even the vacated *Herrera* panel opinion that the defendant cites for his "unlawful user" vagueness challenge concluded that "[t]he term 'addict' is adequately defined in the Controlled Substances Act so as to give clear guidance as to the meaning of that term."  *Herrera*, 289 F.3d at 322 (5th Cir. 2002), *vacated by Herrera*, 313 F.3d 882.

power of self-control with reference to his addiction means that the person has lost the power of self-control with respect to the drugs he is taking.  In short, he can't stop, notwithstanding even some latent desire to do so.  *Cf. Kansas v. Crane*, 534 U.S. 407, 413 (2002) (assessing language in state civil commitment statute, and stating: "In recognizing that fact, we did not give to the phrase 'lack of control' a particularly narrow or technical meaning.  And we recognize that in cases where lack of control is at issue, 'inability to control behavior' will not be demonstrable with mathematical precision.  It is enough to say that there must be proof of serious difficulty in controlling behavior.").

Even the defendant was self-aware enough to understand, contemporaneous with his firearm possession, that he was addicted to Tramadol.  For example, on July 12, 2017, the defendant visited the following websites:

- http://prescription-drug.addictionblog.org/how-long-does-tramadol-withdrawal-last/

- http://americanaddictioncenters.org/withdrawal-timelines-treatments/tramadol/

- Im addicted to tramadol | Tramadol | Brain and nerves | Community ...

- http://prescription-drug-addictionblog.org/how-to-stop-taking-tramadol

The same day, the defendant conducted the following Google searches:

- Does anyone have a good tapering schedule for tramadol?

- easiest taper off tramadol

- How long does it take to get off tramadol?

The following day, as shown in the chart above, the defendant sent $520 to his Mexican connect in exchange for 300 Tramadol.[17]

Similarly, on November 30, 2017—barely two weeks after ordering another 300 Tramadol—the defendant conducted a Google search for "how to come off tramadol" and then visited an article titled "How To Stop Tramadol Without Withdrawal Symptoms?"

Again, just as in *Jackson*, this is not a "borderline case."  The evidence described above sets forth facts from which the Court (on a Rule 29 motion) or the jury (after the close of evidence) could find that the defendant was an addict at the time of his firearm possession.

**III.      The Suppression Motion Should Be Denied.**

During the investigation, the Government obtained a number of search warrants, including:

- Warrants, signed by Magistrate Judge Day, to install a tracking device on the defendant's car ("TARGET VEHICLE"); for cell-site information for the defendant's cell phone ("TARGET TELEPHONE NUMBER"); for the defendant's AT&T email account ("TARGET EMAIL-1"); and for the defendant's Gmail account ("TARGET EMAIL-2") (collectively, the "January 11 Warrants");

- Warrants, signed by Magistrate Judge Sullivan, for TARGET EMAIL-1; TARGET EMAIL-2; the Gmail account of the defendant's Tramadol distributor

---

[17] On July 20, 2018, the defendant also visited a website titled "Magic Mushrooms Show Promise in Treating Addiction, Cancer…"; viewed an article titled "How Psychedelic Drugs Psilocybin LSD Could Help Treat Addiction"; and conducted a Google search for "using magic mushrooms for addiction."  During the search warrant executed at the defendant's residence on February 15, 2019, agents encountered a then-unknown substance that the defendant verbally identified as "mushroom grow kit, wheat germ or some shit…"

("TARGET EMAIL-3");[18] and the email account of one of the defendant's relatives ("TARGET EMAIL-4")[19] (collectively, the "January 22 Warrants");

- Warrants, signed by Magistrate Judge DiGirolamo, for TARGET EMAIL-1 and TARGET EMAIL-2 (collectively, the "February 8 Warrants");

- A warrant to search the defendant's work space in Washington, D.C. (the "February 12 Warrant");

- Warrants, signed by Magistrate Judge Simms, to search the defendant's residence ("TARGET RESIDENCE"); the defendant's vehicle ("TARGET VEHICLE"); the defendant's Proton Mail email account ("TARGET EMAIL-5"); and the defendant's Anonymous Speech email account ("TARGET EMAIL-6"); and to draw a blood sample from the defendant (collectively, the "February 14 Warrants");

- A warrant to search the defendant's work space in Washington, D.C. (the "Washington, D.C., February 14 Warrant");

- A warrant, signed by Magistrate Judge Simms, to search the cell phone seized incident to the defendant's arrest (the "February 15 Warrant"); and

- Warrants, signed by Magistrate Judge DiGirolamo, to search TARGET EMAIL-2; the defendant's Dropbox account; and the defendant's Microsoft account (collectively, the "April 12 Warrants").

