1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF MARYLAND

3

UNITED STATES OF AMERICA  )
4                         )
         vs.              )
5                         )        Case Number 8:19-cr-00096-GJH
CHRISTOPHER PAUL HASSON   )
6                         )
              Defendant.  )
7    _____ )

8

          TRANSCRIPT OF PROCEEDINGS - MOTIONS HEARING
9          BEFORE THE HONORABLE GEORGE JARROD HAZEL
             MONDAY, MAY 13, 2019; 2:00 P.M.
10                GREENBELT, MARYLAND

11

FOR THE GOVERNMENT:
12
         Thomas P. Windom, Assistant United States Attorney
13       Jennifer Sykes, Assistant United States Attorney
         OFFICE OF THE UNITED STATES ATTORNEY
14       6406 Ivy Lane, Suite 800
         Greenbelt, MD  20770
15
FOR THE DEFENDANT:
16
         Eliabeth G. Oyer, Assistant Federal Public Defender
17       OFFICE OF THE FEDERAL PUBLIC DEFENDER
         100 S. Charles Street, 900 Tower II
18       Baltimore, MD  21201

19

20

     Proceedings recorded by mechanical stenography; transcript
21   produced by computer-aided transcription.

22   _____

23

                    CINDY S. DAVIS, RPR
24              FEDERAL OFFICIAL COURT REPORTER
               6500 CHERRYWOOD LANE, SUITE 200
25                  GREENBELT, MD  20770

1          I N D E X

2                                                    P A G E

3    Argument by Mr. Windom for the Government            4

4    Argument by Ms. Oyer for the Defense               22

5    Rebuttal Argument by Mr. Windom for the Government  37

6    The Court's Ruling                                 43

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2        (Call to order of the Court.)

3            THE COURT:  Good afternoon.  You may be seated.  If

4    the Government would call the case.

5            MR. WINDOM:  Good afternoon, Your Honor.  We are here

6    in United States versus Christopher Paul Hasson, criminal

7    number GJH-19-96.  We're here for a detention hearing review of

8    a release order.  Thomas Windom and Jennifer Sykes for the

9    United States.  With us at counsel table are two of the agents

10   involved here, FBI Special Agents Harrison and Thoman.

11           THE COURT:  Good afternoon to you all.

12           MS. OYER:  Good afternoon, Your Honor.  Liz Oyer for

13   Mr. Hasson, who is present to my left.

14           THE COURT:  Good afternoon to you both.  You may both

15   be seated.

16       So we are here, as I understand it, for a motion to

17   review the release order of the magistrate judge, and then I

18   also saw filed, I guess late on Friday, a second motion for

19   detention.  So I didn't know if I should have received that.

20   It's really a memorandum in support of the motion for review or

21   exactly how the Government was now characterizing this.

22           MR. WINDOM:  Your Honor, since it is both a review

23   and a de novo detention hearing, and so we -- I guess I could

24   have styled it, and I possibly should have styled it, as a

25   memorandum in support of a motion for review, what I filed on

1  Friday.

2      The basic point of it was to address some of the concerns

3  that Judge Day raised over the course of the few hearings we

4  had over there, as well as to alert the Court a little bit of

5  new information based on some of the comments that Judge Day

6  had made at the hearing.

7          THE COURT:  So in preparation for today, just so you

8  know where I am, I did review recordings of all the prior

9  hearings in this case.  There were many, and so I've listened

10 to all of them.  I've read all of the submissions that were

11 made to Judge Day from both sides.  And then, again, as I just

12 indicated, I received, Friday evening, the Government's latest

13 submission.  I also received various status reports from

14 pretrial, including one, which I presume the parties have now

15 received, from May 13, 2019, which would be today.  So I just

16 received that today.  And so I have reviewed that as well.

17     So unless there's anything else to discuss as a

18 preliminary matter, I would hear first from the Government.

19 I'll then hear from the defense.  Since it's the Government's

20 motion, you'll get the last word.

21     So, Mr. Windom, Ms. Sykes, whoever is going to speak.

22         **ARGUMENT BY MR. WINDOM FOR THE GOVERNMENT**

23         MR. WINDOM:  Thank you, Your Honor.  Given Your

24 Honor's familiarity with everything that has transpired before,

25 my intention here is not to repeat what has been said but to

1   amplify that.

2           One thing I do want to hand up now, the Government showed

3   certain photographs as Exhibit 1 at one of the prior hearings.

4   I've got a copy for Your Honor, just to hand up.  (Counsel

5   hands documents to the Court.)

6           THE COURT:  Very well.  I assume defense has seen it?

7           MS. OYER:  (Counsel nods head.)

8           MR. WINDOM:  At one of the prior hearings, Your

9   Honor, we went through those photographs.  Essentially, they

10  are photographs from the residential search warrant at the

11  defendant's address in Silver Spring back on February 15th of

12  2019.  They show a number of firearms.  They show much tactical

13  gear.  They show the armor-plated vest.  They show a bunch of

14  the ammunition.  Rather than spending five or ten minutes

15  flipping through that on the ELMO, I figured I would just hand

16  it up to you so you could see what's on the audio of what you

17  listened to before.

18          THE COURT:  All right, I've reviewed them.

19          MR. WINDOM:  Thank you, Your Honor.  So it's one

20  thing -- I'm going to --

21      (Court reporter indicates counsel needs to speak into a

22  microphone.)

23          THE COURT:  Yeah, if you're going to move around, we

24  can get you a lapel mic.

25          MR. WINDOM:  So, Your Honor, it's one thing to see

1    photographs of the weapons, but I wanted to bring some of the

2    long guns into court, as well as one of the unassembled

3    suppressors, so that Your Honor could see what the defendant

4    did here in order to actually create an assembled suppressor.

5    I also brought in the two armor-plated vests as well.

6          So for the first item -- and the long guns that I'm

7    showing are referenced in Count Three as the first four

8    firearms in that count.  But what the defendant did -- and this

9    is the Ruger X15 --

10          THE COURT:  Let me just ask.  I presume they've been

11   cleared for safety?

12          MR. WINDOM:  Yes.  The Ruger X15 -- I'll just hold it

13   up for Your Honor here -- it is a long gun purchased by the

14   defendant, and it's been modified, as have most of these

15   weapons here, with additional items that the defendant has

16   purchased over the course of the last several years.  He has

17   modified many of these weapons by placing the foreign grips on

18   them, which make them easier to handle, and by adding, in this

19   case, a smaller site atop -- just in front of the rail guard.

20   But it's a modification of the Ruger X15.

21          The second long gun also referenced in Count Three is a

22   DPMS 308 caliber.  This also, Your Honor, has the foreign grip

23   and a slightly more advanced site as well.

24          This third one is the Stag AR15, again, modified with a

25   site and with the foreign grip that I'm holding with my right

1    hand here.  Again, all for ease of use.

2         And then this fourth one, Your Honor, is probably the

3    most expensive one that he has.  This is the true sniper rifle.

4    It is the Bergara 308.  The defendant modified it with a

5    separate scope that he purchased separately from the firearm.

6    This cost over $1,000 for the weapon, over $400 for the scope,

7    and it's outfitted with a bipod, which you can see on the

8    photograph where the rifle is positioned as if it were to be --

9    as it is intended to be used, as a sniper rifle.

10        So those are some of the weapons.  There's obviously at

11   least 11 other -- well, 13 other firearms, 11 of which are

12   guns; two of which are silencers.

13            THE COURT:  As to those firearms you've showed me so

14   far, but for the controlled substance issue, would he be

15   lawfully allowed to have those?

16            MR. WINDOM:  Not the Bergara, and I'll talk about

17   them in a moment.  He purchased this illegally, he lied about

18   his residence, and he -- well, I can speak to that now.

