## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA      \*

    v.                     \*            Criminal No.  GJH-19-0096

CHRISTOPHER PAUL HASSON     \*

           \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## REPLY TO THE GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS COUNTS ONE AND TWO ON SECOND AMENDMENT GROUNDS

On June 24, 2019, Defendant Christopher Paul Hasson filed a motion to dismiss Counts One and Two of the indictment as violative of his Second Amendment rights.  ECF No. 62.  The government responded on August 5, 2019.  ECF No. 70 at 2-13.  Mr. Hasson now submits this reply.

### A.     Silencers Are Firearms for Purposes of the Second Amendment.

The government contends Mr. Hasson's Second Amendment challenge "fails at its inception because silencers are not firearms within the meaning of the Second Amendment." ECF No. 70 at 2.  Rather, the government insists, silencers are "mere firearm accessories" and are, therefore, categorically outside the scope of the Second Amendment.  ECF No. 70 at 5.  This argument relies on a cramped and begrudging reading of *District of Columbia v. Heller*, 554 U.S. 570 (2008)—one inconsistent with the Supreme Court's recognition that the Second Amendment does not establish "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees."  *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010).

### 1.   The Second Amendment Extends Protection to Items That Are Not "Integral" to the Operation of Any Gun.

According to the government, an item enjoys Second Amendment protection only if it is "integral to the operation of any gun," i.e., if it is indispensable to use of the gun.  ECF No. 70 at 6.  If a gun "works perfectly well without [a given item]," the government claims, then that item can never qualify as an "arm" for Second Amendment purposes.  ECF No. 70 at 7.  But the government cites no case that stands for this proposition, and post-*Heller* opinions from numerous courts—including the Fourth Circuit—have rejected it.

In *Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016) (*"Kolbe I"*), for instance, the plaintiffs challenged Maryland's prohibition on transferring "a detachable magazine that has a capacity of more than 10 rounds of ammunition."  813 F.3d at 169.  The Fourth Circuit began by "address[ing] the threshold question of whether the ban[] burden[ed] conduct that falls within the scope of the Second Amendment," that is, "whether the particular class of weapons prohibited or regulated by the statute are themselves protected by the Second Amendment."  *Id.* at 172-73.  The court answered that question in the affirmative, concluding that "magazines having a capacity to accept more than ten rounds are in common use" for lawful purposes.  *Id.* at 174-77.  Therefore, the court held, large-capacity magazines "come within the coverage of the Second Amendment."  *Id.* at 178.

Yet a magazine holding more than ten rounds is not "integral to the operation of any gun."  ECF No. 70 at 6.  A gun would "work[] perfectly well without [such a magazine]," ECF No. 70 at 7—e.g., if the owner outfitted the gun with a magazine that held six rounds instead of ten.  Large-capacity magazines are, to use the government's formulation, "a 'nice to have,' but they are not a 'need to have.'"  ECF No. 70 at 7.  A firearm does not cease to be "usable" simply because its magazine holds eight bullets, rather than ten.  ECF No. 70 at

5.  Notwithstanding this fact, the Fourth Circuit held in *Kolbe I* that large-capacity magazines are protected "arms" within the meaning of the Second Amendment.

The en banc Fourth Circuit ultimately reversed the holding in *Kolbe*, ruling that Maryland's ban on large-capacity magazines does not offend the Second Amendment.  But in doing so, it did not cast doubt on the panel's conclusion that large-capacity magazines are Second Amendment "arms."  The en banc court read *Heller* to mean the Second Amendment does not extend to any weapons that are "'like' 'M-16 rifles'—'weapons that are most useful in military service.'"  *Kolbe v. Hogan*, 849 F.3d 114, 135 (4th Cir. 2017) (en banc) ("*Kolbe II*) (quoting *Heller*, 554 U.S. at 627).  Because large-capacity magazines fit this description—i.e., because they are "particularly designed and most suitable for military and law enforcement applications"—the court held they "are not constitutionally protected."  *Id.* at 137.

The en banc court did not hold, or even intimate, that large-capacity magazines, or any other items, are unprotected by the Second Amendment simply because they are not "integral" to the operation of a firearm.  Indeed, the court explicitly noted that given the rationale on which it relied, it did "not reach the State's alternative contention that large-capacity magazines lack constitutional protection because they are not 'arms' within the meaning of the Second Amendment."  *Id.* at 137 n.12.  Thus even if it is not binding on this Court, the panel opinion in *Kolbe I* is persuasive authority on the question of whether the Fourth Circuit would accept the government's "integral to any gun" argument.

Other circuits have endorsed *Kolbe I*'s reasoning, either implicitly or explicitly.  In *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267 (N.D. Cal. 2014), the plaintiffs sought to enjoin a city ordinance that "ban[ned] the possession of magazines having a capacity to

3

accept more than ten rounds." 25 F. Supp. 3d at 1275.  The district court held such magazines were "in common use" for lawful purposes and therefore qualified as "protected arms."  *Id.* at 1275, 1277.  The Ninth Circuit affirmed the grant of a preliminary injunction, concluding the district court "did not clearly err in finding, based on the record before it," that the ordinance "burdens conduct falling within the scope of the Second Amendment."  *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015).

Likewise, the Third Circuit has assumed without deciding that large-capacity magazines are Second Amendment "arms" even though (1) "a prohibition on large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves," and (2) such a prohibition "does not render [firearms] incapable of operating as intended," since "citizens may still possess and utilize magazines, simply with five fewer rounds per magazine."  *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. of N.J.*, 910 F.3d 106, 116-18 (3d Cir. 2018).  On the government's view, the Third Circuit's assumption would be untenable as a matter of law, since an item is considered an "arm" only if banning it "effectively disarm[s] individuals" and renders guns "incapable of operating as intended."  That the Third Circuit assumed large-capacity magazines are "arms" suggests the government's position cannot be right.[1]  *See also, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc.*

---

[1] The government observes that in *Association of New Jersey Rifle & Pistol Clubs*, "the Third Circuit <u>affirmed</u>" an order upholding a ban on large-capacity magazines.  ECF No. 70 at 4 (emphasis in original).  But this fact—which turned on whether the ban survived intermediate scrutiny—is irrelevant to the threshold question of whether large-capacity magazines, or other non-"integral" items, can qualify as "arms" to begin with.  The Third Circuit's opinion indicates they can.  Likewise, it is irrelevant that the Ninth Circuit has "<u>affirmed</u> a district court ruling upholding the constitutionality of a state law banning hollow-point bullets."  ECF No. 70 at 4 (citing *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014)).  As Mr. Hasson explained in his motion, *see* ECF No. 62 at 6-7, *Jackson* is important not for its determination that the regulation in that case failed intermediate scrutiny, but for its recognition that items other than guns themselves can qualify as "arms" for purposes of the Second Amendment.

