IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| Plaintiff, | * | |
| v. | | Case No.: GJH-19-96 |
| | * | |
| CHRISTOPHER PAUL HASSON, | | |
| | * | |
| Defendant. | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Defendant Christopher Paul Hasson has been charged with Unlawful Possession of Unregistered Firearm Silencers ("Count I") and Unlawful Possession of Firearm Silencers Unidentified by Serial Numbers ("Count II") in violation of the National Firearms Act ("NFA"), 26 U.S.C. § 5801 *et seq*.; Possession of Firearms by Unlawful User of and Addict to a Controlled Substance in violation of 18 U.S.C. § 922(g)(3) ("Count III"); and Possession of a Controlled Substance in violation of 21 U.S.C. § 844(a) ("Count IV"). ECF No. 71. Pending before the Court are Defendant's Motion to Dismiss Counts I and II on Second Amendment Grounds, ECF No. 62, Defendant's Motion to Dismiss Count III on Void-for-Vagueness Grounds, ECF No. 63, and Defendant's Motion to Suppress Evidence Seized Pursuant to Search Warrants, ECF No. 66. A hearing was held on September 9, 2019. ECF No. 81. For the following reasons, Defendant's motions are denied.

## I.      BACKGROUND

According to the Criminal Complaint, since at least October 2016, Defendant has regularly purchased 100 to 300 milligrams of Tramadol, a Schedule IV controlled substance,

1

every two to three months. ECF No. 1 ¶¶ 16–17.[1] He kept and used that Tramadol at, among

other locations, his place of employment in Washington, D.C., where he is employed by the

United States Coast Guard. *Id.* ¶¶ 21–23. Since at least late 2017, Defendant has also possessed a

number of firearms, including rifles, shotguns, handguns, and revolvers, *id.* ¶ 11; ECF No. 71 at

3,[2] and in February 2019, he also possessed one assembled firearm silencer and one

disassembled firearm silencer, neither of which was registered to Defendant or identified by a

serial number, *id.* at 1–2.

On February 14, 2019, United States Magistrate Judge Gina L. Simms authorized a

Criminal Complaint charging Defendant with Possession of Firearms by Unlawful User of and

Addict to a Controlled Substance and Possession of a Controlled Substance. ECF No. 1. On

February 27, 2019, a federal grand jury for the District of Maryland returned an indictment

charging Defendant with Unlawful Possession of Unregistered Firearm Silencers ("Count I") and

Unlawful Possession of Firearm Silencers Unidentified by Serial Numbers ("Count II"), in

addition to the counts previously charged by the Criminal Complaint ("Count III" and "Count

IV," respectively). ECF No. 16. Defendant was arraigned on these charges on March 11, 2019,

and he entered a plea of not guilty. ECF No. 19.[3]

On June 24, 2019, Defendant filed three motions: a Motion to Dismiss Counts I and II on

Second Amendment Grounds, ECF No. 62; a Motion to Dismiss Count III on Void-for-

Vagueness Grounds, ECF No. 63; and a Motion to Suppress Evidence Seized Pursuant to Search

Warrants, ECF No. 66. The Government filed a consolidated opposition to Defendant's motions

---

[1] The core factual contentions in the Criminal Complaint and Superseding Indictment were not challenged for purposes of the motion hearing.
[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.
[3] A Superseding Indictment, which did not substantively change the charges, was filed on August 14, 2019, ECF No. 71, and Defendant was rearraigned on September 9, 2019, again entering a plea of not guilty to all counts, ECF No. 81.

on August 5, 2019, ECF No. 70, and Defendant filed three separate replies on August 26, 2019, ECF Nos. 76, 77, 78.

On September 9, 2019, the Court held an evidentiary hearing on the nature, benefits, and purposes of silencers, the application process for registering and serializing silencers, and the prevalence of silencers. ECF No. 81. Defendant offered expert testimony from Gary Schaible, a recently-retired agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and Daniel O'Kelly, a firearms consultant and former ATF agent. Mr. Schaible testified about the NFA and ATF's administration of the NFA, and Mr. Kelly testified about the demand for and uses of NFA-firearms, including silencers.

