**OFFICE OF THE FEDERAL PUBLIC DEFENDER**
**DISTRICT OF MARYLAND**
NORTHERN DIVISION
TOWER II, 9th FLOOR
100 SOUTH CHARLES STREET
BALTIMORE, MARYLAND  21201-2705
TEL:  (410) 962-3962
FAX:  (410) 962-0872

JAMES WYDA
FEDERAL PUBLIC DEFENDER

ELIZABETH G. OYER
SENIOR LITIGATION COUNSEL

January 16, 2020

Honorable George J. Hazel
United States District Judge
U.S. District Court for the District of Maryland
6500 Cherrywood Lane
Greenbelt, Maryland 20770

Re:  *United States v. Christopher Hasson*, Criminal Case No. 19-cr-0096-GJH

Dear Judge Hazel:

Our client Christopher Hasson is scheduled for sentencing before Your Honor on January 31, 2020.  We write to set forth the defense's position with respect to sentencing.  Mr. Hasson has pled guilty to nonviolent offenses related to the unlawful possession of firearms and tramadol, a prescription drug.  We respectfully submit that the appropriate sentence is time served and three years of supervised release.  The requested sentence is proportionate to those offenses and consistent with all of the sentencing objectives set forth in 18 U.S.C. § 3553(a).

I.    <u>Introduction</u>

Mr. Hasson, age 50, is a decorated member of the U.S. Coast Guard who has dedicated his life to serving his country.  Throughout his career, Mr. Hasson has been recognized as an outstanding service member, receiving countless awards for his leadership and only the highest performance evaluations.  Mr. Hasson is also a devoted father and husband, as well as a valued teacher and mentor to many younger servicemen.  He comes from a loving and supportive family.  He has no prior criminal history.

Like many Americans, Mr. Hasson went through a difficult time in mid-life, when he became addicted to prescription opioids.  His criminal conduct arose out of this addiction.  Accompanying this sentencing memorandum is a report from Dr. Kelly Dunn, a behavioral pharmacologist at Johns Hopkins University, diagnosing Mr. Hasson with severe Opioid Use

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 2

Disorder.  Dr. Dunn explains the behavioral implications as well as treatment recommendations for this disease.[1]  Mr. Hasson's prognosis for full recovery is excellent.

Mr. Hasson is deeply ashamed of his conduct.  He regrets that he was too ashamed to seek help with his addiction.  He is sincerely remorseful for the damage he has done to his personal and Coast Guard families.  He is also remorseful for the alarm he caused his fellow citizens.  Despite his mistakes, dozens of Mr. Hasson's friends, family members, and fellow Coast Guarsdmen have written letters of support to the Court.[2]  Those letters, from people who have known Mr. Hasson throughout his life, powerfully illustrate that Mr. Hasson is a good man whose offense conduct does not reflect his true character.

The punishment that Mr. Hasson has already endured, together with the future collateral consequences of his convictions, are substantial and sufficient punishment for his crimes.  Mr. Hasson has already spent nearly a year in jail.  He and his family have suffered greatly under the intense media scrutiny that this case has raised.  His career, reputation, and life as he knew it are destroyed.  And after all of this, the criminal case against Mr. Hasson has turned out to be little more than a run-of-the mill firearms-possession case.  At the outset, the government proclaimed that the gun and drug charges were just "the proverbial tip of the iceberg."[3]  This proved to be incorrect.  We now ask the Court to strip away all of the speculation and rhetoric and sentence Mr. Hasson proportionately to the offenses he actually committed.  The government's unproven claims about his private thoughts and beliefs and its conjecture about his plans and motives have no place in the sentencing courtroom and should have no bearing on the outcome.

We are including with this sentencing memorandum a detailed risk-of-violence assessment prepared by Dr. Stephen Hart, an internationally renowned expert in this field.[4]  Dr. Hart conducted an evidence-based assessment of the risk factors highlighted by the government in support of its theory that Mr. Hasson intended to commit a violent attack.  Dr. Hart strongly rejects the government's hypothesis, concluding that the evidence "does not support the government's theory that Mr. Hasson intends (or intended) to commit acts dangerous to human life or that he is (or was) a domestic terrorist."  Dr. Hart further concludes that "Mr. Hasson does not pose a risk of serious

---

[1] See Exhibit 5.

[2] See Exhibit 8.

[3] Dkt. No. 9, at 1.

[4] See Exhibit 6.

The Hon. George J. Hazel
<u>United States v. Christopher Paul Hasson</u>, Crim. No. GJH-19-0096
January 16, 2020
Page 3

violence, including but not limited to murder and terrorism, either currently or in the foreseeable future."

We hope that Dr. Hart's analysis puts to rest, for once and for all, the unsubstantiated allegations that the government has leveled at Mr. Hasson. We hope that it helps to provide peace of mind to the Court in sentencing Mr. Hasson, and to all others who have participated in or observed this case. And most of all, we hope that it helps Mr. Hasson to reclaim some part of his prior life, before a single government filing brought him national notoriety as the "domestic terrorist Coast Guard officer." If the Court takes away just one theme from reading our submission, we hope that it is this: Mr. Hasson is a good man with a long and honorable history of dedicated service to the safety and well-being of our nation and his fellow citizens. He is an asset, not a danger, to our society.

## II.     <u>**Procedural History**</u>

On February 14, 2019, Mr. Hasson was charged by criminal complaint with one count of possession of firearms by an unlawful user or addict of a controlled substance (18 U.S.C. § 922(g)(3)) and one misdemeanor count of possession of tramadol, a schedule IV controlled substance (21 U.S.C. § 844). In a written motion seeking Mr. Hasson's pretrial detention, the government alleged that the initial charges were just "the proverbial tip of the iceberg."[5] The government made the sweeping allegation that Mr. Hasson "intends to murder innocent civilians on a scale rarely seen in this country" and labeled him "a domestic terrorist."[6] At a detention hearing before the Honorable Charles B. Day, the government again claimed that the firearms and controlled substance charges were "just the tip of the iceberg."[7]

However, the only additional charges that the government ever managed to bring against Mr. Hasson were two additional firearms-possession counts. On February 27, 2019, an indictment was returned charging Mr. Hasson with two regulatory violations of the National Firearms Act (NFA), in addition to the same two charges contained in the original complaint.[8] The NFA counts

---

[5] Dkt. No. 9, at 1.

[6] *Id.*

[7] Transcript of Detention Hearing (Feb. 21, 2019), at 4.

[8] *See* Dkt. No. 16.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 4

alleged that Mr. Hasson possessed silencers that were not registered under the NFA (26 U.S.C. § 5861(d)) and that did not have serial numbers as required by the NFA (26 U.S.C. § 5861(i)).[9]

The government never charged Mr. Hasson with any of the other offenses that were listed in its numerous federal search warrant applications.  The initial search warrant affidavits indicated that the government was investigating Mr. Hasson for suspected violations of 18 U.S.C. §§ 1111 (murder in federal jurisdiction), 1114 (murder or attempted murder of officers or employees of the United States), 351 (assassination of Cabinet secretaries, members of Congress, or Supreme Court justices), and 371 (conspiracy to commit the foregoing crimes).[10]  However, no evidence was uncovered to support charging Mr. Hasson with violating, attempting to violate, or conspiring to violate any of those statutes or any other statute pertaining to domestic terrorism or violent crimes.

Mr. Hasson filed motions to dismiss the charges in the indictment on constitutional grounds.  Those motions were argued at a hearing before this Court on September 9, 2019.  Witness testimony was presented by both sides on the Second Amendment questions raised by Mr. Hasson. On September 20, 2019, the Court issued a Memorandum Opinion and Order denying the motions to dismiss.[11]  Shortly thereafter, the parties entered into a conditional plea agreement that preserves Mr. Hasson's right to appeal the denial of those motions.[12]  On October 3, 2019, Mr. Hasson appeared before Your Honor and pled guilty to all four counts of the indictment.  The Court scheduled Mr. Hasson's sentencing for January 31, 2020.

The Court is required in this case, as in all others, to impose a sentence that is "sufficient, but not greater than necessary," to accomplish the statutory purposes of sentencing, which are punishment, specific deterrence, general deterrence, and rehabilitation.  18 U.S.C. § 3553(a).  In determining the appropriate sentence, the Court is directed to consider a variety of factors, including the nature and circumstances of the offense, the history and characteristics of the offender, the purposes of sentencing, the types of sentences available, and the recommendation of the U.S. Sentencing Guidelines, among others.  *See id.*  Each of the relevant sentencing factors is discussed in the following sections.

---

[9] *See id.*

[10] *See* Dkt. No. 66, at 1-2 & Ex. A.

[11] Dkt. Nos. 87 & 88.

[12] *See* Dkt. No. 94.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 5

### III.    Mr. Hasson's Background and History

One factor the Court must consider under § 3553(a) is the history and characteristics of the defendant, Christopher Hasson.  An overview of Mr. Hasson's relevant life history is set forth below and is supplemented by the numerous character letters accompanying this memo.[13]

*Early Life*

Christopher Paul Hasson, who goes by "Chris," was born on April 24, 1969, to Craig and Maureen Hasson.  When Chris was born, his parents lived in a duplex in New Jersey with his paternal grandparents.  His parents were young—Maureen was only 19 when Chris was born—and Craig worked full-time and attended night school.  Chris's paternal grandfather was a veteran of World War II.  His paternal uncle, a U.S. Marine, was killed in Vietnam the same year Chris was born.  Chris spent a lot of time with his paternal grandparents when he was a young child, and his grandparents poured much time and attention into Chris as they grieved the loss of their son.

Spending time with his grandfather cultivated Chris's interest in the military from a young age.  Chris's mother, Maureen, remembers that he dressed as a Marine for Halloween for the first time when he was four and then every year thereafter until he stopped trick-or-treating.  Chris was so interested in joining the military that he enrolled in Frederick Military Academy in Virginia when he was in the eighth grade.  Eventually, however, Chris stopped attending after someone from the school called his parents and suggested that it was not the right place for him: the Hassons had not realized that the school was intended to provide structure and discipline for troubled youth, which was not the case with Chris.

