

**PROTECT INTERNATIONAL**
RISK AND SAFETY SERVICES INC

January 15, 2020

Ms. Liz Oyer
Federal Public Defender
Baltimore, MD

**Re:    Lt. Christopher Paul HASSON (DOB 24 April 1969)**

Dear Ms. Oyer,

Per your instructions, I have completed a violence risk assessment of Mr. Hasson in anticipation of his upcoming sentencing hearing. My findings and opinions are set out herein.

## Qualifications

My area of expertise is violence risk assessment, including the development, implementation, and evaluation of professional guidelines for violence risk assessment, the management of violence risk, and the association between mental disorder and violence.

Violence is the actual, attempted, or threatened psychological or physical harm of another person, including intimidation or fear-inducing behavior, that is deliberate and without lawful authority. Violence risk assessment is the process of evaluating people to characterize the risks that they will commit violence in the future (e.g., the nature, severity, imminence, frequency, and likelihood of future violence), as well as the steps that could be taken to minimize these risks. Virtually all violence risk assessments are conducted using the discretionary method, which involves gathering and reviewing case information to identify known risk factors (i.e., warning signs), often relying on decision support tools such as professional guidelines.

Of particular relevance to the present matter, I have extensive experience providing consultation, education, training, and assessment services to law enforcement, corrections, national security, and legal agencies and professionals regarding risk for serious violence, including terrorism, mass casualty violence, and targeted violence. For example, I was invited by the U.S. Federal Bureau of Investigation to participate in its 2015 symposium on targeted violence prevention as part of the development of its 2017

publication, "Making Prevention a Reality: Identifying, Assessing, and Managing the Threat of Targeted Attacks," and I was a consultant to Her Majesty's Prison Service of England and Wales in the development of its guidelines for extremist violence risk assessment and management. I have received grants from Public Safety Canada and the Canadian Network for Research on Terrorism, Security and Society to develop and evaluate guidelines relevant to terrorism risk assessment and management. I am responsible for supervising the graduate studies of more than 50 students in the Terrorism, Risk, and Security Studies program at Simon Fraser University, all of whom are professionals working in fields related to law enforcement and national security in Canada. They include members of the Canadian Armed Forces; Royal Canadian Mounted Police and various provincial and municipal police forces; Sergeants-at-Arms responsible for legislative assembly protection; and members of federal and provincial ministries responsible for public safety, such as the Canadian Border Services Agency, Transport Canada, and Immigration, Refugees and Citizenship Canada. I have delivered violence risk assessment and management education and training to agencies in the United States, including the Army, Navy, and Federal Bureau of Prisons, as well as various state corrections and forensic mental health agencies. In addition, I have delivered education and training specifically related to assessment of risk for terrorism and group-based violence to agencies such as the Politie (Netherlands National Police), Ontario Provincial Police, Toronto Police Service, and Calgary Police Service, and at professional meetings including the (U.S.) Association of Threat Assessment Professionals, the Canadian Association of Threat Assessment Professionals, the European Association of Threat Assessment Professionals, and the American Psychology-Law Society. Finally, I have worked on numerous cases related to risk of serious violence, including terrorism. I have been qualified to give expert testimony before various courts, tribunals, and review boards, including: parliamentary committees in Canada and Scotland; the Federal Court of Canada; the superior trial courts of Alberta, British Columbia, Manitoba, and Ontario in Canada; and the superior trial courts of Arizona, California, Florida, Illinois, Iowa, Kansas, Missouri, Texas, Washington, and Wisconsin in the United States.

More generally, I obtained BA, MA, and PhD degrees in psychology at the University of British Columbia. I am currently Professor in the Department of Psychology at Simon Fraser University, where I am also Associate Member in the School of Criminology and Director of the Terrorism, Risk, and Security Studies graduate program. I am also a Visiting Professor in the Faculty of Psychology at the University of Bergen. I have co-authored more than 250 books and manuals, chapters, and articles, as well as more than 550 conference presentations. I have held numerous research grants. The professional guidelines I developed in this field have been translated into more than two dozen languages and have been adopted for use in more than 50 countries, and one of them was identified in a recent survey as the world's most commonly used decision support tool for violence risk assessment. I have received a number of awards for my work,

including the Career Achievement Award from the Society of Clinical Psychology (Div. 12 of the American Psychological Association), the Distinguished Achievement Award from the (U.S.) Association of Threat Assessment Professionals, and the Distinguished Contribution Award from the American Academy of Forensic Psychology. I served as Founding Co-Editor and later Editor of the *International Journal of Forensic Mental Health*, as well as Founding Editor of the *Journal of Threat Assessment and Management*. I am a Past President of the American Psychology-Law Society and the International Association of Forensic Mental Health Services and also served as a Director of the Canadian Association of Threat Assessment Professionals.

I have provided you with a copy of my complete *curriculum vitae* under separate cover.

### Assignment and Overview of Opinion

Mr. Hasson has pled guilty to three weapons offenses and one drug offense: Unlawful Possession of Unregistered Silencers, 26 U.S.C. § 5861(d); Unlawful Possession of Firearm Silencers Unidentified by Serial Number, 26 U.S.C. § 5861(i); Possession of Firearms by an Unlawful User of and Addict to a Controlled Substance, 18 U.S.C. § 922(g)(3); and Possession of a Controlled Substance, 21 U.S.C. § 844(a). The details of the offenses are set out in Attachment A (Stipulation of Facts) of the Plea Agreement dated 2 October 2019 and will not be repeated here.

Although none of the offenses for which he was convicted involved violence, the government has theorized there was a violent motivation underlying them – that is, Mr. Hasson was on the path to committing a violent attack on civilians at the time of his arrest. More specifically, the government theorized:

1. "The defendant intends to murder innocent civilians on a scale rarely seen in this country."

2. "The defendant is a domestic terrorist, bent on committing acts dangerous to human life that are intended to affect governmental conduct."

You instructed me to undertake a violence risk assessment of Mr. Hasson to evaluate evidence supporting the government's theory. To that end, I reviewed documents provided by you that included pleadings and investigative reports related to the index offenses, Mr. Hasson's computer contents and Internet activity, Mr. Hasson's military records, summaries of interviews with numerous collateral informants, and character letters prepared in advance of Mr. Hasson's sentencing. In addition, I relied on a mental health assessment of Mr. Hasson conducted by a forensic psychologist, a substance use assessment conducted by a behavioral pharmacologist, and personal interviews with Mr. Hasson conducted by me. These

sources of information are listed in Attachment A. To reach findings and form opinions, I relied on two sets of professional guidelines: Version 3 of the Historical-Clinical-Risk Management Guide or HCR-20 Version 3 (Douglas, Hart, Webster, & Belfrage, 2013) and the Multi-Level Guidelines or MLG (Cooke, Hart, & Kropp, 2013; Vargen, Hart, & Cooke, in press). As part of the HCR-20 Version 3, I considered the degree to which Mr. Hasson exhibited symptoms of psychopathic personality disorder, as measured by the Screening Version of the Hare Psychopathy Checklist-Revised or PCL:SV (Hart, Cox, & Hare, 1995).

