## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. GJH-19-96** |
| | * | |
| **CHRISTOPHER PAUL HASSON,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

**\*\*\*\*\*\*\*\***

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING



The defendant—inspired by racist murderers—stockpiled assault weapons, studied violence, and intended to exact retribution on minorities and those he considered traitors.  But for the diligent actions of multiple federal law enforcement agencies, we now would be counting bodies of the defendant's victims instead of years of the defendant's prison time.  For the reasons that follow, the defendant should be sentenced to a term of imprisonment of 25 years.

## I.      Background

On February 14, 2019, United States Magistrate Judge Gina L. Simms authorized a criminal complaint charging the defendant with violations of 18 U.S.C. § 922(g)(3) (possession of firearm by unlawful user or addict of controlled substance) and 21 U.S.C. § 844 (simple possession of Tramadol, a Schedule IV opioid).  The defendant has been detained since that date, based on detention orders of United States Magistrate Judge Charles B. Day and, on review, this Court.

On February 27, 2019, a federal grand jury for the District of Maryland returned an indictment charging the defendant with violations of 26 U.S.C. § 5861(d) (unlawful possession of unregistered firearm silencers) and 5861(i) (unlawful possession of firearm silencers unidentified by serial number), in addition to the counts charged previously by criminal complaint.  On August 14, 2019, a federal grand jury for the District of Maryland returned a superseding indictment alleging the same counts.[1]

On September 9, 2019, the Court heard argument on the defendant's three motions: (1) a motion to dismiss the silencer counts on Second Amendment grounds (ECF No. 62); (2) a motion to dismiss the § 922(g)(3) count on the ground that the statute is unconstitutionally vague and thus void (ECF No. 63); and (3) a motion to suppress various search warrants (ECF No. 66).  The Court

---

[1] The Superseding Indictment revised certain language to account for the Supreme Court's *Rehaif* decision.

denied all motions by written order on September 20, 2019 (ECF Nos. 85 and 86).  Shortly thereafter, on October 3, 2019, the defendant pleaded guilty on the condition that he maintained his appellate rights as to the Second Amendment and void-for-vagueness arguments.  In the plea agreement, the parties agreed to certain uncontested Guideline provisions and left all others in dispute.  ECF No. 94.

The U.S. Probation Officer has prepared a presentence report, and incorporated comments from the parties.  ECF No. 98.  The Government now files this memorandum in aid of sentencing.

## II.       The Defendant Has Long Held Racist Views, On Which He Resolved to Act.

On September 29, 2017, using his official Coast Guard e-mail address, the defendant sent to his personal e-mail address a Microsoft Word attachment, which was a letter he wrote to a known American neo-Nazi leader, Harold Covington.[2]  *See* **Exhibit 1**.[3]  In the letter, the defendant identified himself as a "White Nationalist" for over 30 years and advocated for "focused violence" in order to establish a white homeland.  The defendant sent himself this letter roughly seven weeks after the Charlottesville neo-Nazi rally.  In the letter, the defendant wrote:[4]

---

[2] Covington died in July 2018.

[3] The defendant sent the e-mail to himself at 1:15 p.m.  Earlier that day, at 10:20 a.m., the defendant performed a Bing search for "formal introduction letter example."

[4] In the letter, the defendant's reference to "Mr. Cobb" likely is a reference to Craig Cobb, who moved to Leith, North Dakota, with the notion of making it a white supremacist stronghold, only later to be convicted of certain menacing and terrorizing charges.  *See* Associated Press, "North Dakota: White Supremacist Gets Probation for Terrorizing Town," Apr. 29, 2014.  *See also* **Exhibit 19** at 21.  And the defendant's reference to "Rev. Butler" likely is a reference to Richard Butler, the founder of the Aryan Nations, who died in 2004.  *See* **Exhibit 19** at 21.

- 3 -

Mr. Covington,

     I am writing you regards to your ideas behind North West migration. To date I have read most of your books and briefly looked at your website. I am a long time White Nationalist, having been a skinhead 30 plus years ago before my time in the military. I have served in 3 branches currently serving as an Officer (never attended college) with 2 years till I hit mandatory retirement at 30. I have been married 25 years and brought up two ██████████ children ██████████████████████████████. My plans are upon retirement to move to the North West most likely Idaho. While I fully support the idea of a white homeland, my friends who still play at being a skinhead at 40 plus years old say that you are an informant. That is neither here nor there it is not an accusation the person who told me this served a 12 year prison sentence and never ratted me out so I will not dispute him nor will I accuse you. I never saw a reason for mass protest or wearing uniforms marching around provoking people with swastikas etc. I was and am a man of action you cannot change minds protesting like that.  However you can make change with a little focused violence.

     ██████████ has made a good many contacts of normal white people as well as the "alt right "and enjoys "red pilling" them to our cause. I think he has succeeded on bringing some very valuable assets to our cause, people with education and means who seem to be sincere. My intention is to bring as many of these people to the Northwest as can be persuaded however I am reluctant to join or have them join a movement officially as most are infested with informants of one kind or another. The government has expertly infiltrated and destroyed from within most if not all Pro White organizations. I think it best to move there integrate with in the communities and "red pill" the normal folk or become a pillar of the community. I have no law enforcement back ground but am looking at running for sheriff or possibly town counsel in the area I decide to settle after establishing myself, not waving Nazi/confederate flags just being an upstanding citizen in a white community.  To that point Mr. Cobb character is an idiot in my humble opinion why would you announce to the world your intentions and expect anything but push back. The reason for this letter is to hopefully open a dialogue with you and when I do move up there to coordinate efforts. I am not starting a new movement just bringing people to your and Rev Butlers ideas. We need a white homeland as Europe seems lost. How long we can hold out there and prevent niggerization of the Northwest until whites wake up on their own or are forcibly made to make a decision whether to roll over and die or to stand up remains to be seen. But I know a few younger ones that are tired of waiting and I feel we need them to resettle and build a community before they throw their life away with some desperate measure like shooting up a mosque in an area that doesn't want us. They need a Homeland to fight for as America has turned its back on them. I know more than a few that went this path it's a fucking waste.

The same day that he e-mailed himself the letter, the defendant stored in his Google Drive account Covington's 2011 book, The Northwest Front Handbook.[5]  According to the book, "[t]he Northwest Front is a White separatist movement dedicated to the Fourteen Words of David Lane: '**We must secure the existence of our people and a future for White children**.'"  The phrase "14 words" is a popular one among white separatists/nationalists and American neo-Nazis—and

---

[5]  The book has Covington's Northwest Front mailing address on its front cover.  The facts suggest that the defendant did in fact mail the letter to Covington.

it is also a phrase known and used by the defendant, as shown by the below e-mail written in the same month that he wrote the letter to Covington:[6]



In the letter to Covington, the defendant references a particular individual as having "never ratted me out."  This person's identity is known to the Government; the defendant refers to the person as "Missouri" and the Government will so too.

The defendant and Missouri have a long history with one another, as documented in police reports from 1995.  *See* **Exhibit 2**.  Late at night on February 11, 1995, the defendant and Missouri went to a private residence in Hampton, Virginia.[7]  When the homeowner arrived by car and

---

[6] Asatru is a heathen religion whose symbols and other aspects have recently and frequently been co-opted by white nationalists, including those marching in Charlottesville in 2017.  *See* Sigal Samuel, "What to Do When Racists Try to Hijack Your Religion," The Atlantic, Nov. 2, 2017.

[7] The defendant and Missouri were joined by a third man, also a "skinhead" according to the police report.  At the time of the 1995 conduct, the third man was pending sentencing for a weapons conviction and for defacing a predominantly black church with spray paint that read "Leave now or else" and "White power."  As late as 2014, the third man continued to hold a leadership position in a white supremacist organization in the United States.

inquired as to the reason for their presence, the defendant and Missouri—according to the police report—"called [the owner] several names, stated it was none of his business and walked toward the victim."  The victim identified the defendant and Missouri as "skinheads."  According to the police report, Missouri—wearing a black jacket with Swastika patches—pulled a handgun from his jacket, "aimed the firearm to the victim['s] face and pulled the trigger[.]  When the firearm did not discharge[,] the suspect beat the victim with the firearm.  Chris Hasson was standing there with the suspect when this occurred."  In September 1995, Missouri was convicted at trial in Virginia state court of attempted murder, maiming, and firearms charges, after which he served a considerable period of incarceration.

In March 2019, an FBI agent interviewed Missouri, who gave limited information about his relationship with the defendant.  The same day of the interview, Missouri caused one of the defendant's relatives to learn that the FBI had stopped by to speak to Missouri.  When that relative passed the information to the defendant, the defendant's first words were:  "Oh shit."  *See* **Exhibit 3** (from around 4:35 to around 12:00).  After professing that "I didn't put them that way"— apparently concerned that Missouri would think the defendant directed law enforcement toward Missouri—the defendant stated that he thought the Government "would try to get me to inform.  I wouldn't do that, but I'm just saying . . . I had this thing in my head where they'd offer me."  The defendant's relative quickly interrupted: "There's nothing there to inform and they could never prove anything."  The defendant agreed that it was "good for you and I" that Missouri "shut that door down" during the FBI interview.

