## OFFICE OF THE FEDERAL PUBLIC DEFENDER
## DISTRICT OF MARYLAND
### NORTHERN DIVISION
TOWER II, 9th FLOOR
100 SOUTH CHARLES STREET
BALTIMORE, MARYLAND  21201-2705
TEL:  (410) 962-3962
FAX:  (410) 962-0872

JAMES WYDA                                                      ELIZABETH G. OYER
FEDERAL PUBLIC DEFENDER                                         SENIOR LITIGATION COUNSEL

January 24, 2020

Via ECF Filing

Honorable George J. Hazel
United States District Judge
U.S. District Court for the District of Maryland
6500 Cherrywood Lane
Greenbelt, Maryland 20770

     Re:    *United States v. Christopher Hasson*, Criminal Case No. 19-cr-0096-GJH

Dear Judge Hazel:

We write to respond to certain issues raised in the Government's Memorandum in Aid of Sentencing (Dkt. No. 104). The government's request for a 25-year sentence, in a case in which no dangerous actions were taken and no harm to life or limb was caused, is shocking and unprecedented. To impose such an excessively harsh sentence on a decorated veteran with a previously unblemished record would be unlawful and unconscionable. For reasons that are addressed in our initial filing, and discussed further below, we urge the Court to reject the government's false and speculative narrative that Mr. Hasson was planning a terrorist attack and to sentence him in proportion to the offenses of conviction.

I.     **The Government's Theory that Mr. Hasson Was Training for a Sniper Attack Is False and Unsupported.**

The government alleges for the first time in its sentencing memo that Mr. Hasson was training himself to be a sniper during the period leading up to his arrest. That allegation is flatly untrue and relies on mischaracterizations and selective use of evidence. The Court should reject this theory, for multiple reasons.

***First***, the government repeatedly asserts, without support, that the Bergara rifle that Mr. Hasson purchased on December 30, 2017 was a "sniper rifle." That is just not true. The rifle in question is a Bergara B14 HMR (Hunting and Match Rifle).[1] This rifle is designed for hunting and competition ("match") shooting. As explained by the manufacturer in the marketing materials:

---
[1] *See* Govt's Sentencing Memo, Dkt. No. 104 (Ex. 18, p.3).

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 2

"The Bergara Hunting and Match Rifles are built to offer a rifle for both hunters and competition shooters that can perform incredibly in either situation."[2]   The rifle is <u>not</u> a high-end precision rifle, but rather a mid-range rifle favored as a good value.   As the manufacturer describes: "this rifle delivers a level of quality and performance that is unmatched in its price range."[3]   This rifle, which is commercially available for $949, is described by retailers as "[c]ombin[ing] match-grade precision and big-game-dropping power."[4]   The Bergara B-14 HMR rifle has won numerous awards, including Field and Stream's "Best Bargain" rifle in 2017, as well as Outdoor Life's "Editor's Choice" award in 2017.[5]   There is absolutely no evidence whatsoever that this is a rifle used by snipers, or any other military or law enforcement personnel, or anyone other than recreational shooters.

*Second*, the government mischaracterizes Mr. Hasson's intended uses for the Bergara rifle. The government suggests that Mr. Hasson intended to become a sniper because (1) he made some notes that appeared to be a "sniper log"; and (2) he conducted some searches related to calculating distances for precision shooting.   These allegations drastically misunderstand and mischaracterize the evidence.

What the government omits entirely is that Mr. Hasson, a longtime recreational gun enthusiast, was—during the same time period he was allegedly training as a sniper—exploring competition shooting.   His internet search history reflects that he was focused on sport-shooting events occurring at the Quantico Shooting Club, located on the U.S. Marine Corps base in Quantico, Virginia.   According to the Club's webpage, which Mr. Hasson visited on February 20, 2018:

> We offer many opportunities for the shooting enthusiast. If you are a new shooter, we can assist you with instruction in the fundamentals. For the more experienced marksman, our club hosts rifle, pistol, and shotgun competitions and advanced

---

[2] *See* Bergara Product Overview, https://www.bergara.online/us/rifles/b14/hmr-rifle (attached as Exhibit 9).

[3] *Id.*

[4] *See* Cabela's (gun retailer) website, https://www.cabelas.com/product/BERGARA-HMR-MOLDED-BOLT-ACTION-RIFLE/2463726.uts.

[5] *See* Exhibit 9 (Bergara Product Overview).

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 3

marksmanship training. Like our Marine hosts, we are committed to marksmanship and excellence.[6]

Google location data shows that Mr. Hasson visited the Quantico shooting club in person one time, on Saturday, February 17, 2018.[7]  In addition, Mr. Hasson explored all of the basics of the Quantico Shooting Club online, accessing the registration, FAQs, and other sections of the website.[8]  Mr. Hasson also thoroughly explored the competition offerings on Quantico Shooting Club's website.  He accessed pages entitled "Rifle Events," "Calendar," "CMP EIC Match Range 3," and "Steel Challenge," among others.[9]  "CMP EIC" matches are Excellence-in-Competition matches run by the Civilian Marksmanship Program.[10]  "Steel Challenge" matches are competitions hosted around the country by the Steel Challenge Shooting Association.[11]  Mr. Hasson also accessed the webpage for the U.S. National Rifle Team.[12]  All of this internet activity occurred on February 20, 2018.[13]

Consistent with his interest in competition shooting matches, Mr. Hasson searched Google for "308 match grade ammo" on January 30, 2018.  Relatedly, he searched Bing for "competition rifle sights" on February 26, 2018.[14]

The government omits all of these searches related to match shooting, yet references other searches Mr. Hasson conducted on February 20, 2018 (the very same day as the shooting-club activity), related to "subsonic" and "frangible" bullets.  See Dkt. No. 104, at 18.  Plainly, the government has cherry-picked what fits its theory and ignored everything else.  The government also fails to state that there is no evidence whatsoever that Mr. Hasson ever purchased frangible or subsonic bullets.  They were not identified among the diverse array of ammunition seized from Mr. Hasson's home.  There are no records—among the vast quantity of records collected and

---

[6] See Quantico Shooting Club website, https://quanticoshootingclub.com (attached as Exhibit 10).

[7] See Exhibit 11.

[8] See Exhibit 12.

[9] See id.

[10] The particulars of these matches are described on CMP's website.  See http://thecmp.org/wp-content/uploads/Guidelines-for-Conducting-EIC-Matches.pdf.

[11] More information and match offerings are provided on SSCA's website.  See https://scsa.org.

[12] See Exhibit 12.

[13] See id.

[14] See id.

The Hon. George J. Hazel
<u>United States v. Christopher Paul Hasson</u>, Crim. No. GJH-19-0096
January 24, 2020
Page 4

reviewed—indicating that he ever purchased such bullets.  The government's theory that these searches are indicative of plans for a sniper attack is simply not based in fact.

     ***Third***, the government conspicuously fails to explain that the types of information Mr. Hasson was searching for online are commonly used by recreational sport shooters for purposes of improving marksmanship.  Techniques about how to calculate distance and tips for improving a rifle's accuracy are widely and readily available in online guides and forums.  These guides are popularly used by recreational gun users for entirely lawful purposes.[15]  Indeed, the "sniper and sharpshooter forum" for which Mr. Hasson registered has over 43,000 members and over 450,000 posts.[16]  And in 2017, when Mr. Hasson joined that forum and purchased the Bergara HMR rifle, "[p]recision shooting at extreme distance" was described by Guns & Ammo magazine as "arguably the biggest trend in the shooting sports."[17]  Although this may not be obvious to those who are not gun enthusiasts, there is absolutely nothing nefarious or unusual about the pastime of long-range target shooting.

     ***Fourth***, the government's theory that Mr. Hasson was training for a sniper attack makes no sense in light of the timing of the supposed sniper-related activity.  All of the searches and other activity that the government references occurred between December 2017 and February 2018.  *See id.* at 12-18.  That was <u>a year before Mr. Hasson's arrest</u>.  For a full year thereafter, there is no evidence whatsoever that he was pursuing sharpshooting or engaged in any sniper-related training.  Thus, the government's theory that he was preparing for an attack at the time of his arrest simply does not hold up to the facts. After the one trip to Quantico in February 2018, Mr. Hasson abandoned the sharpshooting competition pursuit (as he did with many other short-lived hobbies and interests).  He never shot the Bergara rifle again, nor did he continue to research precision shooting techniques.  Plainly, he was not training for a terrorist attack on Base at Quantico.

---

[15] Countless examples of these types of guides are available online, in magazines, and in book form.  A couple of examples are: Guns & Ammo Magazine, "Long Range Shooting Tips" (Mar. 29, 2017), available at https://www.gunsandammo.com/editorial/long-range-shooting-tips/248274; Ballistic Precision Magazine, "Everything You Need to Know to Get Started with Long-Range Shooting" (May 1, 2018), available at https://www.ballisticmag.com/2018/05/01/ getting-started-long-range-shooting.