---

[18] The defendant has no standing to contest this warrant.

[19] The defendant has no standing to contest this warrant.

The defendant challenges the January 11 Warrants exclusively on the grounds that they are not supported by probable cause.  The remainder of the warrants, the defense argument goes, must fall if the first one does.  The defendant is wrong.

**A.     There Was Probable Cause for Issuance of the January 11 Warrants.**

When issuing a warrant and making a probable cause determination, judges use a "totality of the circumstances analysis."  *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005).  "Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  The probable cause determination is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Gates*, 462 U.S. at 238; *see also Grossman*, 400 F.3d at 217.

The issuing judge is in the best position to determine if probable cause has been established in light of the circumstances as they appear at the time.  The magistrate judge's decision is one that courts review with "great deference."  *Grossman*, 400 F.3d at 217.  Indeed, this Court does not even review the magistrate judge's decision *de novo*; rather, this Court role "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed."  *United States v. Drummond*, 925 F.3d 681, 687 (4th Cir. 2019).

Here, Agent Harrison submitted a lengthy, detailed affidavit in support of the January 11 Warrants, with 34 pages of substance and 12 additional pages of attachments.  The affidavit established probable cause to believe that the warrants would lead to evidence of violations of 18 U.S.C. § 1111 (murder on federal property), 1114 (attempted murder of Government employee), 351 (assault, attempted kidnapping, or attempted murder of designated officials, such as Supreme Court Justices and Congressmen), and 371 (conspiracy to commit each of the

aforementioned statutes), as well as contraband and property intended for use in those crimes.
The affidavit set forth Agent Harrison's bona fides as an FBI agent and former DEA agent.  Aff.
¶ 1.  The affidavit further established a nexus between the defendant and each warrant target—
his vehicle, his phone, and his email accounts.  Aff. ¶¶ 6-9.

The affidavit then described the defendant's extremist views, his tattoos indicative of
white supremacist views, and his September 2017 letter in which he discusses being "a long time
White Nationalist" and his intention to "make change with a little focused violence."  Aff. ¶¶ 13-
15.  The affidavit gave background information regarding Anders Breivik, and detailed the
defendant's possession and review of the Breivik manifesto, as well as the defendant's
distribution of the manifesto to a relative using email.  Aff. ¶¶ 16-17.  The affidavit also
described how the defendant had stockpiled other terrorist manifestos on his work computer.
Aff. ¶ 17.

The affidavit goes on to describe concrete links between the Breivik manifesto and the
defendant's own conduct, including studying improvised munitions; acquiring appropriate
firearms, ammunition, survival gear, and provisions for conducting a terrorist attack and
escaping thereafter; and preparing a personal steroid regimen.  Aff. ¶¶ 18-25, 31-37.  The
affidavit described the defendant's extensive targeting research, which also was consistent with
the Breivik manifesto.  Aff. ¶¶ 26-30.  The affidavit then tied each of the defendant's acts into
his specific use of TARGET EMAIL-1 and TARGET EMAIL-2, his vehicle, and his cell phone.
Aff. ¶¶ 38-44.

The defendant's main argument is that none of his individual actions, considered
discretely, was "prohibited by law."  ECF No. 66 at 10.  But this segmented analysis has been
rejected by the Supreme Court and other courts, because the magistrate judge must look to the

"totality of the circumstances." *Grossman*, 400 F.3d at 217.  The detailed narrative of the evidence against the defendant was sufficient for Magistrate Judge Day to find probable cause to issue the warrants.  *See, e.g.*, *id.* at 217 (noting that "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence") (internal citations and quotation marks omitted).

The defendant also complains that the affidavit was insufficient because his described conduct did not yet amount to an attempt to commit federal crimes.  ECF No. 66 at 12.  According to the defendant, all he did was "sit behind his computer and use the internet."  *Id.*  This simplistic short-hand ignores the vast summary of the defendant's conduct in the 34-page affidavit, as described above.[20]

The defendant furthermore contends that the affidavit fails to substantiate a conspiracy charge.  ECF No. 66 at 13.  But the affidavit describes how the defendant sent another individual a letter detailing his beliefs, and attempted to send the Breivik manifesto—which was his personal lodestar—to a relative, during the time period in which the defendant undertook the other conduct described in the affidavit.  Aff. ¶ 17.  These facts provided Magistrate Judge Day a sufficient basis to conclude that probable cause existed that a conspiracy was afoot.