19        On December 30th of 2017, the defendant was at his home.

20   He had been researching Bergaras.  He had already purchased the

21   Athlon scope that's affixed to it.  He drove from his residence

22   over to a gun show in Virginia.  We know this because of the

23   GPS hits off of a Google search warrant that we received.  So

24   he drove over to a gun show in Virginia.

25        On the ATF form 4473, which I referenced in the filing in

1    which -- I don't want to formally put it in as an exhibit

2    because it actually has the address of a third party on it, but

3    I'm happy to -- this was produced in discovery already, and I

4    can hand it up for Your Honor's review, and perhaps I can file

5    it under seal.  This would be Government's 2.

6            On page 1 of the firearms transaction record, Mr. Hasson

7    states that his current state of residence is Virginia.  Line

8    item number 2 references the home address of the defendant's

9    father-in-law and the location, the city, the state, the zip

10   code.  The defendant has at this point in time been living in

11   Maryland for at least six months, although his credit card

12   statements go to his residence in Silver Spring.  He pays

13   utilities in Silver Spring.  As I referenced before, the GPS

14   hits show him in Silver Spring at his home on that date.

15           So page 1 he lies and says, of course, that he is not an

16   unlawful user or an addict, but the most important part I think

17   is the false address.  The importance of that is so that he can

18   more easily procure a firearm in Virginia by claiming Virginia

19   residency.  So the --

20           THE COURT:  So as to that gun, there are two issues,

21   the addiction issue and the issue as to the address, correct?

22           MR. WINDOM:  As to that gun, yes, Your Honor.

23           THE COURT:  As to the other guns you showed me, it's

24   just the addiction issue.

25           MR. WINDOM:  As to the other -- each of the ones that

1   he purchased from an FFL and filled out a 4473 during this time

2   period, he would have checked that he wasn't an addict.

3       There's a separate purchase of a Springfield 1911, and

4   it's one of the -- I believe it's the pistol on the far -- it's

5   in the middle of the photograph that Your Honor has up there.

6   It's the one on the far left, I believe, purchased October 1,

7   2017, for $900 from a gun show in Virginia, same problems as

8   with the Bergara.

9       THE COURT:  Where's the question on the document you

10  handed me as Government's Exhibit 2 that relates to the

11  addiction issue?

12      MR. WINDOM:  It's 11E.

13      THE COURT:  So it does say user of, not just addicted

14  to, right?

15      MR. WINDOM:  Yes, and then it goes through a litany

16  of different substances, including narcotic, drug or any other

17  controlled substance.

18      I will hand up Government 3 to prove the point as to the

19  Springfield 1911 pistol.  And again, Your Honor, it's an ATF

20  form 4473.  That first page is the Virginia State Transaction

21  Record, followed by the ATF form, and on that one you'll see,

22  on the second page of the document, an October 1, 2017,

23  purchase.  He'd been living in Maryland for at least four

24  months by that point.  Again, left his home, based on the GPS

25  hits, and went to Virginia, purchased the pistol, and then

1    returned home.

2            THE COURT:  I'm sorry, this will be Government's 3?

3            MR. WINDOM:  Yes, Your Honor.  Separately -- well, as

4    I said before, each time he purchased from an FFL, as opposed

5    to, I guess, an individual transaction, he would have lied on

6    the substance abuser form.

7            There was another purchase of a -- well, Government's 4.

8    The gun on the right -- I'll hand this up to you, sir.  The gun

9    on the right in the photograph, Your Honor, is a Diamondback

10   DB15 pistol, actually.  It's got -- the stock here is separate

11   from the weapon, and so it's classified as a pistol that can

12   just be gripped, where the grip is.  He purchased that February

13   1st of '17; again, lied on the ATF form not with respect to the

14   address at that point but with respect to the unlawful-user

15   aspect of it.

16           This gun -- and I was going to touch on this later on.

17   These two weapons here in Government's 4 add to the kind of

18   dangerous argument here because, at least in the one on the

19   right, he purchased February 2017.  Both of them he possessed

20   in this photograph in November of 2017.  And I say he possessed

21   them because the wallboard is the wallboard of his apartment.

22   That futon and that comforter and that blanket were in his

23   apartment in 2019.  Those guns aren't there in 2019.  So these

24   guns are unaccounted for, even though we know that he purchased

25   them, acquired them, possessed them as recently as November of

1    2017, including one of them at least by lying on a federal form

2    for it.  So having no idea where those weapons are gives us

3    great pause.

4         With respect to the remainder of the items up here, Your

5    Honor, the body armor.  I'm happy to hand this up if Your Honor

6    would like.  There's two of them here.  It's not a ballistic

7    vest.  It's not something that you might see in a movie,

8    somebody strapping on right before they go on regular police

9    duty.  It's body armor.  It weighs tens of pounds.  And it is

10   not intended for hunting in any way, unless you're hunting

11   people and expecting return fire.  Each of the plates in here

12   are intended to take -- they're level III body armor.  They're

13   intended to take multiple high-caliber rounds from at least a

14   .308, from short distance, from 30 feet, and survive an impact.

15        THE COURT:  I'm sorry, when was that purchased, if

16   you know?

17        MR. WINDOM:  The body armor was purchased --

18        THE COURT:  If you know.

19        MR. WINDOM:  I don't recall, Your Honor.

20        And then finally, in terms of what we brought, in late

21   July of 2017, the defendant purchased these items that he later

22   assembled into a suppressor.  He has one that's fully

23   assembled.  We did not bring that one.

24        This is the one that is not yet assembled, and it shows,

25   Your Honor, exactly what the defendant had to do in order to

1  create the one that's assembled.  Each of these different

2  baffles -- there's five of them -- they fit within the rod

3  here.  There are end caps that can be screwed in.  All of these

4  need to be drilled out.

5       So you need a drill press, and that's the final picture

6  in Government's 1 that I showed you before, that we used in one

7  of the hearings before Judge Day.  So the defendant, presumably

8  using the drill press in his own home, individually drilled out

9  each of these baffles, individually drilled out the end caps,

10 assembled each of these together into the unlawful suppressor.

11      And then, as you heard on the audio before, the ATF

12 report regarding the assembled suppressor showed they had been

13 used.  There's gunpowder all in it.  So he had affixed it,

14 using a tool that was found at his residence, to the front end

15 of one of his firearms and used it somewhere, took it somewhere

16 and used it, which led to all of the various --

17           THE COURT:  To be clear, that could be a range, that

18 could be any number of things.

19           MR. WINDOM:  Correct.  We have no indication as to

20 where he may have used the information -- let me take this off

21 before I -- unless Your Honor has questions about each of

22 those, I think that will --

23           THE COURT:  I do not.

24           MR. WINDOM:  With that, I'll return to the podium.

25 So, Your Honor, these largely speak to each of the weapons

1   themselves and what the defendant did in order to acquire them

2   and what the defendant did in order to modify them, largely

3   speak to the nature and --

4          THE COURT:  If you could pull the mic back towards

5   you.

6          MR. WINDOM:  Yes, sir.  Largely speak to the nature

7   and circumstances of the offense charged.

8          As Your Honor knows, the four counts here are two NFA

9   counts, the illegal possession of the unregistered or

10  unserialized suppressors, including this one here that the

11  defendant had not yet assembled.  The 1922(g) count covers the

12  17 firearms -- the 15 kind of what we would normally call

13  firearms and the two suppressors -- and then the simple

14  possession of tramadol, which, as we put in the papers, is an

15  opioid.  It's a schedule IV controlled substance.

16         So what I've kind of explained a little bit about the

17  weapons largely goes to the nature and circumstances of the

18  offense.

19         In terms of the weight of the evidence, Your Honor has

20  some of the 4473 showing the defendant himself purchased these

21  weapons.  Separately, these weapons obviously were found in his

22  own residence, several feet -- in a closet, feet from where he

23  lays his head.  There's some photographs as well from one of

24  the electronic devices of the defendant handling one long gun

25  and one pistol in the time frame -- in the immediate time frame

1  before the search warrant.