*v. Cuomo*, 804 F.3d 242, 256-57 (2d Cir. 2015) (assuming "for the sake of argument" that large-capacity magazines are "arms" based on their prevalence and the purposes for which people use them—without considering whether they are absolutely necessary to using a gun); *Heller v. District of Columbia*, 670 F.3d 1244, 1260-61 (D.C. Cir. 2011) ("*Heller II*") (same).

Even more problematic for the government's "integral to any gun" position is the Seventh Circuit's opinion in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011). The plaintiffs in that case challenged a city ordinance that "prohibit[ed] all 'shooting galleries, firearm ranges, or any other place where firearms are discharged.'" *Ezell*, 651 F.3d at 691. The Seventh Circuit struck down the ordinance as violative of the Second Amendment, since "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Id.* at 704. The government cannot argue that a shooting range is "integral" to the operation of a gun, or that a gun would not "work[] perfectly well" without a range at which an owner could practice. ECF No. 70 at 6-7. A shooting range is undoubtedly a "nice to have," not a "need to have." ECF No. 70 at 6-7. Yet, as *Ezell* makes clear, shooting ranges are entitled to Second Amendment protection.

Although Mr. Hasson cited *Ezell* in his motion, *see* ECF No. 62 at 10-11, the government's response fails to reconcile that opinion with its proposed "integral to any gun" principle. The government claims *Ezell* addressed a different question, namely, whether "shooting ranges are . . . categorically outside the scope of the Second Amendment." ECF No. 70 at 5. This is true but irrelevant. *Ezell* makes clear the Second Amendment protects more than simply pieces of equipment that are indispensable to operating a firearm; that the

particular conduct at issue in *Ezell* involved a shooting range, rather than silencers, is immaterial.

*Ezell* and the other cases cited above recognize that adopting the government's restrictive "integral to any gun" rule would divorce the right to bear arms from its ultimate purpose.  The Supreme Court held in *Heller* that the Second Amendment confers an "individual right to possess and carry weapons in case of confrontation," including for such lawful purposes as "hunting" and "self-defense in the home."  554 U.S. at 592, 599, 629.  But this right would be of little value if it did not entail the "corresponding right" to use guns safely and effectively, as silencers allow firearm owners to do.  *Ezell*, 651 F.3d at 704.

The Supreme Court's First Amendment jurisprudence provides a useful comparison.  *See* ECF No. 62 at 10 n.13 (citing cases from multiple federal courts of appeals, including the Fourth Circuit, that hold First Amendment provides appropriate framework for resolving Second Amendment claims); *McDonald*, 561 U.S. at 780 (rejecting city's request "to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees").  The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. Const. amend. I.  Read narrowly—to protect merely the activity "integral" to religious exercise that a religious adherent "need[s] to have," ECF No. 70 at 6-7—this clause would prohibit only laws that, for example, "criminalize[] the way [a church] worships or t[ells] the Church that it cannot subscribe to a certain view of the Gospel." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2022 (2017).  But the Supreme Court has long made clear that statutes can violate the Free Exercise Clause even if they "do[] not prohibit [a] Church

from engaging in any religious conduct or otherwise exercising its religious rights." *Id.* (emphasis omitted).

Rather, that clause also "protects religious observers against unequal treatment," with the result that when the government "condition[s] the availability of benefits . . . upon a recipient's willingness to . . . surrender his religiously impelled status," it "effectively penalizes the free exercise of his constitutional liberties." *Id.* at 2019, 2022 (ellipses in original). Thus a state program that makes money for playground-resurfacing available to any non-religious organization, but not to religious organizations, violates the Establishment Clause. *Id.* at 2021-22; *see also, e.g.*, *Rossignol v. Voorhaar*, 316 F.3d 516, 521-22 (4th Cir. 2003) (holding that even though sheriff's deputies did not prohibit newspaper from publishing a certain issue, they violated paper's First Amendment free-speech rights by buying up every copy in the county so customers could not receive paper's political message, since "without the circulation, the publication would be of little value"). The First Amendment, in other words, protects not only core rights of religious exercise and free speech, but also associated rights that are "implicit" in the constitutional guarantee. *See* ECF No. 62 at 10 (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579 (1980)).

A similar principle applies to the Second Amendment. Properly understood, that amendment protects not only the right to possess handguns and ammunition, but also the right to bear silencers, which, as Mr. Hasson explained in his motion, are essential to (1) protecting firearm users' hearing and health, and (2) enabling gun owners to shoot accurately by reducing recoil and muzzle rise. ECF No. 62 at 7-11. The government barely even tries to rebut these factual assertions. Its sole attempt is an assertion that Mr. Hasson's position on silencers is "schizophrenic" because he claims simultaneously that (1) silencers

help to reduce ear-damaging noise, and (2) the popular perception of silencers' dangerousness is overblown because they do not entirely eliminate the sound of gunfire. ECF No. 70 at 7 n.3. But it is completely coherent to claim—and Mr. Hasson expects testimony at the motions hearing to show—that silencers reduce sound enough to produce health benefits, but not so much that they render gunfire inaudible. Silencers' "noise-cancelling benefits," ECF No. 70 at 7 n.3, are not an all-or-nothing proposition.

The Court should hold silencers are "arms" within the meaning of the Second Amendment.

### 2.    The Cases on Which the Government Relies Are Unpersuasive.

The government claims that "every court to consider the issue has found that silencers are not firearms within the meaning of the Second Amendment." ECF No. 70 at 5 (bold and italics omitted). The government's cited cases do not address the arguments Mr. Hasson raises, and in most instances their analysis is, at best, conclusory.

- The Tenth Circuit did hold in *United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018), that a "silencer is a firearm accessory" and therefore not "a 'bearable arm' protected by the Second Amendment." 906 F.3d at 1186. But as Mr. Hasson explained in his motion, *see* ECF No. 62 at 9 n.12, the *Cox* court "had no occasion to consider whether items that are not themselves bearable arms but are necessary to the operation of a firearm (think ammunition) are also protected." *Id.* at 1196 (Hartz, J., concurring). Indeed, Judge Hartz concurred in *Cox* specifically to "caution against overreading our holding regarding silencers." *Id.* Because *Cox* did not address Mr. Hasson's argument regarding accoutrements that render guns useful and functional, it is of no persuasive value.