The Government offered expert testimony from Elizabeth A. Gillis, a firearms enforcement officer with ATF, and Ted Clutter, a legal instruments examiner supervisor with ATF. Ms. Gillis testified about the objective features of silencers and silencer parts, ATF's testing of silencers, and her report regarding the silencers in the instant case. Mr. Clutter testified about the procedure for obtaining a silencer and how ATF processes applications to make and transfer NFA-firearms, including silencers.

The evidence showed that a silencer, which is also referred to as a muffler or a suppressor, is a device that is attached to a firearm for the primary purpose of reducing the firearm's sound signature. Ms. Gillis testified that, in general, silencers can reduce a firearm's sound signature by anywhere between 2 to 35 decibels.[4] Mr. O'Kelly testified, however, that it is unlikely that a silencer will completely eliminate the sound of a gunshot unless the firearm is particularly small or the silencer is particularly large. Silencers can be commercially-

---

[4] A firearm's sound signature is measured in decibels, which run from 0 to 180 on a logarithmic scale. Thus, if a firearm's sound level is 140 decibels and a silencer is attached that reduces that level by 10 decibels, the firearm's sound has been cut in half. If a silencer decreases the level by 20 decibels, the firearm's sound signature would be reduced to only 25% of its original level.

manufactured or homemade from common household items such as soda bottles, magnesium light flashlights, or oil filters, but Ms. Gillis explained that commercial silencers typically cause a larger sound reduction than homemade silencers.

Silencers generally have no use independent of their attachment to a gun. They do not fire bullets on their own and do not contain a slide, trigger, firing pin, cartridge case, barrel, primer, or gunpowder. Mr. O'Kelly testified that "you can't hurt anybody with a silencer unless you hit them over the head with it." Rather, based on his conversations with gun owners, Mr. O'Kelly testified that the primary reasons for owning a silencer are hearing protection and courtesy to others. Silencers also have an incidental effect of increasing the accuracy of a firearm because their weight prevents muzzle rise. Mr. O'Kelly also explained that when he was on the ATF shooting range as an instructor, he sometimes used firearms without silencers, but he always used earmuffs or earplugs for hearing protection. Finally, Mr. O'Kelly testified that in his thirty-four years as a law enforcement officer, he never saw a case in which a silencer was used in the commission of a violent crime.

Silencers are regulated, in part, by the NFA, which requires that NFA-firearms be serialized and registered in the National Firearms Registry and Transfer Record ("NFRTR") in order to be lawfully possessed. The NFA Division of ATF administers the NFA and maintains the NFRTR. Mr. O'Kelly testified that the NFRTR is helpful in criminal investigations because it can assist law enforcement officers in tracing the control or possession of any NFA-firearm that may have been used during the commission of a crime.

Mr. Schaible testified that any individual, trust, legal entity, or government entity that wants to make or obtain an NFA-firearm, including a silencer, must apply for approval from ATF. The application process involves filling out the appropriate form, providing necessary

supporting documentation, and submitting fingerprints for the purpose of an FBI criminal background check. Applicants who want to make and register an NFA-firearm must fill out "Form 1," which is available both as a paper form and as an electronic form ("eForm"). Applicants who want to transfer and register a firearm must fill out "Form 4," which, since January 2016, has only been available as a paper form. Mr. Schaible and Mr. O'Kelly both noted that demand for silencers has consistently increased over the past ten years, and Mr. Schaible testified that when he retired in September 2018, the most in-demand NFA-firearm registrations were for silencers and short-barrel rifles.

Once an application is submitted, an ATF legal instruments examiner must process that application. Mr. Clutter testified that processing times for applications vary, but he estimated that the processing time is currently thirty days for eForm 1, seven months for paper Form 1, and eight to ten months for paper Form 4. He estimated that in February 2019, when Defendant was arrested, the processing time was less than thirty days for eForm 1 and eight months for paper Form 1. He did not have a February 2019 estimate for Form 4. Mr. Clutter also testified that making and registering an NFA-firearm pursuant to Form 4 is more popular today than it has been in ATF's history; he stated that the increased demand may correlate with the lengthy delays in processing Form 4.