*Career*

Chris entered the U.S. Marine Corps on December 15, 1988, on his second attempt to enlist.  Chris was rejected by the Marines the first time he applied because of his severe acne; he had to reapply after completing a course of Accutane treatment.  Chris was stationed in South Carolina working as an aircraft mechanic until the start of the Gulf War.  The Marines then deployed Chris to Kuwait, where he participated in both Operation Desert Shield and Operation Desert Storm.[14]

---

[13] The information in this section was collected through many interviews with friends, family, and coworkers of Mr. Hasson, interviews of Mr. Hasson, and a review of his military, educational, and medical records.  Excerpts of those records are attached as Exhibits 1-4.  Character letters are attached as Exhibit 8.

[14] *See* Exhibit 1 (Marine Corps Records), at 1-2.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 6

Chris's service abroad was difficult and took a toll on him and his fellow service members.  In one particularly haunting memory, Chris remembers hearing a gunshot in a nearby tent.  When he ran over to check what had happened, he saw a fellow solider bleeding out from a self-inflicted gunshot wound to the head.  Chris continued to serve his country overseas as a Marine through participation in two NATO missions in Bosnia and Herzegovina, known as Operation Provide Promise and Operation Deny Flight.  He earned a number of commendations and medals while in the Marines, including the National Defense Service Medal, the Southeast Asia Service Medal, the Kuwait Liberation Medal, and a Good Conduct Medal.[15]

After returning from the Gulf War, Chris was stationed on the USS Theodore Roosevelt in Newport News, Virginia, working as a security officer.  While in Virginia, he met his wife, Shannon Marie Coleman (now Hasson), at the veterinarian's office where they had both taken their dogs for care.[16]  Chris and Marie married and had their first child, Killian, while Chris was still in the Marines.  As Chris came to the end of his enlistment period, he decided to leave the Marines to try civilian life.  His commanding officers encouraged him to re-enlist, but the overseas deployments had taken a toll on him and, with a young child at home, he wanted to try something different.

The transition back to civilian life was not as easy as Chris had imagined.  Chris found work in construction, but he missed the camaraderie of military service.  While trying to replace this type of connection, Chris began spending time with people in the punk rock world, many of whom identified as white supremacists.  Chris explored this social environment for a few months before realizing it was not for him, as most of the people he met seemed idle and aimless, while he had a young family to support.  With the exception of one or two close friends, Chris cut ties with the people he had been hanging out with and returned to his military roots.  He joined the Army National Guard in Virginia on June 17, 1994—less than six months after he left the Marine Corps.[17]

After his brief, failed foray into civilian life, Chris knew that he wanted to return to military service full-time. While working full-time, caring for his family, and serving in the Army National Guard, Chris continued to look for opportunities to return to full-time military service.  Enlisting

---

[15] See id. at 3-5.

[16] Mrs. Hasson goes by her middle name, Marie, although she is sometimes referred to as Shannon. This memo will refer to her as Marie.

[17] See Exhibit 2 (Army National Guard Records).

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 7

was more difficult the second time around, as many branches of the military did not want a recruit who was a little older and already had a young child at home.

The Coast Guard did not mind that Chris was twenty-seven or that he had a child, so Chris officially enlisted in the Coast Guard in June 1996. His daughter, Maura, was born shortly thereafter, in early 1997. Chris finally felt like he found the right fit with the Coast Guard, as it is a smaller branch of service that treated its members well. He spent the next twenty-three years proudly serving in the U.S. Coast Guard in South Carolina, Nevada, New Jersey, Alaska, Florida, Virginia, and D.C.

By all accounts, Chris had an extraordinary career in the Coast Guard up to the time of his arrest. For the first twenty years of his career, Chris specialized in electronics and did a great deal of hands-on work solving problems that arose in the Coast Guard fleet. He received his first Coast Guard Award, a Coast Guard Meritorious Team Commendation for the Electronics Division of the USCGC Gallatin, in November 1998. He continued receiving awards and honors regularly throughout his career.[18] Fellow service members on the Gallatin remember Chris in positive terms and describe him as funny and helpful. He stood out because he was older and a former Marine, but he got along well with a diverse group of people and was a hard worker. Victor Laro, who worked in the electronic shop with Chris, remembers that he and Chris were an unlikely pair, given that Mr. Laro was practically right out of high school and from the East Coast, whereas Chris was a nearly thirty-year-old former Marine who was from the Southwest. They quickly became friends, bonding over their bald heads, and Mr. Laro remembers watching Chris adjust well to the Coast Guard's more relaxed style while they were on the ship.

Chris continued to excel in his next position in Cape May, where he received a Letter of Commendation for his work performance in early 2000. Chris received the highest marks possible on his Enlisted Performance Evaluation form in late 2001, in which his supervisor stated that Chris demonstrated "technical ability beyond what is expected of his current rank and experience."[19] Jerome Brown, who served in Cape May with Chris, remembers Chris's strong electronics skills. Mr. Brown only had classroom skills when he got to Cape May, and Chris took him under his wing and mentored him while they worked, developing a friendship in the process. They became close enough that Chris was a groomsman in Mr. Brown's wedding.

---

[18] See Exhibit 3 (Coast Guard Award Documentation).

[19] See Exhibit 4 (Coast Guard Performance Evaluations) at 2.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 8

Chris continued to receive the highest accolades for his technical skills, his teamwork, and his volunteerism as he rose through the enlisted ranks. He received Coast Guard Achievement Medals for Outstanding Achievement from both June 2006–August 2008 and September 2008–2010. The citation for his 2010 Medal describes him as "demonstrating exceptional leadership and sound technical skill," and praises him for his mentorship of junior technicians.[20] Chris was awarded the Coast Guard Commendation Medal for his work from July 2010–June 2012 while stationed in Petaluma, California. This award recognized his outstanding work as the Course Chief at the Electronics Technician "C" School (a job-specific advanced training school), where he led a team of instructors and served as the Human Relations Council Chairperson. Chris's "efforts significantly contributed to the celebration of diversity and increased awareness of equal rights for all." The 2012 Commendation Medal also highlighted his volunteer work in the community delivering food to the homeless, completing community home renovation projects, and assisting in English instruction for second graders at a nearby elementary school.[21]

Because of Chris's excellent service, he rose through the ranks as quickly as possible, earning promotions as soon as he completed the required time in grade and service for each grade. In 2012, Chris earned a promotion to Chief Warrant Officer. The Warrant Officer position is for those service members who have risen through the enlisted ranks due to their technical expertise. The promotion was a significant one for Chris, as it raised his rank higher than other enlisted service members', although still lower than commissioned officers'.

After his promotion to Chief Warrant Officer, Chris was transferred to work as a technical expert in the Coast Guard Command, Control and Communications Engineering Center (C3CEN) in Portsmouth, Virginia. He remained in Virginia for about four years until he was transferred to Coast Guard Headquarters in Washington, D.C.

Chris continued to excel while he was in Virginia, as evidenced by his glowing performance reviews each year. Every year, without exception, Chris's reviews gave high praise for his technical and job skills, his ability work with and lead others, and his concern for coworkers and community.[22] His first review with C3CEN describes him as "an amazing leader that gelled

---

[20] See Exhibit 3 at 11-12.

[21] See id. at 14-15.

[22] See Exhibit 4 (Coast Guard Officer Evaluation Reports).

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 9

a diverse team into an one-stop support section," and assigns Chris the reviewer's "highest recommendation for promotion with best of peers & selection to LT [lieutenant]."[23]

*Family Life*

While serving his country, Chris also dedicated himself to providing and caring for his family.  Chris has been married to his wife, Marie, for over twenty-five years, and together they raised their two children, Killian (now 25) and Maura (now 22).  Killian is a student in Petaluma, California, using the G.I. Bill educational benefits he earned while serving in the U.S. Marine Corps.  Maura recently left the Army and attends college in North Carolina, where she lives with her infant son and her husband, who is recently back from deployment in the Army.

By all accounts, Chris was a devoted husband and father.  Maura recalls that whenever he was not at work, he was home spending time with his family.  He did most of the cooking—including his kids' favorite homemade macaroni and cheese with tomatoes—and also took charge of the cleaning.  Killian remembers realizing at a young age that he was very lucky because his dad spent a lot more time with him than most of his friends' fathers did.  Chris and Killian enjoyed spending time together outdoors, hiking, fishing, and camping.  Maura recalls that her father "was the one who taught me everything I know: from riding a bike, swimming, academics, to cooking and hiking."[24]

The Hassons' family life was not without difficulty.  Supporting a family of four on an enlisted salary was not easy.  Chris often worked additional jobs in his off time to help support the family.  Marie, who loves animals, worked as a behavioral specialist for dogs when she could.  However, she often was unable to work due to a variety of serious health conditions, including spina bifida, narcolepsy, and fused vertebrae, among others.  Over the years, she has struggled to find the right medications to address her health issues, which has been physically difficult and emotionally trying for the whole family.  Maura remembers a time when the family lived in California that Marie's health was so bad that she was essentially unable to leave her bedroom for a year.  During that year, Chris worked, took care of the home and the kids, fed Marie, and made sure that she got all the rest she needed.  Killian similarly remembers that Chris was very attuned

---

[23] *Id.* at 3.

[24] *See* Exhibit 8 (Letter from Maura Harper).

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 10

to how Marie was feeling, always stepping up at home and encouraging her to get rest.  Maura describes her father as "the most stable, supportive, caring, selfless individual in [her] life."[25]

Chris's mother and father, who are now retired from social work and engineering, still live in Arizona.  Chris kept in touch with them through regular phone calls no matter where he was stationed, and spent Christmas with them in 2018 shortly before his arrest.