**It is my opinion that the evidence I reviewed does not support the government's theory that Mr. Hasson intends (or intended) to commit acts dangerous to human life or that he is (or was) a domestic terrorist. Furthermore, it is my opinion that Mr. Hasson does not pose a risk of serious violence, including but not limited to murder and terrorism, either currently or in the foreseeable future.**

In the remainder of this report, I present a detailed summary of my findings and opinions. Findings and opinions with respect to the HCR-20 Version 3, PCL:SV, and MLG are presented in Attachments D, E, and F, respectively.

### Findings

For the purpose of forming opinions, I have assumed certain facts to be true, based on the information I reviewed:

1.  **Mr. Hasson had no serious adjustment problems as a child.** He was raised by his biological parents. He had one younger brother. His development was normal. His childhood experiences were positive: he did not experience serious illness or injury; he generally got along well with his parents, brother, and extended family members; he did not suffer child abuse or neglect or other trauma; and his educational adjustment was normal.

2.  **Mr. Hasson had a period of conduct problems as an adolescent.** He attributed the emergence of conduct problems to the adverse impact of his family's frequent moves, a lack of direct supervision due to the work schedules of his parents, and what he perceived to be tension between different racial groups at school. Starting when he was about 12 or 13 years old and continuing until he about 17 to 18 years old, he started to use and then abuse alcohol and cannabis; engaged in truancy, vandalism, theft, and fighting; associated with other disaffected youth, including some who had racist attitudes; and even left home and lived on the street for about one month. As a consequence of the conduct problems, he had contact with police and was arrested on one occasion, and his parents took him to substance use treatment.

3.  **Mr. Hasson had a long and successful career in the Armed Forces.** Inspired by his family's history of military service, he developed an interest in joining the Armed Forces at a young age. After his period of conduct problems

ended in adolescence, he tried to enlist in the U.S. Marine Corps and eventually entered the Corps when he was 19 years old. He served as an aircraft mechanic and later in the Security Force. He was deployed to Kuwait to participate in Operations Desert Shield and Desert Storm, and then to Bosnia and Herzegovina to participate in Operations Provide Promise and Deny Flight. He earned a number of commendations and medals. He received an honorable discharge in 1994 and tried to return to civilian life, working in construction briefly. But he missed military life and within six months joined the U.S. Army National Guard in Virginia and later in Arizona. Eventually, in 1996, he left his civilian job altogether and enlisted in the U.S. Coast Guard. His service in the Coast Guard spanned 23 years, with postings in South Carolina, Nevada, New Jersey, Alaska, Florida, Virginia, and Washington, D.C. He held various positions, received truly outstanding performance evaluations and numerous commendations and awards, and eventually was promoted to the rank of Lieutenant – a rare honor for an enlisted service member, especially someone without a university degree. His co-workers and supervisors described him as intelligent, thoughtful hard-working, agreeable, responsible, and dependable, someone who treated others with respect, was a good mentor to others, and demonstrated exceptional leadership.

Despite his excellent performance, Mr. Hasson experienced some unhappiness at work after he started working as an acquisitions officer for the National Security Cutter program in Washington, D.C. in 2016. His posting meant that he spent time living alone in Maryland, while his wife continued to reside in North Carolina. He worked mostly alone at a computer station and had limited personal contact with co-workers on a daily basis. He completed his work assignments quickly, which meant he was often bored and spent time surfing the Internet. He was preoccupied with his approaching mandatory retirement and what he would do with his life after 30 years in the Armed Forces.

4.  **Mr. Hasson established and maintained close, stable relationships with family and friends.** He was close to his parents and to his younger brother. He was briefly married to a woman who he knew from high school when he was about 20 years old, but they separated after he was deployed overseas during the First Gulf War. After returning from that deployment, he met and married Shannon Marie. They had two children, Killian and Maura, both of whom also served in the Armed Forces. Maura is now married with a child. Mr. Hasson was an active and caring husband and father, despite absences due to his military service and the expected stresses of family life (illnesses, financial problems, etc.). Outside of the family, he socialized with people at work and in the community. He was generally regarded by others as polite, respectful, friendly, funny, and caring, but also quite private and introverted. He did not speak much about personal issues, and preferred to spend time with family, engaged in physical activities (e.g., hunting, motorcycle riding, martial arts), and studying diverse topics.

Mr. Hasson experienced some family problems starting in about 2012 and continuing to the time of his arrest. One problem was that his brother, Matthew, went through a difficult divorce, and Mr. Hasson spent considerable time helping Matthew overcome difficulties related to depression and substance use. A second problem was that his daughter, Maura, married without telling her family. This caused some tension within the family that took time to work through. A third problem was that when Mr. Hasson moved to Maryland in 2016 to begin work as an acquisitions officer, his wife, Shannon Marie, decided to continue living in North Carolina. This, combined with new surroundings and the minimal interaction with co-workers in his new job, caused Mr. Hasson to feel socially isolated and to question the long-term viability of his marriage. The situation improved when Shannon Marie decided to move to Maryland to live with Mr. Hasson.

5.   **Mr. Hasson's self-concept and attitudes were primarily prosocial.** He had a strong group-based identity rooted in patriotism (proud American), career (military service), and heritage (Irish Catholic). He had a strong attachment and loyalty to family, friends, and fellow personnel in the Armed Forces. Although he had a long-standing interest in firearms and has bought and sold many over the past 30 years or so, this interest was entirely consistent with his employment and lawful recreational interests. He did volunteer work on behalf of the homeless, for which he received a commendation, and also reading to disadvantaged school children as part of a program organized through the Coast Guard. On the other hand, he had some attitudes that may be characterized as unconventional or countercultural and were inconsistent with his generally prosocial attitudes:

   a.   As a young adult, he self-identified as a "skinhead." His identification and affiliation were with the "second wave" of skinhead subculture that emerged in the late 1970s and early 1980s. These skinheads were a subculture rather than an organized group (like hippies), so there was no formal leadership or membership. The subculture was characterized primarily by an interest in punk music and a rejection of conservative, middle-class values. He stopped socializing with people from the skinhead subculture after he joined the Armed Forces and had no more contact with them after his early 20s.

   b.   As a young adult, he and Shannon Marie socialized with people who may be characterized as white nationalist. This was not an organized group, so there was no formal leadership or membership. The belief system shared by these people may be characterized as primarily tribalistic in nature, reflecting a desire to establish and maintain a white racial and national identity and a rejection of pluralist and multiculturalist values. He and Shannon Marie got tattoos consistent with white nationalist ideology. He and Shannon Marie stopped socializing with people from the white nationalist subculture by his mid to late 20s. Mr. Hasson and his wife took steps to avoid any further contact with people from this subculture and had their white nationalist tattoos covered up. They have not publicly expressed

attitudes consistent with white nationalism since that time. Mr. Hasson has been consistently respectful of the rights and welfare of others since that time: he was polite and friendly to the people from diverse backgrounds with whom he worked or for whom he volunteered, as well as to those who were friends of his children, and he never engaged in racist, discriminatory, or harassing conduct. Indeed, he even served as the Human Relations Council Chairperson while in the Coast Guard, where it was noted that his "efforts significantly contributed to the celebration of diversity and increased awareness of equal rights for all."