In October 2019, FBI agents interviewed several percipient witnesses to the defendant's 1995 conduct in Virginia.  The third man who joined the defendant and Missouri that night confirmed that the defendant was a skinhead.  *See* **Exhibit 4**.  The third man and the defendant got

together, listened to skinhead music, and talked about Adolf Hitler.  The victim's wife confirmed

that the defendant "used to run around with" the third man and another man, both of whom were

"skinheads."  *See* **Exhibit 5**.  The victim's daughter confirmed that the defendant and Missouri

"were running with a few different guys who were skinheads on the night that her father was

assaulted.  [She] was surprised that the Coast Guard accepted [the defendant] when he applied to

work with them."  *See* **Exhibit 6**.  According to the victim's daughter, her boyfriend, the defendant,

and Missouri "were skinheads because they would get jumped by and fight with blacks a lot.  After

this, the three shaved their heads and became skinheads."  *Id.*

The defendant's 1995 conduct confirms what he wrote himself in 2017 in his letter to

Covington.  It also informs his Internet research over the last several years, which lays bare his

views on race.  For example, on August 16, 2017, the defendant searched for "white homeland"

and "when are whites going to wake up."  **Exhibit 23** at 21.  On November 30, 2017, the defendant

searched for "please god let there be a race war."  *Id.* at 23.  And on March 16, 2018, the defendant

searched for "best n_gg_r killing gun,"[8] *id.* at 24, after which he visited various firearm sales

websites.  Finally, when federal agents searched the defendant's home on February 15, 2019, they

found in his bedside dresser (along with mail matter and other items in his name) two Confederate

battle flags, one of which is shown below.  All of this merely confirms what the defendant himself

wrote was true: "I am a long time White Nationalist."

---

[8] The defendant wrote the full racial epithet.



### III.      The Defendant Intended to Murder Innocent Civilians.

### A.      The Defendant's Manifesto

Through years of research and purchases, the defendant made plain his intentions to murder those with whom he disagreed politically.  He even—helpfully for sentencing purposes—wrote down exactly what he intended to do.  In a draft e-mail dated June 2, 2017, located in the defendant's "Deletions" subfolder under the "Recoverable Items" folder, the defendant wrote the following:

Dear friends , maybe that's a bit of a misnomer. Acquaintances more likely. Hope this finds you well. I am dreaming of a way to kill almost every last person on the earth. I think a plague would be most successful but how do I acquire the needed/ Spanish flu, botulism, anthrax not sure yet but will find something.

Interesting idea the other day. Start with biological attacks followed by attack on food supply. Something called wheat rust/blight. Have to research this. Two pronged attack seems it might be more successful. Institute a bombing/sniper campaign.

What can I do, I will not do nothing...It seems inevitable that we are doomed. I don't think I can cause complete destruction on my own, However if I could enlist the unwitting help of another power/country would be best. Who and how to provoke???

New idea this weekend, R/E orthodox as a way for influence.?.

Things to do in the next 4 years. Get out of debt!!!!

> Buy van to convert, diesel.
> Buy land for family out west or possibly NC mtns.
> I don't know...

Liberalist/globalist ideology is destroying traditional peoples esp white. No way to counteract without violence. It should push for more crack down bringing more people to our side. Much blood will have to be spilled to get whitey off the couch. For some no amount of blood will be enough. They will die as will the traitors who actively work toward our demise. Looking to Russia with hopeful eyes or any land that despises the west's liberalism. Excluding of course the muslim scum. Who rightfully despise the west's liberal degeneracy. I have not properly raised my daughter I will have to reach out to her to see if I can reverse some of the damage done to her.

Need to come off TDL, clear my head. Read and get education have to move to friendly area and start to organize. Get leadership within the community, sheriff, city manager, mayor, lawyer? Not sure but start now. Be ready.

Stockpile 5 locations. Pack, food, GN, supporos ao, clothing, gear. Comb/exp for defense. Extras mortar recoilless, learn basic chemistry, start small.

By land  put 3 homes and multiple hides. Have way to get out and start hitting back. Use lines of drift.

Have to take serious look at appropriate individual targets, to bring greatest impact. Professors, DR's, Politian's, Judges, leftists in general.

Look up tactics used during Ukrainian civil war. During unrest target both sides to increase tension. In other words provoke gov/police to over react which should help to escalate violence. BLM protests or other left crap would be ideal to incite to violence.

Gun rights people will never rise, need religious to stand up. Please send me your violence that I may unleash it onto their heads. Guide my hate to make a lasting impression on this world. So be it. I don't

know if there truly is a "conspiracy" of ((((People)))) out to destroy me and mine, but there is an attack none the less. For that reason I will strike, I can't just strike to wound I must find a way to deliver a blow that cannot be shaken off. Maybe many blows that will cause the needed turmoil.

Food/fuel may be the key, if I can disrupt two or three weeks. When (people) start to loot steal protest dress as cop and shoot them. Burn down Apt complex, bar the doors first. Thermite on gas station tank.

v/r,
LT Christopher P. Hasson
National Security Cutter Acquisition

- 9 -

The defendant's limited manifesto identified 14 different areas in which he would prepare and/or act: "biological attacks"; "attack on the food supply"; "bombing/sniper campaign"; "help of another country"; "R/E [Russian Eastern] orthodox to influence"; "buy a van"; "buy land"; "looking to Russia"; "come off TDL [tramadol]"; "get leadership within the community"; "stockpile five locations"; "learn basic chemistry"; "look at individual targets (Professors, DR's, Politian's [sic], Judges, leftists in general)"; "look up tactics used during Ukrainian civil war"; "incite violence"; and "thermite on gas station tank."[9]   A review of evidence seized from the defendant's residence, the defendant's research on his United States Coast Guard ("USCG") computer, and the defendant's Google searches reveal that the defendant researched and/or acted on at least 11 of the 14 categories identified in his draft e-mail.  The information relevant to that research and action is appended as **Exhibit 7**.[10]

To form, synthesize, and reinforce his own ideas, the defendant drew inspiration from famous murderers who wrote manifestos, as well as other white nationalist/separatist writers.  For example, on March 16, 2017, from his personal e-mail account, the defendant sent to his official USCG account the manifesto of mass murderer Anders Breivik.  *See* **Exhibit 8**.  On May 18, 2017, again from his personal e-mail account, the defendant sent to his official USCG e-mail account the

---

[9] The defendant's manifesto mentions "Lines of Drift."  Eric Rudolph, the 1996 Atlanta Olympics bomber, titled his memoirs, "Between the Lines of Drift: The Memoirs of a Militant."   The defendant saved the book to his Google Drive account on February 20, 2016.  The same book was present on his Coast Guard computer as of at least May 18, 2017.

[10] During the contested detention hearings prior to his guilty plea, the defendant's main argument was that the Magistrate Judge and this Court should not credit the defendant's own written admissions, denominating them as unshared, private thoughts that should not be criminalized.  But the manifestos of those who came before the defendant—those who attacked children in Norway, tourists at the Atlanta Olympics, and worshippers in the Pittsburgh synagogue and New Zealand mosques—also were unshared, private thoughts until those plans turned to action.  Like his heroes, the defendant sought to keep his plans quiet so as not to attract attention, one time writing "why would you announce to the world your intentions and expect anything but push back?"

manifesto of the Unabomber Ted Kaczynski and Eric Rupert Rudolph's Lines of Drift.  *See* **Exhibit 9** and **Exhibit 10**.  On June 7, 2017, using the same means, the defendant sent himself a "home workshop explosives" handbook, *see* **Exhibit 11**; the Anarchist's Cookbook, *see* **Exhibit 12**; a guide on "How to make Semtex,"[11] *see* **Exhibit 13**; a handbook on improvised munitions, *see* **Exhibit 14**; and the self-explanatory The Terrorist's Handbook, which discussed methods of buying, preparing, and detonating various explosive substances, *see* **Exhibit 15**.

### B.      Equip and Study

For years, the defendant prepared himself to take action.  He could not act without equipment, so he got all the equipment he would need.  The defendant's firearm purchase history is detailed in a separate section below.  But to go along with the firearms, the defendant needed kit.  So he spent roughly $12,000 in a three-year period, purchasing approximately 165 discrete items to outfit himself for his ultimate mission.  Attached as **Exhibit 16** is a spreadsheet showing the purchases.  Holsters, knives, magazines, ammunition, handguards, camping supplies, Meals-Ready-to-Eat, steel body armor plates, plate carriers, tactical vests and pouches, firearm repair kits, a firearm barrel, firing pins, knives.  And a $1,300 rifle scope.[12]  And smoke grenades, which according to the company website, produce "a high volume of smoke for approximately 90 seconds":

---

[11] Semtex is a plastic explosive.

[12] When agents searched the defendant's residence, the $1,300 scope was affixed to the DPMS Panther Arms .308.



Though the defendant had served in three military branches, he apparently felt the need to improve his marksmanship before conducting his next mission.  To that end, the defendant studied and planned for his ultimate conduct.  For example, on December 6, 2017, the defendant registered for an online sniper and sharpshooter forum.  *See* **Exhibit 17**.  On December 20, 2017, and then again on December 23, 2017, the defendant purchased two different high-end rifle scopes with advanced optics useful in low-light environments.  Each scope cost almost $400.  *See* **Exhibit 16**. A week later, on December 30, 2017, the defendant purchased the Bergara sniper rifle, *see* **Exhibit 18**, which he then outfitted with one of the $400 scopes and a bipod for greater stability and accuracy.

After acquiring the sniper rifle, the defendant set about to self-teach sniper training and tactics.  For example, on January 3, 2018, while at work at USCG Headquarters, the defendant reviewed a document titled "Worksheet for Calculating 0.1 Mil Target Knob Settings," by Major John L. Plaster, USA (Ret.).  *See* **Exhibit 19** at 85.  According to an FBI sniper,[13] Major Plaster is well-known in the military and law enforcement tactical communities as an expert on sniper training and operations.  Plaster has authored several books that provide instruction on skills critical to sniper tradecraft.  Plaster also has authored several shorter information packets which are freely available online.  These information packets—such as the one the defendant viewed—concentrate on very specific skillsets, including distance marksmanship.  The general purpose of the document viewed by the defendant is to enable the reader to use a rifle scoped with an appropriate reticle to precisely engage targets at distances out to many hundreds of yards.  Having the equipment and the skills to precisely engage targets from distance is a principal capability enhancement of a sniper; it allows a sniper to remain far enough from a target to remain unnoticed until a shot is made.