[16] *See* https://www.sniperforums.com (attached as Exhibit 13).

[17] Guns & Ammo Magazine, "Long Range Shooting Tips" (Mar. 29, 2017), available at https://www.gunsandammo.com/editorial/long-range-shooting-tips/248274.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 5

That Mr. Hasson only used the Bergara once is corroborated by the notebook that the government misleadingly refers to as Mr. Hasson's "sniper data book." Dkt. No. 104, at 14. Almost the entire notebook is empty, containing only a single half-page of notes, from a single session at the shooting range. *See id.* (Ex. 20). Even the government's own FBI sniper source describes Mr. Hasson's notes as "consistent with <u>a day's training</u> on a precision rifle." *See id.* at 14 (emphasis added). We ask that the government make available the complete notebook at sentencing (which is in the custody of the FBI, where it has been reviewed by defense counsel), so the Court can see the full context in which these brief notes were made.

***Finally***, the terminology that the government uses throughout its memo is inaccurate and misleading. Throughout the gun industry, the term "sniper" is loosely and widely used to describe characteristics that are just as consistent with long-range sport shooting as with shooting human targets. Nevertheless, the government uses <u>only</u> the term "sniper"—presumably because it sounds scary and nefarious—to describe those techniques and methods. This is misleading. Indeed, even the government's own anonymous sniper source expressly acknowledges as much. That individual uses the terms "long-range marksman," "expert marksman," and "precision marksman," alongside sniper, in his or her commentary. *See id.* at 16-17. For example, the individual states that the ballistics calculator spreadsheet Mr. Hasson sent himself "contains critical enablers to the <u>long-range marksman or sniper</u>." Dkt. No. 104, at 16 (emphasis added). He/she also says that recording shooting data, like Mr. Hasson did one time, is "consistently practiced by <u>snipers and expert marksman</u>." *Id.* (emphasis added). Similarly, he/she states that the data collected on the so-called "sniper data sheets" in fact "represent data commonly used by a <u>precision marksman or sniper</u>." *Id.* (emphasis added). This individual—who is purportedly an FBI-trained professional—expressly acknowledges that the information that Mr. Hasson researched and recorded was just as plausibly useful to a sportsman as to a so-called sniper.

For all of these reasons, together with the information set forth in our initial sentencing memo, we urge the Court to reject the government's erroneous theory that Mr. Hasson was training for a sniper attack.

## II.    The Court Should Disregard the Purported Commentary of the Unidentified FBI Sniper Referenced in the Government's Filing.

In advancing its sniper-training theory, the government attempts to smuggle in what is functionally expert testimony in the form of block quotes from an undisclosed individual who it says is an FBI sniper. This reliance on a "secret witness" who is unavailable for cross-examination is plainly impermissible. All of the passages of the government's sentencing

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 6

memo purportedly reflecting the analysis of this secret witness should be stricken from the record.

While the Court generally may consider relevant evidence at sentencing without regard to its admissibility at trial, the Fourth Circuit has long recognized that "there are . . . constitutional limitations on the generally broad scope of information a court may consider at sentencing." *United States v. Nichols*, 438 F.3d 437, 440 (4th Cir. 2006) (ellipsis in original). Like all defendants, Mr. Hasson has "a due process right to be sentenced only on information which is accurate." *Id.*; *see also United States v. Gentry*, 941 F.3d 767, 788 (5th Cir. 2019) ("Sentences based upon erroneous and material information or assumptions violate due process.").

The Court therefore may consider only information that "has sufficient indicia of reliability to support its accuracy." *United States v. Wilkinson*, 590 F.3d 259, 269 (4th Cir. 2010) (citing U.S.S.G. § 6A1.3(a)). If the proffered evidence "lacks sufficient indicia of reliability, then it is error for the district court to consider it at sentencing—regardless of whether the defendant objects or offers rebuttal evidence." *United States v. Fields*, 932 F.3d 316, 320 (5th Cir. 2019); *see also* § 6A1.3(a) cmt. ("Unreliable allegations shall not be considered.").

The unsworn testimony from the unnamed FBI sniper bears none of the hallmarks of reliability. Although expert evidence admitted during sentencing does not need to meet the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), it must nevertheless be "reasonably reliable." *United States v. Malone*, 828 F.3d 331, 337 (5th Cir. 2016). The government's one-sentence description of the unnamed FBI agent's experience fails to meet this standard.[18] The government does not provide any specific information about the agent's education, training, professional affiliations, prior experience in firearms investigations, prior experience as an expert witness, or prior involvement in the instant case.

Worse still, the government fails to proffer even the sniper's name, making it impossible for Mr. Hasson to investigate or challenge the agent's credentials or conclusions. "[T]he sentencing court may not rely on factual information from sources not disclosed to the defendant. To do so would deprive the defendant of his opportunity to explain and rebut any claimed errors in the information." *United States v. Linton*, 17 F. App'x 203, 205-06 (4th Cir. 2001) (unpublished); *United States v. Young*, Crim. No. ELH-13-151 (#25), 2018 WL

---

[18] Dkt. No. 104 at 13 n.3.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 7

1426501, at *9 (D. Md. Mar. 22, 2018) ("[W]here the sentencing judge relies upon prejudicial hearsay information, the accuracy of which is questioned, fundamental fairness requires that a defendant be given at least some opportunity to rebut that information." (quoting *United States v. Harris*, 558 F.2d 366, 374 (7th Cir. 1977))).  That reasoning has even greater applicability where, as here, the government offers opinion evidence, the reliability of which is based solely on the credibility of an undisclosed source.

The government also fails to provide any information about the bases for the anonymous witness's conclusions.  The government cites or quotes its purported sniper expert no fewer than nine times.[19]  The sniper opines on the meaning of specific internet search terms, the purpose of Mr. Hasson's internet searches, and the significance of Mr. Hasson's journal entries, other writings, and data—all without providing any bases for the witness's opinion. And rather than provide a full report, the government's memorandum includes only excerpts and summaries of its communications with this individual.  Other courts have rejected such unfounded expert opinion.  *See, e.g.*, *United States v. Sadler*, CR. No. 88-10055, 1989 WL 201203, at *2 (D. Idaho, Oct. 2, 1989) (refusing to consider abstract of doctor's expert opinion contained in postal inspector report where report failed to lay a foundation sufficient to establish doctor's expertise and did not indicate whether the doctor's opinions were held with "a reasonable degree of medical certainty").  This Court should do the same.

### III.   The Court Should Reject the Government's Proposed Guidelines Enhancements, Which Are Unsupported by Fact or Law.

#### A.   The Terrorism Enhancement Does Not Apply and the Government Should Not Be Permitted to Use It to Circumvent Basic Due Process.

The government seeks to ratchet up Mr. Hasson's sentencing exposure in a way that is grossly disproportionate to the offenses of conviction by asking the Court to apply the terrorism enhancement found at U.S.S.G. § 3A1.4.  In effect, the government is attempting to do an end-run around the standard of proof beyond a reasonable doubt and the right to a jury trial by shoehorning into a Guidelines factor conduct that it does not have enough evidence to charge.  The government is effectively putting Mr. Hasson on trial for terrorism offenses without ever charging him with any such offense and without affording him the basic rights and opportunities to defend himself that would be associated with a fair trial in our system of justice.  The government then seeks to use this massive, tail-wagging enhancement as a rationale for sentencing Mr. Hasson to more than five times what the Guidelines would

---

[19] Dkt. No. 104 at 13-18.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 8

otherwise call for.  No court has <u>ever</u> applied § 3A1.4 in the broad and draconian fashion that the government is seeking.  Indeed, even the government's <u>request</u> for application of this enhancement, under these circumstances, is unprecedented.  We urge the Court not to go out on the very frail limb that the government has erected here, and not to take the drastic, harsh, and fundamentally unfair measure of punishing Mr. Hasson for terrorism crimes that have not been charged—because they never occurred.  Basic principles of fairness and due process in our criminal justice system, together with the text and application of the guideline, require the Court to reject the government's effort to apply § 3A1.4 here.

Section 3A1.4 instructs that "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," courts should (1) increase the offense level by 12 levels, or to a minimum of 32, and (2) place the defendant in criminal history category (CHC) VI.  U.S.S.G. § 3A1.4.  For purposes of the enhancement, "'federal crime of terrorism' has the meaning given that term in 18 U.S.C. § 2332b(g)(5)."  *Id.* cmt. n.1.  That statute, in turn, defines a federal crime of terrorism as an offense that (1) "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and (2) is a violation of certain enumerated statutes.  § 2332b(g)(5).  The first part of this definition is known as the terrorism enhancement's "specific intent requirement." *United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008).