Finally, the defendant contends that the information in the affidavit was stale.  ECF No. 66 at 13-15.  The affidavit detailed the defendant's conduct over a two-year period, including conduct that occurred as recently as January 7, 2019—just four days before the warrants were

---

[20] The defendant curiously draws a distinction between "scop[ing] out potential victims' homes in person," ECF NO. 66 at 12, and doing so over the internet.  According to the defendant, the former could amount to an attempt to commit a crime, and the latter could not.  This position is non-sensical.  The latter method, which the affidavit confirms the defendant undertook, provided the defendant an opportunity to "scope out" a particular victim's home with the minute exactness of Google maps without risk of being detected.  Aff. ¶ 30.

issued.  Aff. ¶¶ 17, 19, 29-36.[21]  The passage of four-days time certainly does not render the affidavit's information stale, especially where as here the defendant's conduct was extensive, prolonged, and on-going.[22]

Accordingly, the defendant's motion to suppress the January 11 Warrants should be denied.

### B.    The Good-Faith Exception Applies to the January 11 Warrants.

The defendant's motion does not mention, much less address, the good-faith exception. In the event the Court concludes that Magistrate Judge Day lacked a substantial basis to find probable cause for the January 11 Warrants, the Court should apply the good-faith exception and decline to suppress the information obtained from the warrant, because law enforcement acted in objectively reasonable reliance on the warrant.  *See United States v. Leon*, 468 U.S. 897, 922 (1984); *United States v. Perez*, 393 F.3d 457, 460 (4th Cir. 2004); *United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993) (noting that the good-faith exception provides that "evidence obtained from an invalidated search warrant will be suppressed only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause").

---

[21] The defendant asserts staleness in particular as to the warrants for TARGET EMAIL-1 and TARGET EMAIL-2.  The affidavit shows the defendant's use of TARGET EMAIL-1 throughout the relevant time period, and also shows the nexus between the facility and his conduct.  *See, e.g.*, Aff. ¶ 38.  Though the instances of usage of TARGET EMAIL-2 are more limited, any issues fall by the wayside, since the Government specifically only sought and obtained TARGET EMAIL-2 emails for the very limited timeframe of November 1, 2017, through December 31, 2017, which is the same time period in which the defendant sent a photo of assault rifles to that account.

[22] The defendant continues to assert that his course of conduct was not "ongoing" but rather a series of "discrete instances of email activity."  ECF No. 66 at 15.  Again, that description ignores the substance of the affidavit and the controlling caselaw regarding a review of the "totality of the circumstances."

### C.      Subsequent Warrants Should Not Be Suppressed.

Since the invalidity of the January 11 Warrants is the only basis on which the defendant seeks to suppress all subsequent warrants, ECF No. 66 at 16-17, and since the January 11 Warrants should not be suppressed, all subsequent warrants also must be deemed valid. Accordingly, the defendant's motion should be denied in its entirety.  In addition, separate bases exist for upholding certain of the other warrants.

### i.      TARGET EMAIL-3 and TARGET EMAIL-4

As briefly mentioned above, the defendant has no standing to suppress the warrants for TARGET EMAIL-3 and TARGET EMAIL-4.  Those email accounts were opened and used by separate individuals—the defendant's drug distributor and one of the defendant's relatives, respectively.  The defendant had neither a possessory interest nor an expectation of privacy in those other persons' facilities, and thus he cannot challenge their search.  *See, e.g.*, *Rakas v. Illinois*, 439 U.S. 128, 148 (1978).

### ii.      The D.C. Warrants

The February 12 Warrant for the defendant's workspace in D.C. also should not be suppressed.  The only material gleaned from the January 11 Warrants is contained with paragraph 5 of the February 12 Warrant affidavit.  If that language were stripped from the affidavit, the military judge still would have had probable cause to issue the warrant.  The affidavit otherwise describes the defendant's conduct with respect to white supremacy and Breivik.  And it describes how the defendant has no Tramadol prescriptions but was seen on video taking "an unknown substance in pill form on a daily basis," from one of his desk drawers.