2      So that's the strength of the evidence with respect to

3  the guns.

4      With respect to the drugs, it's similarly extremely

5  strong.  He's on video ingesting tramadol at work.  He has

6  tramadol in his bloodstream based on a blood-draw warrant from

7  the day of the arrest.  He has international drug shipments --

8  excuse me, part of an international drug arrangement, where

9  he's receiving tramadol from California based on communications

10 and payments to somebody in Mexico, all of which are in the

11 defendant's encrypted and then unencrypted e-mail accounts.

12 And then, separately, we just received -- one of the DEA lab

13 reports today confirmed that one of the substances found at his

14 home, 120-odd pills that look like everything else, are

15 tramadol.

16     So in terms of the strength of the evidence as to the new

17 charges, I submit that it is very strong.  An ATF expert, as

18 well, would testify that the suppressors were intended for --

19 that these are, in fact, suppressors.  They're intended to

20 silence the report of a firearm.

21     For the history and characteristics of the defendant,

22 obviously, he has 30 years in different military branches.  But

23 what I said before is he betrayed the oath that's he's taken

24 over time by lying on federal forms and by breaking federal law

25 and by the conduct that he intended to undertake.  It's very

1  clear to the Government from what we've put in our various

2  filings that he intended to act against the very government

3  that he swore that he served, that he swore to defend.

4      And that is the -- in terms of his history and

5  characteristics as well, one thing that Your Honor often comes

6  across is a criminal history category one person, for example,

7  no criminal history, and the instant conduct can be alleged as

8  a one-off incident in terms of mitigation.  But here, none of

9  these are one-off incidents.  They are part of a long-term plan

10 in which, on many occasions, over several years, he violated

11 federal law, he lied about it, he lied about it to the

12 Government, he lied about it to his family, and he concealed

13 it, all with the intentions that the Government has placed in

14 its papers.  So that speaks to the history and characteristics

15 of the defendant.

16      In terms of the nature and seriousness or the danger to

17 the community, nothing is more serious than murder.  Plain and

18 simple, that's what the defendant was going to do.  Whether it

19 was Jewish people, whether it was black people, whether it was

20 Supreme Court justices, congressmen, all of these had been well

21 laid out in the Government's briefs as to where and when he was

22 searching for home addresses and other information as to where

23 these folks lived, where these folks lay their head, where

24 these folks ate --

25          THE COURT:  I have one very specific factual

1   question, and I just want to make sure I ask it before I forget

2   from looking at your paperwork.  So you make reference to --

3   I'm not going to be able to pronounce the name right --

4   Breivik.

5           MR. WINDOM:  Breivik.  Anders Breivik.

6           THE COURT:  Yes, Breivik.  What's the earliest date,

7   if you know, the earliest date that you know that he looked at

8   that?  In your papers it says early 2017.  I don't know if you

9   have a specific date that you can say that's when he began

10  looking.

11          MR. WINDOM:  I'm sure I could find the specific date.

12          THE COURT:  I'll tell you why I'm asking, why I'm

13  curious.  The records that you have regarding the gun purchases

14  seem to start in February 2017.  I guess what I'm trying to get

15  a sense of is are those things linked?  Because that's a lot of

16  what this comes down to, as I see it, right?  Are these

17  searches, these statements he's making, are they linked to the

18  conduct that he's then undertaking?

19      So I'm curious to know if there's a linkage in time

20  between him beginning to look at this, quote, terrorist

21  manifesto and him purchasing these firearms, which you give me

22  records starting in February 2017.

23          MR. WINDOM:  Sure.  From the quick review from the

24  agents, it appears March 17th is probably the earliest.  I

25  could go back and drill down on that, but it's certainly in the

1  same time period in which we see the heightened purchase of

2  firearms, the heightened internet searching for all of the

3  things that we put in the paper, you know, are Supreme Court

4  justices protected, where do congressmen live, things of that

5  nature.

6          THE COURT:  Not unrelated to that.  Again, there are

7  a lot of records that you point to of February 2017 and on.

8  This might be in your paperwork, and maybe I'm just not

9  remembering as I'm sitting here.

10          There were a lot of firearms recovered.  Are all of them

11  believed to have been purchased within the last few years?  My

12  understanding is he already had some of them prior to that.  I

13  just want to make sure I'm clear on that.

14          MR. WINDOM:  Yes, sir.  So some of them he had prior

15  to.  I'll look for the ECF number.  In one of our filings we

16  put the dates of the purchases, dates and locations of the

17  purchases of some of them.  Some of them he purchased in

18  California years before, is my recollection.  This is in one of

19  our filings that I'll flip through and find.

20          THE COURT:  That would be helpful.

21          MR. WINDOM:  The catch on that is -- I think we

22  listed about six or so firearms, including several of the ones

23  that were purchased unlawfully, with the lies on the federal

24  forms.  But some of the -- you learn something new about gun

25  tracing when you have a case like this.  It's very hard to

1  actually trace back the origins of where the defendant obtained

2  some of these firearms.  So some of them we don't have the

3  information as to where he himself purchased it.  We might have

4  the original purchaser information from an FFL, for example.

5  But if it were a separate transaction by the defendant, then

6  that's information that's often hard to come by unless --

7          THE COURT:  I guess what I'm trying to dig at -- and

8  you can tell me whether you feel you can make this argument or

9  not based on the evidence you have.  Is there a change in

10  behavior that's tied to his reviewing of this information,

11  right?  Like, the way you put it in your document, one can

12  infer -- and what I'm trying to drill down on is should I --

13  that in early 2017 he's looking at this manifesto, and then

14  he's doing all these things, such as purchasing firearms.

15      What I'm trying to get at is is that a real link to draw,

16  or is this the guy who bought a firearm a year for 20 years and

17  just, for whatever reason, started looking at these things but

18  really didn't change his behavior as a result, such that I can

19  infer that there's some plan that's being developed?

20          MR. WINDOM:  I can tell you that he did change his

21  pattern of behavior when he read this.  He has ramped up his

22  purchase of firearms, it appears.  And again, some of them we

23  simply can't tell when he bought them.  But he ramped up his

24  purchase of the weapons.

25      But what is most striking, I think, in terms of all the

1  information that we received, he goes and he looks for

2  firearms.  He looks for a particular type of firearm.  He goes

3  and purchases the accessories, stock, the scope, the rail

4  guard, a faster trigger, whatnot, and then goes and lies on

5  forms, whatnot, goes to gun shows and purchases these things,

6  all while also searching, in the same time frame, how to build

7  home-made bombs, how to make ricin, where Supreme Court folks

8  live, all the things that we've otherwise put in the papers.

9  From what we've seen of the evidence, that is definitely

10  something that has kind of ramped up the defendant's behavior

11  and, I believe, changed it.

12       Kind of early on, as well, in terms of how importantly

13  the defendant viewed the Breivik manifesto -- and this is in

14  some of the search warrant materials that we sent -- he sent it

15  to his son early on as kind of an item of note.  And then we

16  have, from work, he's just -- I mean, he's not working.  He's

17  sitting at work, searching, reviewing the Breivik manifesto for

18  hours a day during the time frame that we're looking at most

19  directly, in late '18 through the arrest in February '19.

20  There are days when he spends hours kind of reviewing parts of

21  the Breivik manifesto and then going and searching for those

22  things on the internet.  Or, alternatively, he's reviewing

23  passages that he's clearly read before because they reference

24  the types of politicians or the types of individuals to be

25  attacked, and then he'll go and make a list, or he's already

1    made those searches.  Or they'll reference particular things to

2    do in terms of having like a go-bag, with various supplies,

3    MRE's, and things to get away and to help escape.  You know,

4    from the different searches and from what we've put in and from

5    the purchases that he's made, that he's done that.