8

- In *United States v. Stepp-Zafft*, 733 F. App'x 327 (8th Cir. 2018) (unpublished), the Eighth Circuit applied plain error review to the defendant's contention that silencers are protected Second Amendment arms. 733 F. App'x at 329-30.  The court noted that "because he did not raise this challenge in the district court, the parties did not present evidence on the purposes and common uses of silencers." *Id.* at 330.  The court denied the defendant's claim because it was "at least subject to reasonable dispute in light of existing authorities and the undeveloped record in this case." *Id.*  Thus *Stepp-Zafft* did not decide, one way or the other, whether silencers are protected "arms"; it merely said that a barren record left the question open.

- The Ninth Circuit held in *United States v. McCartney*, 357 F. App'x 73 (9th Cir. 2009) (unpublished), that silencers "are even more dangerous and unusual than machine guns" and "are not typically possessed by law-abiding citizens for lawful purposes."  357 F. App'x at 76.  They are therefore unentitled to Second Amendment protection, the court said.  *Id.*  But the court offered absolutely no analysis to support this conclusion—in the form of case law, academic studies, law review articles, or anything else.  *McCartney*'s conclusion, announced without further elaboration in an unpublished opinion, was pure ipse dixit.

- The district court in *United States v. Grey*, 2018 WL 4403979 (N.D. Cal. Sept. 13, 2018), denied a Second Amendment challenge to the defendant's silencer conviction by simply citing to *McCartney*.  2018 WL 4403979, at *13.  The

court added no further analysis or explanation.  For the same reasons that *McCartney* is unpersuasive, so too is *Grey*.

- In *United States v. Perkins*, 2008 WL 4372821 (D. Neb. Sept. 23, 2008), the district court announced it "ha[d] no doubt" that silencers are not protected by the Second Amendment because they "are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use." 2008 WL 4372821, at *4.  But just like the *McCartney* court, the *Perkins* court provided nothing to substantiate this bare conclusion; it did not quote relevant statistics, cite to news or journal articles, point to persuasive case law, or offer even the most rudimentary explanation of why silencers are dangerous and unusual.  *Id.*

- The analysis in *United States v. Garnett*, 2008 WL 2796098 (E.D. Mich. July 18, 2008), is even more perfunctory than that in *McCartney*, *Grey*, and *Perkins*. The defendant, who had been convicted of possessing unregistered silencers, asked to be released on bond pending appeal, which required him to show that the appeal would "raise a substantial question of law or fact likely to result in a reversal, a new trial or a reduced sentence."  2008 WL 2796098, at *1.  The district court's conclusion that *Heller* did not present such a "substantial question" consisted of a single sentence: "Nothing in [*Heller*] casts doubt on the constitutionality of federal regulations over the machineguns and silencers at issue in this case."  *Id.* at *4.

In short, the government's cases either fail entirely to justify their conclusion that silencers are not Second Amendment "arms," or expressly refrain from addressing the arguments Mr. Hasson raises here. Accordingly, this Court should decline to afford them any persuasive weight.

Finally, the government argues that neither *Heller* nor the Supreme Court's opinion in *United States v. Miller*, 307 U.S. 174 (1939), "speak[s] to the issue [Mr. Hasson] now advances." ECF No. 70 at 4. This, too, is true but irrelevant. The "*Heller* decision was not intended 'to clarify the entire field' of Second Amendment jurisprudence." *Kolbe II*, 849 F.3d at 132 (quoting *Heller*, 554 U.S. at 635). The government cites no case holding that *Heller* is limited to its facts, and Mr. Hasson is unaware of any. Rather, like countless other Supreme Court opinions, *Heller* announced general principles that lower courts have applied to new and different contexts in the years since. Those general principles, as explained above, indicate that silencers are protected "arms" within the meaning of the Second Amendment.

**B.** **The National Firearms Act's Registration and Serialization Requirements Are Unconstitutional as Applied to Mr. Hasson.**

**1.** **Silencers Are Commonly Possessed by Law-Abiding Citizens for Lawful Purposes.**

The government makes several unsubstantiated claims that silencers are not commonly possessed for lawful purposes and that they therefore fall outside the scope of the Second Amendment. None of these assertions, however, aligns with the empirical approach to Second Amendment review that has been broadly accepted by courts. And none carries "the government's burden to establish that a particular weapon or activity falls outside of the scope of the Second Amendment right." *Kolbe I*, 814 F.3d at 176.

**First,** the government improperly relies on the "historical fact" that Americans have been using firearms without silencers "for hundreds of years." ECF No. 70 at 9. But the prevalence of silencers in 1791 or at any other historical point in time does not bear on whether they fall within the scope of the Second Amendment's protections. Instead, "the pertinent Second Amendment inquiry is whether" silencers "are commonly possessed by law-abiding citizens for lawful purposes *today.*" *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1032 (2016) (per curiam) (Alito, J., concurring) (emphasis in original). To find otherwise would be "inconsistent with *Heller*'s clear statement that the Second Amendment 'extends . . . to . . . arms that were not in existence at the founding.'" *Caetano*, 136 S. Ct. at 1028 (opinion of the Court) (rejecting the lower court's finding that stun guns were "unusual" because they were "thoroughly modern").

In any event, silencers are not a particularly modern invention. The first silencer was patented more than a century ago, in 1910, by Hiram Maxim.[2] An avid marksman, Maxim invented the silencer to minimize disturbance to his neighbors during target practice.[3] The device quickly gained favor with hunters and sportsmen, who appreciated that the diminished noise and recoil reduced the risk of physical injuries and improved hunting.[4] Americans

---

[2] U.S. Patent No. 958,935 (issued May 24, 1910).

[3] Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 33, 42 (2016) [hereinafter *Firearm Sound Moderators*].

[4] *Id.* at 42–43. President Teddy Roosevelt was among the early adopters of the silencer, and he owned multiple for hunting. *Id.* at 44–45.

have been using silencers ever since, and the industry continues to grow at an exponential rate.[5]

**Second**, the government misapprehends the evidentiary showing it must make to demonstrate that silencers are not "commonly possessed" in the United States today.  Rather than contend with the overwhelming empirical evidence that silencers are widely owned and accepted as lawful, the government instead rests its case on a comparison between the absolute number of firearms and the number of registered silencers.  ECF No. 70 at 9.  Because there are far fewer silencers than firearms, the government reasons, silencers may not be considered to be in common use.  *See*  ECF No. 70 at 9.