After processing the application, the legal instruments examiner will determine whether to approve the application, deny the application, or ask for additional information. Mr. Schaible testified that the denial rate is low and there is little discretion as to approval or denial where a form is complete. Mr. Clutter testified that an application can be denied for a variety of reasons, including administrative error, incomplete application, failure to provide supporting

documentation or fingerprints, failure to pass the criminal background check, state law violations, or disqualifying characteristics such as unlawful drug use.

In general, the evidence demonstrated that the registration process for silencers does involve certain inefficiencies and redundancies that cause the process to take longer than certain purchasers would like.

## II.     MOTION TO DISMISS COUNTS I AND II

Counts I and II of the Superseding Indictment charge Defendant with possession of unregistered and unserialized silencers in violation of the NFA. Defendant contends that the NFA's registration and serialization requirements unconstitutionally infringe upon his Second Amendment rights and that Counts I and II must be dismissed. Specifically, he contends that silencers are "arms" within the meaning of the Second Amendment, and the NFA's requirements unconstitutionally burden the right of law-abiding citizens to possess silencers for lawful purposes. The Government responds that silencers are not arms and therefore do not fall within the Second Amendment's protections, and even if they did, the NFA does not impose an unconstitutional burden on those protections.

### A.  The Second Amendment

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment "conferred an individual right to keep and bear arms," and it observed that the Second Amendment's "core protection" is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 595, 634–35 (invalidating a District of Columbia statute banning handgun possession in the home).

6

The *Heller* Court recognized, however, that "the right secured by the Second Amendment is not unlimited," in that it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. It also cautioned that its ruling should not "cast doubt" on certain "longstanding prohibitions" on firearms, such as prohibitions on the possession of firearms by felons and the mentally ill or laws imposing conditions and qualifications on the commercial sale of arms. *Id.* at 626–27.

Following *Heller*, the Fourth Circuit has used a two-step approach to determine whether a challenged law violates the Second Amendment. First, the Court must determine "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment guarantee." *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017) (quoting *United States v. Chester*, 628 F.3d 672, 680 (4th Cir. 2010)) (internal quotations omitted). If the answer is no, then the challenged law is valid. *Id.* If the challenged law does impose a burden on conduct protected by the Second Amendment, the Court must "apply an appropriate form of means-end scrutiny" to determine whether the law is nonetheless constitutional. *Id.* (internal punctuation omitted). The Court will apply this approach to determine whether the NFA's requirement that silencers be registered and serialized violates the Second Amendment.

### B. Application

The initial question is whether silencers are within the scope of the Second Amendment. Under *Heller*, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582. The "most natural reading" of the Second Amendment's right to "keep and bear Arms" is the right to "have weapons." *Id.* (internal quotations omitted). Indeed, the Second Amendment "guarantee[s] the individual right to possess and carry *weapons* in case of confrontation." *Id.* at 592 (emphasis added). *Heller* defines the "arms" protected by the

7

Second Amendment as "[w]eapons of offence, or armour of defence" or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* at 581 (citing two dictionaries from the eighteenth century and one from the nineteenth century).

The Court finds that a silencer is not an "arm" or a "weapon" because it is not inherently useful "in case of confrontation" as a "[w]eapon of offence" or an "armour of defence." A silencer is not itself used "to cast at or strike another," it does not contain, feed, or project ammunition, and it does not serve any intrinsic self-defense purpose. As Defendant's own expert testified, a silencer cannot, on its own, cause any harm,[5] and it is not useful independent of its attachment to a firearm. A silencer is not a weapon in and of itself, but simply a "firearm accessory," *see United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018), and therefore not a "bearable arm" protected by the Second Amendment.