*Promotion to Lieutenant and Move to D.C.*

In May 2016, after twenty years in the Coast Guard, Chris was promoted to Lieutenant.[26] The promotion meant that Chris was now a commissioned officer, with a commission directly from the President.  This was no small feat, especially given that Chris never earned a bachelor's degree, which is a traditional prerequisite to receiving an officer commission.  His brother Matt, who spent his career as a commissioned officer in the U.S. Air Force, writes that Chris "is the only person [Matt] has known to be able to do that.  That kind of success and achievement is not just 'given out'…that is earned through superior service, dedication, commitment, and an impeccable record."[27]

The promotion to Lieutenant moved Chris out of the Coast Guard's technical labor force and into a more executive-type position.  He was transferred to Coast Guard Headquarters in Washington, D.C.  The transition was more difficult than Chris anticipated.  He went from living in a single-family home surrounded by land in rural North Carolina to a basement apartment in Silver Spring.  Chris moved alone, while his wife stayed behind for the first year.  Chris found himself spending over an hour commuting to work on multiple bus lines or sitting in traffic, only to then sit behind a desk all day working at a computer.  Working at a desk all day, every day, did not suit Chris at all.  Nor did living in a city.  He missed working on base.  He felt out-of-place and uncomfortable in an office environment and in Washington, D.C.

Chris's friends who had come up with him in the enlisted ranks were surprised he accepted a promotion to Lieutenant.  In his prior position of Chief Warrant Officer, his title reflected his decades of experience and his unique technical skills.  Once he became a Lieutenant, the recognition of his expertise was largely wiped away and he was essentially just another Lieutenant, along with many others at Headquarters who became officers right out of college.  The sense of

---

[25] *Id.*

[26] *See* Exhibit 3 at 16.

[27] *See* Exhibit 8 (Letter from Matthew Hasson).

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 11

camaraderie Chris initially found in the Coast Guard was missing, and instead he felt like a fish out of water.

While he was trying to adjust to a new work environment, Chris was also experiencing significant stress in his personal life. Both of his children graduated from high school and went straight into the military. The Hassons were proud of their children's service, but as is the case with many couples, they had to figure out what their relationship looked like now that it was not centered around raising children anymore. The Hassons separated for a period and Chris spent a year living in D.C. alone. Chris had no friends or family in the D.C. area and spent most of his free time alone. He joined a Brazilian jiu-jitsu studio, although he had little experience with martial arts, in an effort to get some exercise and find a hobby to fill his time. He was older than most of the other students and had to work hard to keep up in class. Roberto da Silva, his jiu-jitsu instructor, remembers Chris as a respectful, polite student who got along well with his fellow classmates and was always willing to help other students.

Chris's tramadol use escalated to a problematic level during this difficult time in his life. Chris had taken tramadol prescribed to his wife occasionally in the past for pain. Eventually, he started using it regularly as a way to ease his mind as well as his body. His tramadol use peaked during his time in D.C., when he was largely alone and unhappy. The tramadol made Chris lethargic and even more introverted than usual. He did little more than work and sleep during the height of his tramadol abuse. Chris recognized that he had developed an addiction and tried multiple times to wean himself off the drug, but he found himself unable to do so.

For the most part, Chris kept his personal and professional struggles to himself. He and his wife eventually reconciled, and in 2017 she moved up to join him in D.C. Chris maintained an extremely close relationship with his son, Killian, talking and texting with him every day. Chris went through a rocky period with his daughter, Maura, after she posted pictures of her wedding on Facebook without telling the family she was getting married. But Chris remained supportive of her and they, too, reconciled. Chris continued to show kindness and generosity toward others; for example, the tenants renting his home in North Carolina report that he took hundreds of dollars off their rent each December as a Christmas gift.

Despite his drug use and other stressors, Chris also continued to excel at work. His first performance review at Coast Guard headquarters, in July 2017, describes how he had an "immediate & positive impact to mission success of the USCG's most technologically advanced cutter" (a large Coast Guard vessel) and earned him the reviewer's "highest possible

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 12

recommendation for promotion to O4" (Lieutenant Commander).[28]    Chris's most recent
performance review, from July 2018, earned him a similarly high recommendation, describing him
as "a consummate Mission Support team player & leader w/in NSC program."[29]

Despite his struggles, Chris remained committed to his work and the Coast Guard mission,
even as he approached retirement age.  He hoped to remain connected to the Coast Guard and,
shortly before his arrest, had even corresponded with his old supervisor, Jeff Cavallo, about the
possibility of moving back to his home in North Carolina and working as a contractor at C3CEN.
Chris knew he was struggling and that something needed to change, but he had not figured out
how to make the change yet.

*Arrest and Incarceration*

Chris's arrest in February 2019 shocked all those who know him.  Chris's brother, Matt,
writes: "to say I was shaken with the allegations against my brother is an understatement I can't
truly put into words."[30]  To Chris's friends, family, and colleagues, what was reported in the press
seemed completely out of character.  The case has been particularly hard on his family, but they
have stood by him and continue to support him.

Since his arrest, Chris has been held at the Chesapeake Detention Facility (CDF) in
Baltimore.  While there, Chris has maintained daily telephone contact with his family.  His wife
and daughter have made the lengthy drive to visit him several times, and Chris was able to meet
his new grandson for the first time through the visitation room glass.  Chris's parents, in-laws, and
others have traveled from around the country, on multiple occasions, to attend his court
proceedings.

Chris has adjusted as well as possible to his surroundings.  As reflected in the letters from
other men housed with him at CDF, Chris has become friends with the others in his unit and has
built a small support community within the confines of the jail.[31]  Chris is in the protective custody
unit because of the media coverage surrounding his case, so he has not been able to participate in
even the limited programs available to other inmates.  Chris has, however, sought out spiritual
counseling and meets regularly with Father Chuck Canterna (a Catholic priest who visits the jail

---

[28] *See* Exhibit 4 (Coast Guard Officer Evaluation Reports) at 19-20.

[29] *See id.* at 21-22.

[30] Exhibit 8 (Letter from Matthew Hasson).

[31] *See* Exhibit 8 (Letters from Spencer Steckman and Ryan Smith).

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 13

periodically) and two lay Catholic volunteers at CDF.  Father Chuck describes Chris as sincere, open about his struggles, committed to growing in his faith, and one of the bright spots of Father Chuck's prison ministry.  Those who know Chris best see clear changes in him over the last several months.  Chris is deeply remorseful for his conduct and especially for the difficulty and pain it has caused his family.  Chris is eager to put this chapter behind him and try to rebuild his life.

### IV.    Nature and Circumstances of the Offenses

Another factor that the Court must consider under § 3553(a) is the nature and circumstances of the offense.  Each of the offenses to which Mr. Hasson has pled guilty is discussed in turn below.

### A.    Tramadol Possession – 21 U.S.C. § 844

Mr. Hasson pled guilty to one count of unlawful possession of tramadol, a misdemeanor offense in violation of 21 U.S.C. § 844.  Tramadol is a Schedule IV opioid pain killer that can be lawfully used with a prescription from a doctor.  Mr. Hasson bought tramadol online, without a prescription, which he admits made his possession of the drug unlawful.

In light of his well-documented struggle with tramadol abuse, Mr. Hasson was evaluated by Dr. Kelly Dunn, a behavioral pharmacologist and tramadol expert at Johns Hopkins.  Dr. Dunn diagnosed him with Severe Opioid Use Disorder.  Dr. Dunn further observed that the extremely high doses of tramadol that Mr. Hasson was consuming likely resulted in a mood disturbance, affecting his behavior and state of mind in the period leading up to his arrest.  Her findings are discussed below and outlined in a report that accompanies this memorandum.[32]

*Tramadol's History and Potential for Abuse*

Tramadol has been commercially available in the United States as an analgesic since 1977, under the brand name Ultram.[33]  For decades, Tramadol was a non-controlled substance, because there was limited evidence of its potential for abuse.[34]  In 2014, the DEA reclassified tramadol

---

[32] Dr. Dunn is a behavioral pharmacologist, researcher, and professor at Johns Hopkins University School of Medicine.  She is an expert in opioid use disorder and treatment and has conducted extensive, published research on the abuse potential of tramadol.  Dr. Dunn prepared a report concerning her assessment of Mr. Hasson, which is attached hereto as Exhibit 5 (hereinafter, "Dunn Report").  Her complete CV is appended to Exhibit 5.

[33] *Id.* at 1-2.

[34] *Id.* at 2.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 14

form unscheduled to Schedule IV.  At the same time, the DEA moved hydrocodone (Vicodin) from Schedule III to Schedule II.  The result of this rescheduling was a sharp decline in prescriptions for hydrocodone and a corresponding sharp increase in prescriptions for tramadol, since Schedule II medications are more difficult to prescribe and viewed as riskier for patients.  As a result, rates of tramadol abuse are increasing within the United States and throughout the world.[35] Research shows that tramadol does have abuse potential and that its abuse potential is unique from other opioids, in that it is more likely to be abused in its oral (as opposed to injectable) formulation.[36]

   *Mr. Hasson's Use of Tramadol*

   Mr. Hasson at first used tramadol only occasionally, taking pills prescribed to his wife to treat episodic pain from headaches.  He began abusing tramadol as early as 2012.  The drug made him feel good and helped him cope with feelings of depression.  Mr. Hasson began ordering the pills online.  At that time, they were not a controlled substance and therefore were readily available with little associated risk.[37]  Mr. Hasson's use of tramadol escalated over time, as a result of his growing opioid tolerance, a common feature of opioid use.  By the time of his arrest, Mr. Hasson was consuming 1,000 to 1,300 milligrams of tramadol per day, which is more than four times the approved dose.[38]  Like many Americans, Mr. Hasson had become addicted to the pain medication. He developed Opioid Use Disorder, which is a chronic illness that afflicted over two million Americans as of 2016.[39]

   Dr. Dunn conducted an evaluation of Mr. Hasson at CDF to determine whether he satisfied the criteria for a diagnosis of Opioid Use Disorder (OUD).  OUD is a formal diagnosis with the 5th edition of the Diagnostic and Statistical Manual (DSM-5) published by the American Psychiatric Association.  A diagnosis of OUD "signifies opioid misuse that interferes with the

---

[35] *Id.*

[36] *Id.* at 2-3.