c.   As a young adult, he socialized with members of an outlaw motorcycle club, an organization that celebrated the motorcycle subculture and values such as freedom, nonconformity to mainstream culture, and loyalty to other club members. (In contrast, an outlaw motorcycle *gang* has explicit antisocial or dissocial values and engages in criminal activities.) The motorcycle club had formal leadership and membership, but Mr. Hasson was not a member: He did not request to join, and even declined an invitation to join, because he did not like some of the members. He stopped socializing with members of the club, except one longtime friend, in his mid to late 20s.

d.   As an adult, he self-identified as a "prepper." He was preoccupied with themes of social disruption, ranging from natural catastrophe to pandemic to political disruption. He avidly consumed written material such as dystopian fiction, manifestos of mass murderers, and so forth. He acquired survivalist supplies and gear for himself and his wife, including foodstuffs, hiking gear, protective gear, and so forth. He also purchased two unregistered suppressor (silencer) kits, knowing this was illegal. He assembled one and tested it on a single occasion and found it to be of poor quality, so never used it again and never assembled the second one; but he did not dispose of them, which resulted in the index offenses. He discussed his prepper beliefs, attitudes, and activities primarily with his wife and son; he did not belong to an informal or formal prepper group. Mr. Hasson was still an active prepper at the time he was arrested.

6.   **Mr. Hasson had some problems with mental health as an adult**. He was characteristically a quietly anxious person who was tense and ruminative. He was also prone to periods of feeling depressed or down. He had some traumatic experiences that occasionally worsened some of these symptoms. For the most part, these symptoms caused limited impairment of his functioning and were not obvious to others; in addition, he did not report them to others and did not seek or receive assessment of or treatment for them. Instead, he coped with them mainly through distraction – engaging in physical activities, studying diverse topics, and so forth. It is possible that Mr. Hasson's symptoms may have met diagnostic criteria for mood or anxiety disorders in the past, albeit of mild or moderate severity.

Mr. Hasson's symptoms of anxiety and depression worsened starting in about 2012. During this period of time he experienced some significant life stresses related to employment and relationships (as discussed previously) and also began to abuse opiate analgesics (as discussed below). His consumption of material related to themes of social disruption increased. He experienced violent ideation that was diffuse and unfocused in nature. It comprised a wide range of thoughts, images, and fantasies with aggressive or violent themes, including some about various other people perpetrating violence against each other or against him, or himself perpetrating violence against various others. The violent ideation was frequent and persistent at times but was not perceived by Mr. Hasson as intrusive or distressing. The ideation did not escalate to intention or action; for example, Mr. Hasson never developed or implemented plans to execute violence. He did not discuss his violent ideation publicly. On two occasions he wrote brief electronic documents (one letter and one email) describing or elaborating some of his violent ideation, but he did not send either of the documents and later deleted them.

7. **Mr. Hasson had some problems with substance use as an adult.** He illegally purchased, stored, and used both anabolic steroids and opiate analgesics.

    a. He initially used steroids when he was younger to increase his muscle mass (i.e., "bulk up") and later to counteract some of the effects of androgen decline associated with aging in normal males (e.g., fatigue, weight gain, loss of muscle mass). Although illegal, steroid use is quite common among young men working in the Armed Forces, law enforcement, and corrections. Also, Mr. Hasson's steroid use did not result in significant adverse effects such as problems with work, personal relationships, physical health, mental health, or the law.

    b. He started using the opiate analgesic, Tramadol, occasionally in about 2005 to deal with physical pain. At that time, Tramadol was not a controlled substance in the U.S., his use of the drug was not excessive, and he desisted use entirely after a short time. He did, however, notice that taking the substance reduced his experience of anxiety and depression and increased his energy. When Mr. Hasson experienced an exacerbation of his symptoms of anxiety and depression starting in about 2012, he resumed using Tramadol. His use escalated, and he eventually developed a dependence on it. He experienced cravings, tolerance (the need to use a higher dosage to achieve the same effect), and withdrawal. The Tramadol also stopped improving his symptoms of anxiety and depression and indeed worsened them. He unsuccessfully tried to desist Tramadol use on his own, knowing that it could lead to loss of his job if discovered. Mr. Hasson managed to keep his Tramadol use from interfering with employment and relationships, and as a consequence his family, friends, and co-workers were unaware of his substance use problem until the index offenses.

## Opinions

Based on the assumed facts outlined above, my opinions are as follows:

1.   **Mr. Hasson does not have a history of violence.** That is, Mr. Hasson, now 50 years old, has never engaged in actual, attempted, or physical harm of others that was deliberate and unauthorized.

2.   **Mr. Hasson's index offenses were not violent in nature and did not have an underlying violent motivation.** Put differently, Mr. Hasson was not on what is sometimes referred to in the field of violence risk (threat) assessment as the "path to intended violence," a popular descriptive model of the behavioral progression toward violence, presented in Attachment D. Although he *thought about* violence, he did not make a choice or decision to *commit* violence. I say this for the following reasons:

     a.   Mr. Hasson did not even reach the first step of the path, namely developing a grievance in relation to specific people. His violent ideation did not center around the belief that he had suffered personal harm or injury at the hands of other people.

     b.   Mr. Hasson did not form the intent to attack specific targets. The people incorporated into his violent ideation were remarkably numerous and diverse, and sometimes even unnamed and unspecified (e.g., "everyone on earth"). Also, as noted above, none of the people incorporated into his violent ideation was identified as responsible for harming or injuring him.

     c.   Mr. Hasson did not research and plan an attack against specific targets. As noted above, he had not identified specific targets or even formed an intent to attack them, so he had nothing to research or plan. He searched for information on the Internet about a number of people who were incorporated into his violent ideation, but these searches were rapid, superficial, and occurred in the context of searching for information concerning many other things that had nothing to do with violence. He did not conduct the research necessary or sufficient to plan an attack, let alone actually plan an attack – something that, as a 30-year veteran of the Armed Forces, he had the training, skills, and experience to do.

     d.   Mr. Hasson did not make preparations for an attack. As noted above, he had not planned an attack, so he had nothing to prepare for. He certainly possessed materiel that one might use to prepare an attack, including firearms. Most of this materiel was consistent with his hunting, military, and prepper interests, however, and was acquired long before he started to experience exacerbation of his violence ideation starting in about 2012. Once again, Mr. Hasson had the training, skills, and experience to prepare for an attack, but he did not.

e.    Mr. Hasson did not probe or breach any target's security as the prelude to an attack. As noted above, he had not made plans or preparations for an attack, or even identified a target, so could not have decided which security to probe or breach or how to do so. Once again, Mr. Hasson had the training, skills, and experience to probe or breach a target's security, but he did not.

f.    Mr. Hasson did not attack or attempt to attack any target, either working alone or while communicating or conspiring with others.