On January 8, 2018, and other dates, the defendant performed a Google search for "sniper data book."  **Exhibit 19** at 30-31.  According to the FBI sniper, a "sniper data book" is a paper log book that is used by snipers to document the performance of a particular rifle in different shooting conditions, such as temperature, relative wind, elevation, and other factors that affect the external ballistics of bullets.  This information is used by snipers to accurately predict where a bullet fired from their weapon will impact given certain environmental conditions, or more commonly enable the sniper to make proper sighting adjustments to accommodate for environmental conditions to

---

[13] The FBI sniper has been an FBI Special Agent for 14 years, of which he has served 12 years on SWAT, 10 years as a sniper, eight years as a firearms instructor, seven years as a tactical instructor, and one year as sniper team leader.

precisely engage targets from established distances.   Consistent with his Internet research, in

January 2018, the defendant then took his skills to the gun range, test firing from 100 and 200

yards in order to appropriately sight his rifle.   The defendant recorded his observations in a journal,

beginning his own sniper data book.   *See* **Exhibit 20**.   The FBI sniper reviewed the defendant's

written observations:

> The notes in the book are consistent with a day's training on a
> precision rifle.  It appears that the writer first recorded work done to
> sight their scope, which is done with a newly-mounted scope to align
> the reticle to an established group of rounds on a target, thereby
> giving a starting point (known and recorded as a "zero") for any
> future adjustments due to distance, temperature, etc.  As is
> commonly taught and practiced, the writer recorded the type of
> ammunition used (Federal 168 grain SMK BTHP; Sierra Match
> King Boat Tail Hollow Point, a bullet and cartridge often used in
> competitions for its accuracy) and weather and lighting conditions
> (55 degrees and overcast).  It then appears that the writer recorded
> confirmation hits of their "zero" at 100 yards, a common zeroing
> distance for snipers, particularly in urban and suburban
> environments.  It then appears that the writer recorded their hits at
> 200 yards, confirming a drop of approximately 3.5 inches (roughly
> consistent with the bullet and conditions recorded), thus establishing
> for this particular rifle and bullet under these weather conditions that
> the bullet will impact 3.5 inches low at 200 yards.  From this actual
> data and knowledge of the adjustment factor of the scope they are
> using, the sniper can infer how much correction to apply to their
> scope in order to directly hit their intended target at 200 yards, i.e.,
> how much to move the reticle within the scope to compensate for
> the 3.5 inch bullet drop.  Finally, it appears that the writer calculated
> and recorded the total number of rounds fired in the session, a
> common practice among snipers to track the longevity of the barrel,
> i.e., maintaining this information over time, the sniper will know
> when the life of the barrel is exhausted.

On January 22, 2018, while at work at USCG Headquarters, the defendant conducted extensive research on distance shooting and performed multiple searches for the following, *see* **Exhibit 19** at 35:

- "how to use trig to calculate distance"
- "trigonometry distance formula"
- "size of door usa"
- "size of garage usa"
- "garages sizes 2 car"
- "stop sign height"
- "integrated suppressed bolt action"

According to the FBI sniper, these queries all reference methods that a trained sniper will employ to quickly determine their distance from a certain target. By way of example, a trained sniper will know the average height of an exterior door in the United States, and thus when observing a door through a rifle scope, the sniper will be able to determine the distance of the door from their position by noting how large the door appears when measured against a scale built into the reticle of the rifle scope. This example is a field-expedient method of determining distance, and thus enables a skilled sniper to correctly adjust their sighting mechanism and produce a precise shot in a short period of time. The term "bolt action" refers to the operating mechanism of the rifle, and generally speaking the most accurate rifles use a bolt action. The term "integrated suppression" refers to the ability of the rifle to suppress sound being built directly into the barrel, as opposed to being an aftermarket attachment. Thus, the defendant's query appears to be research into a precision rifle wherein suppression capability comes built into the rifle. The suppression of the sound of a rifle is a desirable feature for snipers as a means of disguising the noise report of firing the rifle, which could otherwise be used to identify the location of the sniper. Thus, the sniper is able to retain his concealment and therefore potentially continue to engage targets.

On January 30, 2018, the defendant sent himself a ballistics calculator spreadsheet.  *See*

**Exhibit 21**.  The FBI sniper reviewed the spreadsheet and described it as follows:

> The spreadsheet attached to the email contains critical enablers to the long-range marksman or sniper.  Foremost in the spreadsheet is a ballistics calculator, wherein a sniper can enter data relative to their equipment (e.g. caliber, bullet weight, etc.) and shooting environment (temperature, altitude, etc.).  The formulas embedded in several of the sheets use that data to then calculate charts, which are then used by the sniper to accurately compensate for environmental conditions using either sighting adjustments or holdovers in their scope.  So in effect, the ballistic calculator contained in the spreadsheet is essential for correctly compensating for environmental conditions which affect the trajectory of a bullet (e.g. temperature, elevation, etc.), in order to accurately hit an intended target at a given distance.
>
> Also, the charts contain calculations for the amount of energy retained by the bullet at different distances.  Thus, the sniper can determine the range at which their bullet retains enough energy to penetrate its intended target, sometimes referred to as the maximum effective range of a bullet.
>
> Further, the charts allow entry of a sniper's actual firing data, for record keeping purposes.  This data reflects what the sniper has actually recorded while firing a particular round from a particular rifle under particular firing conditions, thus allowing for variations that can occur in manufacturing of rifles and bullets.  Recording this type of data is commonly taught in sniper schools and consistently practiced by snipers and expert marksman.  In effect, by recording data relative to a sniper's practice, the sniper can adjust for anomalies that they might have observed with their particular equipment.

When agents searched the defendant's residence on February 15, 2019, agents recovered

three printed sniper data sheets, consistent with the types of information in the ballistics calculator

the defendant had sent himself a year before.  *See* **Exhibit 22**.  From the FBI sniper:

> The charts represent data commonly used by a precision marksman or sniper.  The data on the first chart are specific to a particular bullet fired by a particular rifle under particular conditions (such as temperature, elevation, etc.), and they indicate several pieces of information useful to the sniper.  These data are sometimes provided

by bullet manufacturers, using some presumptive values for things like velocity, which can be dependent on the length and rifling of the barrel and the propellant (gun powder) used. The data appear to be consistent with that of a .308 caliber bullet of a common weight (e.g. 168 grains) fired at 2650 feet per second (a common approximation for many rifle and propellant combinations). Using this information, the sniper can determine the amount of drop due to gravity that the bullet will experience, given the same presumptive data used to generate the chart (rifle, propellant, weather, etc.). Thus, the sniper can determine how much compensation would be necessary to adjust for bullet drop at a particular distance; for example a drop of approximately 4.25 inches would need to be accounted for at 200 yards using this data.

The second chart is similar in purpose and function to the first chart, with some different data points. In addition to the bullet drop provided in inches, the second chart provides the bullet drop in minutes of angle, a commonly used system of angular measurement, often contrasted with the miliradian system of angular measurement.

The third chart provides holdover values in miliradians (Mils) for a particular bullet (using some presumptive data about the rifle used and weather conditions) at common distances. The chart is designed for use with a Mil-Dot reticle, a commonly used reticle in scopes for its utility in quickly determining distances and/or establishing holdovers for a particular distance. Thus, the sniper can quickly determine how much to compensate for bullet drop at a particular distance using markers on the Mil-Dot reticle, thereby avoiding the alternate (more time consuming) method of compensating for bullet drop over a particular distance by moving the reticle.

On February 13, 2018, using his USCG computer, the defendant searched for "how to do multicam paint on stock." *See* **Exhibit 19** at 44. According to the FBI sniper, the referenced search appears to be an attempt to learn how to paint a portion of a rifle called the stock. Snipers commonly paint their rifles to aid in concealment. Specifically, "multicam" is a reference to the pattern MultiCam, a camouflage pattern commonly used for military clothing and equipment.

On February 16, 2018, the defendant searched for "super accurate 308 ammo" and "most accurate bullets for 308." *See* **Exhibit 19** at 46. The search appears to be an attempt to determine

accurate ammunition for a particular caliber of precision rifle commonly available in the United States, a .308.  On February 20, 2018, the defendant searched for "308 subsonic reload data."  *See* **Exhibit 19** at 47.  According to the FBI sniper, the term "subsonic" refers to ammunition—in this case, .308 caliber—that, when fired, travels at a speed lower than the speed of sound.  When a rifle round that is not subsonic is fired, it will, by breaking the sound barrier, create a shockwave in the air that makes a loud and distinctive sound.  Subsonic ammunition may be used by snipers in concert with a sound-suppressed rifle in order to eliminate any sound emanating during the discharge of the rifle, thereby making it very difficult to determine where a sniper is located, or even that a shot was fired.  This could enable the sniper to remain concealed to then conceivably escape the area unnoticed, or conversely to continue to engage other targets without being located.

The same day, February 20, 2018, the defendant searched for "are frangible bullets untraceable?"  *See* **Exhibit 19** at 47.  According to the FBI sniper, frangible bullets are designed to break apart upon impact with certain media.  This search appears to be an effort to determine whether a frangible bullet when fired and subsequently broken into pieces upon impact would be traceable by forensic means.  This search could indicate an effort to subvert the ability of law enforcement from being able to show that a particular bullet was fired by a particular rifle.

### C.     The Defendant Intended to Kill

The defendant's Google history during this time period confirms his ideology and his intentions to use his arsenal.  For example, from January 2017 to January 2019, the defendant conducted online searches and made thousands of visits for pro-Russian, neo-fascist, and neo-Nazi literature.  Attached as **Exhibit 23** are 25 pages of charts identifying certain categories of searches and site visits performed by the defendant, all of which are in line with his desires and plans to kill.  Those repeated searches include categories related to: the Alt-Right, Anders Breivik, Drugs,

Explosives, Mass Shootings, Timothy McVeigh, Russia, Weapons, and White Supremacy Extremism ("WSE"). In one category, his searches include homemade incendiaries, plastic explosives, ricin, and "homemade biological weapon." In the Miscellaneous category, his searches include "how to bring down the system"; "how to bring down the us government"; "liberal professors watch list"; "lone snip [sniper] in shtf [shit hits the fan]"; and "most liberal fed judges usa." In the WSE category, his searches include "please god let there be a race war"; "how can white people rise against the jews"; "how can white people rise"; and "how to rid the us of jews."