A felony can qualify for the enhancement in two ways: if it "involved" a federal crime of terrorism, or if it "was intended to promote" a federal crime of terrorism.  Although the Fourth Circuit has not parsed the meaning of these two prongs, other courts have held "a defendant's offense 'involves' a federal crime of terrorism when his offense includes such a crime, i.e., the defendant committed, attempted, or conspired to commit a federal crime of terrorism."  *United States v. Awan*, 607 F.3d 306, 313 (2d Cir. 2010); *see also United States v. Graham*, 275 F.3d 490, 516 (6th Cir. 2001) ("[T]he word 'involved' signifies that a defendant's offense included a federal crime of terrorism; in other words, that a defendant committed, attempted, or conspired to commit a federal crime of terrorism.").  By contrast, "an offense is 'intended to promote' a federal crime of terrorism when the offense is intended to help bring about, encourage, or contribute to a federal crime of terrorism."  *Awan*, 607 F.3d at 314; *see also United States v. Fidse*, 778 F.3d 477, 481 (5th Cir. 2015) ("[A] nonenumerated offense qualifies for the enhancement if it was intended to promote—that is, was intended to encourage, further, or bring about—a federal crime of terrorism.").

"[T]he government bears the burden of proof" when it seeks application of the terrorism enhancement.  *United States v. Elshinawy*, No. 16-cr-009, 2018 WL 1521876, at *3 (D. Md.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 9

Mar. 28, 2018) (collecting cases).  Here, the government does not rely on the "involved" prong.
Instead, it claims Mr. Hasson's felonies were "intended to promote" a violation of 18 U.S.C.
§ 351, which prohibits killing or kidnapping members of Congress, Cabinet secretaries,
presidential candidates, Supreme Court justices, and other high-ranking federal officials.[20]

The government is mistaken.  The terrorism enhancement does not apply to cases, like
this one, in which no one—neither the defendant himself nor anyone else—commits, attempts
to commit, or conspires to commit a crime of terrorism.  And even if it did, Mr. Hasson had
no intent to promote a crime of terrorism.  As Dr. Stephen Hart's report explains, the evidence
"does not support the government's theory that Mr. Hasson intends (or intended) to commit
acts dangerous to human life or that he is (or was) a domestic terrorist."[21]  Moreover, even
assuming Mr. Hasson intended to promote an offense enumerated in § 2332b(g)(5), the
government has not borne its burden of showing that that offense was "calculated to influence
or affect the conduct of government by intimidation or coercion, or to retaliate against
government conduct."

> 1. **The enhancement does not apply unless someone—either the defendant
>    or another person—commits, attempts, or conspires to commit a crime
>    of terrorism, which did not occur here.**

The government argues § 3A1.4 applies because Mr. Hasson might one day have used
the firearms underlying his felony convictions to assassinate unspecified politicians or
Supreme Court justices.  According to the government, § 3A1.4(a)'s "intended to promote"
prong is satisfied anytime a defendant does anything to lay the groundwork for an
undetermined crime of terrorism that he might, potentially, commit at some unknown time in
the future.  The government cites no case applying this "but for" principle to § 3A1.4(a), and
Mr. Hasson is aware of none.

Instead, courts treat the "intended to promote" language as covering conduct by which
a defendant aids other people in committing, attempting to commit, or conspiring to commit a
crime of terrorism.  In *Awan*, for instance, the Second Circuit held that "[u]nder the 'intended
to promote' prong, . . . so long as the defendant's offense was intended to encourage, further,
or bring about a federal crime of terrorism as statutorily defined, the defendant himself does
not have to commit an offense listed in § 2332b(g)(5)(B), and the defendant's offense need not
itself be 'calculated' as described in § 2332b(g)(5)(A)."  607 F.3d at 314.  The court supported
this view by noting that the purpose of § 3A1.4(a)'s "intended to promote" language is to
sweep in terrorism crimes committed by others: "If an offense cannot be 'intended to promote'

---

[20] Dkt. No. 104, at 49-50.
[21] Dkt. No. 100, at 2.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 10

a federal crime of terrorism unless the defendant himself committed one of the crimes specified in § 2332b(g)(5)(B) or committed a crime that was itself calculated to influence, affect, or retaliate against government conduct as required by § 2332b(g)(5)(A), § 3A1.4 would not apply to defendants who clearly 'intend to promote' federal crimes of terrorism *committed by other persons*." *Id.* at 315 (emphasis in original). Therefore, the court concluded, the government can carry its burden under § 3A1.4 by showing that a defendant's "crimes and relevant conduct were intended to promote a federal crime of terrorism *committed or to be committed by other individuals*." *Id.* (emphasis added).

Likewise, the Sixth Circuit held in *Graham* that "[a] defendant who intends to promote a federal crime of terrorism has not necessarily completed, attempted, or conspired to commit the crime." 275 F.3d at 516. This interpretation of "intended to promote," the court wrote, "is in harmony with the fact that, pursuant to U.S.S.G. § 1B1.3, a defendant's base offense level may be adjusted for acts which the defendant did not necessarily commit but were *committed by others* in furtherance of a jointly undertaken criminal activity with the defendant and were reasonably foreseeable to the defendant in connection with that activity. These acts are not necessarily the same as those for which the defendant may be held liable as a principal, accomplice, or conspirator." *Id.* at 516-17 (emphasis added); *see also, e.g., United States v. Jumaev*, No. 12-cr-00033-JLK, 2018 WL 3490886, at *6 (D. Colo. July 18, 2018) ("To fall within the 'intended to promote' prong, Mr. Jumaev must have committed his offenses with the intent to help bring about, encourage, or contribute to *another person's* commission of a federal crime of terrorism." (emphasis added)).

In other words, § 3A1.4's "intended to promote" prong covers defendants who assist other people in committing, attempting to commit, or conspiring to commit a crime of terrorism. The defendant himself need not commit, attempt to commit, or conspire to commit such a crime, but *someone* must do so. This interpretation of § 3A1.4 accords with the well-established requirement that "relevant conduct under the Guidelines must be criminal conduct." *United States v. Jinwright*, 683 F.3d 471, 484 (4th Cir. 2012). A different rule—e.g., one that allowed relevant conduct to be founded on any acts that were merely "non-benign"—would sweep in too broad, and too unpredictable, a range of activity:

> if conduct which is not illegal may be relevant conduct because it is "not benign," this approach would involve sentencing courts in the impossibly subjective task of determining the relative "benignness" of various legally permissible acts, and would allow individuals to be punished by having their

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 11

      guideline range increased for activity which is not prohibited by law but merely
      morally distasteful or viewed as simply wrong by the sentencing court.

*United States v. Dove*, 247 F.3d 152, 155 (4th Cir. 2001).

      To avoid this state of affairs, the Fourth Circuit has squarely held that "relevant conduct
under the Guidelines must be criminal conduct." *Id.* Thus the § 3A1.4 terrorism enhancement
can apply only if somebody—either the defendant or someone to whom he provides
assistance—actually commits, attempts to commit, or conspires to commit "criminal conduct,"
namely a "federal crime of terrorism." It is not enough that the defendant takes some "non-
benign," though non-criminal, action that might allow him, at some unknown time in the
future, to commit a crime of terrorism. Such non-criminal activity cannot qualify as relevant
conduct under the Guidelines and is therefore too attenuated to support the terrorism
enhancement.

      The opinion in *United States v. Shehadeh*, No. 1:10-CR-1020-ENV, 2013 WL 6049001
(E.D.N.Y. Nov. 14, 2013), is instructive. During an interview with U.S. Army recruiters, the
defendant in that case claimed he had traveled outside the United States only once, to Israel,
when in fact he had also made an undisclosed trip to Pakistan.[22] The defendant was indicted
on and convicted of three counts of making false statements, based on different interviews.[23]
In its sentencing memorandum, the government asked the district court to apply the § 3A1.4
enhancement, arguing the defendant's deception of the Army recruiter was "intended to
promote" an "attempt to kill or do serious bodily harm to United States soldiers on the
battlefield overseas," in violation of a statute enumerated in the "federal crime of terrorism"
definition.[24] This request was based on evidence that the defendant had told a friend that he
wished to wage jihad against U.S. military forces, and that he hoped to join the U.S. Army so
he would be deployed to a war zone where he could murder American troops.[25]

      The district court declined to apply the terrorism enhancement. The court wrote that
"while [the defendant's] attempt to join the Army for malevolent purposes was real, his
conduct in doing so was simply too remote from an attack on American soldiers abroad to

---

[22] *United States v. Shehadeh*, No. 1:10-cr-01020-ENV (Oct. 21, 2010 E.D.N.Y.), ECF No. 1
(Complaint) at 8.