Similarly, the Washington, D.C., February 14 Warrant for the defendant's workspace should not be suppressed.  Even stripping out information gleaned from the January 11 Warrants, the Washington, D.C., February 14 Warrant includes all the information from the February 12

Warrant affidavit, plus the additional fact that agents found Tramadol in the defendant's desk drawer on February 12.  This serves as independent probable cause sufficient to uphold the search.

### iii.        The February 14 Warrants

The February 14 Warrants survive even if the Court suppresses information learned from the January 11 Warrants.  The February 14 Warrants were authorized based on probable cause to search for evidence of various violations identified in the January 11 Warrant, as well as 21 U.S.C. § 844 (narcotics possession), 21 U.S.C. § 952 (narcotics importation), and 18 U.S.C. § 922(g)(3).  Probable cause existed to search the TARGET RESIDENCE and TARGET VEHICLE for, at a minimum, guns and drugs, based on unchallenged evidence obtained from Coast Guard computer systems; information from a Federal Firearms Licensee; evidence of substantial drug purchases found in TARGET EMAIL-3; and the February 12 Warrant in which Tramadol was found in the defendant's desk.

The warrants for TARGET EMAIL-5 and TARGET EMAIL-6 also are supported by probable cause based on evidence of substantial drug purchases found in TARGET EMAIL-3, bank records, and unchallenged evidence obtained from Coast Guard computer systems.

And the warrant for a blood draw from the defendant is supported by evidence of substantial drug purchases found in TARGET EMAIL-3, video surveillance showing the defendant consuming pills at work, and the discovery of Tramadol in the defendant's desk drawer based on the February 12 Warrant.

### iv.        The February 15 Warrant

The February 15 Warrant for the defendant's cell phone, seized incident to arrest, also should not be suppressed, even if the January 11 Warrants are.  The February 15 Warrant

affidavit explicitly incorporates the affidavit in support of the February 14 Warrants, and discusses the criminal complaint charging the defendant with violations of 21 U.S.C. § 844 and 18 U.S.C. § 922(g)(3).  For the independent reasons therein, the February 15 Warrant survives.

### v.  The April 12 Warrants

The April 12 Warrants also are supported by probable cause, even if the January 11 Warrant information is stripped from the affidavit.  The affidavit in support of the April 12 Warrants describes unchallenged evidence obtained from Coast Guard computer systems; evidence of substantial drug purchases found in TARGET EMAIL-3; video surveillance showing the defendant consuming pills at work; the discovery of Tramadol in the defendant's desk drawer; and evidence from the search of the TARGET RESIDENCE, including gun and drug possession.

### D.  The Inevitable Discovery Doctrine Applies.

As discussed above, the defendant has no standing to move to suppress the search of the email account from his Mexican distributor ("TARGET EMAIL-3").  That search produced substantial evidence of the defendant's unlawful purchases of Tramadol.  Based on those emails alone, the Government would have had probable cause to obtain search warrants for the defendant's email accounts and his home, at the very least for evidence of drug possession and distribution.  If the Government had not obtained the search warrants about which the defendant now complains, and instead only sought a search warrant for the emails of the Mexican distributor, there is no question that the Government would have sought and obtained the complained-of search warrants in short order after obtaining the emails from the Mexican distributor.  Thus, given the history of this case, the importance of the defendant's underlying conduct, and the fact that the Government never hesitated to obtain a host of search warrants relevant to all aspects of this case, the inevitable discovery doctrine applies.  *See Nix v. Williams*,

467 U.S. 431, 440-50 (1984).  *See, e.g.*, *United States v. Bullette*, 854 F.3d 261 (4th Cir. 2017)

("The government meets its burden and this court can affirm on inevitable-discovery grounds if

the district court can assess the inevitability and reasonableness of a hypothetical inventory

search from testimony provided by a law-enforcement official . . . .").[23]

### Conclusion

For the reasons set forth above, the United States respectfully requests that the Court

deny the defendant's motions.

Respectfully submitted,

Robert K. Hur
United States Attorney

/s/_____
Thomas P. Windom
Assistant United States Attorney

---

[23] If necessary, the Government would prove up the inevitability of the discovery with testimony
and evidence at a motions hearing.