6          So by January of 2019, when his internet usage and

7    computer usage at work is more under direct observation, it's

8    clear that he is kind of double checking what he's done.  He's

9    already on stage three.  As I said in one of the audio that

10   you've listened to, Your Honor, stage three of kind of the

11   four-step Breivik manifesto.  He's kind of checking off

12   everything that he's done in terms of the preparation, the

13   planning, the purchasing of materials, and the only thing left

14   to do is execute, and all of that has been laid out by the

15   defendant over the course of the kind of few years in which the

16   Breivik manifesto is key in his thinking.

17         Now, I'll also point out that there's other manifestos of

18   these mass killers that were found in his e-mails and in

19   various electronic devices, including "Lines of Drift," which

20   was written by the Atlanta Olympics bomber, and that's

21   referenced in one of the letters that the defendant made that

22   included so many of the incriminating statements.  But the one

23   that he keyed in on and the one that seemed to serve as the

24   kind of core focus of his thinking was the Breivik manifesto.

25         So in terms of the -- and just finally, Your Honor, just

1   to just close out the nature and dangerousness, danger to the

2   community, we put in any number of the searches, and those -- I

3   think we put in one of them he goes and searches, in the most

4   recent filing, how to kill this type of person, and then he

5   will go to the gun range, for example, in order to kind of

6   perfect what otherwise he has assembled with the specialized

7   firearm hardware that he has acquired over time.

8          I've already spoken to the two firearms that were not

9   found in Government's 4, which, in the Government's mind, is

10  very scary, that there's other weapons out there that we don't

11  know about, that the defendant has access to.  That has to be

12  the working assumption.

13         I'll touch briefly on the custodians because Your Honor

14  has read what we put in before.  In terms of our sealed filing,

15  there's a number of reasons.  I'm not going to speak about it

16  publicly, but there's a number of reasons that this package

17  that has been put together is insufficient.  It's not a viable

18  package.  No package is viable.

19         At the end of the day, if the Court releases the

20  defendant, it is based on trusting his word.  It is based on

21  trusting that he will abide by the release conditions.  He has

22  shown a pattern for several years of not caring about oaths

23  that he has made, about not lying on federal forms, crossing an

24  interstate line and going to a gun show and lying on various

25  forms, which, again, particularly troubling, saying he lived at

1  the address that he wants to be released to at this point.  So

2  there's a history of subterfuge, essentially, that should not

3  give this Court comfort.

4      So what makes this case more unique than others is that

5  law enforcement intervened before an attack occurred.  That's

6  why there's even a real discussion about detention here.  In

7  our view, the defendant should not be rewarded by being granted

8  release because law enforcement acted decisively to protect the

9  public before the defendant could execute his plan, and his

10 plan was to execute people.

11     So I'm happy to answer any questions.

12         THE COURT:  That's all.

13         MR. WINDOM:  Thank you.

14         THE COURT:  Ms. Oyer, I'll hear from you.

15             **ARGUMENT BY MS. OYER FOR THE DEFENSE**

16         MS. OYER:  Thank you, Your Honor.  Your Honor, I am

17 particularly struck by the first sentence of the Government's

18 most recent filing.  In that filing, they start out by saying

19 the Government has no doubt that Lieutenant Hasson's arrest

20 prevented a mass casualty event.  They lead off in this filing,

21 as they have done in past filings, not with evidence, not with

22 facts, but with a gut feeling.  They lead off by telling the

23 Court what they believe is true.  They're essentially asking

24 the Court to take their word for it that Lieutenant Hasson, a

25 military veteran of 30 years, was suddenly planning a mass

1   attack on civilians.  Your Honor, substituting a gut feeling

2   about what someone's intentions were for fact would flip upside

3   down the way things work in our criminal justice system.  But

4   this has become a recurring theme in this case, Your Honor,

5   that there is sweeping, dramatic rhetoric that is not bolstered

6   by supporting facts.

7        Your Honor, the Government continues to make absolutely

8   stunning assertions.  Their previous filing in support of

9   detention stated that Lieutenant Hasson intended to murder

10  innocent civilians on a scale rarely seen in this country.

11  They claim that the charges in the initial filing were just the

12  tip of the iceberg, but the factual support for these

13  allegations, Your Honor, is not there.  Instead --

14        THE COURT:  Doesn't the factual support -- or does

15  the factual support come from his own statements?  Are you

16  challenging at this stage -- and I understand what stage we're

17  at, but are you challenging at this stage that he's made these

18  statements in his writings?

19        MS. OYER:  Your Honor, the writings do make certain

20  statements, and I think it's important to take those in context

21  of what they are.  Those are writings that were made several

22  years ago, several years before Lieutenant Hasson was arrested,

23  and there's no evidence that he took any actions to plot this

24  sort of attack that was discussed in those writings.

25        Moreover, Your Honor, there's no evidence that he

1  actually shared those writings with anyone or that they were

2  posted on social media or that they were sent to anyone.  They

3  were recovered from deleted files on his computer, and there's

4  no evidence that he, over the past year and a half or so since

5  those writings were made, was actually plotting any particular

6  type of attack.

7       Your Honor, I think that one of the most striking things

8  here about the position the Government has taken is that they

9  have not been able to articulate any details about what

10 Lieutenant Hasson was supposedly planning.  I think an

11 important question to consider, when we're considering the

12 question of whether he should be detained pending trial, is

13 what was this attack that he was planning?  Who was he planning

14 to attack?  When was --

15      THE COURT:  On that point, to the extent that he's

16 creating this list and that he's googling certain names, trying

17 to identify where certain people live, can't we infer what he

18 was doing from that?

19      MS. OYER:  I don't think so, Your Honor.  He's

20 running some Google searches.  Many of these Google searches

21 were run in the 2017 time frame.  It's now 2019.

22      And in the months leading up to his arrest, the

23 Government had eyes and ears on him at all times.  They had a

24 GPS tracking device on his car for months prior to his arrest,

25 based on the search warrant that was signed by Judge Day.  They

had tracking of his cell phone in realtime for months prior to

his arrest, based on a search warrant that was signed by Judge

Day.  They had physical surveillance at his residence in Silver

Spring, Maryland.  They had a pole camera outside his residence

in Silver Spring, Maryland.  They had physical surveillance by

camera at his desk at work.  They literally had eyes and ears

on him everywhere he went at all times, and there is no

evidence, not one single shred, that he actually made any

attempts to target these individuals that he supposedly was

interested in on the internet.  He did not go to anyone's home.

He did not go to anyone's place of business.  He made no effort

to actually visit the locations that he allegedly was searching

for.  And Judge Day made the good point in our prior hearing

that the Government hasn't charged him with stalking or any of

the types of offenses that you would expect to be the predicate

to some sort of targeted attack on an individual, even if the

intervention took place early.

　　　　THE COURT:  So let me ask you this.  To the extent

that on January 3, 2019, according to the Government, he's

searching sections of the Breivik manifesto for ways to target

what they refer to as "category A traders," which includes

political leaders, media leaders and the like.  Two weeks later

he's making a list of individuals consistent with that and

also, at the same time on the same day, googling "where do most

senators live in D.C." and "are Supreme Court justices

1   protected."  You don't see that as taking -- it might be the

2   first step, but you don't see that as taking a step towards

3   some plan?

4        MS. OYER:  Your Honor, I don't think that those two

5   can be linked.  He was reading many sections of this manifesto.

6   And is it an odd thing to read?  Yes.  He wasn't -- I think the

7   Government's characterization of him searching for specific

8   things overstates it.  He was reviewing different sections of

9   it.  It's maybe an odd thing to read, but it's not unlawful to

10  read it.