But the government's proposed methodology is inconsistent with the breadth of the Second Amendment.  As explained in *Heller*, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms."  554 U.S. at 582.  Acceptance of the government's percentage-based metric, however, would impermissibly tie the scope of the Second Amendment right to the prevalence of the most popular weapon *du jour*.  Each time sales of the dominant firearm increased, constitutional protection of the remaining categories of weapons would decrease—regardless of whether they, too, were embraced by a significant, albeit relatively smaller, segment of the population.  Taking the government's percentage-based argument to its logical conclusion, "a State would be free to ban *all* weapons *except* handguns, because 'handguns are the most popular weapon chosen by

---

[5] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Commerce in the United States: Annual Statistical Update 2018 at 15 (February 2018) (noting an increase of almost one-and-quarter million in registered silencers since 2010).

Americans for self-defense in the home.'"   *Caetano*, 136 S. Ct. at 1033 (Alito, J., concurring) (emphasis in original).

By the same token, the government's position unquestionably favors older weapons while prejudicing more modern inventions.   New types of firearms would rarely achieve Second Amendment protection under the government's scheme because, at the moment they enter the market for the first time, they are necessarily a minuscule fraction of the overall number of guns owned by Americans.   As a result, the types of weapons protected by the Second Amendment would remain inexorably static.   But the Second Amendment cannot bear such a restrictive reading, and the Court has made clear that "[w]e do not interpret constitutional rights that way."   *Heller*, 554 U.S. at 582 (rejecting, as "bordering on the frivolous," the argument that "only those arms in existence in the 18th century are protected by the Second Amendment").

This common-sense conclusion was made explicit by the Second Circuit in *New York State Rifle & Pistol Association*.   There, the Second Circuit rejected the defendants' argument that certain assault weapons were uncommon because they comprised only two percent of the nation's firearms.   804 F.3d at 255.   Acknowledging that the weapons "are not as commonly owned as the handguns at issue in *Heller*," the court nevertheless concluded that the assault weapons were "in common use" in light of the millions of units that had been manufactured.   *Id.*; *see also Caetano*, 136 S. Ct. at 1032–33 (Alito, J., concurring) (explaining that the absolute number of tasers and stun guns owned, rather than their

comparison to the overall number of firearms, was "[t]he more relevant statistic" for establishing that they were commonly possessed).[6]

The government's position is also inconsistent with findings by other courts that tasers and nunchakus—weapons significantly less prevalent than both firearms and the nearly 1.5 million silencers registered today—are "commonly possessed" for the purposes of the Second Amendment. *See, e.g.*, *Avitabile v. Beach*, 368 F. Supp. 3d 404, 411–12 (N.D.N.Y. 2019) (holding that 300,000 tasers owned by private citizens across the United States were sufficiently numerous to satisfy the common-use requirement); *Maloney v. Singas*, 351 F. Supp. 3d 222, 237 (E.D.N.Y. 2018) (finding defendants had failed to demonstrate that nunchakus were not commonly possessed where 64,890 had been sold over the prior 23 years).

By nearly every metric, silencers are "commonly possessed" in America today. The number of registered silencers has exploded in recent years, increasing five-fold between 2010 and 2018.[7] In absolute terms, nearly 1.5 million silencers were registered with the Bureau of Alcohol, Tobacco, Firearms and Explosives as of February 2018. And a survey of state laws reveals that there is near-national consensus as to the legality of silencers: 42 states permit individuals to own silencers, and 40 states permit silencers in the use of

---

[6] The Fourth Circuit has acknowledged that various questions remain unanswered regarding the parameters of what is "in common use at the time." *Kolbe II*, 849 F.3d at 135. But in listing potential variables the court might consider—including "how many assault weapons and large-capacity magazines are owned; or . . . how many owners there are; or . . . how many of the weapons and magazines are merely in circulation"—the court did not cite the number of a given weapon relative to other firearms. *Id.*

[7] U.S. Dep't of Justice, ATF, Firearms Commerce in the United States: Annual Statistical Update 2018 at 15 (February 2018).

hunting.[8]  *See Caetano*, 136 S. Ct. at 1032–33 (Alito, J., concurring) (explaining that the 200,000 tasers and stun guns in the United States are "widely owned and accepted as a legitimate means of self-defense across the country" where 45 states permit their lawful possession).  Whatever "line separates 'common' from 'uncommon' ownership," silencers have long since moved across it.  *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015).

*Third,* the government's position that Mr. Hasson must proffer evidence that silencers are "actually used" for lawful purposes misunderstands both its burden and the Supreme Court's holding in *Heller*.  ECF No. 70 at 9.  "The proper standard under *Heller* is whether the prohibited [devices] are 'typically *possessed* by law-abiding citizens for lawful purposes,'" not whether they are "often actually employed in self-defense incidents."  *Kolbe I*, 813 F.3d at 176 (quoting *Heller*, 554 U.S. at 625) (emphasis in *Kolbe I*).  And because "it is unlikely most people will ever need to actually discharge a firearm in self-defense," "[a]ctual use in self-defense is a poor measure of whether a particular firearm is 'typically possessed by law-abiding citizens.'"  *Id.*[9]

In any event, empirical evidence demonstrates that the use of silencers for unlawful purposes is exceedingly rare.[10]  More than 99.9 percent of silencers are not involved in

---

[8] *American Suppressor Association*, Education, https://americansuppressorassociation.com/education/ (last visited August 21, 2019).

[9] Nor, as discussed, is it the defendant's burden to present evidence of actual lawful use.  *See Ezell*, 651 F.3d at 702–03 (concluding that the government has the burden to "establish that that the challenged law regulates activity outside the scope of the Second Amendment").

[10] Ronald Turk, *White Paper: Options to Reduce or Modify Firearms Regulations* 6 (January 2017) [hereinafter "*White Pape: Firearms Regulations*"].

criminal activity.[11]  And their lawful uses at shooting ranges as well as "within the sporting and hunting industry are now well recognized."[12]   The vast weight of the evidence demonstrates that silencers are commonly possessed by law-abiding citizens for lawful purposes.  The government has failed to provide any compelling evidence to the contrary.

> **2.      Mr. Hasson May Bring an As-Applied Challenge to the NFA's Silencer Requirements.**

Failing to meet its burden to establish that silencers are not commonly possessed for lawful purposes, the government suggests Mr. Hasson may not challenge the NFA's registration and serialization requirements because they are presumptively lawful, "longstanding prohibitions" and because Mr. Hasson is not a "law-abiding, responsible citizen."  ECF No. 70 at 8 (quoting *Heller*, 554 U.S. at 626–27, 651).  But on both grounds, the government again finds itself at odds with Second Amendment jurisprudence.