Defendant cites to *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) in support of his contention that a silencer is nonetheless protected by the Second Amendment because it is necessary to the effective operation of a firearm. In *Ezell*, the Seventh Circuit invalidated a Chicago ordinance that prohibited all firing ranges despite the City also mandating firing-range training as a prerequisite to lawful gun ownership. 651 F.3d at 691. The Seventh Circuit reasoned that shooting ranges are not "categorically unprotected by the Second Amendment" because "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Id.* at 704.

Defendant argues that just as the Seventh Circuit has determined that firing ranges are constitutionally protected because they are necessary to the effective exercise of the core Second

---

[5] Putting to the side the possibility that it could be thrown at someone like a shoe or a baseball, which, most would agree, are not arms protected by the Second Amendment.

Amendment right, this Court should determine that silencers are also protected because they are similarly necessary to the exercise of the core Second Amendment right. However, the firing ranges in *Ezell* are distinguishable from the silencers in the instant case. The *Ezell* Court noted that even the City "consider[ed] live firing-range training so critical to responsible firearm ownership that it mandate[d] this training as a condition of lawful firearm possession." 651 F.2d at 704–5. Indeed, under the City's ordinance, an individual could not exercise his Second Amendment right without access to the prohibited firing ranges. *See id.* at 689–90 (citing Chi. Mun. Code § 8–20–120). Here, there is no evidence that silencers are "so critical" to firearm ownership that firearms cannot be used effectively without them. Although silencers may improve the usage of a firearm, they are not necessary, and they are therefore not protected by the Second Amendment.

Defendant's citations to *Assoc. of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. of New Jersey*, 910 F.3d 106 (3d Cir. 2018) and *Jackson v. City and Cty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014), cases involving access to and ability to use ammunition including, in *Jackson*, hollow-point bullets, fail for similar reasons. In those cases, the Third and Ninth Circuits, respectively, held that ammunition as a *category* is protected by the Second Amendment because "without bullets, the right to bear arms would be meaningless. A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." *Jackson*, 746 F.3d at 967; *see also Rifle & Pistol Clubs*, 910 F.3d 106 ("Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment."). Although ammunition is the means by which firearms are effective at serving their purpose as weapons and restrictions on type and usage may run afoul of the Second

Amendment, the same cannot be said for silencers because a firearm remains an effective weapon without a silencer of any type attached. Thus, this Court joins every other court to consider the issue in determining that a silencer is not a weapon protected by the Second Amendment. *See, e.g.*, *Cox*, 906 F.3d at 1186 (holding that a silencer is not a "bearable arm" protected by the Second Amendment); *United States v. Stepp-Zafft*, 733 F. App'x 327, 329–30 (8th Cir. 2018) (on plain error review, finding no plain error where district court failed to dismiss unregistered silencer charge on Second Amendment grounds); *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) (holding that silencers are not protected by the Second Amendment); *United States v. Grey*, Case No. CR-18-00412-CAS-1, 2018 WL 4403979, at *13 (N.D. Cal. Sept. 13, 2018) (following *McCartney*'s holding to deny motion to dismiss unregistered silencer charge on Second Amendment grounds); *United States v. Perkins*, Case No. 4:08CR3064, 2008 WL 4372821, at *4 (D. Neb. Sept. 23, 2008) (holding that silencers are not protected by the Second Amendment); *United States v. Garnett*, 2008 WL 2796098, at *4–5 (E.D. Mich. 2008) (finding that nothing in *Heller* "casts doubt" on the constitutionality of the NFA's regulation of silencers). The NFA does not implicate Defendant's constitutional rights, so his Motion to Dismiss Counts I and II must be denied.[6]

## III.   MOTION TO DISMISS COUNT III

Count III of the Superseding Indictment charges Defendant with a violation of 18 U.S.C. § 922(g)(3), which provides, in relevant part, that "[i]t shall be unlawful for any person … who is