[37] *See id.* at 4.

[38] *Id.*

[39] *See* National Institute on Drug Abuse, Medications to Treat Opioid Use Disorder, at 3 (June 2018), available at https://www.drugabuse.gov/node/pdf/21349/medications-to-treat-opioid-use-disorder.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 15

individual's life, and a general lack of control over behavior."[40]   OUD comprises 11 symptoms, and severity is diagnosed by determining the number of symptoms met within the last 12 months. Six or more symptoms indicates severe OUD.[41]   Because Mr. Hasson credibly endorsed each of the 11 criteria, Dr. Dunn diagnosed him with Severe OUD.   Although DSM diagnosis pertains only to the past year, Dr. Dunn was able to conclude with confidence, based on Mr. Hasson's history, "that the defendant's OUD developed several years prior to the 12-month evaluative period." [42]

Dr. Dunn observed that Mr. Hasson's pattern of use was "consistent with a common trajectory of opioid use to OUD" and that his "experience is consistent with that of hundreds of other patients" with whom she has spoken.   Dr. Dunn further observed: "Many of the defendant's behaviors are entirely consistent with severe OUD, including his continued use of tramadol despite the increased potential for consequences, his efforts to repeatedly procure tramadol via the internet and ensure he always had a viable supply available, and his inability to fully taper himself off of tramadol."[43]

*Behavioral Effects of Tramadol Abuse*

Dr. Dunn also assessed the likely behavioral effects of Mr. Hasson's tramadol abuse.   She explained:

The fact that the defendant's OUD was based on high dose tramadol has additional implications. As noted earlier, tramadol works on the opioid, serotonin, and

---

[40] Exhibit 5 (Dunn Report), at 1.   Dr. Dunn summarized the symptoms of OUD as follows:

Opioid tolerance and withdrawal are part of the OUD checklist but cannot themselves indicate OUD without the presence of corresponding maladaptive or problematic behaviors. Additional symptoms include using more of the drug then was intended when they started, repeatedly trying to cut down/control drug use without success, spending substantial time trying to procure the drug, craving the drug, having trouble meeting responsibilities at work, school, or home because of drug use, continuing to use the drug despite it causing problems between the individual and family/friends, using it in situations where it put others at risk, and using it despite it being clearly linked to worsening of psychiatric problems.

[41] *Id.*

[42] *Id.* at 4.

[43] *Id.*

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 16

norepinephrine systems. The serotonin system underlies mood and is the target for some of the most efficacious anti-depressant medications. Collateral activation of these three systems means that tramadol can produce side effects that are not observed from other opioids.

Mood disturbance is one such "prominent" side effect of tramadol use.[44] Case reports have shown "evidence of significant mood disturbance in persons with no history of psychiatric dysfunction following much smaller doses of tramadol than what was consumed by the defendant."[45] These effects include hallucinations and manic behavior. And in individuals with previous psychiatric diagnoses, tramadol has been associated with the onset of psychosis or severe mania. Dr. Dunn explains that these "unexpected psychiatric effects are hypothesized as being the result of serotonin syndrome." When moderate to severe, serotonin syndrome "is characterized by mood disturbance that can include agitation and delirium." Dr. Dunn found a "high probability" that Mr. Hasson was experiencing some of these serotonergically-mediated symptoms as a result of the extremely high doses of tramadol that he was ingesting.[46]

Opioid Use Disorder is also highly correlated with depression, with up to 44% of individuals who misuse opioids showing evidence of depression. The relationship appears to be "bidirectional," in that "persons with depression are significantly more likely than those without depression to initiate opioid misuse and develop OUD," while at the same time the "risk of developing depression and treatment-resistant depression increases as the duration of opioid exposure increases."[47] Dr. Dunn observes that Mr. Hasson's OUD "was likely related, at least in part, to preexisting underlying depression."[48]

*Treatment Recommendations*

Opioid Use Disorder is a chronic relapsing—but treatable—disease. Evidence shows that effective treatment strategies include a combination of medications and behavioral counseling. Dr.

---

[44] *Id.* at 5.

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.*

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 17

Dunn recommends that Mr. Hasson receive medication-assisted treatment and finds that his prognosis for full recovery is good.[49]

### B.     Firearms Possession – 18 U.S.C. § 922(g)(3)

Mr. Hasson pled guilty to one count of unlawful possession of firearms by an addict or user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3).  This charge relates to the fact that Mr. Hasson continued to possess firearms after his chronic tramadol use made it unlawful for him to do so.  Mr. Hasson has owned firearms since long before he started abusing tramadol; however, he acknowledged with his guilty plea that his substance abuse made it unlawful for him to continue to own firearms that he otherwise could lawfully have possessed.

Mr. Hasson has owned and used firearms throughout his entire adult life, both in connection with his military service and recreationally.  He has periodically bought, sold, and traded different firearms, always maintaining a collection of guns.[50]  The home that Mr. Hasson and his wife own in rural North Carolina, which the FBI has visited, has a makeshift firing range on the property.  Mrs. Hasson shoots recreationally, as well, and belongs to a ladies' gun club.

Throughout these proceedings, the government has argued that the quantity and nature of firearms possessed by Mr. Hasson are indicative of an intent to use them for criminal purposes. We note that Mr. Hasson, who is 50 years old, has no history of unlawfully using firearms or committing acts of violence.  The government's argument is misplaced and reflects a skewed cultural lens that we urge this Court to set aside.

*Owning Multiple Guns Is Not Unusual*

The government has argued that Mr. Hasson's ownership of 15 firearms suggests an intent to use them unlawfully.  However, many law-abiding Americans own multiple guns.  Two-thirds of gun owners say they own more than one gun, including 29% who own five or more guns.[51]  As

---

[49] *Id.*

[50] The purchases of the firearms charged in the indictment took place between 2009 and 2017, according to the government's investigation.  *See* Dkt. No. 25, at 3.  However, Mr. Hasson's interest in and ownership of firearms dates back long before that, at least to the start of his military service in 1988.

[51] Pew Research Center, America's Complex Relationship with Guns (2017), at 17, available at https://www.pewsocialtrends.org/2017/06/22/the-demographics-of-gun-ownership   [hereinafter "Pew Report"].

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 18

of 2016, it was estimated that 7.7 million Americans owned between 8 and 140 guns.[52]  Gun owners have many reasons for owning multiple firearms, including collection, variety, accumulation over time, and in some cases, stockpiling.   As one study observed, "[s]ome gun owners have a  survivalist streak, and believe in storing up weapons, as well as food and water, in case of a disaster scenario."[53]

### Gun Ownership Strongly Correlates with Military Service

Military service has been found to be "the strongest predictor of gun ownership."[54]  Nearly half of all veterans own firearms, with the majority reporting that they own both handguns and long guns.[55]  As the Court is aware, Mr. Hasson has served in the military for nearly his entire adult life.

### Mr. Hasson Falls Within Multiple Demographics Most Likely to Own Guns

In addition, gun ownership is more common among men than women, with white men being especially likely to own guns: "About half (48%) say they own a gun, compared with about a quarter of white women and nonwhite men (24% each) and 16% of nonwhite women."[56] Nationally, gun ownership is much more common among those who live in rural areas (where 46% own guns), compared to suburbs (28%) or urban areas (19%).[57]   "There are also significant differences across parties, with Republican and Republican-leaning independents more than twice as likely as Democrats and those who lean Democratic to say they own a gun (44% vs. 20%)."[58]

---

[52] Lois Beckett, Gun Inequality: US Study Charts Rise of Hardcore Super Owners, The Guardian (Sept. 19, 2016), at 2, available at https://www.theguardian.com/us-news/2016/sep/19/us-gun-ownership-survey [hereinafter, "Guardian Report"].

[53] Id. at 4.

[54] Id. at 3.

[55] Cleveland et al., Firearm Ownership Among American Veterans: Findings from the 2015 National Firearm Survey, Injury Epidemiology 4:33 (2017), available at https://www.researchgate.net/publication/321894846_Firearm_ownership_among_American_veterans_findings_from_the_2015_National_Firearm_Survey.

[56] Pew Report, at 18.

[57] Id. at 16.

[58] Id.

The Hon. George J. Hazel
<u>United States v. Christopher Paul Hasson</u>, Crim. No. GJH-19-0096
January 16, 2020
Page 19

*The Types of Guns and Accessories that Mr. Hasson Owned Are Commonplace*

The government has argued at various points that the types of weapons and accessories possessed by Mr. Hasson are indicative of some nefarious intention.  The government has brought several of the rifles he owned into Court to demonstrate that they are "scary looking."

However, all of the firearms seized from Mr. Hasson's home were lawful to own.  Indeed, AR-15-style rifles are among the most popular firearms in America.  Gun owners are drawn to them because of features including their "modular design, light weight, ease of use, low recoil and extraordinary flexibility."[59]  AR-15-style weapons account for approximately 60% of all civilian rifle purchases and one out of every five firearms purchased in the U.S.[60]  While gun-control advocates call them "assault rifles," gun owners regard them as "modern sporting rifles."  Under either name, they are widely recognized as America's most popular rifle.[61]

The firearms accessories, such as sights and grips, that the government has highlighted are also routinely used and widely owned items.  A sight or scope helps the gun user aim at a target and is essential to effectively using a rifle.  Grips help with recoil control and ergonomic use of the rifle.  All of these accessories are readily commercially available and widely customizable based on the needs, comfort, and budget of the user.

Body armor, like the two vests found in the Hassons' home, is also widely commercially available and relatively inexpensive.  Sets of tactical vests with two armored plate inserts are readily available through numerous online retailers for less than $200.[62]  This type of gear is popular among "disaster preppers," like the Hassons, who stockpile survivalist gear for all manner of doomsday-type scenarios.  It may sound quirky or crazy to those of us who do not subscribe to such views, but there are huge numbers of blogs, websites, and other materials devoted to

---

[59] Dan Haar, America's Rifle: Rise of the AR-15, Harford Courant (Mar. 9, 2013), available at https://www.courant.com/business/ar-15/hc-haar-ar-15-it-gun-20130308-column.html.