3.   **Mr. Hasson was not a "domestic terrorist."** Per 18 U.S.C. §2331(5), the definition of domestic terrorism is activities that occur primarily within the territorial jurisdiction of the United States that: (a) involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State; and (b) appear to be intended to intimidate or coerce a civilian population, influence the policy of a government by intimidation or coercion, or affect the conduct of a government by mass destruction, assassination, or kidnapping. I say Mr. Hasson was not a domestic terrorist for the following reasons:

a.    Mr. Hasson did not commit acts dangerous to human life that are a violation of the relevant criminal laws. The offenses for which he has been convicted are not violent in nature, that is, did not occur in the context of actual, attempted, or threatened physical harm of others; and they did not pose a danger to human life other than his own, except in the most distal, indirect, and general or theoretical sense that would render virtually any crime dangerous to human life. First, his index offenses related to possession of a controlled substance are a result of his dependence on Tramadol and intent to use it personally, not the intent to distribute or administer it to others. Second, his index offenses related to possession of firearms are essentially status offenses. He acquired, possessed, and used firearms for more than 25 years, both as a private citizen and a member of the Armed Forces without being arrested for, charged with, or convicted of criminal offenses. It was only after he developed substance-related disorder (i.e., use of and dependence to Tramadol after it became a controlled substance in 2014) that his continued possession of firearms became illegal. There was no indication that his use or possession of controlled substances resulted in use of firearms in a way that threatened the health and safety of others. Third, his index offenses related to possession of firearm silencers reflected his interest in testing the effectiveness of kits available over the Internet. It is true he knew this was illegal and he was required to apply for a permit in advance. It is also the case, however, that firearm silencer kits are readily available for purchase from U.S.-based companies; it has been estimated that more than 1.5 million U.S. citizens own firearm silencers legally, and a large but unknown number own them illegally but apparently not for use in the commission of a crime of violence; and it is rare that silencers, legal or illegal, are used in the

10

commission of a crime of violence. There is no evidence that Mr. Hasson used, attempted to use, or planned to use his silencers in crimes of violence. The use of unregistered silencers has been characterized in some U.S. courts as a "victimless crime"; see *U.S. v. Ritsema*, 89 F.3d 392, 395 (7th Cir. 1996).

b.   Mr. Hasson did not plan, attempt, or commit acts intended to intimidate or coerce a civilian population, influence the policy of a government by intimidation or coercion, or affect the conduct of a government by mass destruction, assassination, or kidnapping. First, there was no evidence that that he – either working alone or while communicating or conspiring with others – had formed the intent to commit such violence, researched or planned such violence, made preparations to commit such violence, probed or breached the security of targets in preparation for such violence, or committed or attempted to commit such violence. Second, he did not have a personal ideology (i.e., a coherent and stable system of ideas or ideals) that condoned, supported, or promoted the commission of crimes of violence, including but not limited to domestic terrorism. Third, he did not belong to and did not affiliate with, either socially or parasocially (i.e., over the Internet), any identifiable group with an ideology that condoned, supported, or promoted the commission of crimes of violence, including but not limited to domestic terrorism. Indeed, the evidence I reviewed suggests quite the opposite is true: from the time he was a young child, Mr. Hasson dreamed of joining the Armed Forces; and as an adult, he formed the intent and acted on this dream, and has devoted the past 30 years of his life to upholding and protecting the values, citizens, and government of the United States.

4.   **Mr. Hasson's violent ideation did not reflect an intent or plan to commit violence.** Violent ideation may reflect one or more of three major causal mechanisms. First, it may be *adaptational* in nature, a way to plan and rehearse the perpetration of violence to enhance its feasibility and effectiveness. This mechanism is consistent with the "path to intended violence" model. Second, violent ideation may be *avolitional* in nature, the experience of perseverative thoughts due to impairment of executive functions associated with mental disorder (e.g., delusion, obsession). Third, it may be *compensatory* in nature, a way to regulate one's emotional state or self-concept in response to actual or perceived external threats. Put another way, violent ideation – like suicidal ideation – can be a way for people to cope with situations in which they feel hopeless or helpless.

It is my opinion that Mr. Hasson's violent ideation was compensatory in nature. I have already discussed (in paragraphs 2 and 3 of this section) why I do not believe Mr. Hasson's violent ideation was adaptational in nature, reflecting an intention or plan to commit violence. Also, I do not believe it was avolitional in nature, due to the fact that he did not suffer from a major mental disorder of the sort characterized by delusions, obsessions, or

similar symptoms. Rather, Mr. Hasson was anxious and tended to perceive the world as place full of threats, and he engaged in violent ideation to cope with this perception. His tendency to perceive threat was evident in his preoccupation with themes of social disruption, including but by no means limited to such things as mass casualty and terrorist violence, and he frequently read about and studied accounts (both fictional and nonfictional) of disruptive events. His tendency to perceive the world as a place full of threats played an important role in his decision to join the Armed Forces: he saw this as a way to protect not only his own safety, but that of his family, his friends, and his fellow citizens. But starting in about 2012, a series of events led to an increase in his symptoms of anxiety and depression. First, he experienced problems in his marital relationship, including uncertainty about its status and future. Second, he experienced problems in his employment. After his promotion to lieutenant and move to DC, he felt unhappy living in an urban environment apart from his wife and working alone at desk job. He was also facing the prospect of retirement from the Armed Forces and the need to figure out what he was going to do for the rest of his life. Third, his use of Tramadol continued and even escalated to the point that he became dependent on it and was unsuccessful in his attempts to desist from using it. His use of Tramadol was a threat to his employment in the Coast Guard, especially after it became a controlled substance in 2014. Fourth, he spent considerable time helping his brother cope with problem related to depression and substance use stemming from a difficult marital breakdown at the time when he was facing some of these same problems himself. Fifth, he was adjusting to life as an aging male and the physical changes that come with it. As a consequence of all these problems, he experienced threats to his identities as a husband, father, and member of the Armed Forces – identities that were critical to his self-concept as a man. This in turn led to demoralization and uncertainty about the future. Violent ideation served to validate his perception that he was under threat, help him take a more agentic and active approach to dealing with perceived threats, and decrease his feelings of helplessness and hopelessness.

Compensatory violent ideation may reasonably be considered grounds for concern about a person's adjustment but is not at all specifically characteristic or indicative of major mental disorder or violence risk. Indeed, compensatory violent ideation is surprisingly common even among normal or healthy people and typically does not progress or escalate into violent intent, threats, attempts, or acts. Many people experience persistent violent ideation, sometimes even sharing their thoughts and fantasies orally or in writing with others, without ever committing actual violence. It is my opinion that Mr. Hasson is one of these people.

5. **There is no plausible scenario whereby Mr. Hasson engages in violence that might threaten public safety or public order, including but not limited to mass casualty attacks or domestic terrorism.** The only plausible scenario is that Mr. Hasson will live the rest of his life as did the first 50 years – without engaging in actual, attempted, or threatened violence toward others. He will no doubt encounter normal life stresses as well as other stresses that

are outside the experience of the average or typical person, including those related to dealing with the consequences of his conviction for the index offences and avoiding recurrence of substance use or dependence. But it is my opinion that he coped effectively with both normal and atypical life stresses for many years and likely would have coped with the problems he was experiencing between 2012 and the time of his arrest, eventually achieving a more positive and stable adjustment, even if he had not been arrested. It is also my opinion that he is likely to establish and maintain a positive, violence-free adjustment in the future. I say this for three main reasons. First, as a consequence of his arrest, incarceration, and conviction, he had the chance to admit to and discuss with his family the problems he experienced. This means he no longer needs to try to keep those problems private and cope with them on his own. Second, his incarceration provided him with the opportunity to fully "detox" from (i.e., desist using) Tramadol. He is now in full remission, which is the necessary first step in living a drug-free life. Third, while incarcerated, he has been fully compliant with institutional rules and has used his available time to talk, think about, and plan for the future. His plans for the future, although tentative at the present time in light of his upcoming sentencing hearing, appear to be entirely appropriate and feasible.