So too are the defendant's intentions confirmed by the searches and site visits done from his official Coast Guard computer while he was supposed to be working at USCG Headquarters. Attached as **Exhibit 19** is a report of the defendant's activity on his Coast Guard computer. The report is as exhaustive as it is exhausting; the defendant constantly researched his criminal goal while ostensibly serving his country. The troubling research and searches he performed include "308 vepr for long range killing"; "best 7.62 suppressor for semi auto"; "us sniper rifle set up"; "longest kill with acog [scope]"; "how to make explosively formed penetrator"; and "how to hasten collapse of usa." *See* **Exhibit 19** at 28, 73, 88.

### D. Targeting Potential Victims

As described below, consistent with the directions in the Breivik manifesto, the defendant began the process of targeting specific victims, including current and former elected officials.

For example, on December 27, 2018, the defendant performed an Internet search for "joe Scarborough" ("Scarborough"), after viewing a headline claiming that Scarborough referred to the President as "the worst ever." (Scarborough is the host of a popular morning television show on MSNBC and previously served as a United States Congressman representing a district in Florida.) The defendant spent the next approximately five minutes reviewing Scarborough's Wikipedia page

and personal website before performing a Google search for "where is morning joe filmed." After further searches, the defendant found Scarborough's prior home, and then proceeded to scroll in and out on the location for approximately 35 seconds.

On January 3, 2019, the defendant performed a search within the Breivik manifesto for "category A." *See* **Exhibit 19** at 83. Page 930 of Breivik's manifesto classifies traitors as category A, B, or C with the following explanation: "*This classification system is used to identify various individual cultural Marxist/multiculturalist traitors. The intention of the system is to easier identify priority targets and will also serve as the foundation for the future 'Nuremberg trials' once the European cultural conservatives reassert political and military control of any given country. Any category A, B or C traitor is an individual who has deliberately used his or her influence in a way which makes him or her indirectly or directly guilty of the charges specified in this document: 1-8. Many of these individuals will attempt to claim 'ignorance' of the crimes they are accused of.*"

Breivik prioritizes "Category A" traitors as the most influential and highest profile traitors, which includes political leaders, media leaders, cultural leaders, and industry leaders at a ratio of ten per one million citizens. Page 921 of Breivik's manifesto encourages would-be assailants to concentrate on massive and compact buildings with high concentration of Category A and B traitors that are vulnerable to a "single source" blast or assault during Phase 1 of their attack. On pages 835 and 836, Breivik lists his "*7 deadly mistakes to be avoided,*" the third mistake being "*to select an overwhelmingly protected individual as a target for assassination. 12 failed attempts on an extremely well protected individual could have alternatively been 12 successful attacks on lesser targets executing more than 50 primary targets. Targets should be influential media personalities – multiculturalist politicians, journalists/editors, cultural marxist professors, Marxist writers/artists, NGO leaders, global investors. Obviously, focus on individuals who do not*

*have armed body guards.*"

On January 17, 2019, consistent with the types of people who Breivik identifies as "traitors" and targets for an attack, the defendant compiled a list of prominent Democratic Congressional leaders, activists, political organizations, and MSNBC and CNN media personalities, *see* **Exhibit 19** at 91, as shown below:



Those individuals included "JOEY" (who most likely is Joe Scarborough of MSNBC, based on the searches described above); "Chris hayes" (who presumably is Chris Hayes from MSNBC); "Sen blumen jew" (who presumably is U.S. Senator Richard Blumenthal (D-CT)); "pelosi" (who presumably is House Speaker Nancy Pelosi (D-CA)); "sen kaine" (who presumably is U.S. Senator Tim Kaine (D-VA)); "ari melber" (who presumably is Ari Melber from MSNBC); "shumer" (who presumably is U.S. Senator Chuck Schumer (D-NY)); "don lemon" (who presumably is Don Lemon from CNN); "gillibran" (who presumably is U.S. Senator Kirsten

Gillibrand (D-NY)); "poca warren" (who presumably is U.S. Senator Elizabeth Warren (D-MA));

"cortez" (who presumably is U.S. Representative Alexandria Ocasio-Cortez (D-NY)); "booker"

(who presumably is U.S. Senator Cory Booker (D-NJ)); "harris" (who presumably is U.S. Senator

Kamala Harris (D-CA)); "beto orourke" (who presumably is former U.S. Representative Beto

O'Rourke (D-TX)); "maxine waters" (who presumably is U.S. Representative Maxine Waters (D-

CA)); "sheila jackson" (who presumably is U.S. Representative Sheila Jackson (D-TX)); "iihan

omar" (who presumably is U.S. Representative Ilhan Omar (D-MN)); "chris cuomo" (who

presumably is Chris Cuomo from CNN); "DSA" (which presumably is the political organization

Democratic Socialists of America); "van jones" (who presumably is Van Jones from CNN); and

"podesta" (who presumably is former Hillary Clinton campaign chairman John Podesta). The

defendant developed this list in the above spreadsheet while reviewing the MSNBC, CNN, and

FOX News websites, as well as other websites, from his work computer. *See* **Exhibit 19** at 90-92.

The same day, January 17, 2019, from his USCG computer, the defendant performed the

following Google searches at the following approximate times, *see* **Exhibit 19** at 92:

- 8:54 a.m.: "what if trump illegally impeached"

- 8:57 a.m.: "best place in dc to see congress people"

- 8:58 a.m.: "where in dc to congress live"

- 10:39 a.m.: "civil war if trump impeached"

- 11:26 a.m.: "social democrats usa"

There is no question the defendant intended and planned to turn his thoughts into action.

His conduct corroborates his statements.  He has been a closet skinhead his entire adult life.  He

did not go to the streets or online forums to lament his imagined white plight, instead choosing to

quietly purchase urban and woodland combat gear—small arms, long guns, tactical gear, chest

armor, ammunition, camping gear, MRE food provisions.  ("I was and am a man of action." "To that point Mr. Cobb character is an idiot in my humble opinion why would you announce to the world your intentions and expect anything but push back.").  He researched how to make homemade bombs and mortars, studied sniper training and bullet trajectory manuals, and fashioned a firearm silencer.  ("Institute a bombing/sniping campaign.").  He compiled information on victims—Supreme Court justices, members of Congress, and journalists.  ("Have to take a serious look at appropriate individual targets, to bring greatest impact.  Professors, DR's, Politi[ci]an's, Judges, leftists in general.").  He was going to murder many, and only the diligent work of federal law enforcement prevented that from happening.

### E.      Steroids/Human Growth Hormone

As described below, consistent with the directions in the Breivik manifesto, the defendant stockpiled the resources necessary to begin the process of taking narcotics in order to increase his ability to conduct attacks.  Indeed, he already was taking some of those narcotics at the time he was arrested.

On January 3, 2019, from his USCG computer, the defendant performed a search within the Breivik manifesto for "steroids."  *See* **Exhibit 19** at 84.   The search resulted in the defendant reading page 1464 and the diary entry by Breivik for Day 63 which states: "*Noticing that the testo withdrawal is contributing to increased aggressiveness. As I'm now continuing with 50mg it will most likely pass. I wish it be possible to somehow manipulate this effect to my advantage later on when it is needed. Because the state seems to very efficiently suppress fear. I wonder if it is possible to acquire specialized 'aggressiveness' pills on the market. It would probably be extremely useful in select military operations, especially when combined with steroids and ECA stack...! It would turn you into a superhuman one-man-army for 2 hours!*" On page 938 of the Breivik manifesto,

Breivik writes that an assailant should begin a six-week steroid cycle once all the equipment and components for their operation has been acquired and the preparation phase begins.  **Exhibit 19** at 84.

When agents searched the defendant's residence on February 15, 2019, they found a locked container, inside of which were over thirty bottles labeled as HGH:



In addition to the above, agents also recovered from the defendant's home five vials of testosterone, as well as mestanolone—an anabolic steroid—in both pill and powder form.  Based on emails obtained through search warrants, the Government is certain that the defendant took testosterone or other steroids for years, coincident to the time period he took Tramadol and studied the Breivik manifesto.  For example, on April 28, 2016, using an overseas encrypted e-mail account, the defendant purchased "2x test eth," "1x test prop," and "100 Winstrol" for $250 from

a prepaid card, all to be shipped to his North Carolina residence.  *See* **Exhibit 24**.[14]  On October 3, 2016, the defendant sent an e-mail from an overseas encrypted e-mail account to a different testosterone distributor, ordering "5 test-E" and "2 test-prop" for $200 in Bitcoin, to be shipped to his North Carolina residence.  *See* **Exhibit 25**.  After receiving the testosterone, the defendant wrote the second distributor, "You will be seeing more from me[.]  I usually cruise year round with 2 blasts.  You guys have awesome turn around time and shit looks professional thanks talk to you soon."  *See* **Exhibit 26**.[15]  By this e-mail, the defendant was admitting that he consistently took steroids. And on February 21, 2017, the defendant sent an e-mail to one of his distributors, ordering "test prop x2 and test ace x2."  *See* **Exhibit 27**.

### F.    The Defendant Spoke His Truth in Private

The defendant's world-view also was laid bare in private text messages he exchanged with a family member.  Some of those text messages are appended here.  In the text messages below, the defendant lamented the creativity of robust law enforcement; chastised a murdering terrorist for having poor operational security; and aggrandized another, more successful murdering terrorist:

| Time | Direction | Status | Message |
|---|---|---|---|
| 3/19/2018 5:38:35 PM(UTC-4) | Incoming | Read | You see the recent serial bomber attack in austin? |
| 3/19/2018 5:39:06 PM(UTC-4) | Incoming | Read | Used a trip wirr |

---

[14] "Test eth" and "test-E" are short for "testosterone enanthate."   "Test prop" is short for "testosterone propionate."   "Test ace" is short for "testosterone acetate."  All three forms of testosterone are anabolic steroids, as is Winstrol.