[23] *Shehadeh*, ECF Nos. 12 (Indictment), 153 (Verdict).

[24] *Shehadeh*, ECF No. 164 at 6 (citing 18 U.S.C. § 2332).

[25] *Shehadeh*, ECF No. 1 at 11-12.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 12

qualify as conduct warranting the § 3A1.4 enhancement." *Shehadeh*, 2013 WL 6049001, at *2. "At bottom," the court wrote, "the only offenses the government claims [the defendant] was 'promoting' were those he wanted to commit himself." *Id.* Laying the groundwork for one's own possible future crimes cannot satisfy the "intended to promote" standard, which requires more than preparatory steps far removed from actual commission of a crime. *Id.* Thus the *Shehadeh* defendant's attempt to join the Army "d[id] not constitute 'promoting' [homicide against United States nationals outside of the United States] as that term is used in § 3A1.4 of the guidelines." *Id.* As the court explained: "Thanks to the diligence of federal agents and NYPD officers, [the defendant] never got to enlist, much less got close to the completion of training and deployment overseas. What he did, as opposed to what he hoped to do, could not be characterized as conduct sufficient to have been 'intended to promote' the overseas murder of Americans or any other 'federal crime of terrorism.'" *Id.*

The same is true here. Mr. Hasson's possession of firearms is "simply too remote" from any possible assassination he might, theoretically, have carried out at some unknown future time. *Id.* Like the defendant in *Shehadeh*, Mr. Hasson did not even "get close" to committing a crime of terrorism. *Id.* The actions the government cites to support the § 3A1.4 enhancement—Googling "most liberal senators," researching whether Supreme Court justices receive Secret Service protection, musing in a deleted email about the need to select as yet unidentified targets, etc.—indicate, at most, that Mr. Hasson considered the possibility of committing a crime someday.[26] But "[w]hat [Mr. Hasson] did, as opposed to what he hoped to do, could not be characterized as conduct sufficient to have been 'intended to promote'" assassination of a federal official. *Id.* The government cannot carry its burden under § 3A1.4.

### 2. Mr. Hasson did not intend to commit acts of violence.

Even assuming that preparatory actions remote in time, untethered to any specific plan to commit a crime, can satisfy § 3A1.4's "intended to promote" prong, the Court should decline to apply the terrorism enhancement because there was no realistic probability that Mr. Hasson was going to resort to violence. As explained in our sentencing memorandum, Dr. Stephen Hart, a psychologist and internationally renowned expert in the field of risk-of-violence assessment, conducted an extensive evaluation of Mr. Hasson to determine whether he posed a threat to others. Dr. Hart reviewed "pleadings and investigative reports related to the index offenses, Mr. Hasson's computer contents and Internet activity, Mr. Hasson's military records, summaries of interviews with numerous collateral informants, and character letters prepared

---

[26] Dkt. No. 104, at 50.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 13

in advance of Mr. Hasson's sentencing," as well as "a mental health assessment of Mr. Hasson conducted by a forensic psychologist, a substance use assessment conducted by a behavioral pharmacologist, and personal interviews with Mr. Hasson conducted by [Dr. Hart]."[27]

Based on this exhaustive investigation, Dr. Hart concluded the evidence "does not support the government's theory that Mr. Hasson intends (or intended) to commit acts dangerous to human life or that he is (or was) a domestic terrorist."[28]  It is Dr. Hart's opinion that "Mr. Hasson does not pose a risk of serious violence, including but not limited to murder and terrorism, either currently or in the foreseeable future."[29]  According to Dr. Hart, the offenses of conviction "did not have an underlying violent motivation," and Mr. Hasson "was not on what is sometimes referred to in the field of violence risk (threat) assessment as the 'path to intended violence.'"[30]  Dr. Hart reviewed the internet searches the government cites and determined that the violent ideation in those searches "did not reflect an intent or plan to commit violence."[31]  Rather, Mr. Hasson's violent ideation "was compensatory in nature"—a way "to cope with [the] perception" that "the world [is a] place full of threats."[32]  Dr. Hart wrote in his report that "[c]ompensatory violent ideation may reasonably be considered grounds for concern about a person's adjustment but is not at all specifically characteristic or indicative of . . . violence."[33]  Therefore, Dr. Hart concluded, "[t]here is no plausible scenario whereby Mr. Hasson engages in violence that might threaten public safety or public order, including but not limited to mass casualty attacks or domestic terrorism."[34]

Because Mr. Hasson had no plan or intent to engage in violence, his firearm and silencer possession cannot be "a felony that . .  was intended to promote" a crime of terrorism.  U.S.S.G. § 3A1.4(a).  It is simply not "plausible" that Mr. Hasson would ever actually have assassinated, or attempted to assassinate, a member of Congress, Supreme Court justice, or other federal official, and thus his gun possession was not "intended to promote" such a crime.  Rather than

---

[27] Dkt. No. 100-6 (Hart Report), at 3.

[28] *Id.* at 4.

[29] *Id.*

[30] *Id.* at 9.

[31] *Id.* at 11.

[32] *Id.* at 11-12.

[33] *Id.* at 12.

[34] *Id.*

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 14

indicating an intent to promote a crime of terrorism, Mr. Hasson's offenses of conviction simply reflect a lifelong interest in collecting firearms.  Mr. Hasson has owned and used firearms his whole adult life, and has bought, sold, and traded firearms for many years, since well before the events detailed in the government's sentencing memorandum.  He enjoys shooting recreationally and even kept a makeshift firing range at his former home in North Carolina.[35]

In these circumstances, the § 3A1.4 terrorism enhancement does not apply.

### 3. Mr. Hasson did not intend to influence government conduct or retaliate against the government.

The terrorism enhancement is inapplicable for another reason.  For the enhancement to apply, the government must show that "[a defendant's] actions were 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'"  United States v. Hassan, 742 F.3d 104, 149 (4th Cir. 2014) (quoting § 2232b(g)(5)(A)).  To decide this question, courts ask whether a defendant has engaged in conduct that "convincingly demonstrate[s] his intent to participate in conduct calculated to influence or affect government."  Id. at 150 (finding standard satisfied based on, inter alia, defendant's travels to Middle East to "engage in violent jihad").  Thus application of the enhancement is appropriate where, for instance, a defendant's "conduct [goes] beyond words to actions."  Id.

The government has not shouldered its burden of establishing "specific intent" in this case.  Id. at 148.  The government does not dispute that Mr. Hasson did not actually commit, attempt to commit, or conspire to commit a "[f]ederal crime of terrorism," such as assassination of high-ranking federal officials.  Rather, it cites two pieces of evidence that supposedly establish Mr. Hasson's "motive and intent to influence or affect the conduct of the government," id.  at 149: (1) a letter he wrote advocating the establishment of a white-nationalist homeland in the Northwest, and (2) a deleted email in which Mr. Hasson talks about provoking police violence.[36]  As explained above, Dr. Hart concluded, based on a thorough evaluation of Mr. Hasson's background and the discovery in this case, that there is no basis for the government's theory that "Mr. Hasson intends (or intended) to commit acts dangerous

---

[35] Dkt. No. 100 (Defense Sentencing Memorandum), at 17.

[36] Dkt. No. 104, at 50-51.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 15

to human life."[37]   The statements in Mr. Hasson's letter and email were "compensatory in nature, a way to regulate [his] emotional state or self-concept in response to actual or perceived external threats."[38]   Accordingly, they do not establish a "specific intent." *Id.*

More important, even if those statements were "adaptational in nature"—i.e., "a way to plan and rehearse the perpetration of violence"[39]—they would still fall well short of demonstrating that Mr. Hasson had an "intent to participate" in conduct calculated to influence or affect government.   *Id.* at 150.   Mr. Hasson never took any concrete steps toward assassinating a federal official: he did not select a specific target, pick a date or time to commit the crime, identify a location for its commission, choose which weapons he would use, decide what demands, if any, he would make in connection with the assassination, or do anything else remotely suggesting he actually intended to go forward with his supposed plan.  His conduct, in short, did not "[go] beyond words to actions."  *Id.*

Nor is there any reason to believe that, if Mr. Hasson had attempted to assassinate a member of Congress, he would have done so in order to "intimidate and coerce the Government into allowing the creation of a white refuge in the Northwest United States."[40]   Without knowing the specifics of Mr. Hasson's hypothetical plot—such as whom he intended to kill or how he intended to do it—it is impossible to know whether the assassination would have been calculated to achieve that purpose, as opposed to some other purpose.[41]

Pointing to *United States v. Elshinawy*, 781 F. App'x 168 (4th Cir. 2019) (unpublished), the government argues it is irrelevant that Mr. Hasson "did not have a specific plan."[42]   The defendant in *Elshinawy* pled guilty to conspiring to provide material support to a foreign terrorist organization, as well as providing and attempting to provide material support. 781 F. App'x at 171-72.  Among other things, the defendant had pledged his allegiance to ISIS and

---

[37] Dkt. No. 100-6, at 4.