11       And, Your Honor, the searches that he was doing also are

12  not unlawful, and I think that in this day and age of politics,

13  it's, frankly, very common that people make lists of political

14  enemies and folks that they see on TV that they don't like, and

15  the rhetoric can become heated, but inferring that this list of

16  names that was found in a tiny corner of Lieutenant Hasson's

17  work computer was a hit list is a huge leap that is not

18  supported by evidence.

19       Your Honor, I think it is very striking in this case that

20  there is the entire U.S. Code available to the Government.  We

21  have this giant book that is filled with statutes that they

22  could have charged him with if he were actually planning to

23  attack a person or property or to harm anyone, and there is

24  nothing.  There is nothing along those lines.

25       Even the basic descriptions --

1           THE COURT:  Well, let me ask since you say that.  You

2    just held up a big book.  Is there's one particular statute

3    you're pointing to and saying, well, if they really had this,

4    this is what they would have charged?  Because I think -- on

5    both sides I think there have been a lot of statements there

6    are being made, but I think we really know that it's not as

7    broad as you might be suggesting now.  Is there one particular

8    statute that you're saying if they really had what they're

9    saying, this is what they would have charged?

10          MS. OYER:  Well, Your Honor, I want to point to a

11   couple of things.  Judge Day suggested stalking.  That would be

12   appropriate.  There are many different statutes that relate to

13   both on-line as well as physical stalking of individuals, and

14   that's a charge that we commonly see in federal court.

15          Your Honor, there are all of the charges that are listed

16   in the search warrant applications as to what they were

17   investigating, and there are probably six or seven or eight

18   different statutes that they cite which relate to conspiracy to

19   commit an offense against the United States, various different

20   murder and attempted murder statutes related to federal

21   officials, Supreme Court justices, Congress members.  There is

22   a whole array of statutes that address that.

23          And, Your Honor, I actually want to point to this case

24   that the Government cited in their most recent brief.  They

25   cite this case of -- let me look up the name.  My memory is not

1   perfect.  They cite the case of *U.S. v. Stone*, which is a Sixth

2   Circuit case in 2010, and that case addressed the detention

3   question in a case involving a group of individuals who were

4   members of an organized militia, and they were charged with

5   seditious conspiracy against the United States, which is 18

6   U.S.C. Section 2384, a statute that I confess I didn't know

7   existed before reading that case.  They were charged with

8   attempted use of weapons of mass destruction, which is what

9   those letters reference.  They were charged with various counts

10  of 924(c) offenses.

11       I think there is a vast array of offenses that involve

12  use of weapons, that involve plotting physical attacks, that

13  involve cyber stalking and attacks, and that involve plans and

14  conspiracies to do so that Lieutenant Hasson could and

15  absolutely would have been charged under if he had actually

16  been planning anything and if the Government could show

17  probable cause that he was planning some sort of attack.

18            THE COURT:  So is your argument then that because

19  those statutes have not been charged, I shouldn't give any

20  consideration to it?  I should give limited consideration to

21  it?  What precisely are you asking?

22            MS. OYER:  Your Honor, my view of this is that the

23  Court should consider all the facts and circumstances, just as

24  Judge Day did, but at the end of the day, the Bail Reform Act

25  is really built in a way that requires the Court to first look

1   at what's actually charged, and that determines whether there's

2   a presumption of detention or not and what the Court's initial

3   sort of starting point should be, and I think the Court should,

4   at the end of the day, not draw conclusions about what a

5   defendant intended that are not supported by probable cause.  I

6   think that there are behaviors that the Government has pointed

7   to that certainly are concerning.

8        But one thing that I think is really striking here is the

9   Government has a lot of tools at its disposal to deal with a

10  case such as this, where a defendant behaves -- or an

11  individual, not necessarily even a defendant, behaves in a way

12  that raises red flags, let's call them, and there's a whole

13  field that is built around this.  It's called threat

14  assessment.  It's the social science of threat assessment, and

15  the Secret Service, which is a federal law enforcement agency,

16  has an entire wing or bureau that is called the National Threat

17  Assessment Center, and they have built a model that allows

18  prosecutors and law enforcement and judges to look at facts and

19  circumstances like this and make an informed decision based on

20  scientific methods of whether the individual poses a real

21  threat or whether this is one of many individuals who has

22  strange thoughts and maybe behaves in a way that's concerning

23  but isn't actually presenting a danger.

24       Law enforcement across the country uses these threat

25  assessment models, and I find it surprising that in this case

1  we haven't seen any real type of threat assessment that applies

2  to Lieutenant Hasson that says here are the things that,

3  historically and empirically, he has done that lead us to

4  conclude that he is one of the guys who is really planning

5  something bad, as opposed to one of the people who may have

6  some mental illness, may be depressed, may be in an episodic

7  phase of strange thinking.  The Government hasn't offered the

8  Court any principled framework to conclude that all of these

9  different pieces fit together in the way they say they fit

10  together.  They're saying we believe he was planning something,

11  but they're not providing the Court with any credible framework

12  to draw an informed conclusion that all of this really adds up

13  to a real threat.  They're asking the Court to go with a gut

14  feeling.  They're saying we have no doubt, so the Court should

15  have no doubt.

16      But this is a case where the Court starts from a

17  presumption that Lieutenant Hasson should be released, and this

18  is a case in which the Government has essentially said that

19  they do not have probable cause to support the idea that he was

20  planning any of these things that they believe he was planning.

21      And I want to note also, Your Honor, that one of the

22  basic principles of this social science of threat assessment is

23  that the Government has, and law enforcement has, at its

24  disposal an array of potential interventions when concerns are

25  raised that an individual poses a threat.  Preemptive

1   incarceration because we think somebody probably poses a

2   threat, that is not one of them.  That is not a lawful tool.

3   There is no statute that provides for preventively using our

4   criminal justice system to incarcerate someone because we think

5   they might commit a crime in the future and --

6          THE COURT:  Well, just to be -- would this fall into

7   that category?  I understand the point you're making.  They

8   have a charge.  You're not disputing the fact that they have a

9   legitimate charge against him.  Or are you?  I don't know.

10          MS. OYER:  Well, Your Honor, I think the basis for a

11   detention is what they believe that he's planning.  Mr. Windom

12   has repeatedly referenced his belief that Lieutenant Hasson is

13   going to go out and execute his true intentions, I believe were

14   the words that he used in one of his recent filings, if he's

15   released.  So their argument in favor of detention is based on

16   the theory that he is going to go out there and commit a crime

17   along the lines of what the government envisions he's been

18   planning all along, and that's not something that the Bail

19   Reform Act allows.  There's no provision under criminal law

20   that says charge somebody with one crime, and then you can lock

21   them up for as long as you want because of concern that they

22   might commit another much more serious crime.

23          Your Honor, what we have is a system that has social and

24   mental health interventions and lots of different paths that

25   are laid out by the Secret Service and their threat assessment

1   bureau and other law enforcement agencies about how you should

2   engage an individual like Lieutenant Hasson, who has caused us

3   some concern, but who we absolutely cannot say with any

4   certainty had any intent to carry out an attack.

5        That's what the Government should be looking at here.

6   With the help of their many trained government professionals

7   who specialize in threat assessment, we should be looking for a

8   way to assure ourselves that Lieutenant Hasson doesn't pose a

9   threat in future, but we shouldn't be prophylactically

10  incarcerating him indefinitely because we have these types of

11  concerns.

12       And, Your Honor, if the Government wants to propose

13  another way for addressing this, we are willing to engage in

14  that.  He'll participate in that.  He'll participate in a

15  process to ensure the Government that he doesn't pose a real

16  threat.  But we can't deal with those types of concerns by

17  looking him up and throwing away the key.  The Bail Reform Act

18  doesn't allow that.

19       And it leads to the question of where is this case going

20  if he's convicted of the offenses in the indictment at

21  sentencing?  The way I view the sentencing guidelines, I would

22  argue that the guidelines call for a sentence of minimal jail

23  time compared to what we see in federal cases.  So that will

24  raise, at sentencing if he's convicted, the question of how

25  much longer can we continue to incarcerate him because we fear

1    that he intends some harm when he hasn't been actually charged

2    with a crime of that nature.