*First,* the government argues that because the NFA's silencer regulations have been in place for 75 years, they should be considered to be among the "longstanding prohibitions" that *Heller* described as "presumptively lawful."  ECF No. 70 at 8; *Heller*, 554 U.S. at 627 n.26.  But the government's drive-by argument cites no case law for its proposition that the

---

[11] *See* Stephen Gutowski, *ATF: 1.3 Million Silencers in U.S. Rarely Used in Crimes*, Washington Free Beacon (Feb. 17, 2017), https://freebeacon.com/issues/atf-despite-nearly-1-3-million-silencers-united-states-rarely-used-crimes/.   Although the government argues that the dearth of criminal use of silencers can be attributed to the NFA's requirements, it does not explain why the NFA is not similarly effective at eradicating criminal use of other regulated firearms.  *See* ECF No. 70 at 9–10.  Nor does a single isolated instance of criminal suppressor use at Virginia Beach support its thesis—the alleged Virginia Beach shooter, after all, legally possessed his suppressor.  Whit Johnson & Bill Hutchinson, *Suspected Virginia Beach shooter used legally-bought gun suppressor*, ABC News (June 4, 2019), https://abcnews.go.com/US/suspected-virginia-beach-gunman-resigned-personal-reasons-massacre/story?id=63449625.

[12] *White Paper: Firearms Regulations* at 6.

NFA's registration and serialization requirements are sufficiently longstanding that they may be presumed lawful.

Moreover, even if the regulations were presumptively lawful, that would not be the end of the constitutional inquiry. *See Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 686 (6th Cir. 2016) (en banc) ("*Heller* only established a presumption that such bans were lawful; it did not invite courts onto an analytical off-ramp to avoid constitutional analysis."). As the Fourth Circuit has recognized, "the phrase 'presumptively lawful regulatory measures' suggests" that the regulation "could be unconstitutional in the face of an as-applied challenge." *United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010). For the presumption to fall, the challenger need only show that the regulation has "more than a de minimis effect upon his right." *Heller II*, 670 F.3d at 1253.

The presumption is easily rebutted in this case. As described in Mr. Hasson's motion and *infra*, the NFA's registration and serialization requirements impose a burden that is more than de minimis. Taken as a whole, they place a substantial burden on Mr. Hasson's Second Amendment rights. Compliance with the NFA's registration and serialization scheme, in the case of silencers, requires either (1) the expenditure of hundreds to thousands of dollars just to purchase a serialized silencer, or (2) use of sophisticated technology that is not readily available to the general public. *See* ECF No. 62 at 17, 26. After making the requisite payments, Mr. Hasson's application would likely languish for months in the administrative void, wholly prohibiting him from exercising his Second Amendment right to own a silencer in the interim. *See* ECF No. 62 at 16–18. Such a total deprivation, even for "a limited time," "represents a serious imposition" on Mr. Hasson's Second Amendment rights. *Murphy v. Geurrero*, 2016 WL 5508998, at *8 (D.N.M.I. Sept. 28. 2016). Longstanding or not, any

18

presumption of the requirements' legality quickly evaporates in the face of such onerous burdens.

**Second,** the government contends Mr. Hasson cannot bring an as-applied challenge to the NFA's restrictions because he is neither a "law-abiding, responsible" citizen nor was he using the silencers in self-defense. This argument rests on unproven allegations that Mr. Hasson is a "felonious" drug user, is addicted to controlled substances, and is "a misdemeanant possessor of controlled substances." ECF No. 70 at 8. But "[a] person under indictment is presumed innocent," and hence, "for purposes of construing the statute, a defendant under indictment is a law abiding citizen who remains eligible for Second Amendment protections." *United States v. Call*, 874 F. Supp. 2d 969, 977 (D. Nev. 2012) (citing *United States v. Laurent*, 861 F. Supp. 2d 71, 102 (E.D.N.Y. 2011)). To hold otherwise would permit the government to insulate laws from constitutional review solely on the basis of the prosecution's assertion that a challenger has an unfavorable status. The Court should reject the government's position outright.

At any rate, even if Mr. Hasson were eventually convicted of misdemeanor possession at some future date, the government has not established that he would be excluded from the class of individuals protected by the Second Amendment. As the Fourth Circuit has acknowledged, it cannot be "that any person committing any crime automatically loses the protection of the Second Amendment." *United States v. Carpio-Leon*, 701 F.3d 974, 981 (4th Cir. 2012). "The *Heller* Court's holding that defines the core right to bear arms by law-abiding, responsible citizens does not preclude some future determination that persons who commit some offenses might nonetheless remain in the protected class of 'law-abiding, responsible' persons." *Id.* The Court must consider whether the offense of conviction was

"serious enough to strip [him] of [his] Second Amendment rights." *Binderup v. Attorney General*, 836 F.3d 336, 351 (3d Cir. 2016).  And since simple possession of a Schedule IV controlled substance is a non-violent, non-serious misdemeanor, the Court should find that conviction on that count would not deprive Mr. Hasson of his Second Amendment rights. *See id.* at 351–52 (concluding that individuals convicted of non-violent, non-serious misdemeanors retain their Second Amendment rights).

The government's argument that Mr. Hasson did not possess the silencers for self-defense fares no better.  The government alleges that the silencers were not affixed to a weapon, that one was disassembled, and that one had been used outside of the home.  ECF No. 70 at 8.  But none of these alleged facts leads to the conclusion that the silencers were not intended for self-defense.  The defensive purpose and capability of a device do not change merely because, at any given moment, the device is not in use.  Many firearms owners keep their weapons locked in a cabinet, unloaded, or stored separately from their ammunition.[13] There can be no serious contention that such firearms owners do not possess their firearms for self-defense simply because the gun is not readily at hand.  Nor does use of a weapon outside the home for hunting or at a target range constitute evidence that the weapon is not intended for self-defense.  Indeed, as *Ezell* notes, use of weapons outside the home to train and practice at firing ranges is a necessary corollary of possession of firearms in the home for self-defense.  651 F.3d at 704.  The government's contention that Mr. Hasson could not have possessed the silencer for defensive purposes inside the home because he allegedly

---

[13] *See* Cassandra K. Crifasi, et al., *Storage Practices of US Gun Owners in 2016*, 108 Am. J. Pub. Health 532, 533 (April 2018) (finding that in 2016, 22 percent of American gun owners stored their guns in a safe; 44 percent stored their firearms unloaded; and 79 percent stored their ammunition in a locked safe or separately from their guns).

intended to use the silencer for offensive purpose is unavailing for the same reason. The two purposes are not mutually exclusive. Moreover, a single firearm or accompanying device may have multiple intended uses, i.e., for self-defense, hunting, and sport. The government has not established that Mr. Hasson was not also using the silencer for self-defense, and hence Mr. Hasson is not barred from asserting a Second Amendment challenge on that basis.