---

[6] The evidence received by the Court at the hearing presents close calls on other aspects of the Second Amendment analysis, including whether silencers are in common use for lawful purposes, *see Heller*, 554 U.S. at 625 (stating that the Second Amendment only protects weapons "typically possessed by law-abiding citizens for lawful purposes"), and whether the regulation at issue would survive intermediate scrutiny, *see Kolbe*, 849 F.3d at 138 (applying intermediate scrutiny where a law "does not severely burden the core protection of the Second Amendment, i.e., the right of law-abiding, responsible citizens to use arms for self-defense in the home"). Because the Court's determination that a silencer is not an arm subject to protection by the Second Amendment is dispositive of the motion, the Court will decline to resolve those issues.

an unlawful user of or addict to any controlled substance (as defined in section 102 of the

Controlled Substances Act (21 U.S.C. 802)) … to … possess in or affecting commerce, any

firearm or ammunition." Defendant contends that Count III must be dismissed because §

922(g)(3) is unconstitutionally vague on its face and is therefore void. The Government responds

that Defendant cannot make a facial challenge to the statute because it clearly covers his alleged

conduct.

### A.  The Void-for-Vagueness Doctrine

"The void-for-vagueness doctrine requires that a penal statute define the criminal offense

with sufficient definiteness that ordinary people can understand what conduct is prohibited and

in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v.*

*Hosford*, 843 F.3d 161, 170 (4th Cir. 2016) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357

(1983)) (internal punctuation omitted). Vagueness challenges to statutes not threatening First

Amendment interests are typically judged on an as-applied basis, *United States v. Jaensch*, 665

F.3d 83, 89 (4th Cir. 2011), but the Supreme Court has permitted facial challenges to criminal

statutes "[w]hen vagueness permeates the text of such law," *see, e.g.*, *City of Chicago v.*

*Morales*, 527 U.S. 41, 55 (1999).

The Fourth Circuit has recently reaffirmed that "a plaintiff who engages in some conduct

that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct

of others." *Hosford*, 843 F.3d at 170 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1,

18–19 (2010)) (internal quotations omitted). "Thus, if a law clearly prohibits a defendant's

conduct, the defendant cannot challenge, and a court cannot examine, whether the law may be

vague for other hypothetical defendants." *Id.* Defendant contends, however, that the Supreme

Court's decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015) eliminated this rule and

permitted defendants to mount facial vagueness challenges regardless of whether their conduct is clearly prohibited by a statute. The Court disagrees.

In *Johnson*, the Supreme Court declared the residual clause of the Armed Career Criminal Act ("ACCA") to be unconstitutionally vague without requiring the defendant to show that the ACCA was vague as applied to his particular conduct. 135 S. Ct. at 2563. The ACCA increases the prison term of a defendant convicted of a firearms offense under § 922(g) from ten years to a minimum of fifteen years and a maximum of life where the defendant has three or more prior convictions for either a "serious drug offense" or a "violent felony." § 924(e)(1); *Johnson*, 135 S. Ct. at 2555. As was relevant in *Johnson*, "violent felony" was defined as any crime punishable by imprisonment for more than one year that "is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another*[.]" § 924(e)(2)(B)(ii). The italicized portion of the definition is what was known as the ACCA's "residual clause." 125 S. Ct. at 2556.

As the Court held prior to *Johnson*, the ACCA requires a sentencing court to employ a categorical approach to determining whether an offense "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another," wherein the court will assess the generic version of the offense, rather than how the specific offender committed the crime on the particular occasion at issue. *Johnson*, 135 S. Ct. at 2557 (citing *Taylor v. United States*, 495 U.S. 575, 600 (1990)). In light of this categorical approach, the *Johnson* Court concluded that the ACCA's residual clause was unconstitutionally vague because it combined the indeterminacy of how to measure the risk posed by an idealized version of a crime with the indeterminacy of how much risk it takes for an idealized version of a crime to qualify as a violent felony when compared with the offenses

expressly identified in the statute. *Id.* at 2558. This uncertainty "produce[d] more unpredictability and arbitrariness than the Due Process Clause tolerates." *Id.*