[60] *Id.*; Jon Schuppe, NBC News, America's Rifle: Why So Many People Love the AR-15 (Dec. 27, 2017), available at https://www.nbcnews.com/news/us-news/america-s-rifle-why-so-many-people-love-ar-15-n831171.

[61] *See, e.g.*, *id.*

[62] *See, e.g.*, https://www.bodyarmormegastore.com (among many others).

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 20

"prepping."  Body armor is considered an essential item, with many prepper websites offering recommendation about the best type to own.[63]

### The Quantity of Ammunition Possessed Is Not Unusual

The government has also suggested that the quantity of ammunition found in Mr. Hasson's home – over 1,000 rounds – is suggestive of some nefarious intent.[64]   In fact, this is an unremarkable quantity of ammunition.  According to the National Shooting Sports Foundation, "the consumption of 1,000 rounds or more is often routine for a weekend trip to the range."[65] Increased consumption of ammunition has accompanied the rising popularity of consumer versions of military-style rifles as well as high-capacity magazines, which are widely commercially available online and in stores.[66]

### Attitudes Toward Gun Ownership Differ Sharply Based on Personal Experience

We urge the Court to consider Mr. Hasson's firearm possession within the context of his background and experience.  Attitudes toward firearms differ throughout our diverse nation.  Negative views about guns are more common among non-gun owners, while positive views of guns are more common among gun owners.[67]   In addition, "[p]artisanship and ideology are strongly correlated with views about the importance of gun ownership as a guaranteed right."[68]

Moreover, divergent attitudes toward guns tend to be self-reinforcing.  For example, "adults who grew up with guns in their households are far more likely than those who did not to

---

[63] *See, e.g.*, Bullet Proof Blog, The Ultimate Ballistic Body Armor Guide for Preppers and Survivalists (Aug. 25, 2018),  https://bulletproofzone.com/blogs/bullet-proof-blog/the-ultimate-ballistic-body-armor-guide-for-preppers-and-survivalists (describing body armor as "essential" during any "catastrophic situation" and explaining that only hard armor – not Kevlar – will provide adequate protection).

[64] *See, e.g.*, Dkt. No. 9, at 6.

[65] *See* Peter Henderson & Daniel Trotta, What's Missing in US Gun Control Scramble? Bullets, Reuters (Jan. 20, 2013).

[66] *See, e.g.*, *id.*

[67] *See, e.g.*, Pew Report, at 27-28.

[68] *Id.* at 31.

The Hon. George J. Hazel
<u>United States v. Christopher Paul Hasson</u>, Crim. No. GJH-19-0096
January 16, 2020
Page 21

be gun owners themselves."[69]  In addition, gun owners more often tend to exist in social circles where gun ownership is common.  The Pew Report found:

> Roughly half of all gun owners say that all or most of their friends own guns. An additional 38% say some of their friends own guns and 13% say only a few do. In stark contrast, among the non-gun owning public, only one-in-ten say all or most of their friends own guns. These social connections are strongly tied to gun use, as gun owners who say all or most of their friends own guns engage more frequently in hunting and sport shooting than those with fewer friends that own guns.[70]

In sum, we ask the Court to consider that Mr. Hasson's collection of firearms may look much different to someone of his background than it does to those of us residing in the suburbs of Washington, D.C.  Mr. Hasson should not be disproportionately penalized simply because his case is being prosecuted in the Southern Division of the District of Maryland rather than the Eastern District of North Carolina – where his home is located – or any other district that is more hospitable to firearms.

### C.       Silencers – 26 U.S.C. § 5861

Mr. Hasson also pled guilty to two regulatory violations of the National Firearms Act: possession of unregistered silencers (26 U.S.C. § 5861(d)) and possession of silencers unidentified by serial numbers (26 U.S.C. § 5861(i)).  Both charges pertain to Mr. Hasson's possession of two prepackaged kits, sold online, to assemble your own silencer at home.  One kit was assembled and the other was not.  The National Firearms Act requires registration and identification by serial number of such devices, which Mr. Hasson did not complete.

The Court heard extensive testimony and has reviewed lengthy briefing on the use and regulation of silencers, and so we will not rehash all of that information here.[71]  We will simply highlight some key facts that are necessary to put in perspective the offenses of conviction.

---

[69] *See id.* at 23.

[70] *Id.* at 29.

[71] *See* Dkt. Nos. 62 & 76 (briefing on Second Amendment motion); Transcript of Testimony of Daniel O'Kelly (Sept. 9, 2019 Motions Hearing) [hereinafter, "O'Kelly Testimony"].

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 22

Over the last ten years, demand for silencers has increased exponentially.[72]  Silencers are popular and desirable among gun owners for their primary benefit of providing hearing protection.  They also have the added benefit of reducing muzzle rise and thereby improving accuracy.[73]  Gun owners commonly use silencers at shooting ranges and elsewhere when they practice firing their weapons.  Silencers are commercially available in gun stores and can also be made at home.  Silencers are widely used for lawful purposes.  Silencers are seldom used in the commission of crimes.[74]

Despite their popularity and lawful uses, the process for acquiring a silencer under the National Firearms Act is burdensome and time-consuming.[75]  Surging application volumes have created lengthy delays in the approval process.[76]  Complaints among the public and within ATF about these delays are widespread.  As a result, there have been substantial legislative pushes to remove silencers from the regulations of the NFA.[77]  Many gun owners, lawmakers, and industry professionals view it as simply unnecessary to treat silencers – which are a harmless device – in the same fashion as machineguns, destructive devices, and short-barreled rifles, which are dangerous weapons that are much more commonly used in the commission of crimes.[78]

Notwithstanding these policy considerations, Mr. Hasson acknowledges that it was unlawful for him to possess a silencer without completing the regulatory process prescribed by the NFA.  As a result, he has pled guilty to violating those regulations.

## V.     The Applicable Sentencing Guidelines

Another factor that the Court must consider is the applicable Sentencing Guidelines.  In this case, we agree with the Guidelines calculations set forth in the Presentence Investigation

---

[72] *See, e.g.*, Dkt. No. 62, at 12-13.

[73] *See, e.g.*, *id.* at 7-9.

[74] *See, e.g.*, *id.* at 14-15; O'Kelly Testimony at 104-106.

[75] *See, e.g.*, O'Kelly Testimony at 102.

[76] The Court summarized witness testimony on this issue as follows: "there is a backlog, it takes a really, really long time to get a silencer."  *See* Transcript of Mots. Hearing (Sept. 9, 2019), at 48.

[77] *See, e.g.*, Dkt. No. 62, at 13-14.

[78] *See, e.g.*, O'Kelly Testimony at 109-10.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 23

Report (PSR).  However, we respectfully submit that the Court should vary downward for policy reasons set forth below.

### A.    The PSR Correctly Calculates the Guidelines Range.

The PSR groups all four counts of conviction pursuant to U.S.S.G. § 3D1.2(c), (d) and uses Count One (possession of an unregistered silencer) as the basis for the Guidelines calculation.  PSR ¶¶ 22, 23.  The PSR assigns Mr. Hasson a base offense level of 20 under U.S.S.G. § 2K2.1(a)(4)(B) because (1) he was a prohibited person when he committed the instant offense, and (2) the offense involved a semiautomatic firearm that is capable of accepting a large capacity magazine (LCM) and "a firearm that is described in 26 U.S.C. § 5845(a)."  PSR ¶ 25.  Although the PSR does not specify, the latter weapon is presumably the silencer referenced in Count One of the indictment. *See* § 5845(a)(7) (defining "firearm" to include "any silencer").  The PSR also applies a four-level enhancement under U.S.S.G. § 2K2.1(b)(1)(B) because the offense involved between 8 and 24 firearms.  PSR ¶ 26.

After a two-level reduction for acceptance of responsibility, the PSR calculates a total offense level of 22.  PSR ¶ 34.  Mr. Hasson has no juvenile adjudications or adult criminal convictions and therefore falls in Criminal History Category I, yielding an advisory Guidelines range of 41-51 months in prison.  PSR ¶¶ 35-37, 64.

### B.    The Court Should Vary Downward Because the Base Offense Level Overstates the Seriousness of Mr. Hasson's Offense.

Although we agree that the Guidelines range calculated by the PSR is technically correct, we submit that the base offense level overstates the seriousness of the offense and should be discounted on policy grounds.

The base offense level in this case reflects a six-level bump because the offense involved a silencer and an LCM-enabled firearm.  Had the offense involved neither of those specific features, Mr. Hasson's base offense level would be 14, rather than 20.  *See* U.S.S.G. § 2K2.1(a)(6) (base offense level 14 if defendant was a prohibited person at time of the offense).  Keeping all other Guidelines calculations the same, a base offense level of 14 would produce a total offense level of 16 and an advisory Guidelines range of 21-27 months' imprisonment.  The Court should vary down to this range because neither silencers nor LCMs warrant such a dramatic increase to the base offense level.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 24

Unlike most of the weapons that call for an enhanced base offense level under U.S.S.G. § 2K2.1(a)(4)(B)(i)(II), silencers are not inherently dangerous devices.  *See* § 5845(a) (listing short-barreled shotguns, short-barreled rifles, machineguns, and destructive devices).  They do not fire bullets themselves, and they do not render firearms more deadly or more dangerous.[79]  To the contrary, silencers enhance the safety of firearm use, as shooting firearms without some form of sound suppression can cause permanent hearing damage.[80]  And while silencers' sound-suppression effects are substantial enough to protect firearm users' health, they are not so great as to render a gunshot inaudible.  A silencer typically reduces the sound of a gunshot—which, on average, registers 150 decibels—by 20-30 decibels.  Thus, contrary to popular perception, the report from a gun with an attached silencer will still, in most instances, make as much sound as a power tool, a lawnmower, or a chainsaw.[81]  In short, there is no reason to believe silencers enable violent criminals to avoid detection or otherwise facilitate the commission of crime.