6.  **Intensive or intrusive sentencing provisions and conditions for Mr. Hasson are not necessary to protect public safety.** With the greatest respect for and in deference to the Court, I acknowledge there are many valid goals of sentencing, and my assessment is only relevant to some of them. Regarding the goal of specific deterrence, it is my opinion that Mr. Hasson fully appreciates the seriousness of his actions; is remorseful for, embarrassed by, and ashamed of his actions; and is fully aware of the severe consequences should he ever engage in similar conduct again. Perhaps more importantly, regarding the general goals of protection of public safety and offender rehabilitation, it is my opinion that intensive or intrusive sentencing provisions and conditions for Mr. Hasson are unnecessary. Indeed, from the perspective of the Risk-Need-Responsivity model of offender management, the dominant model in the United States and most other countries with developed economies around the world, an extended period of incarceration may actually be counter-productive, decreasing his opportunities to develop and maintain prosocial relationships and substantially impairing his future re-integration into the community. Rather, the best general strategy is to provide monitoring, treatment, and supervision at a level commensurate with the level of risk he poses, which at present is low. For these reasons, it is my opinion that the following release conditions would be individually necessary and jointly sufficient to effectively manage Mr. Hasson's violence risk in the community, now and in the foreseeable future:

     a.   *Monitoring.* Mr. Hasson's mood, substance use, and violent ideation should be monitored. It will be important for designated professionals (people responsible for this community supervision) and members of his social support network (family and friends) to discuss these topics

openly with him and also to be alert for behavioral evidence that he is depressed, using opiates, or increasingly preoccupied with themes of social disruption. His opiate use can also be monitored by analysis of hair or urine.

b.      *Treatment*. Mr. Hasson does not need treatment to address deficits in psychological or social functioning at this time. In the event there are indications that he is becoming depressed, experiencing urges to use opiates, or becoming preoccupied with violence, he should be encouraged to seek voluntary treatment on an outpatient basis from a qualified mental health professional – ideally, one with a specialty in forensic mental health. In the event he experiences relationship problems or difficulties adjusting to life after a career in the Armed Forces, he should be encouraged to seek assistance from a marital counsellor, vocational counsellor, or veteran's support group.

c.      *Supervision*. I understand that Mr. Hasson will be prohibited from possessing weapons. I do not see the need for any other restrictions or conditions to be placed on him.

## Limitations

The quality of a violence risk assessment is constrained by the information on which it is based. If new and potentially important information becomes available, it may be necessary to update this violence risk assessment.

Also, violence risk is dynamic. If there are important changes in Mr. Hasson's life circumstances, it may also be necessary to update this violence risk assessment.

Thank you for the opportunity to assist in this matter.

Sincerely,

Stephen D. Hart, PhD

Attachments:
   A: Sources of Information Reviewed
   B: Summary of Findings With Respect to the HCR-20 Version 3
   C: Summary of Findings With Respect to the PCL:SV
   D: Summary of Findings With Respect to the MLG
   E: Path to Intended Violence

## Attachment A

## Sources of Information Reviewed

### A. Pleadings

A1.   Affidavit in Support of Criminal Complaint and Arrest Warrant (ECF 1), dated 14 February 2019.

A2.   Motion for Detention Pending Trial (ECF 9), 19 February 2019.

A3.   Order of Detention Pending Trial (ECF 12), 21 February 2019.

A4.   Indictment (ECF 16), dated 27 February 2019.

A5.   Letter from Ms. Oyer to Judge Day requesting a further detention hearing (ECF 24), dated 15 April 2019.

A6.   Opposition to Motion for Reconsideration of Detention Order (ECF 25), dated 23 April 2019.

A7.   Letter from Ms. Oyer to Judge Day regarding detention hearing (ECF 26), dated 24 April 2019.

A8.   Letter from Ms. Oyer to Judge Day regarding proposed release conditions, exhibit redacted (ECF 29), dated 29 April 2019.

A9.   Opposition to Defendant's Proposed Release Conditions (ECF 35), undated.

A10.   Second Motion for Detention Pending Trial (ECF 42), 10 May 2019.

A11.   Plea Agreement (ECF 94), including Attachment A: Stipulation of Facts (ECF 94-1), dated 2 October 2019

### B. Discovery Materials

B1.   Hampton Police Division, Crime Report (with Addendum), dated 11 February 1995.

B2.   Master's thesis titled, "Imagining the Impossible: Insurgency in the U.S.A.", by Mr. Eric Sauer, Naval Postgraduate School, dated March 2011.

B3.   Firearms Transaction Record, dated 30 December 2017.

B4.   Maryland Gun Center, results of Automated Firearms Service System queries regarding Mr. Hasson and Ms. Shannon Marie Hasson, dated 4

January 2019.

B5.   Driver's license information concerning Mr. Hasson, dated 4 January 2019.

B6.   Driver's license information regarding Ms. Shannon Marie Hasson, dated 4 January 2019.

B7.   Coast Guard Member Information, dated 9 January 2019.

B8.   Registered vehicle information report, dated 11 January 2019.

B9.   Completed Electronic Questionnaires for Investigations Processing (e-QIP) Investigation Request #20124573, dated 5 February 2016.

B10.  Coast Guard Investigative Service search photo log, "Hasson cubicle Search," containing 11 photographs, dated 12 February 2019.

B11.  Baltimore Police Department, Laboratory Section/Drug Analysis Report (with attachments), dated 12 to 13 February 2019.

B12.  Federal Bureau of Investigation, Advice of Rights form completed and signed by Mr. Hasson, dated 15 February 2015.

B13.  Handwritten notes of interview by Federal Bureau of Investigation, author unknown, dated 15 February 2019.

B14.  Federal Bureau of Investigation, note by Special Agent Alexandria M. Thoman, dated 15 February 2019.

B15.  Coast Guard Investigative Service search photo logs, "Hasson cubicle Search," containing 38 photographs, dated 15 February 2019.

B16.  Coast Guard Investigative Service inventory of property taken pursuant to search authorization by Special Agent Erik J. Hayes, dated 19 February 2019.

B17.  Politiets Sikkerhetstjeneste, General Purpose Message, dated 20 February 2019.

B18.  Federal Bureau of Investigation, summary of personal interview with Ms. Maura Harper (née Hasson), by Special Agent Michelle Clark Nicolet, dated 21 February 2019.

B19.  Federal Bureau of Investigation, Collected Item Logs (5 in total), dated 21 and 22 February 2019.

B20. Federal Bureau of Investigation, note by Special Agents Michael J. Fowler, Andrew Vogel, and Charles Jenkins, dated 22 February 2019.

B21. Federal Bureau of Investigation, note by Special Agent Michael J. Fowler, dated 22 February 2019.

B22. Extraction report for Samsung SM-G950U Galaxy S8, dated 22 February 2019.

B23. Search results for Samsung GSM_SM-T378V Galaxy, dated 23 February 2019.