[15] The Internet contains a wealth of information, videos, and academic articles regarding steroid use.  The general nature of a "cruise" and "blast" is summed up as follows throughout the reviewed material, including the following website: "That's right, people who blast and cruise run steroids year-round.  When you cruise, you run a moderate dosage of testosterone as a base to put you in the high-end range of testosterone levels. . . .  A blast is when you run multiple compounds at the same time to put on a lot of size.  Most people will only do 1 or 2 blasts in order to minimize risk." http://www.bluecloud.org/blast-and-cruise (last visited December 29, 2019).

| 3/19/2018 5:39:08 PM(UTC-4) | Incoming | Read | Wire |
|---|---|---|---|
| 3/19/2018 5:39:54 PM(UTC-4) | Outgoing | Sent | Yep saw it this morning, someone is having fun |
| 3/19/2018 5:40:43 PM(UTC-4) | Incoming | Read | Yuuup, im atleast excited to see who it is and if he or she is going to have a manifesto |
| 3/19/2018 5:45:00 PM(UTC-4) | Outgoing | Sent | Yep 4 sure |
| 3/21/2018 2:34:28 PM(UTC-4) | Incoming | Read | Well the bomber killed himself |
| 3/21/2018 2:34:50 PM(UTC-4) | Outgoing | Sent | Yeah saw that |
| 3/21/2018 2:35:21 PM(UTC-4) | Outgoing | Sent | Kinda figured he was gonna get caught kept doing it in same town |
| 3/21/2018 2:43:39 PM(UTC-4) | Incoming | Read | Yeah true |
| 3/21/2018 2:44:09 PM(UTC-4) | Incoming | Read | It just seems like getting away with anytging serious is becoming more ans more impossible |
| 3/21/2018 2:45:39 PM(UTC-4) | Outgoing | Sent | Cameras every where |
| 3/21/2018 2:46:42 PM(UTC-4) | Outgoing | Sent | Eric Rudolph was smart bring all gas you need for operation all food everything so you can avoid businesses. |
| 3/21/2018 2:47:54 PM(UTC-4) | Outgoing | Sent | His book has a lot of good pointers opsec is key |
| 3/21/2018 2:48:35 PM(UTC-4) | Outgoing | Sent | All his bombings were at least 3 or 4 hours away and different state |
| 3/21/2018 2:49:38 PM(UTC-4) | Outgoing | Sent | Did his initial recon a month before operation kept notes and maps etc burned everything when done |
| 3/21/2018 2:50:25 PM(UTC-4) | Outgoing | Sent | Month between initial recon and operation allows security tapes to write over |
| 3/21/2018 2:53:00 PM(UTC-4) | Outgoing | Sent | Dude in Austin was an amateur |
| 3/21/2018 2:55:19 PM(UTC-4) | Incoming | Read | Yeah |

In the text messages below, the defendant exposed his disgust for modern society:

| Time | Direction | Status | Message |
|---|---|---|---|
| 4/25/2018 1:47:08 PM(UTC-4) | Incoming | Read | I was arguing that its american culture and society that is causing these mass shootings |
| 4/25/2018 1:47:28 PM(UTC-4) | Outgoing | Sent | And drugging up misfits |
| 4/25/2018 1:49:24 PM(UTC-4) | Incoming | Read | Like were a society with extremely shallow personalities and no national unity, so of course kids with no friends in a heartless and broken society would lash out |
| 4/25/2018 1:51:03 PM(UTC-4) | Outgoing | Sent | Yeah it's a mess and no real plan or idea can fix it . People will lose themselves in this multicultural "world wide society" |

| Time | Direction | Status | Message |
|---|---|---|---|
| 4/25/2018 1:51:23 PM(UTC-4) | Outgoing | Sent | Global I meant |
| 4/25/2018 2:09:19 PM(UTC-4) | Incoming | Read | Yup |
| 4/25/2018 2:09:55 PM(UTC-4) | Outgoing | Sent | Almost no going back with out a reset |

In the text messages below, the defendant lambasted a relative for marrying a "husband" who is black.

| Time | Direction | Status | Message |
|---|---|---|---|
| 7/28/2018 3:13:13 PM(UTC-4) | Incoming | Read | Hey |
| 7/28/2018 3:19:46 PM(UTC-4) | Outgoing | Sent | What's up |
| 7/28/2018 3:20:27 PM(UTC-4) | Incoming | Read | Just seein how youre doin with the news on ███ |
| 7/28/2018 3:22:02 PM(UTC-4) | Outgoing | Sent | Calling in sec |
| 7/28/2018 3:23:04 PM(UTC-4) | Incoming | Read | I cant im at work |
| 7/28/2018 3:23:20 PM(UTC-4) | Outgoing | Sent | Ok tomorrow or tonight? |
| 7/28/2018 3:23:27 PM(UTC-4) | Outgoing | Sent | See the bike? |
| 7/28/2018 3:23:31 PM(UTC-4) | Incoming | Read | Either or |
| 7/28/2018 3:23:37 PM(UTC-4) | Incoming | Read | Yeah i see it looks dope |
| 7/28/2018 3:23:46 PM(UTC-4) | Outgoing | Sent | Fuck yeah! |
| 7/28/2018 3:24:22 PM(UTC-4) | Outgoing | Sent | And I dont give a fuck about what ███ does, shes married and I guarentee pregnant |
| 7/28/2018 3:25:08 PM(UTC-4) | Outgoing | Sent | Her "husband" is going overseas and she will get bored and cheat on him just for drama. |
| 7/28/2018 3:25:27 PM(UTC-4) | Outgoing | Sent | Waste of a human |
| 7/28/2018 3:25:38 PM(UTC-4) | Incoming | Read | Yeah i was just telling ███████ has been about attention since forever |
| 7/28/2018 3:25:51 PM(UTC-4) | Outgoing | Sent | She is typical western woman you were right all along |

In the text messages below, the defendant showed a casual disdain for federal law:

| Time | Direction | Status | Message |
|---|---|---|---|
| 8/21/2018 2:20:24 PM(UTC-4) | Incoming | Read | I think i might try shrooms once |
| 8/21/2018 2:20:41 PM(UTC-4) | Outgoing | Sent | Heck yeah me too |

In the text messages below, the defendant told a relative that he will join the relative in overseas fighting (in criminal contravention of the Neutrality Act) with other white nationalists:

| Time | Direction | Status | Message |
|---|---|---|---|
| 9/26/2018 9:17:01 PM(UTC-4) | Incoming | Read | I have this kenyan kid in speech who haates muslims somalians and black americans |
| 9/26/2018 9:17:38 PM(UTC-4) | Incoming | Read | He said he would rather be with racist whites that hate him than with Muslims |
| 9/26/2018 9:21:34 PM(UTC-4) | Outgoing | Sent | Ha |
| 10/1/2018 3:04:10 PM(UTC-4) | Incoming | Read | I also found a group that bpunces from war to war in the world, they just got back from Ukraine and i guess a. War is popping off in South america soon |
| 10/1/2018 3:11:12 PM(UTC-4) | Incoming | Read | Theyre going to South America in 3 weeks to assist nationalists there |
| 10/1/2018 3:14:53 PM(UTC-4) | Outgoing | Sent | Cool |
| 10/1/2018 3:36:55 PM(UTC-4) | Incoming | Read | Yeah i need to talk to you about them soon |
| 10/1/2018 3:37:10 PM(UTC-4) | Incoming | Read | They had tabs on me already |
| 10/1/2018 3:42:57 PM(UTC-4) | Outgoing | Sent | Huh ? yeah I will call later this week. |
| 10/1/2018 3:47:11 PM(UTC-4) | Incoming | Read | A year ago me and ▓▓▓ went into the gym and there was a guy there who spoke heard ▓▓▓ and started speaking french to her. So i went up and started tqlkin to him, he said he was in the Marines but got out and was in Ukraine as a volunteer. I didnt believe him but didnt say anything just told him i really wanted to go but didnt know any connections to go |
| 10/1/2018 3:47:58 PM(UTC-4) | Outgoing | Sent | That's cool watch out for a CIA fuck job |
| 10/1/2018 3:48:32 PM(UTC-4) | Incoming | Read | So today i saw a dude on FB who had pics in Ukraine and he was from Pheonix so i messaged him asking how he managed to get over in ukraine for the war, he said ah youre from Petaluma yeah we heard about you we try to keep tabs on people that ask questions to make aure theyre not feds |
| 10/1/2018 3:49:43 PM(UTC-4) | Incoming | Read | He then went on to say theyre apart of a group and go to foreign countries to assist nationalists in war. They are in South Africa, South America, Syria, and Ukraine |
| 10/1/2018 3:53:06 PM(UTC-4) | Incoming | Read | They have people all through the country and most are all nationalists and US veterans. It sounds too good to be true |
| 10/1/2018 3:53:37 PM(UTC-4) | Incoming | Read | And i wouldnt believe him if it wasnt for meeting that kid at 24 hour fitness a year ago |