[38] *Id.* at 11 (emphasis omitted).

[39] *Id.* (emphasis omitted).

[40] Dkt. No. 104 at 50-51.

[41] The difficulty of determining the purpose of a crime that no one—neither the defendant nor his associates—ever committed, attempted to commit, or conspired to commit provides further support for the view that § 3A1.4's "intended to promote" prong is limited to situations in which a crime, an attempt, or a conspiracy actually occurs.  *See supra*, Part I.A.

[42] Dkt. No. 104, at 50 n.29.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 16

asked a friend to communicate that pledge to ISIS's leader; received cash transfers from ISIS, which he used to purchase a laptop, a private network, and multiple cellphones; and told a friend to listen to speeches by an ISIS spokesman urging followers to launch attacks in western countries. *Id.* at 170-71. The district court applied § 3A1.4, and the defendant appealed, arguing the government "failed to prove the specific intent prong of the Guidelines' definition." *Id.* at 173.

In affirming, the Fourth Circuit rejected the defendant's argument that the "calculated" requirement in § 2232b(g)(5)(A) was not met because he had not personally formulated a specific plan to launch attacks:

> Elshinawy argues, however, that the terrorism enhancement doesn't apply to him because the record shows only his "generalized commitment to conduct an unspecified attack," and no "actual plan" to affect or retaliate against government conduct. Appellant's Br. at 17. That's beside the point. Elshinawy has admitted providing material support to ISIS by pledging his services, buying equipment, and accepting cash. The terrorism enhancement hinges on what *those acts* were calculated to accomplish—not some other acts he may or may not have been planning. And, as the district court found, the evidence strongly indicates that the purpose of Elshinawy's material support was to advance ISIS's goals of avenging perceived mistreatment of Muslims by the United States and its allies.

*Id.* at 175 (emphasis in original).

*Elshinawy* does not help the government. The opinion in that case was grounded in the general rule that "the government may prove the requisite intent with evidence that a defendant gave material aid to a foreign terrorist group knowing and supporting that group's goals of coercing or avenging government conduct." *Id.* at 174. That is, if someone knows that a particular group is dedicated to "influenc[ing] or affect[ing] the conduct of government by intimidation or coercion, or to retaliat[ing] against government conduct," as ISIS is, then providing material support to that group is necessarily "calculated" to achieve those ends, § 2232b(g)(5)(A), regardless of whether that person himself carries out violent attacks. It is impossible to provide support to ISIS—of any amount, or in any form—without intending to influence the conduct of government, since influencing government conduct is ISIS's raison d'etre. Because the *Elshinawy* defendant "evidently knew ISIS's purpose was to coerce and retaliate against government conduct," and because he "wholeheartedly supported [its] goals,"

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 17

his provision of material support to the organization proved "that [he] possessed the necessary intent." 781 F. App'x at 174.

Mr. Hasson's case is different. He has not provided support to, or even expressed sympathy for, a group known to be in the business of "influenc[ing] or affect[ing] the conduct of government by intimidation or coercion, or . . . retaliat[ing] against government conduct." Unlike in *Elshinawy*, therefore, the extent of Mr. Hasson's own conduct is the only evidence relevant to deciding whether he "demonstrated his intent to participate" in conduct calculated to influence or affect government conduct. *Hassan*, 742 F.3d at 150. The evidence the government cites is insufficient to establish "the requisite intent" in Mr. Hasson's case. *Id.* at 148.

### 4.   The Court should decline to depart under the § 3A1.4 commentary.

The government argues that if the terrorism enhancement does not apply, the Court should depart upward based on application note four to § 3A1.4. That application note provides:

> By the terms of the directive to the Commission in section 730 of the Antiterrorism and Effective Death Penalty Act of 1996, the adjustment provided by this guideline applies only to federal crimes of terrorism. However, there may be cases in which (A) the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct but the offense involved, or was intended to promote, an offense other than one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B); or (B) the offense involved, or was intended to promote, one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B), but the terrorist motive was to intimidate or coerce a civilian population, rather than to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. In such cases an upward departure would be warranted, except that the sentence resulting from such a departure may not exceed the top of the guideline range that would have resulted if the adjustment under this guideline had been applied.

U.S.S.G. § 3A1.4 cmt. n.4. The departure contemplated by this application note is inappropriate, for several reasons.

The Hon. George J. Hazel
<u>United States v. Christopher Paul Hasson</u>, Crim. No. GJH-19-0096
January 24, 2020
Page 18

*First,* the application note is invalid.  Under the Sentencing Reform Act of 1984, the Sentencing Commission is authorized to "promulgate Sentencing Guidelines" and "issue[] commentary to the guideline provisions."  *United States v. Muldrow*, 844 F.3d 434, 437 (4th Cir. 2016).  "The Guidelines necessarily are structured at a level of generality that permits their application to the many varied facts and circumstances presented in the sentencing process."  *United States v. Allen*, 909 F.3d 671, 674 (4th Cir. 2018).  The commentary, therefore, is intended to "explain[] the guidelines and provide[] concrete guidance as to how even unambiguous guidelines are to be applied in practice."  *United States v. Hawley*, 919 F.3d 252, 255 (4th Cir. 2019).  Said differently, the commentary "puts flesh on the bones of the Guidelines."  *Allen*, 909 F.3d 671, 674 (4th Cir. 2018).  Commentary "is controlling . . . unless it: [1] violates the Constitution or a federal statute; [2] is inconsistent with the Guidelines; or [3] constitutes a plainly erroneous reading of the Guidelines."  *Hawley*, 919 F.3d at 256 (alterations in original); *see also Muldrow*, 844 F.3d at 439 ("If the commentary conflicts with the Guidelines text, it cannot bind courts.").

Here, application note four is inconsistent with, and a plainly erroneous reading of, § 3A1.4.  That guideline provides that the terrorism enhancement applies if the offense involved, or was intended to promote, a "federal crime of terrorism," defined as an offense that both (1) "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and (2) "is a violation of" certain enumerated statutes.  U.S.S.G. § 3A1.4(a).  To qualify as a "federal crime of terrorism," therefore, an offense must satisfy *two* criteria: it must be calculated to influence government conduct, *and* it must be found in an enumerated statute.

Application note four reads this conjunctive definition out of the guideline.  Under note four, an upward departure is appropriate if an offense *either* (1) is calculated to influence government conduct, *or* (2) violates an enumerated statute.  Where a guideline requires the government to satisfy two criteria, an application note necessarily conflicts with the guideline if it permits the government to apply the enhancement based on satisfying only one of those criteria.  This is not a case where commentary is "put[ting] flesh on the bones" of a guideline that is "necessarily . . . at a level of generality."  *Allen*, 909 F.3d at 674.  Instead, application note four simply rewrites the meaning of "federal crime of terrorism" by removing an essential component of that term's definition.  The commentary more or less acknowledges as much, indicating that even though Congress provided for the enhancement to "appl[y] *only* to federal crimes of terrorism," application note four extends the enhancement to offenses that do not meet that term's definition.  Because "following the commentary would violate the dictates of the relevant Guideline[]," this Court should decline to depart under application note four.  *Id.*

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 19

*Second,* even if application note four is valid as a general matter, it does not apply here. Subpart (A) is inapplicable because, as explained above, the government has not carried its burden of showing that Mr. Hasson's hypothetical commission of (or attempt or conspiracy to commit) a crime of terrorism was calculated to influence the conduct of government. And for the same reasons that the government cannot show Mr. Hasson "intended to promote" a violation of 18 U.S.C. § 351 (murder of members of Congress, Cabinet secretaries, etc.), it also cannot show he "intended to promote" any of the other statutes it identifies in its sentencing memorandum.[43]   Mr. Hasson's violent ideation was compensatory, not adaptational, in nature. No one (neither Mr. Hasson nor any other person) actually committed, attempted to commit, or conspired to commit a crime of terrorism, *see Awan*, 607 F.3d at 315; *Graham*, 275 F.3d at 516; *Jumaev*, 2018 WL 3490886, at *6, and Mr. Hasson's possession of firearms was "simply too remote" from any actual crime of terrorism to satisfy § 3A1.4's "intended to promote" prong.  *Shehadeh*, 2013 WL 6049001, at *2.

Subpart (B) is inapplicable for similar reasons. The government has not shown that Mr. Hasson intended to promote any offense enumerated in § 2232b(g)(5)(B). And because he did not promote such an offense, any conclusion about his "terrorist motive" necessarily constitutes speculation about why, hypothetically, he might have done something that neither he nor anyone else ever did.