3          So this is a hard case, Your Honor, and Judge Day

4    correctly flagged the issue of when does the Government

5    intervene in a case like this, and we don't fault them for

6    anything they did in the investigation of this case, but we've

7    reached the point where the investigation has not yielded the

8    results they were concerned about.  It has not shown that he

9    was plotting a mass attack on civilians.  It hasn't shown that

10   he was plotting a sniper attack.  It hasn't shown that he was

11   plotting a quiet murder using a silencer, along the lines of

12   the various theories the Government has put forth.  So it is

13   time now to deescalate the situation.  It's time to release

14   him.

15         Your Honor, I want to talk briefly about the firearms

16   that have been discussed in this court.  If we were just

17   dealing with these firearms and the firearms-related offenses,

18   my guess is that the Government would not even be seeking

19   detention.  This is the type of case where release would be

20   routine in this court, an individual with no criminal history,

21   charged with regulatory offenses related to firearms.

22         Your Honor, I want to emphasize that the firearms in this

23   case have legitimate lawful uses, and I'm sure that the

24   Government is aware that Lieutenant Hasson has owned firearms

25   throughout his adult life.  He's bought and sold them at

1    different times in his life, and in the Government's own

2    filing, they list the dates at which he purchased six different

3    firearms that are the subject of the indictment, and four of

4    them, by my reading, were purchased well before he's alleged to

5    have even started looking at this Breivik manifesto.  The dates

6    go back to 2009, and I submit, Your Honor, that he's owned

7    firearms and bought and sold them much longer than that, since

8    much earlier than 2009.

9        This is maybe uncommon to have this collection of guns in

10   suburban Washington, D.C., but I think we need to think about

11   where he was coming from in buying and collecting these guns.

12   He's lived in Virginia.  He's lived at the address that's on

13   that application.  It's the address of his father-in-law, where

14   he previously resided for a time period.  He's lived in North

15   Carolina.  I'm sure the Government is aware that at his home in

16   North Carolina, where he lived from 2013 to 2016, he had a

17   makeshift firing range in the backyard because he's always been

18   interested in recreational and sport shooting.

19       It happens to be very common, Your Honor, that

20   individuals who are interested in firearms really take it to a

21   level that those of us who don't own them and who have never

22   shot a gun really can't relate to.  Looking at the pile of them

23   on the table may look scary.  I think they were brought in here

24   for the purpose of making this look really scary to everyone

25   who is sitting here.  But they have legitimate uses.  They're

1   lawfully bought and sold.  They were lawfully purchased by

2   Lieutenant Hasson, except for the allegation that he shouldn't

3   have bought them because he was using a controlled substance.

4   Let me note that we don't even know if he was using a

5   controlled substance at the time he bought those firearms.

6   That hasn't been alleged.

7        And regarding the issue with the paperwork, he lived in

8   Virginia at that address.  It's an address that he and his wife

9   have both gone back to at different times because it's his

10  wife's father's home.  They're in the military and, therefore,

11  have moved around a lot.  And the idea of using a place that's

12  always there as a stable residence in your life as your address

13  on a form, frankly, Your Honor, it's something that I have done

14  in periods of transition in life.  It's really not that

15  uncommon, and I think the Government is over blowing it because

16  of other considerations here.

17       Your Honor, I also want to address the body armor.  I

18  confess that I didn't know this before this became my case

19  either, but there's a whole community of people that you'll

20  find on the internet readily who are into that stuff.  If you

21  Google the word "preppers," there are dozens of people who have

22  blogs about disaster preparation, preparing for doomsday,

23  buying body armor so that you're prepared for the worst-case

24  scenario.  You know, Lieutenant Hasson had one for himself and

25  one for his wife, two of these body armor vests.  It is really,

1    in certain circles, not that uncommon, not that unusual.  Does

2    it look strange to me, somebody who has lived for many years in

3    the D.C. area?  Yeah, it does.  But if you actually do some

4    research and look at the facts surrounding it, there are

5    purposes for having things like this other than the ones the

6    Government has suggested.

7         And, Your Honor, I know I've talked a lot, but I just

8    want to check my notes to make sure I didn't want to say

9    anything else.

10        THE COURT:  Sure, take your time.

11        MS. OYER:  Your Honor, I guess I just want to close

12   by reminding the Court that the individual seated in this chair

13   is a long time military veteran.  He's got a 30-year-service

14   record.  He has not a blemish on that record prior to this.

15   He's also the father of two young people who have gone on to

16   follow in his footsteps and serve their countries in the

17   military.  He's a devoted father.  He's a devoted husband, son

18   and brother.  His wife is seated here today.  His

19   father-in-law, who Judge Day selected as a third-party

20   custodian, is also seated in court today.  He has no criminal

21   history.  He has no history of violence, and he stands charged

22   with offenses that, we would argue under the sentencing

23   guidelines, would carry minimal jail time.

24        Under these circumstance, Your Honor, Judge Day concluded

25   that continued detention prior to trial was not appropriate,

1  and we would ask Your Honor to affirm that conclusion.

2          THE COURT:  Thank you, Ms. Oyer.

3      All right, Mr. Windom, since it's the Government's

4  motion, I'll give you the last word.  One thing I would like

5  you to address -- I know it came up in the last hearing, and I

6  briefly asked Ms. Oyer to switch hats and pretend she was a

7  prosecutor and tell me what she could have charged.  Because,

8  again, I think part of their argument, and I think part of what

9  Judge Day was looking at, was this idea that the Government

10  itself took these allegations more seriously.  There are other

11  more serious crimes that you could have charged.  So I want to

12  give you an opportunity to address that point.

13          **REBUTTAL ARGUMENT BY MR. WINDOM FOR THE GOVERNMENT**

14          MR. WINDOM:  Thank you, Your Honor.  As you know from

15  having been over here before, we don't charge based on probable

16  cause.  We don't even charge based on preponderance.  We charge

17  based on what we believe we can prove at trial beyond a

18  reasonable doubt.  We have charged what we believe we can prove

19  at trial beyond a reasonable doubt.

20      The lies on the federal forms, we could prove that beyond

21  a reasonable doubt, but the venue would lie in Virginia.  It

22  would be a 10-year sen. max.  We don't have venue over those

23  particular lies.

24      With respect to -- I hope that answers Your Honor's

25  direct question.  I was going to move on to some of the points

1    that Ms. Oyer has raised.

2         THE COURT:  It does.

3         MR. WINDOM:  We're not just saying the Government

4    believes the defendant was planning to do this.  His intentions

5    matter, and he told us exactly what those things were.  He did

6    that in these writings that we put in our first detention memo

7    at ECF number 9.  Now, the first thing he wrote was around

8    May/June of 2017.  That one was found in a deleted sub-folder

9    on his work computer, but the statements ring true and are

10   consistent with all of his internet searches before and after

11   and his purchases of the equipment with which he was going to

12   execute his plan.  Your Honor has seen these in several of our

13   briefs.

14        "I'm dreaming of a way to kill almost every person on the

15   Earth."

16        "Institute a bombing sniper campaign."

17        "What can I do?  I will not do nothing."

18        "Please send me your violence that I may unleash it onto

19   your heads."

20        "Guide my hate to make a lasting impression on this

21   world."

22        "For that reason, I can't just strike to wound.  I must

23   find a way to deliver a blow that cannot be shaken off.  Maybe

24   many blows that will cause turmoil."