## C.    The Silencer-Registration Requirement Fails Intermediate Scrutiny.

The government makes several arguments that the silencer-registration requirement passes intermediate scrutiny. None is persuasive.

*First,* the government acknowledges silencers are rarely used to commit crime, but hypothesizes that "a low rate of silencer use by criminals today *could* indicate simply that Congress's attempt to deter the unlawful use of silencers has succeeded." ECF No. 70 at 10 (emphasis added). This argument is wholly insufficient to show that the registration requirement is "narrowly tailored to serve a significant governmental interest." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017). For one thing, it assumes the government has an interest in "deter[ring] the unlawful use of silencers," but does not say why that is so. As Mr. Hasson explained in his motion, *see* ECF No. 62 at 13-15, 19-23, silencers are not dangerous objects. They do not make bullets more lethal; they do not increase the speed or accuracy with which someone can shoot; and they do not mask the sound of a firearm to such an extent that potential victims are unable to hear gunfire. Deterring the "unlawful use of silencers" can count as a governmental interest—whether "significant" or otherwise—only if there is some reason that the use of silencers should be unlawful to begin with. The government has identified none.

Even assuming the government's articulated interest is not circular, the government utterly fails to show that the registration requirement furthers that interest. Intermediate

scrutiny "is not . . . a toothless standard." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 515 (4th Cir. 2002). When courts apply that standard, "it is not enough for the [government] to identify an interest that is significant in the abstract." *Ross v. Early*, 746 F.3d 546, 556 (4th Cir. 2014). "Rather, the [government] must demonstrate [its policy] materially advances an important or substantial interest by redressing past harms or preventing future ones." *Id.* And "[a]lthough [courts] do not require the government to present a panoply of empirical evidence in order to satisfy this standard, it must nonetheless make some evidentiary showing that the recited harms are real, not merely conjectural, and that the [p]olicy alleviates these harms in a direct and material way." *Id.* The court must "assure" itself that, "in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994).

Here, the government offers nothing more than a fleeting surmise that silencers' infrequent connection to crime "could" indicate the NFA's registration requirement has succeeded. ECF No. 70 at 10. The government does not identify which "past harms" the registration requirement is supposed to "redress[]" or which "future" ones it is meant to "prevent[]." *Ross*, 746 F.3d at 556. Nor does the government make any "evidentiary showing" that its recited harms are "real." *Id.* Much less does it demonstrate that in enacting the registration requirement, Congress relied on "substantial evidence." *Turner Broad. Sys., Inc.*, 512 U.S. at 666.

In the Second Amendment context, the Fourth Circuit has held intermediate scrutiny unsatisfied even where the government made a more robust showing than it has here. *See, e.g.*, *United States v. Carter*, 669 F.3d 411, 419 (4th Cir. 2012) ("[T]he government still bears the burden of showing that § 922(g)(3)'s limited imposition on Second Amendment

rights proportionately advances the goal of preventing gun violence.  And we conclude that in this case, the record it made is insufficient.  Without pointing to any study, empirical data, or legislative findings, it merely argued to the district court that the fit was a matter of common sense.").  This Court should do the same.

*Second,* the government argues the registration requirement survives intermediate scrutiny because "Congress concluded 75 years ago (and reaffirmed as recently as 1986) that silencers' connection to criminal enterprise warranted some regulation."  ECF No. 70 at 10. This conclusory assertion falls well short of discharging the government's burden.  *See Chester*, 628 F.3d at 683 ("[I]ntermediate scrutiny places the burden of establishing the required fit squarely upon the government.").  "[I]n order to determine whether the government's interest is significant, substantial, or important, [courts] first define the government's objective." *Mahoney v. Sessions*, 871 F.3d 873, 881 (9th Cir. 2017).  Defining the government's objective is a prerequisite to applying intermediate scrutiny because, to satisfy that test, the government must show that "a *particular* government interest is sufficiently . . . important to justify an infringement on the individual right in question." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 775 F.3d 308, 323 (6th Cir. 2014), *rev'd on other grounds*, 837 F.3d 678 (6th Cir. 2016) (en banc).

But the government does not actually "define" the "particular" interest it believes the registration requirement serves.  Instead, it simply contends, without further discussion, that silencers have some unspecified "connection to criminal enterprise," and that "some regulation" is needed to solve the problem.  What is the nature of silencers' "connection to criminal enterprise"?  How does that connection endanger the public?  And how would "some regulation" solve the problem?  The government does not say.  This failure to identify the

specific governmental interest at stake dooms the government's argument.  *Cf. Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 193 (1997) (upholding telecommunications statute under intermediate scrutiny where "Congress identified a *specific* interest in 'ensuring the continuation' of 'the local origination of broadcast programming'" (emphasis added)); *Hutchins v. District of Columbia*, 188 F.3d 531 (D.C. Cir. 1999) (en banc) (Rogers, J., concurring in part and dissenting in part) (explaining that intermediate scrutiny "requires that justifications for complex, but burdensome, policy choices emanate from the legislature and that burdens be tailored to *specific ends*" (emphasis added)).

   ***Third,*** citing *Heller II*, the government offers a "transitive proof": registration of "actual guns" is not prohibited by the Second Amendment; silencers are like actual guns; therefore, registration of silencers is also not prohibited by the Second Amendment.  ECF No. 70 at 11 & n.8.  This argument misconstrues *Heller II* and elides the important differences between "actual guns" and silencers.

   The plaintiffs in *Heller II* challenged the District of Columbia's statutory scheme for registering firearms.  670 F.3d at 1248.  In resolving that challenge, the D.C. Circuit grouped D.C.'s various registration requirements into two buckets: "basic registration requirements" and "novel registration requirements."  *Id.* at 1253-55.  The former mandated that a gun owner "[d]isclose certain information about himself—such as his name, address, and occupation—and about his firearm."  *See id.* at 1248, 1253-54.  The latter included requirements that a gun owner register no more than one pistol in a 30-day period, pass a vision test, demonstrate knowledge of the safe and responsible handling of firearms, submit to being fingerprinted and photographed, and attend a firearms training course, among other things.  *Id.* at 1248-49, 1255.