Contrary to what Defendant argues, *Johnson* did not expand the universe of litigants who may attack statutes as facially vague. Although the *Johnson* Court rejected the notion that for a statute to be vague on its face, it must be vague in all of its applications, 135 S. Ct. at 2561, the Court's invalidation of the residual clause on vagueness grounds was tied to the "hopeless indeterminacy" caused by application of the ACCA's unique categorical approach. *Id.* at 2558; *see United States v. Cook*, 914 F.3d 545, 553 (7th Cir. 2019) ("[S]o much of the Court's analysis in *Johnson* deals with a statute that is in key respects *sui generis* … it was the categorical approach called for by the ACCA's residual clause … which the court found to be particularly vexing."). "Assessing the degree of risk posed by an idealized 'typical' version of an offense was significantly different, as the Court emphasized, from looking at the risks posed by a set of actual, concrete facts." *Cook*, 914 F.3d at 553 (citing *Johnson*, 135 S. Ct. at 2558); *see Johnson*, 135 S. Ct. at 2561.

In contrast to the ACCA, Section 922(g)(3) "does not call for the court to engage in any abstract analysis; it calls on the court to apply the statutory prohibition to a defendant's real-world conduct." *Cook*, 914 F.3d at 553 (listing cases).  Thus, the uncertainty posed by the residual clause is not found in § 922(g)(3), and the Court will apply "the general rule that a defendant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge." *See Cook*, 914 F.3d at 554; *see also United States v. Bramer*, 832 F.3d 908, 909 (8th Cir. 2016) (After *Johnson*, "our case law still requires [a defendant] to show that the statute is vague as applied to his particular conduct.").

**B. Application**

Having determined that a facial challenge is only available when a statute is vague as applied to a defendant's particular conduct, the Court is left with the question of whether Defendant's conduct in this case is clearly prohibited by § 922(g)(3). Fourth Circuit case law makes clear that "[t]o sustain a conviction [under § 922(g)(3)], the government must prove that the defendant's drug use was 'sufficiently consistent, prolonged, and close in time to his gun possession to put him on notice that he qualified as an unlawful user' under the terms of statute." *United States v. Sperling*, 400 F. App'x 765, 767 (4th Cir. 2010) (quoting *United States v. Purdy*, 264 F.3d 809, 812 (9th Cir. 2001)). Whatever doubt there may be about the exact reach of § 922(g)(3), "this is not a borderline case," *see United States v. Jackson*, 280 F.3d 403, 406 (4th Cir. 2002), and even Defendant does not seem to contest that his alleged conduct falls squarely within the confines of the statute.

The Criminal Complaint states that Defendant possessed firearms since at least late 2017. ECF No. 1 ¶ 11. When he was arrested, he was in possession of seventeen different firearms. ECF No. 71 at 3. The Criminal Complaint also states that over the past three years, Defendant regularly purchased Tramadol, a Schedule IV controlled substance, ECF No. 1 ¶¶ 16–17, and he contemporaneously purchased synthetic urine, likely in an attempt to "beat" the urinalysis tests he was subjected to as a Coast Guard employee. *Id.* ¶¶ 19–20. In its brief, the Government refers to additional evidence that Defendant had Tramadol in his bloodstream at the time of his arrest, ECF No. 70 at 20, and had admitted to relatives on recorded jail calls that he "has been using drugs for years," *id.* at 19 n.14. This alleged conduct is clearly prohibited by § 922(g)(3)'s prohibition on possession of firearms by an individual whose drug use is consistent, prolonged,

and close in time to his firearm possession. Because § 922(g)(3) is not vague as applied to

Defendant, he cannot mount a facial attack, so his Motion to Dismiss Count III must be denied.

## IV.    MOTION TO SUPPRESS

Finally, Defendant moves to suppress evidence seized pursuant to warrants dated January

11, 2019, which authorized the FBI to place a tracker on Defendant's car, seize and search two of

Defendant's email accounts, and obtain information from Defendant's cellphone. *See* ECF No.

65-2; ECF No. 65-3; ECF No. 65-4; ECF No. 65-5. He also challenges subsequent warrants, but

only as derivative of his challenge to the January 11, 2019 warrants. Defendant contends that the

January 11, 2019 warrants were not supported by probable cause, so the evidence seized

pursuant to those warrants and all derivative evidence must be excluded. The Government

responds that there was probable cause for issuance of the January 11, 2019 warrants, but even if

the issuing magistrate judge lacked a substantial basis to find probable cause, the good-faith

exception applies.