Silencers also improve accuracy by reducing muzzle rise, which reduces the risk that a firearm user will accidentally injure someone nearby.[82]  And affixing a silencer to a firearm increases the overall size of the weapon, making it harder to conceal.[83]  It is therefore unsurprising that silencers are virtually never used in violent crimes.[84]  At the motions hearing, Mr. O'Kelly testified that in his 34 years in law enforcement—including eleven years with local police departments and 23 years with the ATF—he never encountered a single case in which a silencer was used in the commission of a violent crime.[85]

Indeed, ATF Form 4 requires purchasers of machine guns, short-barreled rifles, short-barreled shotguns, and destructive devices to certify that they have a "reasonable necessity" to possess those weapons, and that doing so "would be consistent with public safety"—but it does

---

[79] *See* Dkt. No. 76, at 21.

[80] O'Kelly Testimony, at 96-98.

[81] *Id.* at 94-95.

[82] *Id.* at 96-98.

[83] *Id.* at 106.

[84] Dkt. No. 62, at 14 ("Between 2012 and 2015, only 390 silencers were recovered from crime scenes where an ATF trace was requested—compared to more than 600,000 pistols in the same period.").

[85] O'Kelly Testimony, at 72-73, 106.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 25

not require a similar certification from those wishing to purchase silencers.[86]  That ATF exempts silencers from this certification requirement suggests that the agency tasked with regulating NFA firearms does not perceive silencers to be dangerous.  This judgment is consistent with the views of the 42 states where silencer possession is entirely legal.[87]  Even the government in this case has never articulated—either in its written response to Mr. Hasson's Second Amendment motion or at the motions hearing—any legitimate public interest in restricting the possession of silencers.

Given the lawful purposes for which firearm owners use silencers, and given the lack of any evidence that banning silencers improves public safety, it makes little sense to dramatically increase Mr. Hasson's offense level based on the presence of a silencer.  The Court should therefore exercise its discretion to disagree with § 2K2.1(a)(4)(B)(i)(II) as a policy matter.  *See United States v. Rivera-Santana*, 668 F.3d 95, 101 (4th Cir. 2012) ("[A] sentencing court may be entitled to consider policy decisions underlying the Guidelines, including the presence or absence of empirical data."); *United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2010) ("[D]istrict courts may vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines.").

As for LCM-enabled firearms, magazines with a capacity of more than ten rounds are, for the most part, entirely lawful to possess.  Only eight states banned or heavily regulated the possession of such magazines as of July 2018,[88] and federal law does not regulate them at all.[89] More than 250 million magazines capable of holding at least 11 rounds are in circulation in the United Sates, of which 100 million can hold at least 30 rounds.[90]  Since expiration of the federal assault weapons ban in 2004, ten-round magazines have been standard for most semiautomatic

---

[86] Transcript of Testimony of Gary Schaible (Sept. 9, 2019 Motions Hearing), at 34-36.

[87] Dkt. No. 62, at 13.

[88] Matthew Larosiere, *Losing Count: The Empty Case for "High-Capacity" Magazine Restrictions*, Cato Institute (July 17, 2018), https://www.cato.org/publications/legal-policy-bulletin/losing-count-empty-case-high-capacity-magazine-restrictions.

[89] Martha Bellisle, *High-capacity magazines get new scrutiny as Congress returns*, abcNEWS (Sept. 2, 2019), https://abcnews.go.com/US/wireStory/high-capacity-magazines-scrutiny-congress-returns-65345381.

[90] Griff Witte, *As mass shootings rise, experts say high-capacity magazines should be the focus*, Washington Post (Aug. 18, 2019), https://www.washingtonpost.com/national/as-mass-shootings-rise-experts-say-high-capacity-magazines-should-be-the-focus/2019/08/18/d016fa66-bfa3-11e9-a5c6-1e74f7ec4a93_story.html.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 26

rifles and pistols sold in the United States.[91]  And a leading study on the effects of that legislation found "very, very little evidence, almost none, that gun violence was becoming any less lethal or any less injurious during [the course of the Assault Weapon and Large Capacity Magazine (LCM) ban]."[92]

In light of LCMs' lawfulness, prevalence, and tenuous connection to criminal activity, the presence of an LCM-enabled firearm does not distinguish Mr. Hasson's firearm possession from a typical case in a way that would justify increasing his base offense level by six levels.  *Cf. United States v. Tutty*, 612 F.3d 128, 132 (2d Cir. 2010) (explaining that in previous case, court held child-pornography sentence substantively unreasonable because "the child pornography Guidelines provide for a series of enhancements that apply in virtually every case" and therefore "result in virtually no distinction" between serious and less serious offenders).  The Court should therefore vary down to a range consistent with a base offense level of 14, rather than 20.  An offense level of 20 significantly overstates the seriousness of the firearms-possession offenses to which Mr. Hasson has pled guilty, which is more proportionately reflected in an offense level of 14.

### C.  No Additional Guidelines Factors Apply.

Pursuant to the plea agreement in this case, the government has reserved the right to seek a laundry list of additional enhancements under the Guidelines, including but not limited to U.S.S.G. §§ 2K2.1(b)(6)(B) (use of a firearm in connection with another felony), 3A1.1(a) (hate crime motivation), 3A1.2(a) (government victim), 3A1.4 (promotion of a federal crime of terrorism), 3B1.3 (abuse of trust), and 4A1.3(a) (under-representation of criminal history).[93]  We are not aware of any factual or legal basis to apply these or other Guidelines enhancements.  We respectfully agree with the Guidelines calculation set forth in the PSR.  To the extent the government offers, in its sentencing memorandum, a theory in support of additional Guidelines factors, we will address its arguments in a response.

---

[91]  National Shooting Sports Foundation, *Fast Facts, Another Ban on "High-Capacity" Magazines?*, https://www3.nssf.org/share/factsheets/PDF/HighCapMag.pdf (last visited Jan. 2, 2020).

[92]  Larosiere, *supra* (citation omitted).

[93]  Dkt. No. 94, at 6.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 27

### VI.    The Appropriate Sentence

Applying all of the relevant sentencing factors set forth in § 3553(a), we respectfully submit that the appropriate sentence is time served (Mr. Hasson has been incarcerated for just under one year) followed by a three-year term of supervised release.

### A.    The Goals of Sentencing

The Court's statutory mandate is to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing set forth in 18 U.S.C. § 3553(a)(2). Each of these objectives, which are discussed in turn below, are served by the proposed sentence.

*Punishment*

The first objective that the Court must consider is the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." *Id.* § 3553(a)(2)(A).

Mr. Hasson has already been amply punished simply by the fact of his prosecution and nearly one year spent in pretrial detention. As the result of the government's filings in this case, he has been publicly labeled a domestic terrorist, an extremist, and a racist, despite the lack of any charges related to those allegations. The intense media scrutiny that those allegations have received will ensure that he continues to be punished by the stigma of this case for the rest of his life. In any case, the collateral consequences of a criminal conviction are steep for a first-time offender.[94] They are especially severe in this case. Mr. Hasson's reputation is destroyed. His career is all but over. He is nationally notorious as a pariah.

---

[94] Indeed, the collateral consequences of a criminal conviction "affect virtually every aspect of human endeavor, including employment and licensing, housing, education, public benefits, credit and loans, immigration status, parental rights, interstate travel, and even volunteer opportunities. Collateral consequences can be a criminal defendant's most serious punishment, permanently relegating a person to second-class status." Nat'l Ass'n of Criminal Defense Lawyers, Collateral Damage: America's Failure to Forgive or Forget in the War on Crime, at 12 (May 2014), available at https://www.nacdl.org/restoration/roadmapreport. The Department of Justice awarded a grant to the Council of State Governments to study the collateral consequences of criminal convictions. *See* NICCC Project Description, at https://niccc.csgjusticecenter.org/description/#. The resulting National Inventory of Collateral Consequences of Conviction (NICCC) found more than 47,000 laws nationwide that impose collateral consequences on convicted criminals. In Maryland, the study found more than 1,000 laws imposing collateral consequences on convicted criminals. These

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 28

We ask the Court to weigh heavily those collateral consequences in assessing the appropriate sentence. The Fourth Circuit has expressly held that collateral consequences of a criminal conviction are a relevant sentencing consideration under § 3553(a). *See United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (holding that sentencing court's consideration of defendant's loss of teaching license and state pension was "consistent with § 3553(a)'s directive that the sentence reflect the need for 'just punishment,' *id.* § 3553(a)(2)(A), and 'adequate deterrence,' *id.* § 3553(a)(2)(B)"). In this case, Mr. Hasson has been justly punished already without the need for further incarceration. The charges of conviction relate to nonviolent, simple drug and firearms possession offenses. The punishment Mr. Hasson has already endured is more than sufficient to reflect the seriousness of those offenses, committed by a first-time offender.

### General Deterrence

The second sentencing objective that the Court must consider is the need "to afford adequate deterrence to criminal conduct" – i.e., general deterrence. *Id.* § 3553(a)(2)(B).

We respectfully submit that the proposed sentence is more than adequate to deter similarly situated, generally law-abiding citizens from committing the same offenses as Mr. Hasson. The mere fact of the criminal prosecution has a greater deterrent effect than any sentence subsequently imposed. Most individuals who consider making their own silencers at home, or unlawfully purchasing and using prescription drugs online, would be significantly deterred if they were made aware that they might be federally prosecuted as Mr. Hasson was here. Any general deterrence effect that this case might have has already been accomplished.

### Specific Deterrence

The third sentencing objective that the Court must consider is the need "to protect the public from further crimes of the defendant"—i.e., specific deterrence. *Id.* § 3553(a)(2)(C).