B24. Federal Bureau of Investigation, arrest report by Special Agents Sean Patrick O'Rourke, Rachid Thomas Harrison, and Michael J. Fowler, dated 25 February 2019.

B25. Federal Bureau of Investigation, interview report by Special Agents Sean Patrick O'Rourke, Rachid Thomas Harrison, and Michael J. Fowler, dated 25 February 2019

B26. Federal Bureau of Investigation, note by Special Agents Michael J. Fowler, Charles Jenkins, and Rachid Thomas Harrison, dated 25 February 2019.

B27. Federal Bureau of Investigation, note by Special Agents Christopher L. Izant, Michael J. Raska (with attachments), dated 25 February 2019.

B28. Federal Bureau of Investigation Laboratory, Evidence Submitted Receipt, dated 25 February 2019.

B29. Microsoft, account reports 612691 and 612692, dated 26 February 2019.

B30. Federal Bureau of Investigation, note by Special Agents Christopher L. Izant, Michael J. Raska (with attachments), dated 26 February 2019.

B31. Federal Bureau of Investigation, note by Special Agent Alexander Becker, dated 26 February 2019.

B32. Federal Bureau of Investigation, note by Special Agent Christopher J. Wood, dated 4 March 2019.

B33. Federal Bureau of Investigation, Collected Item Log, dated 5 March 2019.

B34. Federal Bureau of Investigation, note by Special Agent Michael Fregeau (with attachment), dated 6 March 2019.

B35. Federal Bureau of Investigation, summary of personal interview with Mr.

Robert Davis and Ms. Denise Davis, by Special Agents Sean Patrick O'Rourke and George Gjelaj, dated 7 March 2019.

B36.   Federal Bureau of Investigation, note by Special Agent Alexandria M. Thoman (with attachments), dated 8 March 2019.

B37.   Federal Bureau of Investigation, Electronic Communication, dated 8 March 2019.

B38.   Federal Bureau of Investigation, Collected Item Log, dated 8 March 2019.

B39.   Federal Bureau of Investigation, note by Special Agents Alexandria M. Thoman and Alexander Becker (with attachments), dated 8 March 2019.

B40.   Federal Bureau of Investigation, note by Computer Scientist Susi T. Hajeski, dated 12 March 2019.

B41.   Recordings of telephone calls by Mr. Hasson made from Maryland Correctional Facility, dated 12, 13, 14, and 22 March 2019.

B42.   Federal Bureau of Investigation, summary of personal interview with Ms. Anina Kotlyarskaya and Ms. Laura Small, by Special Agents Alexandria M. Thoman & Rachid Thomas Harrison (with 4 photographs attached), dated 15 March 2019.

B43.   Federal Bureau of Investigation, summary of personal interview with Ms. Shannon Marie Hasson by Special Agents Alexandria M. Thoman and Rachid Thomas Harrison, dated 15 March 2019.

B44.   Federal Bureau of Investigation, summary of personal interview with Ms. Maura Harper (née Hasson), by Special Agents Alexandria M. Thoman and Michelle Clark Nicolet, dated 18 March 2019.

B45.   Federal Bureau of Investigation report by Computer Scientist Scott Gillis and Susi Hajeski (including attachments), dated 18 March 2019.

B46.   Federal Bureau of Investigation, record regarding drug evidence by Special Agent Alexandria M. Thoman, dated 19 March 2019.

B47.   Federal Bureau of Investigation, record regarding drug testing by Special Agents Alexandria M. Thoman and Sean Patrick O'Rourke, dated 20 March 2019.

B48.   Federal Bureau of Investigation, record regarding drug evidence by Special Agent Alexandria M. Thoman, dated 20 March 2019.

B49.   Federal Bureau of Investigation, record regarding drug evidence by

Special Agent Alexandria M. Thoman, dated 20 March 2019.

B50.  Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Technology Criminal Branch, Report of Technical Examination, dated 21 March 2019.

B51.  Federal Bureau of Investigation record by Special Agent Francis Cesare, dated 25 March 2019.

B52.  Federal Bureau of Investigation, summary of personal interview with Mr. Steven Casey Jones, by Special Agents Keith Kohne and Douglas J. Hartman, dated 28 March 2019.

B53.  Federal Bureau of Investigation, note by Special Agent Sean Patrick O'Rourke, dated 1 April 2019.

B54.  Federal Bureau of Investigation, note by Special Agent Alexandria M. Thoman (with attachments), dated 3 April 2019.

B55.  Federal Bureau of Investigation Laboratory, Laboratory Report, dated 4 April 2019.

B56.  Federal Bureau of Investigation Laboratory, Case Record Reports, dated 5 April and 17 May 2019.

B57.  Federal Bureau of Investigation, summary of personal interview with Ms. Shannon Marie Hasson (with attachments), by Special Agents Michelle C. Gast and Alexandria M. Thoman, dated 11 April 2019.

B58.  United States District Court for the District of Maryland, Search and Seizure Warrants (with attachments), dated 12 April 2019.

B59.  United States Coast Guard Insider Threat Detection report prepared for Federal Bureau of Investigation Special Agent James Burkett, dated 10 April 2019.

B60.  Affidavit in Support of Applications for Search Warrant, dated 12 April 2019.

B61.  Microsoft, Declaration of Authentication of Business Records, dated 19 April 2019.

B62.  Microsoft, account reports 641468 and 641470, dated 19 April 2019.

B63.  United States Coast Guard, response to request for records regarding Mr. Hasson, dated 26 April 2019.

B64.   Federal Bureau of Investigation, Digital Forensics Analysis Section Technical Assistance Report, author unknown, dated 8 May 2019.

B65.   Federal Bureau of Investigation Laboratory, Laboratory Report, dated 14 May 2019.

B66.   Federal Bureau of Investigation Evidence Entry by Special Agent Wilma Janice Simon, dated 31 May 2019.

B67.   Drug Enforcement Administration, Chemical Analysis Report, 6 June 2019.

B68.   Federal Bureau of Investigation, note by Supervisory Special Agent Brian E. Cooney, dated 7 June 2019.

B69.   Drug Enforcement Administration, Chemical Analysis Reports (25 in total), dated 13 and 28 June 2019.

B70.   Federal Bureau of Investigation, Electronic Communication, "Processing of Google Location Data," by Special Agents Mathew J. Wilde and Timothy Blair McDermid (with Google Earth Location Data for Device Tags -1384753683 and -1557465207 for the period January 2018 to February 2019, by month), dated 23 July 2019.

B71.   Federal Bureau of Investigation, Electronic Communication, "CAIR Review," by Special Agent Rebecca S. Deisterhoft, dated 8 August 2019.

B72.   Requested documents from Adams Arms, Amazon, Ammunition Depot, ATT.NET, Brownells, Capital One, ClaimFox, Discover, Ebay, Enterprise, Excelsior College, EZStorage, FaceBook, FedEx, Gmail, HSBC, JPMorgan, MoneyGram, Navy Federal Credit Union, PayPal, State Department Federal Credit Union, Synchrony, Trader Jerry's, Tricare Prescription Records, UPS, Verizon, Walmart, Wells Fargo, Western Union, and Yahoo, various dates.

B73.   Image files (1,113 in total) of photographs taken at Mr. Hasson's residence at 1004 Navahoe Drive, undated.