| 10/1/2018 3:54:33 PM(UTC-4) | Outgoing | Sent | Yeah that would be fuckin awesome like germans helping in Spanish civil war before ww2, condor legion |
|---|---|---|---|
| 10/1/2018 3:55:10 PM(UTC-4) | Incoming | Read | Yeah he cant talk about the country but they can and will take any veterans into this group regardless of time or MOS |
| 10/1/2018 3:55:28 PM(UTC-4) | Incoming | Read | You just meet in the US and fly into the same place and bring cash |
| 10/1/2018 3:55:53 PM(UTC-4) | Incoming | Read | They have people that provide the weapons and such, no need for the language either |
| 10/1/2018 3:56:37 PM(UTC-4) | Outgoing | Sent | Damn that sounds perfect |
| 10/1/2018 3:57:01 PM(UTC-4) | Incoming | Read | It does, i want to meet with the Petaluma kid again once hw gets back from ukraine |
| 10/1/2018 3:57:53 PM(UTC-4) | Incoming | Read | I woulda went to south america if i knew about it a little earlier |
| 10/1/2018 3:58:22 PM(UTC-4) | Incoming | Read | Theyre either in Venezuela or another country killing the communist drug cartels in the jungle |
| 10/1/2018 3:58:33 PM(UTC-4) | Outgoing | Sent | Helicopter rides!!!! For our commie friends |
| 10/1/2018 6:52:12 PM(UTC-4) | Incoming | Read | 1200-1500 for rifle<br>600 for pistol<br>Armor provided<br>Ammo and food provided by the Army |
| 10/1/2018 6:52:21 PM(UTC-4) | Incoming | Read | Flighr to Bogota Columbia |
| 10/1/2018 6:52:50 PM(UTC-4) | Outgoing | Sent | Holy shit real deal huh? |
| 10/1/2018 6:52:58 PM(UTC-4) | Incoming | Read | Yup |
| 10/1/2018 6:53:12 PM(UTC-4) | Incoming | Read | Hunting commies in the jungle like dogs |
| 10/1/2018 6:53:23 PM(UTC-4) | Incoming | Read | He has footage from ukraine that was fuckin insane |
| 10/1/2018 6:53:23 PM(UTC-4) | Outgoing | Sent | Make sure no kidnapping setup that's big down there |
| 10/1/2018 6:54:27 PM(UTC-4) | Incoming | Read | Oh yeah i know, i told him im probably not able to go on this one because of school he said its cool that they would find me a team when im ready and that they may need more volunteers in africa in the coming years |
| 10/1/2018 6:55:00 PM(UTC-4) | Incoming | Read | So im gonna wait until the guy from Petaluma gets back and ima sit down and have a beer with him |
| 10/1/2018 6:55:20 PM(UTC-4) | Outgoing | Sent | Shit I'll go with you. |
| 10/1/2018 6:55:35 PM(UTC-4) | Incoming | Read | Hell yeah i talked with ████ too |

| | | | |
|---|---|---|---|
| 10/1/2018 6:56:37 PM(UTC-4) | Incoming | Read | They open a gofundme every operation for gear and take socks, underwear, and other carepackage shit i told him id send him some stuff atleast and when he gets back to pheonix id try to link up with him |
| 10/1/2018 6:57:05 PM(UTC-4) | Incoming | Read | They just tricked out there high-speed team in Ukraone with NVGs and some suppressors for the real gangster shit |
| 10/1/2018 6:57:33 PM(UTC-4) | Outgoing | Sent | Cool brb talking to ▮▮▮▮▮ |
| 10/1/2018 7:51:22 PM(UTC-4) | Outgoing | Sent | I am going with you. |
| 10/3/2018 12:22:25 PM(UTC-4) | Incoming | Read | The guy i talked to touched down in Columbia yesterday, he said stand by for videos of the raid this weekend. Ill try to send it to you |
| 10/3/2018 12:23:14 PM(UTC-4) | Outgoing | Sent | Hell yeah I want to hook up with these guys if possible |
| 10/3/2018 12:24:16 PM(UTC-4) | Incoming | Read | Definitely this guys in Phoenix but theyre all throughout the country |
| 10/3/2018 12:28:54 PM(UTC-4) | Incoming | Read | Crazy to think that these guys just go around to wars, not for money or fame but just to do it |
| 10/3/2018 12:30:11 PM(UTC-4) | Outgoing | Sent | Well anything to rid the world of commies, getting contacts is hard part |
| 10/3/2018 12:30:57 PM(UTC-4) | Incoming | Read | Yeah its alsp technically illegal to go around like this and governments try to get you smashed so you have to be careful who you talk to |
| 10/3/2018 12:31:25 PM(UTC-4) | Incoming | Read | They have 2 polish members that were arrested for going to Syria and Ukraine |
| 10/3/2018 12:31:32 PM(UTC-4) | Outgoing | Sent | Yep but they seem to have worked it out |
| 10/3/2018 12:33:42 PM(UTC-4) | Incoming | Read | Definitely, i gotta call and explain what had happened a year ago with ▮▮▮▮▮ and how they knew about me eventually haha |
| 10/3/2018 12:34:31 PM(UTC-4) | Outgoing | Sent | I can call you after work |
| 10/3/2018 12:35:29 PM(UTC-4) | Incoming | Read | Ok just let me know a time |
| 10/3/2018 12:35:58 PM(UTC-4) | Outgoing | Sent | About 3 1/2 hours |

In the text messages below, from just three months before his arrest, the defendant confirmed first-hand what otherwise is easily gleaned from his Internet search history and other prior writings—he has given up on "this country being saved":

| Time | Direction | Status | Message |
|---|---|---|---|
| 11/18/2018 1:46:55 PM(UTC-5) | Outgoing | Sent | Yeah I give up on this country being saved |
| 11/18/2018 1:47:58 PM(UTC-5) | Outgoing | Sent | Its ideological social financial morally bankrupt |
| 11/18/2018 1:48:26 PM(UTC-5) | Outgoing | Sent | There is nothing worth saving at the federal level |
| 11/18/2018 1:48:41 PM(UTC-5) | Incoming | Read | Nope |

## G.     Intentions Matter

When imposing an ultimate sentence, the defendant's intentions matter.  There is no sharper proof of this axiom than when courts in this District are called upon to impose sentence on defendants convicted of 18 U.S.C. § 922(g)(1) where the conduct involves only the unlawful possession of a firearm in the defendant's home or vehicle without other indication that the defendant planned to use the weapon proactively to commit other criminal conduct.  In those situations, defense attorneys routinely implore courts to find mitigation—suggesting, perhaps, that the weapon was for home protection, self-defense in a dangerous neighborhood, or some other innocent-sounding reason.  Outside of the drug trafficking context, it is rare that the Government can counter those defendants' arguments.  Here, the Government brings ample evidence that the

defendant intended to use his firearms to murder innocent civilians, whether "Jews,"[16] "n_gg_rs,"[17] media personalities,[18] Senators,[19] Congressmen,[20] or Supreme Court Justices.[21]

Proof of the defendant's criminal plan is also evident from the manner in which he purchased some of the firearms found in his residence.  In order to acquire the firearms most expeditiously, the defendant simply lied.  The defendant lied on federal ATF forms to obtain firearms at gun shows, claiming residency in Virginia rather than Maryland.[22]  For example, the defendant lived in a rented apartment in Maryland as of mid-2016, *see* **Exhibit 31**, and by that time was stationed at USCG Headquarters in Washington, D.C.  Yet on three occasions later the following year—February 11, October 1, and December 30, 2017—the defendant signed Firearms Transaction Records (ATF Forms 4473) affirming under legal penalty that he was a resident of Virginia.  *See* **Exhibit 32, Exhibit 33, and Exhibit 18**.[23]  Similarly, the defendant lied in a written

---

[16] On February 17, 2018, the defendant searched for "how to rid the us of jews."  *See* **Exhibit 28**.

[17] On March 16, 2018, the defendant searched for "best n_gg_r killing gun."  The defendant's search included the full racial epithet.  *See* **Exhibit 29**.

[18] On December 28, 2018, the defendant searched for the home address of a media figure.  *See* **Exhibit 19** at 80-81.

[19] On February 26, 2018, the defendant searched for "most liberal senators," "where do most senators live in dc," and "do senators have ss [secret service] protection."  *See* **Exhibit 19** at 50-51.

[20] On January 17, 2019, the defendant compiled a list of prominent Democratic Congressional leaders.  *See* **Exhibit 19** at 90-92.

[21] On February 26, 2018, the defendant searched for "are supreme court justices protected," *see* **Exhibit 19** at 51, and then two weeks later searched for the home addresses of two Supreme Court justices, *see* **Exhibit 30**.

[22] Under Virginia state law, a non-resident can purchase rifles and shotguns from Virginia FFLs, but may not purchase handguns.  *See* https://www.vsp.virginia.gov/Firearms_VFTP.shtm.  The defendant lied about his Virginia residence on October 1, 2017, when he purchased a handgun at a gun show.

[23] On the same forms, the defendant falsely averred that he was not an unlawful user of, or addicted to, any controlled substance.

contract, claiming Virginia residence to permit a private purchase of a firearm on October 9, 2017. *See* **Exhibit 34**.

## IV.      The Discrete Conduct Underlying the Counts of Conviction.

The defendant pleaded guilty to possessing unregistered and unserialized silencers, being a drug addict in possession of firearms, and Tramadol possession.  The Statement of Facts appended to the plea agreement is extensive, and the Government will not repeat it here.  Rather, the Government below highlights certain particularly relevant information.

*Tramadol*:  The facts show that the defendant's efforts to purchase and use Tramadol were sophisticated and time-intensive.  The defendant ordered the drugs online, using various e-mail accounts (including at least one overseas encrypted one).  He ordered from various distributors. He used at least three different methods to pay for the drugs, and had the drugs shipped to at least three different locations—even when he was not living at two of them.  He took the drugs at home and at work—as captured on surveillance camera, at his desk at Coast Guard Headquarters.  The defendant took drugs at work almost every working day the camera was installed, *see* **Exhibit 35**, as shown by the photographic examples in **Exhibit 36**.[24]  Over the course of 35 months, the defendant ordered at least 4,650 pills, resulting in actually consuming roughly 400mg of Tramadol per day.  By contrast, a typical prescription for Tramadol might be for 50mg per day.

The defendant had a plan in place to hide his illegal drug usage from the Coast Guard, which had a random drug test policy.  According to financial records, the defendant made two purchases from a particular vendor on July 24, 2018, and August 2, 2018.  The July 2018 purchase

---

[24] The first photograph in **Exhibit 35** was taken on January 18, 2019.  The second was taken on January 22, 2019.  The remainder are a series taken on January 24, 2019, showing the defendant— in uniform—removing narcotics from his desk drawer, manipulating them, preparing his knife to cut one, and placing the narcotics back in the drawer.

was for "Synthetic Urine," "Golden Flask Synthetic Urine," and "The Clean Kit"; and the August 2018 purchase was for "Golden Flask Synthetic Urine" and "The Clean Kit."   A search of the vendor's website shows that a Golden Flask is a flask filled with four ounces of synthetic urine, as well as a heating pad, presumably to bring the synthetic urine up to body temperature.   On the website, The Clean Kit is described as follows: "This kit comes with everything you need to discreetly [sic] hide any type of fluids. It comes with an empty vinyl medical grade bag attached to a cotton elastic belt. It has an easy to read temperature strip, a refill port and a hose with two clips attached. You will also receive a medical grade syringe, 2 organic heat pads and a set of instructions."   When law enforcement agents searched the defendant's workspace on February 15, 2019, agents found many of the items described above, as pictured below.   The defendant even stored the items in his Coast Guard regulation uniform jacket that he kept hanging in his workspace.