### 5. Sentencing Mr. Hasson for terrorism conduct would violate basic principles of fairness, due process, and other constitutional protections.

Setting aside questions of the technical application of the guideline, the Court should reject the proposed application of § 3A1.4 and the proposed 25-year prison sentence on grounds of fundamental fairness. It would erode the most basic safeguards of our criminal justice system to create a vehicle by which the Court can sentence a defendant for a completely different crime than the one of which he has been convicted—and, in this case, a crime that has not actually occurred. Yet that is exactly what the government proposes to do here. This Court should reject the government's proposal on due process grounds.

The Supreme Court has repeatedly reaffirmed that the Due Process Clause guards against practices and procedures that threaten to undermine the fundamental fairness of

---

[43] Dkt. No. 104, at 52 (citing 18 U.S.C. §§ 1111 (murder within the special maritime and territorial jurisdiction of the United States), 1113 (attempted murder within the special maritime and territorial jurisdiction of the United States), 1114 (murder or attempted murder of officers and employees of the United States), and 371 (conspiracy to commit the foregoing crimes)).

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 20

criminal proceedings.  The precise contours of due process are not rigid, but rather require "an exercise of judgment upon the whole course of the proceedings (resulting in a conviction) in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice" that are central to our society.  *Rochin v. California*, 342 U.S. 165, 169 (1952).  In determining whether a particular practice or procedure violates due process, the reviewing court must be "duly mindful of reconciling the needs both of continuity and of change in a progressive society."  *Id.* at 172.

        We respectfully submit that the government's approach to prosecuting and sentencing Mr. Hasson runs afoul of the basic notions of justice that are central to due process.  The government proposes to fundamentally alter the way our criminal process works.  It suggests that as long as a conviction is secured for any crime, the Court is free to sentence the defendant for any imaginable offense, without the need to ever formally charge or prove a crime.  In effect, the government is asking the Court to do away with grand jury procedures, trial proceedings, burdens of proof, confrontation rights, and a whole host of other constitutional guarantees designed to protect the rights of criminal defendants and safeguard the fairness of our system.  Essentially, the government is proposing to jump right to sentencing for a crime that has never been charged or tried.

        On top of all of this, the government claims that it is entitled to proceed on the basis of a defendant's words and ideas, without the need to prove any criminal conduct.  In effect, the government is inviting the Court to mete out punishment for offensive and distasteful thinking.  We do not live in a society that puts people in prison for thoughts, ideas, or beliefs—no matter how heinous.  We do not live in a society with morality police.

        The Supreme Court expressly recognized the dangers of diluting the procedural safeguards when it held that the requirement of proof beyond a reasonable doubt was inherent in the Due Process Clause even though it is not expressly enumerated.  *See In re Winship*, 397 U.S. 358 (1970).  Precisely the same inherent interests are at stake today, as the government attempts to circumvent the standard of proof beyond a reasonable doubt by shoving what should be a separate criminal case into the rubric of a sentencing proceeding, where the standard of proof (along with other procedural protections) is much, much lower.  This bizarre and unprecedented maneuver is plainly at odds with the Supreme Court's guidance in *Winship*, which stated:

The Hon. George J. Hazel
<u>United States v. Christopher Paul Hasson</u>, Crim. No. GJH-19-0096
January 24, 2020
Page 21

> It is critical that the moral force of the criminal law not be diluted by a standard
> of proof that leaves people in doubt whether innocent men are being condemned.
> It is also important in our free society that every individual going about his
> ordinary affairs have confidence that his government cannot adjudge him guilty
> of a criminal offense without convincing a proper factfinder of his guilt with
> utmost certainty.

*Id.* at 354.

The Supreme Court has expressed equal concern with preserving the actual fairness and the perception of fairness of the criminal justice system. *See id.* The practice in question here undercuts both. The Court should reject it.

We know of no other case as extreme and egregious as this one. However, in less severe contexts, at least some courts have recognized that "when a sentencing factor has an extremely disproportionate impact on the sentence relative to the offense of conviction, due process requires that the government prove the facts underlying the enhancement by clear and convincing evidence." *United States v. Staten*, 466 F.3d 708, 719 (9th Cir. 2006). Mandating a clear-and-convincing standard of proof prevents the government from too easily imposing "a severe sentencing enhancement . . . on the basis of uncharged or acquitted conduct." *United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010). It also "ensure[s] that legislatures cannot evade the constitutionally required standard of proof by reclassifying an element of a crime as a sentencing factor, thereby depriving a defendant of important criminal procedural protections." *Id.* Here, applying the <u>12-level</u> terrorism enhancement would increase Mr. Hasson's Guidelines range from 41-51 months (assuming the PSR's calculations are otherwise correct) to 262-327 months' imprisonment (total offense level 34 and CHC VI). The effect would be, as it often is in § 3A1.4 cases, to "thr[o]w the guidelines into outer space." *United States v. Queen*, 738 F. App'x 794, 795 (4th Cir. 2018) (unpublished). Accordingly, the government should be required <u>at minimum</u> to prove the application of the terrorism enhancement by clear and convincing evidence—which it certainly cannot do.

We acknowledge the Fourth Circuit has held that, once *United States v. Booker*, 543 U.S. 220 (2005), rendered the Guidelines advisory, enhancements need only be proven by a preponderance of the evidence, even if they amount to "the tail wagging the dog." *United States v. Grubbs*, 585 F.3d 793, 801-03 (4th Cir. 2009). But we believe this holding is mistaken, at least as applied to this extreme and unusual case. The Supreme Court's opinion in *Booker* "does not discuss the role that standards of proof play in criminal sentencing, nor does it discuss at all the due process concerns that such standards are intended to satisfy."

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 22

*Staten*, 466 F.3d at 718.  Thus *Booker* does not dictate that a preponderance standard is sufficient to support enhancements, like § 3A1.4, that produce a "dramatic" effect on a defendant's Guidelines range.  *Elshinawy*, 781 F. App'x at 173.

We object to use of the preponderance standard here to prove the terrorism enhancement.  We further object, on grounds of due process, to the consideration of any allegations of terrorism-related conduct in sentencing Mr. Hasson.  Due process requires that the Court sentence Mr. Hasson only on the basis of the offenses he actually committed, without factoring in uncharged, unproven allegations of additional criminal intentions.

6. **Even if the Court concludes the terrorism enhancement applies, it should depart down to CHC I.**

Even if the Court applies the terrorism enhancement (which we strongly urge it not to), thereby placing Mr. Hasson in CHC VI, it should nevertheless depart downward to CHC I.  The Guidelines expressly provide that "a downward departure may be warranted" where, as here, "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."  U.S.S.G. § 4A1.3(b).  Section 3A1.4's automatic bump to CHC VI is unsupported by any empirical data or persuasive rationale.  More important, it is inappropriate in Mr. Hasson's case, as it drastically overstates his criminal history and future dangerousness.  A downward departure to CHC I, the category in which Mr. Hasson would fall absent the terrorism enhancement, *see* PSR ¶¶ 35-37, is therefore warranted.

Congress established the Sentencing Commission "to formulate and constantly refine national sentencing standards."  *Kimbrough v. United States*, 552 U.S. 85, 108 (2007).  It assigned this role to the Commission because that body "has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise."  *Id.* at 109.  "In the main, the Commission developed Guidelines sentences using an empirical approach based on data about past sentencing practices."  *Id.* at 96.  But in a handful of cases, particular guidelines have resulted not from the Commission's usual technocratic approach, but rather from congressional "directive[s]" to write the Guidelines a certain way.  *Id.* at 99.  In such cases, where a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," that guideline may "fail[] properly to reflect § 3553(a) considerations even in a mine-run case."  *Id.* at 109.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 23

Several courts have concluded § 3A1.4 is such a guideline. *See United States v. Nayyar*, No. 09-cr-1037-RWS, 2013 WL 2436564, at *8 (S.D.N.Y. June 5, 2013) ("[The terrorism enhancement] is the result of a congressional directive to the Sentencing Commission, rather than an organic outgrowth of the Commission's own empirical studies." (citing U.S.S.G. App. C, Amend. 526)).   Although the guideline does not say, presumably Congress believed an automatic CHC VI was appropriate because terrorism defendants are more likely to recidivate. But such "assumptions about recidivism" are "unsubstantiated," and "[n]othing in the history of U.S.S.G. section 3A1.4 would indicate that any reliable data was used to determine if a person convicted of a material support offense is more likely to be a recidivist." *United States v. Alhaggagi*, 372 F. Supp. 3d 1005, 1014 (N.D. Cal. 2019); *see also Jumaev*, 2018 WL 3490886, at *10 ("[The terrorism enhancement] is not backed by any empirical evidence."). Indeed, "while the question of recidivism after terrorism-related detention is empirically fraught, the very limited data suggests that individuals convicted of terrorism offenses do not recidivate at higher rates than those convicted of other crimes." *Alhaggagi*, 372 F. Supp. 3d at 1015 (emphasis in original); *see also id.* at 1014 ("The guidelines are not based on any empirical research.   There has been no study to determine how much time a terrorist should have.").