25        That's in May or June.

1        Then he writes a letter, and this one is not deleted.

2   It's on his computer.  We don't know if it was sent, but he

3   wrote a letter to an actual person who is identified in the

4   letter, in September of 2017, seven weeks after

5   Charlottesville, where he affirms, basically, why he didn't go

6   to Charlottesville.  "I never saw a reason for mass protests or

7   wearing uniforms, marching around, provoking people with

8   swastikas, etc.  I was and am a man of action.  You cannot

9   change minds protesting like that.  However, you can make

10  change with a little focussed violence."  And this was after he

11  affirmed that he had been a white nationalist for 30 years,

12  which is confirmed by the court records that we put into one of

13  our other filings about the 1995 incident in eastern Virginia.

14       So it's not the Government hypothesizing that this might

15  happen.  This is the defendant saying in his own words to us,

16  to the public, to you, here's what I'm intending to do.  And

17  then he goes and gets everything he needs to do in order to do

18  that --

19            THE COURT:  Let me ask.  This question kind of goes

20  to some of the back and forth here.  Should the Court be

21  concerned with the notion that this could become sort of the

22  tail wagging the dog; that the Government's core concern isn't

23  individuals having these firearms while also having some

24  tramadol addiction?  The Government's concern are these other

25  issues that you're saying to me you didn't feel like you could

1  bring charges for because you couldn't prove those things

2  beyond a reasonable doubt. Does that become the tail wagging

3  the dog in a way that the Court should be concerned about?

4         MR. WINDOM: I don't believe it does, Your Honor, in

5  terms of the concern. In terms of the ultimate sentence, I

6  will say that the Government intends to ask for a sentence far

7  above what Ms. Oyer is projecting as her view of the sentencing

8  guidelines. There's a number of different guidelines that

9  apply. There is a terrorism enhancement that is found by a

10 preponderance of the evidence under the guidelines that would

11 apply in this case. There is --

12        THE COURT: Are you seeking that in this case?

13        MR. WINDOM: It is a decision that would have to be

14 approved by main Justice. It is my current intention to seek

15 that approval from main Justice, yes. Some of those

16 preliminary discussions have been had.

17        So there's 31 years of statutory max cap space based on

18 these four charges -- three 10-year counts and a one year

19 possession count. That is 31 years possibility for a statutory

20 maximum term of imprisonment. And whether or not the

21 guidelines that Ms. Oyer propounds, say, at three or four

22 years, the Government is going to ask for well in excess of

23 that.

24        Going back to the tail wagging the dog in terms of the

25 sentence but also here, as is clearly laid out by 3142, the

1   Bail Reform Act, the charge is what gets you in the door for a

2   detention hearing.  After that, there are the factors to

3   consider that are all well laid out and that have all been well

4   discussed by the parties, both here and in the prior hearings

5   and in the briefs.  We've laid out the case law, and there's

6   nothing to the contrary that I have been able to find.  In

7   terms of common sense, it's something that the courts do every

8   day in terms of considering uncharged conduct for dangerousness

9   and for flight, for example.

10          Just to return to one of Ms. Oyer's points about the name

11  on the ATF form 4473, that, oh, he may have just been trying to

12  use an address that he used to use in terms of stability.  He

13  lived with his father-in-law for, like, eight months back in

14  2012, early 2013.  That's based on an SF86 that he filled out.

15  Years later he actually owns property in a different state.

16  He's lived elsewhere several times since then.  He goes and

17  rents a place in Maryland.  He gets orders to go work in D.C.

18  He signs a lease.  He pays utilities.  He changes all of his

19  credit card bills.  He gets all of his product shipments to his

20  new address.  He's lived there for six months, four months by

21  the time he fills out these forms.  It doesn't make any sense

22  that somehow he leaves his home and drives over to Virginia and

23  fills out a form with an address which is in no way his, that

24  he once lived at five years before.  That doesn't even stand

25  the common sense test, Your Honor.

1        And then just kind of overall, stepping back on it, this

2    is a -- all of the information in the different briefs, which

3    is kind of fleshed out even more in the various search warrants

4    I know Your Honor has not seen yet, but some of the same

5    information expanded upon there, it's essentially a years long

6    criminal plan where the defendant has been taking drugs for

7    some time, and there is proof that he was taking the drugs

8    while he bought these guns because all of that is in ECF number

9    9, where there's a chart of his different tramadol purchases

10   from the international shipper going back to, I believe, late

11   2016.

12       So there's conduct involving where the defendant has said

13   he's going to go kill people.  Then he arranges these

14   international drug purchases.  He purchases firearms illegally.

15   He outfits them.  He searches locations for people that he's

16   indicated -- written he wants to kill, and then he's charged

17   and appears before Your Honor.

18       That's the big picture for why we believe the defendant

19   is extraordinarily dangerous.  It's why the Government and law

20   enforcement, the commendable efforts of the FBI, the ATF, and

21   Coast Guard, acted so quickly on a criminal complaint in order

22   to get this defendant before the Court and to have him detained

23   pending trial.

24            THE COURT:  Thank you, Mr. Windom.

25            MR. WINDOM:  The last thing, Your Honor, I would say

1   is I think it might make sense to hear from pretrial in case

2   they have additional things, because they, of course, are in

3   favor or detention as well.

4           THE COURT:  Ms. McCabe, if you want to be heard.

5           PROBATION OFFICER MCCABE:  Good afternoon, Your

6   Honor.  Beverly McCabe from Pretrial Services.  No, we don't

7   have anything additional to add to the release status report

8   that we prepared for the Court today.  We are continuing, Your

9   Honor, to ask that the defendant be detained based on the

10  factors identified for flight and danger.

11          THE COURT:  Sorry, flight and danger or just danger?

12          PROBATION OFFICER MCCABE:  Nonappearance and danger.

13  That's what we recommended detention on, Your Honor.  And those

14  factors are identified in all of the -- the original report,

15  the addendum, I believe there's a second addendum, as well as

16  the status report that I prepared today.

17      Thank you, Your Honor.

18                        **THE COURT'S RULING**

19          THE COURT:  Thank you, Ms. McCabe.  I did read your

20  report.

21      I'm going to take about five minutes -- I'm going to sit

22  here at the bench and do it.  I'm going to take probably around

23  five minutes to just review the notes that I took in this

24  hearing and work them into some notes I wrote before.  If the

25  parties want to -- if the lawyers want to stand and stretch,

1    that's fine.  I'll let you know when I'm about to go back on

2    the record.

3         Back on the record.

4         So we are here today on the Government's motion for

5    review of release order, which was filed at ECF number 38.  As

6    I indicated at the beginning of this proceeding, very late

7    Friday evening the Government also filed a second motion for

8    detention pending trial.  I think this proceeding is best

9    characterized as a motion for review of release order, as their

10   original filing indicated, and so I will consider this, quote,

11   second motion really as a memorandum in support of their motion

12   for review.

13        As all the parties agree, my review of the magistrate

14   judge's decision at this stage is done de novo.

15        As an initial matter, I think it's worth noting -- and I

16   have often said this -- that among the most difficult decisions

17   judges are called upon to make are decisions regarding pretrial

18   detention.  That is because there are important but competing

19   considerations at play.

20        First, there is the presumption of innocence.  As he sits

21   here today, Mr. Hasson is presumed to be an innocent man, and

22   he will maintain that presumption unless at some point he

23   acknowledges guilt or a jury of his peers determines his guilt.

24        On the other hand, the Court must consider the potential

25   danger the defendant poses to the community and the likelihood

1   he will or will not flee.  As the Court, I must determine

2   whether someone should lose their liberty based on danger or

3   likelihood of flight at a time when the law still presumes

4   their innocence.

5        That decision is made even more difficult in a case such

6   as this one where, on the one hand, the Government strenuously

7   claims that the defendant poses a grave and present danger,

8   presents evidence in support of that claim, but his criminal

9   history is clean, and the charges in the indictment are

10  actually somewhat unremarkable compared to cases typically seen

11  in this courthouse.  It's, therefore, not surprising that this

12  is a situation where reasonable people can disagree on the

13  appropriate detention decision.  Indeed, reasonable judges can

14  disagree, and this is such a situation.