The D.C. Circuit held the "basic registration requirements" were "longstanding in American law" and therefore presumptively legal. *Id.* at 1254. And the court found no basis to rebut the presumption: "basic registration requirements are self-evidently de minimis, for they are similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous." *Id.* at 1254-55. But the "novel registration requirements" were "not longstanding," and they "affect[ed] the Second Amendment right because they [we]re not de minimis." *Id.* at 1255. Those requirements, the court held, "make it considerably more difficult for a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-defense in the home—the 'core lawful purpose' protected by the Second Amendment." *Id.* (quoting *Heller*, 554 U.S. at 630). The "novel registration requirements" were therefore permissible only if they satisfied intermediate scrutiny. *Id.* at 1255-58.

Applying that test, the court concluded the District had identified "two important governmental interests it may have in the [novel] registration requirements, *viz.*, to protect police officers and to aid in crime control." *Id.* at 1258. Registration might accomplish these goals by "allow[ing] officers to determine in advance whether individuals involved in a call may have firearms . . . and assist[ing] law enforcement in determining whether registered owners are eligible to possess firearms or have fallen into a prohibited class." *Id.* But the court held the District had "not demonstrated a close fit between those [novel registration] requirements and its governmental interests" because it had "fail[ed] to present any data or other evidence to substantiate its claim that these requirements c[ould] reasonably be expected to promote either of the important governmental interests it ha[d] invoked." *Id.* at 1258-59. Intermediate scrutiny required the District to "present some meaningful evidence,

25

not mere assertions, to justify its predictive judgments." *Id.* at 1259. Because the District had not done so, the novel registration requirements could not be sustained on the record before the court. *Id.* at 1259-60.

Heller II supports Mr. Hasson's position, not the government's. The NFA's silencer-registration requirement is not what *Heller II* referred to as a "basic registration requirement." Instead of merely asking an applicant to provide his name, address, and information about his firearm, the ATF directs would-be possessors to provide information for a background check, such as a photograph and fingerprint card—just like the "novel registration requirement" in *Heller II*. Such a requirement, according to *Heller II*, is "not de minimis" and "make[s] it considerably more difficult for a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-defense in the home—the 'core lawful purpose' protected by the Second Amendment." 670 F.3d at 1255. It is therefore constitutional only if the government "present[s] some meaningful evidence, not mere assertions, to justify [it]." *Id.* at 1259. The government has not done so here. Thus the government's "transitive proof" fails because the first step in that proof pertained only to "basic registration requirements" of the kind not at issue in Mr. Hasson's case.

It fails for another reason, as well. The proof assumes that whatever reasons justify a *gun*-registration requirement must also justify a *silencer*-registration requirement. But the government does not explain why this should be so. *Heller II* suggested a gun-registration requirement may be justified because it "allows officers to determine in advance whether individuals involved in a call may have firearms." *Id.* at 1258. Presumably this knowledge reduces risk to officers by alerting them to the possible presence of a dangerous weapon—a firearm. But as explained above, silencers are not dangerous weapons. Thus it is not clear

how giving officers forewarning of a silencer's presence would improve public safety. The second step in the government's syllogism—i.e., that silencers are equivalent to "actual guns"—rests on a faulty premise. The government's "transitive proof" proves nothing.

Regardless, even if the NFA imposed something akin to a "basic registration requirement," rather than a "novel registration requirement," *Heller II* still would not support the government's position. The D.C. Circuit upheld basic registration requirements because "they are similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous." *Heller II*, 670 F.3d at 1255. But notwithstanding near universal frustration with wait times at the DMV, registering a car does not take six to eight months. Neither does signing up to vote. *Heller II*'s conclusion that "basic registration requirements" pass constitutional muster was premised on the idea that registering a gun, like registering to vote, is a quick and painless process. The same cannot be said of registering a silencer under the NFA. When *Heller II* blessed "basic registration requirements," it did not contemplate the dysfunction and delay that characterize the ATF registration process—which, for all practical purposes, entirely deprives people of their Second Amendment rights for a substantial period of time.

Courts have recognized, relatedly, that "waiting period[s] on . . . handgun sales . . . pose a burden on constitutional rights that must be justified by a sufficient government interest." *Mance v. Sessions*, 896 F.3d 390, 399 (5th Cir. 2018) (Ho, J., dissenting from denial of rehearing en banc). If courts would strike down "a 10–day waiting period for abortions" or "a 10–day waiting period on the publication of racist speech," there is no reason to uphold, for instance, a ten-day waiting period on the purchase of a gun. *Silvester v. Becerra*, 138 S. Ct. 945, 951-52 (2018) (Thomas, J., dissenting from denial of certiorari). At

six to eight months, the de facto waiting period for NFA registration is much longer than ten days, and therefore much more vulnerable to constitutional attack.[14]

In the First Amendment context, the Supreme Court has held that a license for First Amendment-protected speech "must be issued within a reasonable period of time, because undue delay results in the unconstitutional suppression of protected speech." *City of Littleton, Colo. V. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774, 780 (2004). Excessive "administrative[] delay" risks turning a licensing requirement into a "censorship" scheme that chills protected speech. *Id.* at 778-81 (emphasis omitted). The same logic applies here. *See, e.g.*, *Chester*, 628 F.3d at 632 ("[W]e agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment."); *Ezell*, 651 F.3d at 706-07 ("[W]e and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context."). Even assuming some kind of silencer-registration requirement is permissible in the abstract, therefore, the government cannot make the process for registration so lengthy, burdensome, and opaque that it effectively denies gun owners their Second Amendment right to bear arms.

---

[14] In *Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016), the case that prompted Justice Thomas' dissent, the Ninth Circuit rejected a Second Amendment challenge to a ten-day waiting period for the purchase of firearms. 843 F.3d at 829. But it grounded its analysis in the belief that imposing such a "very small" delay in acquiring a gun was "a reasonable precaution" that promoted the state's interests in (1) allowing law enforcement time to complete a background check, and (2) providing a "cooling off" period for those who seek to buy guns while gripped by a violent impulse. *Silvester*, 843 F.3d at 819, 827-29. Concurring, Chief Judge Thomas emphasized that the statute "only delays—for a brief, predictable term—the full exercise of the Second Amendment right to keep and bear arms." *Id.* at 832 (Thomas, C.J., concurring). The statute's "known ten-day delay" did not violate the Second Amendment, he wrote, because it imposed only a "minor temporal regulation." *Id.* The delay in registering a silencer with the ATF, by contrast, is neither "brief," "minor," "known," nor "predictable"; it may persist for five months, eight months, or even a year or longer. Thus *Silvester* does not suggest the NFA is constitutional as applied to Mr. Hasson.