### A.  Standard of Review

"As a general rule, the Fourth Amendment requires that law enforcement searches be

accompanied by a warrant based on probable cause." *United States v. Kolsuz*, 890 F.3d 133, 137

(4th Cir. 2018). "Although the concept of probable cause defies a precise definition, it exists

where the known facts and circumstances are sufficient to warrant a man of reasonable prudence

in the belief that contraband or evidence of a crime will be found in the place to be searched."

*United States v. Richardson*, 607 F.3d 357, 369 (4th Cir. 2010) (quoting *Ornelas v. United*

*States*, 517 U.S. 690, 696 (1996)) (internal quotations omitted). "A probable cause assessment

requires the issuing judge to decide whether, given the totality of the circumstances, there is a

fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*

(quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)) (internal quotations omitted). A magistrate judge's determination of probable cause "is entitled to great deference," and this Court's role "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *United States v. Drummond*, 925 F.3d 681, 687 (4th Cir. 2019) (quoting *Richardson*, 607 F.3d at 369)) (internal quotations omitted).

### B. Discussion

Here, the issuing magistrate judge clearly had a "substantial basis" to conclude that there was probable cause to support the January 11, 2019 warrants. In making his determination, the issuing judge relied on a detailed, 46-page affidavit submitted by FBI Agent Rachid Harrison that outlined Defendant's relevant conduct, tied the Defendant's conduct to the specific locations to be searched, and explained what evidence of criminal activity law enforcement officials expected to find at those locations. ECF No. 65-1. Specifically, the affidavit describes Defendant's extremist views, his tattoo's indicative of white supremacist and Neo-Nazi views, and a letter he wrote in September 2017 to a known American neo-Nazi leader in which he discussed being "a long time White Nationalist" and his intention to "make change with a little focused violence." *Id.* ¶¶ 13–15. The affidavit also provides background on Norwegian citizen Anders Breivik, a far-right domestic terrorist who committed two coordinated terror attacks leading to the death of 77 Norwegian citizens, and it describes Defendant's possession and distribution of the Breivik manifesto, as well as his possession of other terrorist manifestos. *Id.* ¶¶ 16–17.

The affidavit goes on to describe strong correlations between instructions in the Breivik manifesto and Defendant's own conduct, including conducting extensive targeting research; acquiring firearms and ammunition; obtaining disguises, survival gear, and provisions for

conducting terrorist attacks and escaping thereafter; studying improvised munitions; and preparing a steroid regimen. *Id.* ¶¶ 18–37. The affidavit links each of Defendant's acts to his specific use of his two email accounts, his car, and his cellphone. *Id.* ¶¶ 38–44.

Considered together, as is required by a "totality of the circumstances" analysis, these activities demonstrate at least a "substantial basis" for the issuing judge to determine that there was probable cause to support the January 11, 2019 warrants. Even if probable cause did not exist, however, the good-faith doctrine would apply to prevent suppression because law enforcement acted in objectively reasonable reliance on the warrants. *See United States v. Perez*, 393 F.3d 457, 460 (4th Cir. 2004); *United State v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993) (noting that the good-faith exception provides that "evidence obtained from an invalidated search warrant will be suppressed only if 'the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause'") (quoting *United States v. Leon*, 468 U.S. 897, 926 (1984)). Thus, there are no grounds for suppression of any evidence seized pursuant to the January 11, 2019 warrants, and because Defendant's challenges to subsequent warrants are derivative of his challenge to the January 11, 2019 warrants, those challenges fail as well. The Motion to Suppress is denied.

## V.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss Counts I and II is denied, Defendant's Motion to Dismiss Count III is denied, and Defendant's Motion to Suppress is denied. A separate Order shall issue.

Date: September   20, 2019                                   /s/
                                                      GEORGE J. HAZEL
                                                      United States District Judge