Mr. Hasson has already been amply deterred from committing future crimes by the many adverse consequences that he has already experienced, and will continue to experience, as a result of this prosecution. Never again will he put himself or his family through a similar ordeal after what they have endured already. Mr. Hasson has a long track record as a law-abiding citizen. By

---

include a wide array of restrictions on employment, housing, parental rights, government benefits, professional licensing, and government contracts, among others. *See* NICCC (Maryland), at https://niccc.csgjusticecenter.org/search/?jurisdiction=24.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 29

all accounts of family, friends, and coworkers, the offense conduct here was completely out of character.[95]

Throughout the period of the offense conduct, Mr. Hasson was struggling with severe Opioid Use Disorder, which impaired his clear thinking, judgment, and decision-making and caused him to behave in a way that was inconsistent with his true character.  As Dr. Dunn explains, OUD is a treatable disease and Mr. Hasson's prognosis for treatment is good.[96]  Mr. Hasson is already abstinent from opioid use as a result of a year of incarceration.  With the additional treatment he will receive on supervised release, he will make a full recovery, further ensuring that his behavior will not repeat itself.

Dr. Hart agrees that with substance-abuse treatment and minimal supervision, Mr. Hasson poses a low risk of recidivism.  He explains:

> Regarding the goal of specific deterrence, it is my opinion that Mr. Hasson fully appreciates the seriousness of his actions; is remorseful for, embarrassed by, and ashamed of his actions; and is fully aware of the severe consequences should he ever engage in similar conduct again. Perhaps more importantly, regarding the general goals of protection of public safety and offender rehabilitation, it is my opinion that intensive or intrusive sentencing provisions and conditions for Mr. Hasson are unnecessary. Indeed, from the perspective of the Risk-Need-Responsivity model of offender management, the dominant model in the United States and most other countries with developed economies around the world, an extended period of incarceration may actually be counter-productive, decreasing his opportunities to develop and maintain prosocial relationships and substantially impairing his future re-integration into the community. Rather, the best general strategy is to provide monitoring, treatment, and supervision at a level commensurate with the level of risk he poses, which at present is low.[97]

In sum, the treatment and supervision that Mr. Hasson will receive during his term of supervised release will be adequate to ensure that he does not recidivate.

---

[95] *See* Exhibit 8 (character letters).

[96] Exhibit 5 (Dunn Report), at 5-6.

[97] Exhibit 6 (Hart Report), at 13.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 30

*Rehabilitation*

The final sentencing objective that the Court must consider is the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).

Mr. Hasson does not need educational or vocational training; he is already well trained and highly skilled. What he needs is treatment for his addiction to tramadol and his associated depression. Dr. Dunn prescribed "medication-assisted treatment (Vivitrol, Suboxone) for OUD management in combination with psychological/counseling treatment to address underlying emotional/depressive issues and issues resulting from OUD to help reduce risk of relapse and promote sustained recovery."[98] This treatment will be readily available to Mr. Hasson during his term of supervised release and indeed he is much more likely to receive the appropriate treatment through the probation office than in the Bureau of Prisons.

## B.    Uncharged Conduct

We anticipate that the government will ask the Court to place great weight, in its sentencing analysis, on allegations related to viewpoints and beliefs purportedly held and expressed by Mr. Hasson that do not relate to the criminal conduct of which he has been convicted. The government has alleged that Mr. Hasson was a white nationalist, a racist, and an extremist, among other things. We vigorously dispute that Mr. Hasson actually held these beliefs, as discussed in further detail below. But even if he did, we submit that the Court is constitutionally prohibited from factoring a defendant's viewpoints and beliefs into its sentencing decision.

*A Defendant's Beliefs Are Not an Appropriate Sentencing Consideration*

Both the Supreme Court and the Fourth Circuit have held that considering a defendant's alleged beliefs at sentencing would violate core constitutional principles. "The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). As a result, the "Supreme Court has held that the First Amendment 'prevents the prosecution from employing evidence of a defendant's abstract beliefs at a sentencing hearing when those beliefs have no bearing on the issue being

---

[98] Exhibit 5 (Dunn Report), at 6.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 31

tried.'" *United States v. Runyon*, 707 F.3d 475, 494 (4th Cir. 2013) (quoting *Dawson v. Delaware*, 503 U.S. 159, 168 (1992)); *see also Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993) ("[A] defendant's abstract beliefs, however obnoxious to most people, may not be taken into consideration by a sentencing judge.").

Mr. Hasson's supposed personal thoughts and beliefs "ha[ve] no bearing on either the crime[s] committed or on any of the relevant sentencing factors" under § 3553(a). *United States v. Alvarez-Nunez*, 828 F.3d 52, 56 (1st Cir. 2016). Allowing evidence of those supposed beliefs would merely serve "the irrelevant and impermissible purpose of demonstrating his general moral reprehensibility." *United States v. Schmidt*, 930 F.3d 858, 865 n.16 (7th Cir. 2019). Considering Mr. Hasson's opinions at sentencing would therefore "infringe[] [his] First Amendment rights." *Alvarez-Nunez*, 828 F.3d at 56.

Again, we vigorously dispute that Mr. Hasson sincerely held extremist, racist, or white nationalist views. Regardless, we respectfully request that the Court exclude from sentencing any evidence of Mr. Hasson's purported personal thoughts, beliefs, and viewpoints. The Court should confine its sentencing analysis to the relevant factors set forth in § 3553(a), which are discussed in turn in the next section.

### Mr. Hasson Is Not a White Nationalist, a Racist, or an Extremist

But to the extent the Court considers these allegations, they should carry little weight when viewed against the backdrop of Mr. Hasson's entire, upstanding life. As all who know him agree, the ideas expressed in those writings do not reflect the person that Mr. Hasson is or the beliefs that he truly holds. The numerous character letters submitted by friends, family, and coworkers of Mr. Hasson clearly illustrate this. For example:

- Mr. Hasson's brother, Matthew Hasson, writes: "As disturbing as those writings appear to have been, ***those are NOT Christopher…. I know this man's heart***."[99]

- Mr. Hasson's close friend Drew Buechley says the notion that Chris is "capable of killing a person or committing a mass killing of people could not be further from reality." Mr. Buechley describes Mr. Hasson as a "gentle bear" and a "stabilizing, nonviolent personality." Mr. Buechley also rejects the suggestion that Mr. Hasson

---

[99] Exhibit 8 (Letter from Matthew Hasson) (emphasis added). Matthew Hasson retired from the United States Air Force in 2017 as a Lieutenant Colonel with 23 years of service. He currently works in public relations.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 32

> is a racist.  He explains that Mr. Hasson worked with people of all backgrounds and races in the Coast Guard and "seemed content, comfortable, and happy to be in groups of a range of diversity."[100]

- Lieutenant Commander Jerome Brown, a longtime friend whom Mr. Hasson mentored in the Coast Guard and who is African American, writes: "To hear that a person that I considered a close and dear friend, a person that was in my wedding, a person that helped mold me into the person I am today would plan such things is unbelievable.  I can't say why or how Chris is accused of these horrible acts but I can say that ***the Chris I know has NOT been a racist for over 20 years.***  I can say that Chris has never been anything but honorable and respectful to all that have had the pleasure of working with him.  He has served his country with dignity and respect and has an impeccable record so far as I have known him."[101]

These individuals and others who know Mr. Hasson have uniformly expressed disbelief that he was capable of committing the types of violent acts that the government has speculated he was planning.[102]  Instead, the rambling, incoherent thoughts and ideas that Mr. Hasson expressed in a couple of deleted documents, recovered from his work computer, appear to be the product of a situational mood disturbance, which Dr. Dunn described as a likely effect of Mr. Hasson's tramadol addiction.[103]  Mr. Hasson wholeheartedly disavows the sentiments expressed in his writings, which do not reflect his character, values, or intentions.

Dr. Hart explains that the violent ideation reflected in those writings was compensatory in nature—i.e., a way of coping with feelings of demoralization and uncertainty about the future—and "***did not reflect an intent or plan to commit violence.***"[104]  Dr. Hart identifies a host of factors in Mr. Hasson's personal life that caused him to feel as though his identity and critical "self-concept as a man" were under threat.  He explains that violent ideation was a way for Mr. Hasson to cope with these perceived threats "and decrease his feelings of helplessness and

---

[100] *Id.* (Letter from Drew A. Buechley).

[101] *Id.* (Letter from Lt. Cdr. Jerome Brown Jr.) (emphasis added).

[102] *See also, e.g.*, *id.* (Letters from Marc Triglia and James Fagnant, retired Coast Guard Officers).

[103] *See* Exhibit 5 (Dunn Report).

[104] Exhibit 6 (Hart Report), at 11 (emphasis added).

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 33

hopelessness."[105]  Dr. Hart explains that while such behavior may be concerning, it is not unusual in healthy, non-violent adults:

> Compensatory violent ideation may reasonably be considered grounds for concern about a person's adjustment but is not at all specifically characteristic or indicative of major mental disorder or violence risk. Indeed, compensatory violent ideation is surprisingly common even among normal or healthy people and typically does not progress or escalate into violent intent, threats, attempts, or acts. Many people experience persistent violent ideation, sometimes even sharing their thoughts and fantasies orally or in writing with others, without ever committing actual violence. It is my opinion that Mr. Hasson is one of these people.[106]

In sum, Dr. Hart concludes that "[t]here is no plausible scenario whereby Mr. Hasson engages in violence that might threaten public safety or public order, including but not limited to mass casualty attacks or domestic terrorism."[107]

### C.     Mr. Hasson's Character

In assessing Mr. Hasson's true character and intentions, we urge the Court to read closely the many character letters submitted by his family, friends, and coworkers.  The letters paint a very different picture of Mr. Hasson than the one the government has created and that the media has seized upon.  It would be hard to believe, after reading these letters from those who know him best, that Mr. Hasson is not a man of good character who simply made some human mistakes.

Mr. Hasson's family members highlight the exceptional care and devotion that he has shown to his children, his wife, and many others.  Mr. Hasson's father-in-law, Granville Coleman, describes Mr. Hasson's total "devotion to his faith, family, and service of his country."  He highlights Mr. Hasson's "care and concern for others" as "a quality I have always admired."  Mr. Coleman writes: "Christopher is truly a blessing to our family, our community, and our country."  Mr. Hasson's mother-in-law, Jean Coleman, similarly describes him as "a wonderful husband and father," and an honorable man with a strong work ethic.[108]

---

[105] *Id.* at 11-12.