B74.   Additional image files (122 in total) of property seized, undated.

B75.   Completed ATF gun traces for 11 weapons, various dates.

B76.   Key for electronic devices, undated.

B77.   Letter addressed to "Mr. Covington" by Mr. Hasson, undated.

B78.   Email addressed to "Dear friends" by Mr. Hasson, undated.

B79.  Microsoft, Guidelines for U.S. Law Enforcement, undated.

B80.  Microsoft, Online Services –Law Enforcement National Security, undated.

B81.  Image files of Google searches made by Mr. Hasson (3 in total), undated.

B82.  Microsoft, OneDrive profiles for christopher.hasson.2016@gmail.com and chris_hasson@att.net, undated.

B83.  Location history for christopher.hasson.2016@gmail.com, undated.

B84.  Emails retrieved from Anonymous Speech account of Mr. Hasson (243 in total), various dates.

B85.  Drug Enforcement Administration, Case Detail Reports, undated.

B86.  Summary of digital forensics analysis, author unknown, undated.

B87.  Electronic document, 266N-BA-3033784_0000152_Import.txt, author unknown, undated.

B88.  Handwritten notes of arrest by Federal Bureau of Investigation, author unknown, undated.

B89.  Image files of photographs taken of Mr. Hasson's tattoos (3 in total), undated.

B90.  Driver's license information regarding Mr. Killian Hasson, undated.

B91.  Image files of family photographs of Mr. Hasson, Ms. Shannon Marie Hasson, and Mr. Killian Hasson (3 in total), undated.

## C. Additional Information

C1.  Summary of interview with Mrs. Shannon Marie Hasson by Ms. Claire Benack, dated 16 April 2019.

C2.  Letter from Mr. Matthew Hasson to Judge Day, dated 24 April 2019.

C3.  Summary of forensic analysis of Mr. Hasson's Internet history conducted by Mr. Larry Daniel, dated 24 April 2019.

C4.  Coast Guard Personnel Records, dated 26 April 2019.

C5.  Summary of interview with Mr. Bob Davis and Mrs. Denise Davis by Ms. Claire Benack, dated 28 May 2019.

C6.  Summary of telephone interview with Ms. Maura Harper (née Hasson) by

Ms. Claire Benack, dated 21 June 2019.

C7.     Personal interview with Mr. Hasson at Chesapeake Detention Facility, 0930 to 1300 hrs, dated 24 June 2019.

C8.     Telephone interview with Dr. Barry Rosenfeld regarding clinical-forensic psychological assessment of Mr. Hasson, dated 25 June 2019.

C9.     Summary of telephone interview with Mr. Killian Hasson by Ms. Claire Benack, dated 26 June 2019.

C10.    Summary of telephone interview with Mr. Jeffrey Cavallo by Ms. Claire Benack, dated 26 June 2019.

C11.    Summary of telephone interview with Mr. James Fagnant conducted by Ms. Claire Benack, dated 9 July 2019.

C12.    Summary of interview with Mr. Kevin Carroll conducted by Ms. Claire Benack, dated 11 July 2019.

C13.    Summary of telephone interview with Ms. Ashley Cannon conducted by Ms. Claire Benack, dated 22 August 2019.

C14.    Summary of interview with Mr. Jerome Brown conducted by Ms. Claire Benack, dated 29 August 2019.

C15.    Summary of telephone conversations between Ministers at Chesapeake Detention Facility and Ms. Claire Benack, dated 2 December 2019.

C16.    Personal interview with Mr. Hasson at Chesapeake Detention Facility, 1330 to 1600 hrs, dated 9 December 2019.

C17.    Letter from Mr. Jeffrey Cavallo to Judge Hazel, dated 10 December 2019.

C18.    Letter from Mr. James Fagnant to Judge Hazel, dated 13 December 2019.

C19.    Letter from Mr. Craig and Ms. Maureen Hasson to Judge Hazel, dated 13 December 2019.

C20.    Social History Report prepared by Ms. Claire Benack, dated 16 December 2019.

C21.    Behavioral pharmacology report by Dr. Kelly Dunn, dated 17 December 2019.

C22.    Letter from Ms. Ashely Cannon to Judge Hazel, dated 18 December 2019.

C23.  Letter from Mr. Daniel Coleman to Judge Hazel, dated 4 January 2020.

C24.  Letter from Mr. Jerome Brown to Judge Hazel, undated.

C25.  Letter from Mr. Drew Buechley to Judge Hazel, undated.

C26.  Letter from Father Charles (Chuck) Canterna to Judge Hazel, undated

C27.  Letter from Mr. Granville Coleman Jr. to Judge Hazel, undated.

C28.  Letter from Mr. Jean Coleman to Judge Hazel, undated.

C29.  Letter from Mr. David Donahue to Judge Hazel, undated.

C30.  Letter from Ms. Kelly Elgas "To whom it may concern," undated.

C31.  Letter from Ms. Monica Flores to Judge Hazel, undated.

C32.  Letter from Mr. Killian Hasson to Judge Hazel, undated.

C33.  Letter from Mr. Matthew Hasson to Judge Hazel, undated.

C34.  Letter from Ms. Maura Harper (née Hasson) to Judge Hazel, undated.

C35.  Letter from Ms. Shannon Marie Hasson to Judge Hazel, undated.

C36.  Letter from Mr. Ryan Smith to Judge Hazel, undated.

C37.  Letter from Mr. Spencer Steckman to Judge Hazel, undated.

C38.  Letter from Ms. Janet Triglia to Judge Hazel, undated.

C39.  Letter from Mr. Lucas Triglia to Judge Hazel, undated.

C40.  Letter from Mr. Marc Triglia to Judge Hazel, undated.

C41.  Letter from Ms. Victoria Triglia to Judge Hazel, undated.

C42.  Letter from Ms. Emily Warmingham to Judge Hazel, undated.

C43.  List of books ordered from Amazon by Mr. Hasson, compiled by Ms. Claire Benack, undated.

**Attachment B**

**Summary of Findings With Respect to the HCR-20 Version 3**

The HCR-20 Version 3 is a set of structured professional guidelines for assessing risk for general violence. Evaluators use the guidelines to identify the presence and relevance of 20 basic risk factors for general violence reflecting the personal characteristics and living situations of evaluees: 10 reflect Historical or past adjustment, 5 reflect Clinical or current adjustment, and 5 reflect Risk Management or future adjustment. Ratings are based on interview and case history materials. The factors in the HCR-20 Version 3 are listed on the following page. I am familiar with the development and use of the HCR-20 Version 3: I am one of its developers, and I have conducted research evaluating its usefulness, trained professionals in its use, and given expert testimony about and based on the HCR-20 Version 3 and its earlier versions.

With respect to Presence, I rated one Historical factor (H5) as *present*. I rated five Historical factors (H2, H4, H6, H8, and H9) and one Risk Management factor (R5) as *possibly or partially present*. I rated the remaining factors as *not present*.

With respect to Relevance, I rated all the factors as *low relevance*. This was due to the fact that Mr. Hasson had no history of violence, despite the fact that most of the factors rated as *present* were longstanding.