*Guns*:  From the defendant's residence, agents recovered fifteen guns.  Due to limitations in gun purchase and registration laws, the Government can only know with certainty the dates the defendant purchased eight of those guns:[25]

- a Remington 870 shotgun (purchased on June 21, 2009, in Tamales, California)

- a Stag Arms AR15 5.56mm rifle (purchased on October 1, 2009, in Petaluma, California)

---

[25] The Government is unable to ascertain the dates the defendant purchased a Ruger CQR Model X15 rifle; a DPMS Panther Arms 308 Model LR-308 rifle; a Remington Model 241 .22 caliber rifle; a Ranger 101-16 .22 caliber rifle (which was made prior to 1968 and bears no serial number); a Marlin Model 795 rifle; an R Guns revolver; and an RG 14 revolver.  Virginia state law does not require private sellers (as opposed to FFLs) to conduct background checks or track the sale of firearms.  Furthermore, the Government was unable to locate another handgun the defendant purchased on February 11, 2017.

- another Remington 870 shotgun (purchased on March 21, 2012, in Glendale, Arizona)

- an H&K handgun (purchased on January 24, 2015, in Norfolk, Virginia)

- a Glock handgun (purchased on May 7, 2016, in Chesapeake, Virginia)

- a Springfield .45 caliber handgun (purchased on October 1, 2017, in Chantilly, Virginia)

- a Sig Sauer Model 1911 handgun (purchased on October 9, 2017, in Fairfax, Virginia)

- a Bergara 308 rifle (purchased on December 30, 2017, in Chantilly, Virginia)

*Silencers*:  According to e-mails and banking records, on July 30, 2017, the defendant bought certain known metal parts from a company in California for $202.55.  *See* **Exhibit 37**. Those parts contained pre-indexed holes—ready to be drilled and assembled into unlawful silencers.  On August 12, 2017, the defendant purchased an appropriate drill press and other components for $175.41.  *See* **Exhibit 38**.  Agents found the drill press in the defendant's residence during the execution of the search warrant on February 15, 2019.  *See* **Exhibit 39**.  Some of the silencer parts were found drilled out, and one silencer was fully assembled.  The defendant went to the trouble of clandestinely manufacturing a silencer—paying more than he would have for the $200 transfer tax to purchase a silencer legally.  He then test-fired the illegally made silencer, as proven by the fact that the internal components were covered with a gray residue, indicative of gunpowder and thus use.

\*        \*        \*

In a prior hearing, the Court expressed an interest in knowing whether the nature of the defendant's firearm purchase history correlated to the timing of his Internet research into

murdering public officials.  It did.  While all of the defendant's firearms were dangerous in his

hands, the one that he apparently intended to use in his sniper campaign is the last one we can trace

to him: the Bergara rifle purchased on December 30, 2017.  Moreover, the purchase of the Bergara

coincided in time with the purchase of the $400 scope in December 2017, immediately preceded

the defendant's research into sniper training described herein, and was proximate to the

defendant's clandestine manufacture of the silencer in early August 2019.

Contrary to any argument the defendant now makes, he made the silencer to kill people.

The defendant did not intend to use the silencer for lawful purposes; otherwise, he would have

acquired or made it lawfully, which he knew based on his Internet research how to do.  For

example, on February 20, 2017, the defendant conducted a Google search for "atf suppressor stamp

wait time" and visited a website regarding ATF wait times.  *See* **Exhibit 40**.

The defendant did not intend to use the silencer to minimize the risk of hearing loss while

at target practice, *see* ECF No. 62 at 7-8.  Rather, the defendant appears to have worn ear protection

for years, and also fired weapons (such as shotguns) that cannot be used with silencers at all.  For

example, in the following image, clipped from a video that was taken on or about March 29, 2015,

the defendant is holding a shotgun while wearing ear protection:



The defendant even wore ear protection while firing a weapon on which he could have affixed the silencer.  The following photo was taken on or about March 13, 2018—more than seven months **<u>after</u>** the defendant purchased the silencer parts that he drilled out to make his silencer:



The defendant did not intend to use the silencer to reduce "disorientation" or promote accuracy while warding off a home invader; otherwise, the silencer would have been affixed to a weapon in a reachable location, instead of in a bag in a locked closet with other guns.[26]



Rather, the defendant intended to use the silencer in his unlawful criminal conduct, to achieve and prolong the sniper campaign he wanted to conduct, to complement the sophisticated sniper rifle he contemporaneously purchased, and to be used while he wore the Level III body armor, tactical belts, bags, magazines, and ammunition he had stockpiled and kept with the sniper rifle, silencer, and other high-end firearms.

---

[26] The defendant's primary weapon to defend against a home invasion likely would have been the shotgun resting behind his bedroom door, rather than any of the weapons in his locked closet.

As shown in the picture below, the defendant had readily accessible in a closet next to his bed four long-guns, including (on the left) the DPMS with the $1,300 scope and (behind it) the Bergara sniper rifle with the $400 scope.



In proximity to the long guns, the defendant had two sets of body armor, tactical gear, magazines, and ammunition, as shown below.





That the defendant intended to use the silencer to murder is supported by the utter lack of evidence in support of the defendant's implied arguments during the detention hearings and motions practice that he illegally made the silencers for some sort of health reason or to better defend his homestead.  No historical evidence supports the defendant's post-arrest arguments to that effect.  Indeed, all evidence is to the contrary.

## V.        The Defendant's Additional Narcotics Distribution Conduct

The defendant's narcotics conduct is more extensive than just that to which he pleaded guilty.  As the Court knows, for several years prior to his arrest, the defendant purchased Tramadol from a Mexico-based distributor.  Consistent with this fact, the defendant pleaded guilty to Counts Three and Four of the Superseding Indictment.  In addition, however, the defendant conspired with the Mexico-based distributor to distribute oxycodone to an individual in California (in violation of 21 U.S.C. § 846) and actually distributed oxycodone to the individual in California (in violation of 21 U.S.C. § 841).  *See* **Exhibit 41**.  The Government provides this information because all of it is relevant to the § 3553(a) factors.

## VI.        The Sentencing Guidelines

In the plea agreement, the parties agreed to a basic set of applicable Guidelines.  ECF No. 94.  The parties agree that the base offense level is 20, because the offense involved a National Firearms Act weapon and/or a large-capacity magazine, and the defendant was a prohibited person.  And there is no dispute that a 4-level increase applies because of the large number of guns the defendant possessed.  Finally, the Government does not oppose a 2-level reduction for acceptance of responsibility.  In the absence of the applicability of any other Guideline provisions, the offense level would be 22.

However, in the plea agreement, the parties also reserved the right to argue for and against the applicability of any other Guideline.  The Government believes the offense level should be increased under several additional provisions described below.[27]

### A.    U.S.S.G. § 2K2.1(b)(6)(B)

A 4-level increase applies because the defendant possessed any firearm or ammunition in connection with another felony offense, or possessed any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense.  Here, at the very least, the defendant possessed three firearms in connection with the felony offense of making a false statement on ATF Form 4473, in violation of 18 U.S.C. §§ 922(a)(6) or 1001.  On May 7, 2016, the defendant purchased a Glock pistol and lied by responding in the negative to Question 11(e), "Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance?"  *See* **Exhibit 42.**  On October 1, 2017, the defendant purchased a Springfield .45 caliber handgun in Chantilly, Virginia, and lied by responding in the negative to Question 11(e) and by falsely stating that he lived in Virginia in response to Question 2.  *See* **Exhibit 33.**  On December 30, 2017, the defendant purchased a Bergara .308 rifle and lied by responding in the negative to Question 11(e) and by falsely stating that he lived in Virginia in response to Question 2.  *See* **Exhibit 18**. Furthermore, the defendant lied about his Virginia residency during a private purchase of a 1911 handgun on October 9, 2017.  *See* **Exhibit 35**.  More broadly, the defendant possessed the fifteen guns, two silencers, and thousands of rounds of ammunition with "intent" that they would be "used

---

[27] The Guidelines are presented in numerical order, even though the terrorism enhancement of § 3A1.4 yields the highest enhancement.

or possessed in connection with" the murder of civilians, as described throughout this memorandum.

### B.   U.S.S.G. § 3A1.4(a) and (b)

The offenses in Counts One through Three—the firearm and silencer counts—and the relevant conduct described in this memorandum involved, or were intended to promote, a federal crime of terrorism.  With this enhancement, the offense level is increased by 12 levels or to level 32 (whichever is higher), and the defendant's criminal history category becomes Category VI.