Congress may also have provided for an automatic CHC VI because terrorism is a serious crime.   But that fact is irrelevant to determining an appropriate criminal history.   As Judge Breyer has explained:

> [T]he terrorism enhancement both increases a terror defendant's offense level, and increases his or her criminal history category to the highest possible number (VI).   The argument for doing so is presumably that terrorism is an extremely serious crime.   Of course it is.   But it is the offense level that reflects the seriousness of a charged offense.
>
> A defendant's criminal history category reflects something different.   Criminal history evaluates the need to increase the offender's sentence incrementally to deter him from further criminal activity.   If terrorism sentences are too low, the Sentencing Commission can recommend increasing the offense level for those crimes.   But automatically increasing a defendant's criminal history to reflect the seriousness of the charged offense is inappropriate, as it does not reflect—unlike every other offense—the seriousness of the defendant's previous criminal convictions

*Id.* at 1013-14 (citations omitted) (emphasis in original).  Other judges have described the enhancement as being premised on a "fiction":

> The automatic assignment of a defendant to a Criminal History Category VI is not only too blunt an instrument to have genuine analytical value, it is fundamentally at odds with the design of the Guidelines.  It can, as it does in this case, import a fiction into the calculus.  It would impute to a defendant who has had no criminal history a fictional history of the highest level of seriousness.

*Jumaev*, 2018 WL 3490886, at *9 (quoting *United States v. Mehanna*, No. 1:09-cr-10017-GAO (D. Mass. Apr. 12, 2012)).  Simply put, increasing a defendant's CHC based on his offense conduct is illogical and inconsistent with the overall scheme established by the Guidelines. *See id.* at *5 ("The Terrorism Enhancement, when applied, takes a wrecking ball to the initial Guidelines range.").

Given the lack of empirical basis or theoretical justification for § 3A1.4, courts that apply the enhancement frequently depart down from CHC VI to CHC I when sentencing defendants with little to no criminal history.  *See Alhaggagi*, 372 F. Supp. 3d at 1017; *Jumaev*, 2018 WL 3490886, at *9 (finding enhancement does not apply but noting that if it did, court "would depart under § 4A1.3 to lower him back down to Criminal History Category I"); *Nayyar*, 2013 WL 2436564, at *8-9; *United States v. Benkahla*, 501 F. Supp. 2d 748, 759 (E.D. Va. 2007); *United States v. Aref*, No. 04-CR-402, 2007 WL 804814, at *3 (N.D.N.Y. Mar. 14, 2007); *United States v. Garey*, 383 F. Supp. 2d 1374, 1379-80 (M.D. Ga. 2005) (departing down to CHC III, defendant's original category); *United States v. Sihai Cheng*, No. 13-cr-10332-PBS, 2016 WL 413077, at *5 (D. Mass. Feb. 1, 2016) ("Even if § 3A1.4 applied, I would have downwardly departed or varied.").

This Court should do the same.  The PSR concluded, and the government does not dispute, that Mr. Hasson has no juvenile adjudications or adult criminal convictions.  PSR ¶¶ 35-36.  Absent the terrorism enhancement, he would therefore fall in CHC I.  PSR ¶ 37.  As a result, CHC VI undoubtedly over-represents "the seriousness of [Mr. Hasson's] criminal history."  § 4A1.3(b)(1).

As for "the likelihood that [Mr. Hasson] will commit other crimes," *id.*, the guideline specifies five types of information courts should consider when assessing this question, all of which require either a formal adjudication of some kind or, at the very least, "[p]rior similar adult criminal conduct not resulting in a criminal conviction."  *See* U.S.S.G. § 4A1.3(a)(2).  Courts should disregard other sources of information.  *See Hawley*, 919 F.3d at 256 ("Under

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 25

the *expressio unius* canon, expressing one item of an associated group or series excludes another left unmentioned."); *United States v. McClam*, 417 F. App'x 281, 283 (4th Cir. 2011) (unpublished) (affirming upward departure because "district court found, by a preponderance of the evidence," that defendant had engaged in "prior similar adult criminal conduct").

Mr. Hasson has never been adjudicated guilty of criminal conduct, and the government's sentencing memorandum does not contend he ever actually committed "prior similar adult criminal conduct," such as committing, attempting to commit, or conspiring to commit a crime of terrorism.[44]  A downward departure to CHC I is appropriate.

**B.    The Enhancement for Use of a Firearm in Connection with Another Felony Does Not Apply.**

The government asks the Court to apply U.S.S.G. § 2K2.1(b)(6)(B), which calls for a four-level enhancement if the defendant "used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense."  The government points to two supposed felonies to justify its request.  Neither justifies the enhancement.

*First,* the government claims Mr. Hasson made false statements on ATF forms in 2016 and 2017.[45]  Even assuming Mr. Hasson in fact committed violations of the false-statement statutes, he did not possess any firearms "in connection with" those violations.  A "firearm is possessed 'in connection with' another offense if the firearm facilitated, or had the potential of facilitating the other offense."  *United States v. Jenkins*, 566 F.3d 160, 162 (4th Cir. 2009).

---

[44] Nor could it.  "The mere intent to violate a federal criminal statute is not punishable as an attempt unless it is also accompanied by significant conduct."  *United States v. Engle*, 676 F.3d 405, 419 (4th Cir. 2012).  To establish an attempt, therefore, the government "must prove beyond a reasonable doubt, that (1) [a defendant] had culpable intent to commit the crime and (2) he took a substantial step towards completion of the crime that strongly corroborates that intent."  *Id.* at 419-20.  A substantial step "is more than mere preparation but less . . . than completion of the crime."  *Id.* at 423 (ellipsis in original).  Mr. Hasson's actions amount, at most, to "mere preparation" to commit an offense—not the something "more" required to prove an attempt.  As for conspiracy, the government can obtain a conviction only if it proves "an agreement between *two or more people*" to commit a crime.  *United States v. Camara*, 908 F.3d 41, 46 (4th Cir. 2018) (emphasis added).  But there is no evidence Mr. Hasson joined such an agreement with anyone else.

[45] Dkt. No. 104, at 48.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 26

"This requirement is satisfied if the firearm had some purpose or effect with respect to the other offense, including if the firearm was present for protection or to embolden the actor." *United States v. McKenzie-Gude*, 671 F.3d 452, 464 (4th Cir. 2011).

Mr. Hasson's possession of firearms did not "facilitate, or ha[ve] the potential of facilitating," any supposed false-statement violations. *Jenkins*, 566 F.3d at 162. Possessing firearms in no way made it easier for Mr. Hasson to make false statements on ATF forms. It is not clear that Mr. Hasson even had any firearms with him when he allegedly made the false statements in question, but to the extent he did, they certainly were not "present for protection or to embolden [Mr. Hasson]." *McKenzie-Gude*, 671 F.3d at 464. Rather, they would have been there "due to mere accident or coincidence," which is insufficient to trigger the enhancement. *Jenkins*, 566 F.3d at 163.

**Second,** the government asserts Mr. Hasson possessed firearms "with 'intent' that they would be 'used or possessed in connection with' the murder of civilians."[46] Under § 2K2.1(b)(6)(B)'s "possess with intent" prong, a defendant "need not actually commit [a] crime," but "the government must produce sufficient evidence that he intended to 'use or possess' firearms 'in connection with' a specifically contemplated felony." *United States v. Jimison*, 493 F.3d 1148, 1149 (9th Cir. 2007). As the Ninth Circuit has explained:

> The plan to commit the felony need not be fully developed. Thus if a defendant acquires a gun intending to use it in a bank robbery, he need not have cased the location or even identified a specific bank that he plans to rob. But he must have formed a firm intent to use the gun for a felonious purpose.

*Id.* If the government's evidence "lacks sufficient specificity to establish that he formed a firm intent" to commit another felony, the enhancement does not apply. *Id.* at 1150.

Here, the government has not carried its burden of showing Mr. Hasson had a "firm intent" to commit "a specifically contemplated felony." *See United States v. Blount*, 337 F.3d 404, 411 (4th Cir. 2003) ("The Government bears the burden of proving that the defendant possessed a firearm 'in connection with another felony offense.'"). The government's evidence—consisting mostly of internet search history, deleted emails, and rambling text messages—establishes, at most, that Mr. Hasson *thought about* committing other crimes, or *researched* how he might commit them. But it does not demonstrate that Mr. Hasson ever identified the "specifically contemplated felony" that he hoped to commit, e.g., 18 U.S.C.