15       Much of the discussion in front of Judge Day centered

16  around the degree to which the Court should consider

17  information involving the alleged intentions of the defendant

18  as indicated by his various writings.  In deciding how much

19  weight to give that information or whether to consider it at

20  all, I started by looking at 18 U.S.C. 3142(g), which lists, as

21  the very first factor for the Court's consideration, both the

22  nature and the circumstances of the offense charged.

23       Here, I am of the view that the offenses are the firearm

24  charges, but the additional information does go directly to the

25  circumstances of the offense.  I also find that they are

1  relevant to the danger of his release, potential danger, which

2  goes to the fourth factor, and also the history and

3  characteristics of the defendant, which is the second factor.

4       So I find that the fact that additional charges have not

5  been filed related to these issues does not prevent me from

6  considering all of the information proffered by the Government

7  in making my detention decision.

8       Here, the Court has been provided with information

9  indicating that a search warrant revealed the defendant had 15

10 firearms and over 1,000 rounds of ammunition; that these did

11 not appear to be solely kept as collectors' items, but, indeed,

12 there is evidence that he intended to use these items to commit

13 a series of violent acts.

14      Specifically, evidence has been proffered by the

15 Government that beginning in early 2017, or at least as early

16 as early 2017, the defendant routinely reviewed portions of a

17 manifesto written by Anders Breivik, a known domestic

18 terrorist.  That manifesto provided information to potential

19 assailants on how to carry out violent attacks.  Among other

20 things, he instructed assailants to amass firearms and

21 firearm-related equipment.

22      Records indicate that from early 2017 through April 2018,

23 the defendant made at least 21 separate purchases involving

24 various firearms or firearms-related equipment, such as

25 tactical vests and other objects.  While it does appear that he

1   had purchased some firearms before that point, there does

2   appear to have been an increase in that activity, seemingly

3   fuelled, at least in part, by some of what he was reading.

4        Additionally, on January 3, 2019, the defendant searched

5   sections of the Breivik manifesto dealing with ways to target

6   what it referred to as, quote, category A traitors.  These

7   individuals were defined as political leaders, media leaders,

8   cultural leaders, and the like, and discusses, among other

9   issues, avoiding individuals who have armed bodyguards.

10       I then find it relevant and troubling that on January 17,

11  2019, the defendant made a list of individuals, and that list,

12  if you simply look at the names, was consistent with the types

13  of individuals identified in the search for, quote, category A

14  traitors just made two weeks earlier, which includes media

15  figures and politicians.  That same day he performed Google

16  searches, including best place in D.C. to see Congress people

17  and searches related to where in D.C. Congress people live.

18       Prior to those dates, not long prior, however, in

19  December of 2018 -- again, this is by Government proffer -- he

20  had specifically reviewed information on a well-known MSNBC

21  personality, including searches about where the show was filmed

22  and information about that person's home.

23       Other searches he did, according to the Government,

24  include where do most senators live in D.C., do senators have

25  Secret Service protection, and are Supreme Court Justices

1   protected.  All of these relate to matters he would have

2   reviewed in the Breivik manifesto.

3         Beyond those very clear connections between the manifesto

4   and his actions, there are his own statements where he has

5   stated that he dreams of, quote, a way to kill almost every

6   last person on the Earth; he plans to, quote, institute a

7   bombing sniper campaign; he indicates, quote, that much blood

8   will have to be spilled and that he needed to take a, quote,

9   serious look at appropriate individual targets to bring

10  greatest impact.  He also, in some of his writings, identifies

11  as a white nationalist and says that you can make change with a

12  little focussed violence.

13        So in viewing the nature and circumstances of this

14  offense, it weighs heavily in favor of detention.  This is a

15  search warrant case, so the weight of the evidence is in favor

16  of detention, as the evidence appears strong as to the charges.

17        The history and characteristics of the defendant includes

18  both the fact that he has no criminal history as well as his

19  admirable military service, so far as I'm aware, but also

20  includes the evidence we've discussed today.  So, at best,

21  that's balanced but probably weighs slightly in favor of

22  detention.

23        Certainly, the seriousness of the danger that he would

24  possess if released weighs in favor of detention.  I include in

25  that final finding also the comments made by the Government,

1   the proffer from the Government that there are indeed firearms

2   that are left unaccounted for.  That's something that concerns

3   the Court because, of course, one of arguments for release

4   would be that all of the firearms were seized, but it appears

5   that that's not actually the case.

6           So in sum, according to the evidence proffered by the

7   Government, the defendant expressed the desire to commit

8   violent acts; he read what's, in effect, an instruction manual

9   on how to do so; and then took what I see as concrete steps,

10  allegedly, towards fulfilling those desires, including by

11  amassing an array of firearms and doing some investigation on

12  where potential targets could be found.  I cannot, in this

13  Court's view, leave it to a handful of civilian family members

14  to make sure he does not carry out that plan while he awaits

15  trial, and so I will put that job into the hands of the United

16  States marshals.

17          Now, defense made a point that this is, in effect, him

18  being held indefinitely because of a guess about a plan.  I

19  think I've sort of addressed my view about whether this is

20  merely a guess, but I do want to be clear it's not about being

21  held indefinitely.  It's been about being held pending trial.

22  Mr. Hasson will get his day in court, and he will be given the

23  opportunity to prove that all of these allegations are untrue.

24  He is still presumed to be innocent.

25          But I do find, by clear and convincing evidence, that no

1   condition or combination of conditions of release will

2   reasonably assure the safety of other persons and the

3   community, and so the Government's motion is granted.  The

4   prior order of release is vacated, and he will be detained

5   pending trial of this matter.

6          Now, as a practical matter, I know Judge Day had issued

7   an order of detention.  I don't know if a release order was

8   ever put to writing, because I know there was some things that

9   had to be done first.  So I don't know if I now need to -- and

10  I'm happy to do it -- sign a new order of detention or if his

11  original detention order still remains in place.  Just to make

12  sure, I can -- unless someone disagrees, I can certainly

13  execute and sign a fresh order of detention with today's date.

14          MR. WINDOM:  I'd prefer a new detention order, Your

15  Honor.

16          THE COURT:  That's fine.

17          MR. WINDOM:  Thank you.

18          THE COURT:  Are there any questions regarding the

19  Court's order?

20          MR. WINDOM:  No, sir.

21          THE COURT:  I believe we have a status call -- I

22  don't have the date in front of me, but I believe we have a

23  status call set; is that right?

24          MS. OYER:  Yes, Your Honor.

25          THE COURT:  It would be my hope that by then we'll

1    know where we're going and set a trial date if that's where

2    we're going.

3              MS. OYER:  Yes, Your Honor.

4              MR. WINDOM:  Thank you, sir.

5              THE COURT:  Anything else we need to do today?

6              MR. WINDOM:  No, sir.

7              THE COURT:  Thank you.

8         (The hearing concluded at 3:20 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

                    CERTIFICATE OF OFFICIAL REPORTER

2

3        I, Cindy S. Davis, Federal Official Court Reporter in and

4    for the United States District Court for the Southern District

5    of Maryland, do hereby certify that I reported, by machine

6    shorthand and computer-aided transcription, in my official

7    capacity the motions hearing proceedings had in the case of

8    United States of America versus Christopher Paul Hasson, case

9    number 8-19-cr-00096-GJH, in said court on May 13, 2019.

10        I further certify that the foregoing 51 pages constitute

11    the official transcript of said proceedings, as taken from my

12    electronic notes to the best of my ability.

13        In witness whereof, I have hereto subscribed my name this

14    23rd day of August 2019.

15

16

17

18

19                        *Cindy S. Davis*

20    _____

                          CINDY S. DAVIS, RPR
21                        FEDERAL OFFICIAL COURT REPORTER

22

23

24

25