*Fourth,* the government argues the silencer-registration requirement is narrowly tailored notwithstanding the lengthy wait times following submission of a transfer application. This is so, according to the government, because "administrative sloth does not make the implementing law unconstitutional; it only provides a plaintiff a basis for an injunctive lawsuit." ECF No. 70 at 11 n.8. The government does not cite any authority for this proposition. Nor does the argument make sense on its face. If "administrative sloth" provides a basis to seek injunctive relief, that must be because excessive delay violates some source of law, e.g., a statute or the Constitution. (Without a violation of law, there can be no cause of action.) Mr. Hasson is unaware of any statute that requires the ATF to process transfer applications within a given period of time. Thus the law underlying Mr. Hasson's supposed "injunctive lawsuit" must be the Constitution, which means the "implementing law" is indeed unconstitutional.

The government also claims average wait times are immaterial to Mr. Hasson's as-applied challenge because Mr. Hasson obtained a silencer without first submitting a transfer application and waiting for it to be approved. ECF No. 70 at 11 n.8. To the extent the government is contending that someone who is prosecuted for violating the law cannot defend on the basis that the law is unconstitutional, this claim is plainly meritless. Courts routinely adjudicate constitutional claims raised by defendants whose violation of a criminal statute is clear. The defendant in *Miller*, for instance, was convicted of transporting an unregistered double-barrel shotgun under the predecessor to the statute the government has charged Mr. Hasson with violating. 307 U.S. at 175 & n.1. Although the Supreme Court rejected the *Miller* defendant's Second Amendment challenge to the registration statute, it neither stated nor implied that the defendant was barred from bringing that challenge simply

because he had failed to seek—and been denied—a registration stamp.  Federal criminal law does not recognize, and has never recognized, any such requirement.  *See also, e.g.*, *United States v. Hosford*, 843 F.3d 161, 167-70 (4th Cir. 2016) (rejecting defendant's as-applied Second Amendment challenge to statute banning unlicensed firearms sales, without attributing any relevance to fact that he never applied for a license).

### D.      The Silencer-Serialization Requirement Fails Intermediate Scrutiny.

The government attempts to show the serialization requirement satisfies intermediate scrutiny, but its arguments are unavailing.

*First,* the government asserts it "has an interest in tracking certain firearm accessories (such as silencers)."  ECF No. 70 at 12.  But the government does not explain *why* it has such an interest or *why* that interest is "significant."  *Packingham*, 137 S. Ct. at 1736.  More important, the government makes no "evidentiary showing" that the harms caused by untrackable silencers are "real" or that the serialization requirement "alleviates these harms in a direct and material way."  *Ross*, 746 F.3d at 556.  The government does not even attempt to demonstrate that in passing the serialization requirement, Congress "dr[ew] reasonable inferences based on substantial evidence."  *Turner Broad. Sys., Inc.*, 512 U.S. at 666.

Even where the government offers a more developed argument, the Fourth Circuit has held the record insufficient to satisfy intermediate scrutiny:

> We cannot conclude on this record that the government has carried its burden of establishing a reasonable fit between the important object of reducing domestic gun violence and § 922(g)(9)'s permanent disarmament of all domestic-violence misdemeanants.  The government has offered numerous plausible *reasons* why the disarmament of domestic violence misdemeanants is substantially related to an important government goal; however, it has not attempted to offer sufficient *evidence* to establish a substantial relationship between § 922(g)(9) and an important governmental goal.

*Chester*, 628 F.3d at 683 (emphasis in original).  The record in this case is sparser than it was in *Chester*.  The government has therefore failed to carry its burden of showing the serialization requirement advances a significant governmental interest.  *See also Giovani Carandola, Ltd.*, 303 F.3d at 516 (holding statute did not pass intermediate scrutiny where government "offered nothing—no evidence, no judicial opinion, not even any argument—to suggest that [prohibited conduct] produce[d] the kind of adverse secondary effects that the state s[ought] to prevent").

*Second,* the government maintains the serialization requirement is not unconstitutional as applied to Mr. Hasson because, "if [he] had the ability to cut steel to create [a] silencer, he had the ability to cut steel to engrave numbers into it."  ECF No. 70 at 12.  The government's conclusion does not follow from its premise.  "Drill[ing] out pre-indexed holes" in a piece of metal, ECF No. 70 at 11, can be accomplished with a standard household drill; it does not require any particularly sophisticated or expensive equipment.  Inscribing a long sequence of tiny letters and numbers on the side of a silencer, by contrast, requires specialized equipment to which most people do not have access.  That Mr. Hasson assembled a pre-packaged silencer does not establish his ability to "engrave numbers into it."

*Third,* the government cites *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), in which the Third Circuit held that a separate firearm-serialization statute does not offend the Second Amendment.  ECF No. 70 at 12.  The defendant in *Marzzarella* was charged under 18 U.S.C. § 922(k), which prohibits knowingly transporting or possessing "any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered."  614 F.3d at 88 & n.1.  In holding that this statute survived intermediate scrutiny,

31

the Third Circuit did not consider the argument Mr. Hasson makes: that because professionally manufactured silencers are prohibitively expensive, potential possessors can comply with the 26 U.S.C. § 5861(i) serialization requirement only by inscribing serial numbers themselves—a task for which they lack the technological wherewithal. *See* ECF No. 62 at 26-27.[15] *Marzzarella*, therefore, did not address either (1) the burden that § 5861(i) imposes on the Second Amendment rights of people like Mr. Hasson, or (2) whether, in light of that burden, § 5861(i) is narrowly tailored to achieve a significant governmental interest. Because *Marzzarella* did not decide these issues, it does not control Mr. Hasson's case.

### E.    Conclusion

For the reasons described above and in Mr. Hasson's motion, this Court should dismiss Counts One and Two of the indictment.

---

[15] *Marzzarella*'s failure to confront this argument is unsurprising.  Section 922(k), unlike 26 U.S.C. § 5861(i), applies only to firearms that have already been imprinted with a serial number; if the gun never bore a serial number, that number cannot have been "removed, obliterated, or altered."  Thus § 922(k) has no bearing on cases, like Mr. Hasson's, in which a defendant potentially faces liability for failing to proactively engrave a serial number on a firearm himself.

Respectfully submitted,

James Wyda
Federal Public Defender


_____/s/_____
Elizabeth G. Oyer, #95458
Cullen Macbeth, #810923
Assistant Federal Public Defenders
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland  21201
Telephone: (410) 962-3962
Facsimile: (410) 962-0872
Email: liz_oyer@fd.org
        cullen_macbeth@fd.org