[106] *Id.* at 12.

[107] *Id.* at 12.

[108] Exhibit 8 (Letter from Granville Coleman Jr.; Letter from Jean Coleman).

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 34

Mr. Hasson's children, Maura and Killian, both describe him as a hands-on dad who taught them everything from life skills, like swimming and riding a bike, to values of compassion and empathy.  He engaged both of his children in community service activities at a young age, including delivering food to the homeless and rebuilding neighborhoods.  Maura recalls that Mr. Hasson was the primary parent involved in her school activities.  Both Maura and Killian followed in their father's footsteps and joined the military.  Mr. Hasson has continued to support his children into adulthood.  Maura writes: "This year I became a mother myself, and I am confident the devotion and unconditional love I have for my son is a quality that has always been instilled and shown to me by my father."[109]

Mr. Hasson's brother, Matt, recalls how Chris cared for him when Matt was struggling with depression and alcohol abuse after a painful divorce.  Every weekend, for six months, Chris drove from North Carolina to Washington, D.C. to be by Matt's side.  Matt writes:

> Chris' love and support are the reason I was able to get back on my feet.  His compassion and selflessness didn't stop at me.  He treats every person he encounters the same way.  He is kind, engaging, and respectful.  My brother will do anything for anyone.  If he sees someone in need he'll be the first to offer a hand.

Those who worked with him in the Coast Guard describe Mr. Hasson as a generous mentor, a dedicated public servant, and an all-around good guy.  Jerome Brown writes:

> Chris took me in like I was a little cousin. We spent many days together and even some nights. He taught me everything that I know about being an electronic technician. He was my first mentor, providing me with invaluable advice and guidance when no other superior would. … He was never angry or disappointed. Chris was a very loving and dedicated man.

Jeffrey Cavallo, who worked with Mr. Hasson in the Coast Guard from 2012–2019 and supervised him from 2013–2016, writes:

> During my military/civilian career I had the opportunity to serve alongside exceptional people.  Chris was one of these people and I do not say this lightly. Chris from the moment I met him always went above and beyond to exemplify the characteristics of a Servant Leader.  A Servant Leader empowers, puts the needs of his employees first and helps people develop and perform as highly as possible.

---

[109] Id. (Letter from Maura Harper; Letter from Killian Hasson).

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 35

Chris always put people first and ensured that they had the tools and training to excel.

Mr. Cavallo recalls that Chris was approachable, always smiling, and "always had a positive attitude." He was "a consummate professional that was dedicated to serving his country and the people he worked with." Mr. Cavallo expresses "every confidence that he can put this behind him and be a very productive member of society like he always has been."[110]

David Donahue, who worked under Mr. Hasson from 2011–2016, describes Chris as "a good supervisor," who fostered "a positive work environment," was "quick with a thank you," and was always open to suggestions for improvement. Mr. Donahue describes Chris as supportive, encouraging, and overall "a positive person."[111]

Jim Fagnant, who worked alongside Mr. Hasson from 2012–2016, writes:

Chris reported to C3CEN as a newly commissioned Warrant Officer in 2012, and the first thing I noticed was how polite he was. He was always very agreeable, hardworking, easy to work with, and listened to advice keenly. Chris always presented himself as an accomplished professional. He was punctual, polished, dependable, and always willing to go out of his way to complete a job.[112]

Mr. Fagnant, Mr. Donahue, and others also highlight Mr. Hasson's active participation in community service activities during his tenure with the Coast Guard. Mr. Fagnant describes himself as "shocked at the charges leveled against Chris," noting that he "continue[s] to find the accusations difficult to believe."[113]

Patrick Walsh, a medical doctor and professor at Johns Hopkins School of Medicine, has been visiting with Mr. Hasson weekly since April of 2019 as a lay Catholic prison minister. Dr. Walsh writes:

---

[110] *Id.* (Letter from Jeffrey Cavallo, retired Coast Guard Officer).

[111] *Id.* (Letter from David Donahue, U.S. Coast Guard).

[112] *Id.* (Letter from James J. Fagnant, retired Coast Guard Officer).

[113] *Id.*

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 36

> From the very beginning of these visits, I have been impressed with his religious
> convictions and sorrow over what he has done to his family by putting them through
> this ordeal.
>
> He has not made excuses for himself and deeply regrets his actions.  It seems that
> addiction contributed heavily to his behavior, which would not have occurred if he
> had been sober.
>
> His contrition is sincere and he is committed to amend his life with the help of God.
> We have wonderful conversations about the Bible and the role of God in our lives
> helping others.[114]

Similarly, Laura Johnston, another religious counselor who has seen Mr. Hasson weekly
over the last year (she was paired with him because of her military background), writes that "the
man [she] encountered was not the person depicted in the media reports."  She has seen Mr. Hasson
truly "embrace his situation and, through reflection, come to terms with the self-destructive
decision making that lead him to incarceration."  Ms. Johnston does not "believe he is or would be
inclined to acquire weapons again or to return to using narcotics, knowing how drug use derailed
his life."  She adds:

> I offer this assessment after considerable reflection. Today, I work at the
> Washington Navy Yard, in a building next to the site of a mass shooting. The
> repercussions of that incident live on. I hope that the training we receive on
> recognizing threats would help deter incidents in future. I do not see a likelihood
> for that type of destructive behavior with Lt. Hasson.  I do see a man who served
> his country and is working hard to earn another chance at living a better and more
> empathetic and compassionate life.  I hope Your Honor affords him that opportunity
> in the near term. [115]

These letters—together with many others not specifically quoted herein—are a powerful
testament to the person Mr. Hasson really is.  It is telling that all of these individuals, who have
known Mr. Hasson in different settings and during different periods of his life, agree on the basic
outlines of who he is.  He is a good man.  He has a positive outlook on life.  He is kind, gentle, and
generous.  He is not violent.  He is not hateful.  He is human, and he was struggling, for a bit, with

---

[114] *Id.* (Letter from Dr. Patrick C. Walsh); *see also id.* (Letter of Fr. Chuck Canterna).

[115] *Id.* (Letter from Laura D. Johnston).

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 37

addiction and depression.  He made mistakes as a result.  But he has strong foundations and an extensive support system that will ensure that he can safely return to the community and get back on his feet.

### D.  Comparator Cases

Finally, in imposing sentence, this Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Notwithstanding evidence of "extremist" or "white supremacist" views of the type the government ascribes to Mr. Hasson, defendants in several recent cases, who were charged with unlawful firearms possession, have received sentences in the range proposed by Mr. Hasson.

On August 8, 2019, Brian Baynes pled guilty to possession of a firearm by a user or addict of a controlled substance under 18 U.S.C. § 922(g)(3)—the same offense to which Mr. Hasson pled guilty.[116]  During a search of Baynes' home, investigators found "paraphernalia" affiliated with Atomwaffen Division, a "neo-Nazi group" that "has been linked to several killings."[117]  Despite these affiliations, the district court in *Baynes* sentenced the defendant to just two years' probation, with thirty days of intermittent confinement.[118]

Similarly, Jeffrey Clark pled guilty to a § 922(g)(3) charge on July 23, 2019.[119]  Clark was a vocal white supremacist who openly "fantasized about killing 'Jews and blacks,'" made statements online praising the Pittsburgh synagogue shooter (including that his victims "deserved" what they got), and described himself on social media as a "meth-smoking, pipebomb making, mailman-murdering … #DemoKKKrat."  Clark was connected with the Pittsburgh synagogue shooter on social media, he attended the "Unite the Right" rally in Charlottesville, and he openly expressed admiration for Dylann Roof, Timothy McVeigh, Ted Kaczynski, and other notorious mass killers.  A search of Clark's residence revealed evidence of his ties to the violent neo-Nazi group Atomwaffen Division, as well as body armor and helmets, hollow-point ammunition, and assorted other expressions of violent ideology.  These facts were described in detail in the

---

[116] *United States v. Brian Baynes*, No. 1:19-cr-00232-LO, ECF No. 26 (E.D. Va. Aug. 8, 2019).

[117] Michael Kunzelman, *Man Linked to Neo-Nazi Group Pleads Guilty to Gun Charges*, The Associated Press (Nov. 12, 2019), https://apnews.com/0145d59d6c4e44ed99826a7e6e4e83c6.

[118] *Baynes*, ECF No. 43 at 2.

[119] *United States v. Clark*, No. 1:18-cr-00338-TJK, ECF No. 16 (D.D.C. July 23, 2019).

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 16, 2020
Page 38

government's motion to detain Clark pending trial.[120]   However, the district court properly set aside this information pertaining to Clark's violent ideology in sentencing him and imposed a sentence of ten months in prison—essentially, time served.[121]

This Court should likewise give no weight to any views or opinions the government may seek to attribute to Mr. Hasson and, like the courts in *Baynes* and *Clark*, should impose a sentence that is tailored to the actual offense conduct.  In this case, as in *Clark*, that sentence is time served.

**VIII.   Conclusion**

For the all of the reasons set forth herein and in the supporting attachments, we respectfully request that the Court sentence Mr. Hasson to time served and place him on a three-year term of supervised release.

Respectfully submitted,

/s/

Elizabeth G. Oyer
Cullen Macbeth

EGO:sdf
cc:  Thomas Windom, AUSA
     Jennifer Sykes, AUSA

---

[120] *See* Govt's Memorandum in Support of Pre-Trial Detention, *United States v. Clark*, No. 1:18-cr-00338-TJK, ECF No. 5 (D.D.C. Nov. 15, 2018).  A copy of this filing is attached as Exhibit 7.

[121] Asher Stockler, *White Supremacist Sentenced to Time Served After Receiving Federal Weapons Charge*, Newsweek (Sept. 13, 2019), https://www.newsweek.com/jeffrey-clark-pittsburgh-shooting-white-supremacy-1459241.