As the HCR-20 Version 3 is an *aide mémoire* or checklist designed to assist clinical evaluations, it cannot be used to make quantitative estimates (i.e., probabilistic predictions) of risk for general violence. With that caveat in mind, one risk factor rated as *present* and a total of seven risk factors rated as *possibly or partially present* is very low relative to the average or typical correctional offender.

**Source**

Douglas, K. S., Hart, S. D., Webster, C. D., & Belfrage, H. (2013). *HCR-20$^{V3}$: Assessing risk for violence*. Burnaby, Canada: Mental Health, Law, and Policy Institute, Simon Fraser University. [ISBN: 978-0-86491-344-9]

## Factors in the HCR-20 Version 3

| Historical Factors | Clinical Factors | Risk Management Factors |
|---|---|---|
| H1. Violence | C1. Insight | R1. Professional services and plans |
| H2. Other antisocial behavior | C2. Violent ideation or intent | R2. Living situation |
| H3. Relationships | C3. Symptoms of a major mental disorder | R3. Personal support |
| H4. Employment | C4. Instability | R4. Treatment and supervision response |
| H5. Substance use | C5. Treatment or supervision response | R5. Stress or coping |
| H6. Major mental disorder | | |
| H7. Personality disorder | | |
| H8. Traumatic experiences | | |
| H9. Violent attitudes | | |
| H10. Treatment or supervision response | | |

**Attachment C**

**Summary of Findings With Respect to the PCL:SV**

The PCL:SV is multi-item observer rating scale designed to assess the lifetime presence and severity of symptoms of psychopathic personality disorder. I am familiar with the development and use of the PCL:SV: I was one of the test developers; and I have conducted research evaluating its usefulness, trained professionals in its use, and provided expert evidence about and based on it.

When administering the PCL:SV, the evaluator makes ratings on 12 items based on personal interview and third-party information such as collateral interviews and official records). The items are presented on the following page. Each reflects a different symptom or characteristic of psychopathy. Items are rated on a 3-point scale (0 = *absent/does not apply*, 1 = *partially present/applies to a certain extent*, 2 = *present and severe/applies*). Items are summed to yield total scores. Total scores range from 0 to 24, with scores of 18 and higher used to diagnose psychopathy. Total scores also can be interpreted dimensionally, relative to norms from various comparison groups, or cut-off scores can be used to make categorical diagnoses. Norms are available for correctional offenders, forensic psychiatric patients, civil psychiatric patients, and community residents.

I gave Mr. Hasson a rating of *present* on Item 11 and a rating of *partially present* on Item 12, reflecting delinquency in adolescence and some limited criminality in adulthood (i.e., the index offenses). I gave him a rating of *absent* on the remaining ten items. Overall, my ratings yielded a total score of 3 out of a possible 24 points. There is a "margin of error" for PCL:SV scores, as is true for scores on all psychological tests. According to the test manual, independent evaluators who are appropriately trained and reviewed similar information should obtain total scores within $\pm2$ points of the total score I obtained. This means that, in the majority of cases, evaluators would be expected to obtain total scores between 1 and 5 for Mr. Hasson. According to the test manual, a total score in the range of 1 to 5 are very low in absolute terms, falling well below the diagnostic cutoff of 18 points or higher. Compared to correctional offenders and forensic psychiatric patients in the normative sample for the test, the total score I gave Mr. Hasson falls in the bottom 5% (i.e., at least 95% of them have more psychopathic traits than he does).

**Source**

Hart, S. D., Cox, D. N., & Hare, R. D. (1995). *Manual for the Hare Psychopathy Checklist: Screening Version (PCL:SV)*. Toronto: Multi-Health Systems Inc.

**Items in the PCL:SV**

1.  Superficial

2.  Grandiose

3.  Deceitful

4.  Lacks remorse

5.  Lacks empathy

6.  Doesn't accept responsibility

7.  Impulsive

8.  Poor behavior controls

9.  Lacks goals

10. Irresponsible

11. Adolescent antisocial behavior

12. Adult antisocial behavior

## Attachment D

## Summary of Findings With Respect to the MLG

The MLG is a set of structured professional guidelines for assessing risk for group-based violence. Evaluators use the guidelines to identify the presence and relevance of 16 basic risk factors reflecting characteristics of the evaluee, the evaluee in relation to relevant groups, the groups themselves, and the groups in relation to society. The factors in the MLG are listed on the following page. I am familiar with the development and use of the MLG: I am one of the developers, conducted research evaluating its usefulness, and trained professionals in its use.

With respect to Presence, I rated one Individual risk factor (I4) as *definitely present* and the other three Individual factors (I1, I2, and I3) as *possibly or partially present*. I rated all the Individual-Group, Group, and Group-Societal risk factors as *not present*. With respect to Relevance, I rated all of the factors as *not relevant* to group-based violence in light of the facts that Mr. Hasson has no history of: (a) perpetrating individual or group-based violence; (b) a personal ideology that condoned, supported, or promoted group-based violence; or (c) membership in or affiliation through social or parasocial (i.e., virtual or online) relationships with a group whose ideology condoned, supported, or promoted, violence.

As the MLG is an *aide mémoire* or checklist designed to assist evaluations, it cannot be used to make quantitative estimates (i.e., probabilistic predictions) of risk for group-based violence.

## Sources

Cook, A. N., Hart, S. D., & Kropp, P. R. (2013). *Multi-Level Guidelines (MLG) for the assessment and management of group-based violence*, Draft 4. Burnaby, Canada: Mental Health, Law, and Policy Institute, Simon Fraser University.

Vargen, L., Hart, S. D., & Cook, A. N. (in press). *Multi-Level Guidelines (MLG) for the assessment and management of group-based violence*. Burnaby, Canada: Mental Health, Law, and Policy Institute, Simon Fraser University.

## Risk Factors in the MLG

| Individual Factors | Individual-Group Factors |
| --- | --- |
| I1.  Conduct problems | IG1.  Strong group-based identity |
| I2.  Attitude problems | IG2.  Violent role or status in group |
| I3.  Social adjustment problems | IG3.  Strong commitment to group |
| I4.  Mental health problems | IG4.  Negative attitudes toward people outside the group |

| Group Factors | Group-Societal Factors |
| --- | --- |
| G1.  Capacity for violence | GS1.  Large in size/scope |
| G2.  Violent norms or goals | GS2.  Socially isolated/isolative |
| G3.  Strong cohesion | GS3.  Operating in an unstable context/environment |
| G4.  Strong leadership/-power structure | GS4.  Threatened by or in conflict with other groups |

**Attachment E**

**Path to Intended Violence**

As summarized in a recent article by Calhoun and Weston (2015, p. 259), who developed the model:

> Problem individuals…[who] truly intend to commit an act of violence against whatever target they have selected…intentionally proceed along what we call "the path to intended violence"; that is, they move from:

- feeling a *grievance* to

- *developing the idea* that only violence can resolve their injury, to

- *researching and planning* the attack, to

- *making preparations* according to the dictates of the plan and the opportunities available, to

- *breaching* the target's security (however primitive or sophisticated that may be), and then to

- *attack*.

**Source**

Calhoun, F. S., & Weston, S. W. (2015). Perspectives on threat management. *Journal of Threat Assessment and Management*, *2* (3/4), 258–267. [DOI: 10.1037/tam0000056]