"Federal crime of terrorism" is defined at U.S.S.G. § 3A1.4, app. note 1 and 18 U.S.C. § 2332b(g)(5).  According to this definition, a "federal crime of terrorism" has two components. First, it must be a violation of one of several enumerated statutes. 18 U.S.C. § 2332b(g)(5)(B). Second, it must be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  18 U.S.C. § 2332b(g)(5)(A).  By § 3A1.4's plain wording, there is no requirement that the defendant have committed a federal crime of terrorism.  All that is required is that the crimes of conviction (or relevant conduct) involved or were intended to promote a federal crime of terrorism.  *See, e.g.*, *United States v. Graham*, 275 F.3d 490, 516 (6th Cir. 2001) ("A defendant who intends to promote a federal crime of terrorism has not necessarily completed, attempted, or conspired to commit the crime; instead the phrase implies that the defendant has as one purpose of his substantive count of conviction or his relevant conduct the intent to promote a federal crime of terrorism.").  To apply the enhancement, the Court needs to identify which specific enumerated federal crime of terrorism the defendant intended to promote, and the Court's findings need to be supported by only a preponderance of the evidence. *Id.* [28]

---

[28] A district court deciding whether to impose the terrorism enhancement must "resolve any factual disputes" relevant to the enhancement and then, if it finds the requisite intent, should "identify the

By aggregating the sniper rifle, other firearms, sophisticated scopes, ammunition, suppressors, and other material, the defendant here intended to promote an enumerated federal crime of terrorism, 18 U.S.C. § 351 (attempting to kill or kidnap any Member of Congress, certain Executive officials, and any Supreme Court Justice).   The defendant wrote: "Institute a bombing/sniper campaign"; "Have to take serious look at appropriate individual targets, to bring greatest impact. Professors, DR's, Politian's, Judges, leftists in general"; "Please send me your violence that I may unleash it onto their heads"; and "For that reason I will strike, I can't just strike to wound I must find a way to deliver a blow that cannot be shaken off. Maybe many blows that will cause the needed turmoil."  On January 24, 2018, the defendant conducted searches related to ricin, which was the source of a still-unresolved attack on the White House and the Dirksen Senate Office Building in 2003 and 2004.  *See* **Exhibit 23** at 7.  Further, the defendant conducted Internet searches on February 26, 2018, for "most liberal senators," "where do most senators live in dc," "do senators have ss [secret service] protection," and "are supreme court justices protected," and two weeks later searched for the home addresses of two Supreme Court Justices.  And on January 17, 2019, the defendant compiled a list of prominent Democratic Congressional leaders.  The defendant's Google activity, *see* **Exhibit 23** at 7, 11-15, as well as his activity on his USCG work station, *see generally* **Exhibit 19**, confirm his almost single-minded devotedness to this plan over the course of years.

Furthermore, there can be no serious dispute that the defendant's intention was "to influence or affect the conduct of government by intimidation or coercion."  The defendant said so himself in his writings, including his desire to intimidate and coerce the Government into

---

evidence in the record that supports" that finding.  *United States v. Hassan*, 742 F.3d at 148 (quoting *United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008)).

allowing the creation of a white refuge in the Northwest United States. Moreover, the defendant specifically wrote that he intended to coerce or intimidate the Government into action: "In other words provoke gov/police to over react which should help to escalate violence."[29]

Since § 3A1.4 applies, a 12-level increase applies, and the resulting offense level cannot be lower than 32. In addition, the defendant's criminal history category becomes Category VI.

### C.      U.S.S.G. § 3A1.4, app. note 4

Congress has defined domestic terrorism,[30] but no statute specifically criminalizes domestic terrorism. Instead, prosecutors rely on a variety of federal statutes to prosecute domestic terrorists. The statutory maximum terms of imprisonment for the available charges typically (but not always) permit a sentencing court to adequately account for the underlying conduct. In order to hold domestic terrorists appropriately accountable at sentencing, if not in the charging document, the Sentencing Commission has provided U.S.S.G. § 3A1.4, app. note 4.

If the Court concludes that the § 3A1.4 terrorism enhancement does not apply, the Court should depart upward based on application note 4. Under application note 4, the Sentencing Commission expressly endorsed an upward departure under certain circumstances:

> By the terms of the directive to the Commission in section 730 of the Antiterrorism and Effective Death Penalty Act of 1996, the adjustment provided by this guideline applies only to federal crimes of terrorism. However, there may be cases in which (A) the offense

---

[29] The defendant may retort that he did not have a specific plan—no concrete date, time, or target—in mind at the time of his arrest. But the defendant having failed to decide between his many choices is of no moment. The defendant in *United States v. Elshinawy* made the same argument when claiming that the § 3A1.4 enhancement should not apply, and the district court (Hollander, J.) and Fourth Circuit found the argument unavailing. *See* 781 F. App'x 168 (4th Cir. 2019).

[30] "'Domestic terrorism' means activities that (A) involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State; (B) appear to be intended (i) to intimidate or coerce a civilian population, (ii) to influence the policy of a government by intimidation or coercion, or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and (C) occur primarily within the territorial jurisdiction of the United States." 18 U.S.C. § 2331(f).

was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct but the offense involved, or was intended to promote, an offense other than one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B); or (B) the offense involved, or was intended to promote, one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B), but the terrorist motive was to intimidate or coerce a civilian population, rather than to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.  In such cases an upward departure would be warranted, except that the sentence resulting from such a departure may not exceed the top of the guideline range that would have resulted if the adjustment under this guideline had been applied.

If subparagraph (A) applies—"the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct but the offense involved, or was intended to promote, an offense other than one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B)"—the Government's argument in the prior section with respect to the defendant's intention to influence or affect Government conduct through intimidation or coercion applies equally here.  But instead of having to prove that the defendant intended to promote an enumerated statute, the Government could prove that the defendant intended to promote any other statute.  Here, the defendant intended to promote the statutes of conviction, in addition to the several other federal statutes for which multiple magistrate judges in this District found probable cause to issue search warrants, including 18 U.S.C. §§ 1111 (murder within the special maritime and territorial jurisdiction of the United States), 1113 (attempted murder within the special maritime and territorial jurisdiction of the United States), 1114 (murder or attempted murder of officers and employees of the United States), and 371 (conspiracy to commit violations of 18 U.S.C. §§ 1111, 1113, and 1114).

If subparagraph (B) applies—"the offense involved, or was intended to promote, one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B), but the terrorist motive was to

intimidate or coerce a civilian population, rather than to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"—then the Government's argument in the prior section regarding the enumerated offense of 18 U.S.C. § 351 applies equally here.   But instead of proving that the defendant's conduct was intended to influence, affect, or retaliate against Government conduct, the Government must prove that the defendant intended to intimidate or coerce a civilian population.   This is easily done, again with resort to the defendant's own words.   In or around May 2017, the defendant wrote: "Liberalist/globalist ideology is destroying traditional peoples esp white.  No way to counteract without violence.  It should push for more crack down bringing more people to our side.  Much blood will have to be spilled to get whitey off the couch.  For some no amount of blood will be enough.  They will die as will the traitors who actively work toward our demise."  And in September 2017, the defendant wrote: "We need a white homeland as Europe seems lost.  How long can we hold out there and prevent n_gg_rization of the Northwest until whites wake up on their own or are forcibly made to make a decision whether to roll over and die or stand up remains to be seen."[31]  No clearer message is needed to show that the defendant intended to coerce and intimidate civilian populations into bending to his view of white supremacy.

### D.      U.S.S.G. § 3B1.3

Under § 3B1.3, a 2-level increase applies if the defendant abused a position of public trust in a manner that significantly facilitated the commission or concealment of the offense.   As recounted herein, the defendant was a Coast Guard Lieutenant stationed at USCG Headquarters. In that position, he routinely used the safe space of his work cubicle to take Tramadol, a controlled substance.  *See* **Exhibit 35 and Exhibit 36**.  During the years he took Tramadol, he also purchased

---

[31] The defendant wrote the full racial epithet.

firearms unlawfully, and in doing so used his Coast Guard identification and certain supposed placement orders to falsely represent that he was a Virginia resident.  For example, on February 11, 2017, the defendant used his Coast Guard identification card and orders to claim Virginia residency in order to unlawfully purchase a firearm.  *See* **Exhibit 32**.  On October 1, 2017, he did it again.  *See* **Exhibit 33**.  And on December 30, 2017, he showed some sort of Coast Guard orders to unlawfully purchase a firearm.  *See* **Exhibit 18**.  One thing is clear: The defendant spent at least as much time at Coast Guard Headquarters researching his intended criminal activity as he did actually working.  Quite simply, the defendant could not have committed his crimes of conviction without abusing his position as a Coast Guard officer, using his workspace, identification, and orders to violate the law.

### E.       U.S.S.G. § 5K2.0

Under § 5K2.0, the Court may depart upward in certain exceptional cases not otherwise accounted for by the Guidelines.  For example, under § 5K2.0(a)(2)(B), the Court can depart upward "in the exceptional case where there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant in determining the appropriate sentence."  If the Court finds that § 3A1.4 or § 3A1.4, application note 4, do not apply, then the Government submits that the Court should make an equivalent upward departure under § 5K2.0 because of the defendant's intent and preparation to commit acts of domestic terrorism.

### VII.       The Recommended Sentence

To the extent not addressed in this memorandum, the Government will discuss each 18 U.S.C. § 3553(a) factor at sentencing.  Based on consideration of all the § 3553(a) factors, the Government believes that the appropriate term of imprisonment is 25 years (300 months).  The term of imprisonment should be followed by a three-year term of supervised release.  The

Government also will file an appropriate forfeiture order prior to sentencing, in conformity with the plea agreement.

To the extent that the Government's recommendation is above the advisory Guideline range found by the Court during the sentencing hearing, an upward variance to reach the recommended sentence is warranted here.[32]  The defendant poses a severe risk to public safety. He is a domestic terrorist and should be sentenced accordingly.

**<u>Conclusion</u>**

For the reasons set forth above, the United States respectfully requests that the Court impose a term of imprisonment of 25 years.

Respectfully submitted,

Robert K. Hur
United States Attorney

/s/ _____
Thomas P. Windom
Assistant United States Attorney

---

[32] The Fourth Circuit has regularly found upward variant sentences substantively reasonable where the district court has considered and explained its sentence based on the § 3553(a) factors.  *See United States v. Washington,* 743 F.3d 938, 944-45 (4th Cir. 2014) (sentence six years above guidelines range substantively reasonable); *Rivera-Santana,* 668 F.3d at 106 (sentence seven and half years above guidelines range substantively reasonable); *Diosdado-Star,* 630 F.3d at 367 (sentence more than six years above guidelines range substantively reasonable); *United States v. Johnson*, 538 Fed. Appx. 62, 65 (4th Cir. 2014) (per curiam) (sentence 250% above top of guidelines range substantively reasonable).