---

[46] *Id.* at 48-49.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 27

§§ 351 (murder of Supreme Court Justices, members of Congress, and other high-ranking officials), 1111 (murder within the special maritime and territorial jurisdiction of the United States), 371 (conspiracy to commit another crime), etc.  Much less does the evidence prove that Mr. Hasson had a "firm intent" to commit whatever crime he supposedly had planned. Indeed, Dr. Hart dismissed as unfounded "the government's theory that Mr. Hasson intends (or intended) to commit acts dangerous to human life," and concluded "[t]here [wa]s no plausible scenario whereby Mr. Hasson engages in violence that might threaten public safety or public order."[47]

The "in connection with" enhancement does not apply.

### C.     The Abuse of Trust Enhancement Does Not Apply.

The government requests a two-level enhancement under U.S.S.G. § 3B1.3, which applies if "the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."[48]  The guideline commentary defines "public or private trust" as "a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)," and it instructs that "[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature."  § 3B1.3 cmt. n.1.  The commentary makes clear that the enhancement does not apply unless the defendant's discretion or professional expertise played a substantial role in the offense:

> For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult).  This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination.

Id.  Applying the plain language of this guideline, the Fourth Circuit has held "[t]here must be a trust relationship between the defendant and his victim for the enhancement to apply."

---

[47] Dkt. No. 100-6, at 4, 12.

[48] Dkt. No. 104, at 53-54.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 28

*United States v. Caplinger*, 339 F.3d 226, 236 (4th Cir. 2003). And it has concluded that
"§ 3B1.3's critical term—'position of public or private trust'—is a term of art, appropriating
some of the aspects of the legal concept of a trustee or fiduciary." *Id.* at 237.

Here, the government contends the enhancement applies because Mr. Hasson took
Tramadol while at work and may have used his Coast Guard identification to establish Virginia
residence on ATF forms.[49] These facts are inadequate to carry the government's burden. The
government has not alleged that, in his role as a Coast Guard officer, Mr. Hasson possessed
"professional or managerial discretion" that "is ordinarily given considerable deference," or
that he was "subject to significantly less supervision than employees whose responsibilities
are primarily non-discretionary in nature." Indeed, the government offers no description at all
of Mr. Hasson's job responsibilities or what competencies he needed to fulfill those
responsibilities. And even assuming Mr. Hasson's position entailed "substantial discretionary
judgment," the government has not shown how that judgment "contributed in some significant
way to facilitating the commission or concealment of the offense." No professional discretion
inherent in Mr. Hasson's Coast Guard duties played any role in his commission of the offense.

Nor has the government explained what "trust relationship" existed between "[Mr.
Hasson] and his victim"—or even identified who the purported "victim" of his possession
offenses was. *Caplinger*, 339 F.3d at 236; *cf. United States v. Ritsema*, 31 F.3d 559, 566 (7th
Cir. 1994) ("Possession of unregistered silencers is a victimless crime."). And, whoever that
victim might be, the government has not even tried to show that he or she enjoyed a "trustee
or fiduciary" relationship with Mr. Hasson. *Id.* at 237.

At bottom, the government appears to argue the enhancement should apply because Mr.
Hasson "spent at least as much time at Coast Guard Headquarters researching his intended
criminal activity as he did actually working."[50] But § 3B1.1 is not designed to punish people
who slack off at work; it is reserved for defendants who exploit a fiduciary-type relationship
or special work-related "professional or managerial discretion" to commit a crime. The
government has failed to show Mr. Hasson falls in this category.

## D.    The Catchall Departure Provision at U.S.S.G. § 5K2.0 Does Not Apply.

Finally, the government argues that if the § 3A1.4 terrorism enhancement does not
apply, the Court should depart upward under U.S.S.G. § 5K2.0(a)(1)(A), which applies when

---

[49] Dkt. No. 104, at 53-54.

[50] *Id.* at 54.

The Hon. George J. Hazel
United States v. Christopher Paul Hasson, Crim. No. GJH-19-0096
January 24, 2020
Page 29

"the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating or mitigating circumstance."  That statute permits for departures if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."  § 3553(b)(1).  The government asserts a § 5K2.0 departure is appropriate "because of [Mr. Hasson's] intent and preparation to commit acts of domestic terrorism."[51]

By its terms, § 5K2.0 is inapplicable.  That guideline applies only if the Sentencing Commission has "not adequately taken into consideration" the circumstances supposedly justifying a departure.  But as evidenced by its promulgation of § 3A1.4, the Commission has taken very seriously the need to provide sufficiently severe sentences in terrorism cases.  The government does not explain how the Commission's consideration of this issue was inadequate.  A § 5K2.0 departure is inappropriate.

## IV.     The Government's Requested Sentence Exceeds the Statutory Maximum.

In a final illustration of how excessive the government's sentencing request is, we note that it exceeds the statutory maximum.  The government seeks a 25-year sentence.  Mr. Hasson's National Firearms Act offenses, however, cannot support more than a combined total of ten years in prison.  Because the statutory maxima for Mr. Hasson's other offenses are ten years and one year, respectively, see 18 U.S.C. §§ 922(g)(3), 924(a)(2); 21 U.S.C. § 844(a), Mr. Hasson's sentence may not exceed 21 years' imprisonment.

"The National Firearms Act creates 12 separate firearms offenses," found at 26 U.S.C. § 5861(a) through § 5861(l).  United States v. Santiesteban, 825 F.3d 779, 781 (4th Cir. 1987).  A defendant can be convicted on two counts charging violations of different subsections of § 5861, but depending on the circumstances, "the imposition of consecutive maximum sentences after conviction for both [offenses] constitutes an unlawful pyramiding of punishment for a single transaction."  United States v. Kaplan, 588 F.2d 71, 74 (4th Cir. 1978).  Consecutive sentences are forbidden if the two § 5861 offenses are "part of a single act" or if one is "incidental to" the other.  Santiesteban, 825 F.2d at 782.  In either of those conditions is present, a defendant "convicted of [two offenses] under the Act may not receive a total sentence exceeding the maximum sentence provided for one violation (I. e., ten years)."  Kaplan, 588 F.2d at 75.

---

[51] Id.

The Hon. George J. Hazel
<u>United States v. Christopher Paul Hasson</u>, Crim. No. GJH-19-0096
January 24, 2020
Page 30

       The Fourth Circuit has held that possessing and manufacturing the same firearm, though charged in separate counts of an indictment, constitute a single violation of the NFA, punishable by a maximum of ten years. *Id.* And although it appears the Fourth Circuit has not addressed the issue, two courts of appeals have also held that possession of an unregistered firearm, under § 5861(d), and possession of the same firearm unidentified by serial number, under § 5861(i)—the two NFA charges to which Mr. Hasson pled guilty—are a single offense, for which a court may not impose more than ten years' imprisonment. *Rollins v. United States*, 543 F.2d 574, 575 (5th Cir. 1976) (per curiam); *United States v. Edick*, 603 F.2d 772, 773-75 (9th Cir. 1979). This rule makes sense. As the Fifth Circuit explained in a materially identical context: "[B]ecause it was unlawful to possess a weapon with an obliterated serial number, s 5861(h), it is impossible to register it. Therefore, possession of a firearm with an obliterated serial number necessarily entails possession of an unregistered firearm, s 5861(d), and the two fall within the 'single act' rationale." *United States v. McDaniel*, 550 F.2d 214, 219 (5th Cir. 1977). Consistent with this reasoning, Mr. Hasson's combined sentence on the two NFA counts, for possessing an unregistered silencer and possessing a silencer without a serial number, cannot exceed ten years.

### V.      Potential Additional Witness Testimony

    We previously disclosed the testimony of one witness, Dr. Stephen Hart. If the Court deems it necessary, we will also make available a staff investigator from the Office of the Federal Public Defender to authenticate the exhibits, internet history, and location data referenced in and attached to this filing. In addition, Mr. Hasson may elect to testify and/or allocute in response to the government's allegations that he was planning an act of terrorism.

The Hon. George J. Hazel
<u>United States v. Christopher Paul Hasson</u>, Crim. No. GJH-19-0096
January 24, 2020
Page 31


**VI.     Conclusion**

For the reasons set forth herein and in our initial sentencing memo, we respectfully submit that the Court should impose a sentence of time-served, together with three years of supervised release.


Respectfully submitted,

/s/

Elizabeth G. Oyer
Cullen Macbeth

EGO:sdf
cc:  Thomas Windom, AUSA (via ECF)
     Jennifer Sykes, AUSA (via ECF)