**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA          \*
                                  \*
          v.                      \*          CRIMINAL NO. GJH-19-96
                                  \*
CHRISTOPHER PAUL HASSON,          \*          
                                  \*
          Defendant               \*
                                  \*
                          \*\*\*\*\*\*\*\*

<u>**GOVERNMENT'S RESPONSE TO DEFENSE SENTENCING MEMORANDUM**</u>

This is not a case about the First Amendment.  Nor is this a case about the Second Amendment.  It is not a case about a good man briefly undone by opioids and now on the right track.  This is a case about a defendant who intended to murder, and who now seeks to have this Court grant an extreme leniency untethered to the facts or the statutory sentencing factors.  The Government submits this response to the defendant's sentencing memorandum, in order to dispel the many falsehoods therein.

**I.          Introduction**

On January 16, 2020, the defendant filed an extensive sentencing memorandum.  On January 17, 2020, the Government filed its opening sentencing memorandum, having not yet reviewed the defendant's opening memorandum.  The Government now responds to the defendant's opening memorandum.

**II.          The Defendant's Exculpatory Self-Reporting Conflicts With The Facts.**

**A.          The Defendant's Self-Reporting Is False or Misleading.**

The defendant's memo paints a relatively rosy picture of an apple-pie-eating American boy who prospered in the military, only to briefly turn to entirely understandable criminal activity undertaken for innocent purposes.  The problem is, the defendant's story does not survive first

contact.  For example, in his sentencing memorandum, the defendant claims that he "was so interested in joining the military that he enrolled in Frederick Military Academy in Virginia when he was in the eighth grade.  Eventually, however, Chris stopped attending after someone from the school called his parents and suggested that it was not the right place for him: the Hassons had not realized that the school was intended to provide structure and discipline for troubled youth, which was not the case with Chris."  ECF No. 100 at 5.  This statement is entirely at odds with the defendant's self-reporting to his future-dangerousness expert, Dr. Stephen Hart, who reported the following: "Starting when he was about 12 or 13 years old and continuing until he [was] about 17 to 18 years old, he started to use and then abuse alcohol and cannabis; engaged in truancy, vandalism, theft, and fighting; associated with other disaffected youth, including some who had racist attitudes; and even left home and lived on the street for about one month."  ECF No. 100-4 at 4.  Dr. Hart's handwritten notes spell it out more explicitly:

Though Dr. Hart's handwriting is not always legible, these notes appear to state:

> —Stealing, etc.
> —went to military school for ½ a year, break into people's rooms and stole things – throwing stars, etc.
> —-Police contact—on railroad track vandalized equipment @ 12-13yo
> —arrested @14-15 yo for breaking into school, broke into NG [National Guard] armory to get stuff & mess around, took CS gas grenade
> —selling drugs, stole a car, used to hanging with skin heads, go to punk-rock shows, have fistfights, had a stolen gun

Thus, according to Dr. Hart's notes, the defendant stated that he had been "arrested @14-15 yr," and elsewhere Dr. Hart notes: "Michigan: broke into 'abandoned' 1 room school house, ran away from home, really started to use Alc[ohol]/Drugs, on street for a month but seemed longer." **Exhibit 43** at 2. Meanwhile, on a recorded jail call on March 27, 2019—three months before meeting with Dr. Hart—the defendant confided in ▮▮▮▮ "I told her [the defense investigator] about my problems in Michigan . . . . I don't know, there's not a lot to investigate though in my life. **I have never been arrested.**" **Exhibit 44** (around 16:50 to 17:35). Equally inconsistent, the defendant reported to the Probation Officer (presumably in September 2019, after his guilty plea) none of the issues he had relayed to Dr. Hart in June 2019. *See* Revised PSR, ECF No. 98, ¶ 44.

Which is not to say that the defendant was being truthful with Dr. Hart rather than ▮▮▮▮ or the Probation Officer. Rather, he appears to be an opportunistic storyteller. For example, the defendant told Dr. Hart that the defendant's ▮▮▮▮ "seems to get along with everybody, strong personality, follows the rules." **Exhibit 43** at 3. This version of reality is entirely inconsistent with the text messages the defendant and ▮▮▮▮ exchanged, as shown in the

Government's opening sentencing memorandum.  *See* ECF No. 104 at 25-30.[1]  So too is the defendant's statement to Dr. Hart inconsistent with what the defendant wrote in the Covington letter, that he had raised ▮▮▮▮▮▮▮▮▮▮ and tha ▮▮▮▮ "has made a good many contacts of normal white people as well as the 'alt right' and enjoys 'red pilling' them to our cause. I think he has succeeded on bringing some very valuable assets to our cause, people with education and means who seem to be sincere."  *See* **Exhibit 45**.[2]

The defendant's timeline of his alleged withdrawal of white supremacy similarly does not stack up.  According to the defendant, **after** leaving the Marines in January 1994 and **before** joining the Army National Guard in Virginia on June 17, 1994, the defendant

> began spending time with people in the punk rock world, many of
> whom identified as white supremacists.  Chris explored this social
> environment for a few months before realizing it was not for him, as
> most of the people he met seemed idle and aimless, while he had a
> young family to support.  With the exception of one or two close
> friends, Chris cut ties with the people he had been hanging out with
> and returned to his military roots. [ECF No. 100 at 6.]

The calendar tells a different story.  The incident for which the defendant's friend Missouri was arrested took place in Virginia on February 11, 1995.  The Government already set forth several percipient witness statements identifying the defendant as a skinhead as of that date.  *See* ECF No. 104 at 5-7.  Thus, the defendant's statement that he "cut ties" with skinheads in early 1994 is not true.  *See* ECF No. 100 at 6.[3]  Nor does the defendant's fable in any way grapple with

---

[1] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[2] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[3] According to Dr. Hart's notes, the defendant claims he "moved back to AZ [Arizona] to avoid testifying" against his friend, Missouri.  **Exhibit 43** at 5.

his 2017 admission, in his letter to Harold Covington, that he was a "long time White Nationalist."

**Exhibit 45**.

The defendant also claims that, "[b]y all accounts, Chris was a devoted husband and father." ECF No. 100 at 9. Again, the Government's opening sentencing memo directly refutes this contention. The defendant's most frequently visited website from 2017 to 2019 was dedicated to posts about MGTOW—"Men Going Their Own Way"—the very definition of not being a devoted husband. *See* **Exhibit 19** at 2. In addition, the text messages in the Government's opening sentencing memo, in which the defendant bashes ▆▆▆▆▆▆ for being a "[w]aste of a human" are patently inconsistent with his new-found theory of familial devotion. *See* ECF No. 104 at 27.[4]

The Government notes this factual misstatements so as to disabuse the Court of the story the defendant is selling here, and sold to Drs. Dunn and Hart.

### B. The Defendant Is A Self-Avowed Racist and White Nationalist, Who Intended To Act on His Beliefs.

The defendant has chosen to take issue with his own admissions and other facts proving that he is a racist and white nationalist. *See* ECF No. 100 at 30 ("The government has alleged that Mr. Hasson was a white nationalist, a racist, and an extremist, among other things. We vigorously dispute that Mr. Hasson actually held these beliefs . . . ."); *id.* at 31 ("Again, we vigorously dispute that Mr. Hasson sincerely held extremist, racist, or white nationalist views."). The defendant's reason to do so is logical: If the defendant is not racist, then he could not have been angling to murder because of his racist beliefs. The Government addresses this argument head-on, not to

---

[4] Consistent with these views, the defendant kept on his Coast Guard computer a Word document of Bible verses derogatory toward women. *See* **Exhibit 46**. The document was created in June 2018.

take issue with the defendant's otherwise-protected (though awful) First Amendment views, but to prove the intent and rationale behind his criminal plans.

Let's set the stage early: The defendant was a racist.  In 1995, several witnesses described him as a "skinhead."  ECF No. 104 at 6-7.  Around that time, the defendant got a swastika tattoo, *see* **Exhibit 43** at 5, though he later covered it up, presumably because of the policy each U.S. military branch has forbidding service members from bearing racist tattoos.  In May 2017, the defendant wrote "Liberalist/globalist ideology is destroying traditional peoples esp white.  No way to counteract without violence.  It should push for more crack down bringing more people to our side.  Much blood will have to be spilled to get whitey off the couch."  ECF No. 104 at 9.  In September 2017, the defendant wrote to Harold Covington that he was a "long time White Nationalist" and wanted to "prevent n_gg_rization of the Northwest."  *See* **Exhibit 45**.[5]  In February 2018, the defendant searched for "how can white people rise against the jews," "how to rid the us of jews," and "jews enemy of the world."  *See* **Exhibit 47**; **Exhibit 28**.  In March 2018, the defendant searched for "best n_gg_r killing gun."  *See* **Exhibit 29**.[6]  In June 2019, the defendant told Dr. Hart, in a moment of candor, "I was a racist."  *See* **Exhibit 43** at 5.   In a search of the defendant's residence in February 2019, agents found not one but *two* Confederate battle flags, in drawers next to the defendant's bed with mail matter and other items in his name.  ECF No. 104 at 7.

Despite these facts, the defendant contends without evidence that "the rambling, incoherent thoughts and ideas that Mr. Hasson expressed in a couple of deleted documents, recovered from his work computer, appear to be the product of a situational mood disturbance, which Dr. Dunn

---

[5] The defendant wrote the full epithet.

[6] Here too, the defendant wrote the full epithet.

described as a likely effect of Mr. Hasson's tramadol addiction." ECF No. 100 at 32. This statement is remarkable because almost everything in it is wrong. The defendant's thoughts in his manifesto and Covington letter were neither rambling nor incoherent. The Covington letter was not deleted; rather, the defendant researched how to write formal letters, wrote the letter, then emailed it to himself; indeed, every indicator suggests the defendant actually mailed it to Covington. *See* ECF No. 104 at 33-35. Finally, as discussed below in a section below, Dr. Dunn did not opine that the writings and conduct were the product of a "mood disturbance."

While the Government's opening sentencing memorandum is replete with the defendant's admissions and other indicia of the defendant's racism, the Government submits the following additional evidence of the defendant's views, which also were shared by his closest relatives.

In the below text messages, the defendant makes plain to ▓▓▓▓ his racist views on March 15, 2018:

| 15/03/2018 09:52:20 (GMT-4) | Sent | Sent | Phone | Outgoing | Looks like Australia may be taking white south Africans due to violence. However south African gov "niggers" say it's not needed because they are safe and nothing is happening to them. |
|---|---|---|---|---|---|
| 15/03/2018 09:52:45 (GMT-4) | Sent | Sent | Phone | Outgoing | Hopefully Australia let's them in under special visas |

The defendant confirmed these views in another text message exchange with ▓▓▓▓ on January 28, 2019:

| 28/01/2019 08:27:57 (GMT-5) | Sent | Sent | Phone | Outgoing | We are gonna find a new country |
|---|---|---|---|---|---|
| 28/01/2019 08:28:52 (GMT-5) | Sent | Sent | Phone | Outgoing | It's almost like we are whites leaving south Africa before it turned to 100% shit |

### III.        The Defendant's Second Amendment Arguments Are Unavailing.

The defendant devotes much of his sentencing memorandum to trying to convince the Court that the crimes of conviction are overstated based on Second Amendment arguments. *See* ECF No. 100 at 17-22. But these arguments are misplaced. The Government's argument that the defendant intended to use his weapons to kill does not "reflect[ ] a skewed cultural lens" premised on a bias against ownership of multiple guns of a certain type and multiple silencers. ECF No.

100 at 17.  This is simply another iteration of the defense argument that the defendant did not have bad intentions.  And this argument is not founded in facts, rather appearing to regurgitate some of the briefing in the motion to dismiss.  For example, the defendant attempts to legitimize his criminal possession of silencers by referring to reasons other people may have wanted to possess silencers, as opposed to the reasons he himself wanted them.  As discussed extensively in the Government's opening sentencing memorandum, the crimes of conviction are firearm- and drug-related, but the core conduct for which the defendant should be severely punished amounts to domestic terrorism.  This case has nothing to do with the Second Amendment.

IV.      **The Defendant's Proffered Experts Offer No Comfort.**

A.      **Dr. Hart**

The defendant submitted a report by Dr. Hart to support an argument that he never was and never will be a danger to anybody.  Dr. Hart's report is so grandiose and hyperbolic as to be unhelpful.  Thus, the Court should give Dr. Hart's report little or no weight.

The meat of Dr. Hart's opinion is that "[t]here is no plausible scenario" in which the defendant commits violence in the future.  ECF No. 100-6 at 12.  The stark concreteness of this turn of phrase should immediately raise the Court's antenna, as doctors (even Ph.D.s like Dr. Hart) rarely if ever make such bold specific claims.  Other than being facially odd, Dr. Hart's opinion suffers from other fatal flaws.

First, Dr. Hart's opinion conflicts with this Court's own finding upon detaining the defendant prior to trial.  *See* ECF No. 51.  In order to detain the defendant, the Court already found by clear and convincing evidence on the information then before it that "no condition or combination of conditions will reasonably assure the safety of any other person and the community."  ECF No. 51; 18 U.S.C. § 3142(f)(2)(B).  So too does Dr. Hart's opinion conflict

with the considered judgment of multiple law enforcement agencies who investigated and arrested the defendant.  At core, Dr. Hart's opinion conflicts with the opinions of people whose job it is to make decisions about future danger every day, without the distance or lack of accountability of leisurely review in an academic hall.

Second, Dr. Hart's assessment ignores or minimizes much of the Government's evidence. If Dr. Hart reviewed the vast body of material described in Attachment A to the report,[7] his assessment ignores evidence of racism, preparation, study, purchasing, and planning outlined in the Government's sentencing memorandum.   Perhaps this is because, at core, Dr. Hart's assessment relies on the defendant's self-reporting during two interviews in June 2019 (3.5 hours) and December 2019 (2.5 hours).[8]

The Government elsewhere in this brief has described the problems inherent in relying on the defendant's self-reporting.  It is clear from the interview notes that Dr. Hart never challenged the defendant on his stated reasons for various conduct.  For example, when Dr. Hart asked the defendant about the list of prominent politicians and journalists the defendant made in his spreadsheet in January 2019, the defendant stated: "[S]Hit list—government shut down at the time, was pissed off, was reading about killing politicians, thought about how hard it was going to be." **Exhibit 43** at 8.  This response is exceptionally brief, and does not account for many facts pointed out by the Government, including that: the list references not just politicians but also journalists

---

[7] The list of sources reviewed is extensive, and includes many pleadings, much of the Government's extensive discovery production, and additional information prepared by defense counsel.  The Government has requested from the defendant the hours and costs associated with Dr. Hart's assessment, but none of that information has been produced to date.  Defense counsel has committed that Dr. Hart will be prepared to respond to questions about time and costs at the sentencing hearing.

[8] Dr. Hart's complete notes of those interviews are appended as **Exhibit 43**.  The notes span far fewer pages than the Government would expect from six hours of interviews.

and others (i.e., people that have nothing to do with the government shutdown at the time); the list includes "Sen blumen jew," which is further indicative of the defendant's continuing views about Jews; and the defendant previously—in February 2018, well before the shutdown—had researched liberal U.S. Senators, whether Senators and Supreme Court Justices had Secret Service protection, and the home addresses of two Supreme Court Justices. *See* ECF No. 104 at 50. Dr. Hart gives the defendant a complete pass on all this conduct, calling it "violent ideation" that amounted to nothing but fantasy.

Similarly, Dr. Hart places no significance on the defendant's troubling manifesto and Covington letter. According to Dr. Hart, "[o]n two occasions he wrote brief electronic documents (one letter and one email) describing or elaborating some of his violent ideation, but he did not send either of the documents and later deleted them." ECF No. 100-5 at 8. Again, Dr. Hart is simply parroting the defendant's words. Based on a review of Dr. Hart's notes, Dr. Hart does not appear to have asked the defendant specifically about his manifesto at all. Dr. Hart did inquire about the Covington letter at the very end of the second interview in December 2019, recording the defendant's response that the "last letter was written in preparation for leaving the CG [Coast Guard]; after separation from wife." **Exhibit 43** at 9. But here again, the defendant provided misleading information to Dr. Hart, who appears never to have engaged the defendant again on the subject. By the time he wrote the letter at the end of September 2017, the defendant was not even physically separated from his wife; she had moved to Maryland to live with the defendant earlier in 2017, before the defendant wrote the manifesto or the Covington letter.

Dr. Hart's confusion over the facts extends to the written material he allegedly reviewed. For example, in order to conclude that the defendant "did not make preparations for an attack," Dr. Hart discounts the firearms, body armor, and tactical gear found in the defendant's residence

by asserting that "**[m]ost of this materiel** was consistent with his hunting, military, and prepper interests, however, and **was acquired long before he started to experience exacerbation of his violence ideation starting in about 2012**." ECF No. 100-6 at 9 (emphasis added). Literally nothing supports the bolded contention. It simply is not true. In its opening sentencing memorandum, the Government set forth a timeline of the defendant's purchases. Virtually all of the material, other than a few firearms, was purchased beginning in May 2016. *See* **Exhibit 16**. The $1,300 scope was purchased in March 2017. *Id.* The body armor and suppressor components were purchased in July 2017. *Id.* The other high-end scopes and the Bergara sniper rifle were purchased in December 2017. *See* **Exhibit 16**, **Exhibit 18**.

<u>Third</u>, Dr. Hart's grandiose claim is contradicted by other facets of his report. For example, Dr. Hart recommends that "Mr. Hasson's mood, substance use, and violent ideation should be monitored." ECF No. 100-6 at 13. Why? If "there is no plausible scenario" of the defendant committing future violence, why should he be monitored?[9] Dr. Hart seems to imply that the defendant would be a future danger if "he is depressed, using opiates, or increasingly preoccupied with themes of social disruption." ECF No. 100-6 at 13-14. Under the defendant's theory, he was all three of these things prior to being arrested, which necessarily means he was a future danger at the time of his arrest. Following Dr. Hart's logic to its natural conclusion, if the defendant relapses, he would be a danger to others. And as discussed below, there is a significant chance the defendant relapses into opioid use. This alone creates a "plausible scenario" that the defendant is a danger to others.

---

[9] Dr. Hart hedges his assessment later in the report, when he says that one of the tests he relied on in coming to his conclusion (HCR-20 v3) "cannot be used to make quantitative estimates (i.e., probabilistic predictions) of risk for general violence." This statement conflicts with the concrete certainty of his "no plausible scenario" prediction.

<u>Fourth</u>, even though *Daubert* likely does not apply to this sentencing hearing, the Court nonetheless should take guidance from the *Daubert* factors. Dr. Hart's assessment is a non-replicable judgment call by one psychologist who has never testified in a federal case in the United States.[10] Dr. Hart's assessment is no more than the defendant's own argument masquerading as an expert opinion. The Court should not permit Dr. Hart to supplant its own judgment.

### B.      Dr. Dunn

The defendant submitted a report by Dr. Dunn to support an argument that he suffered from Opioid Use Disorder ("OUD"). Dr. Dunn's report is so generic as to be unhelpful. Though the defendant seeks to ascribe much more import to Dr. Dunn's report, the entire report boils down to one lay conclusion: The defendant was addicted to tramadol. But that issue is not in dispute; indeed, the defendant already pleaded guilty to that fact, which was an element of the § 922(g)(3) crime of conviction. Thus, the Court should give Dr. Dunn's report little weight.

Dr. Dunn met with the defendant for 90 minutes on December 4, 2019. *See* **Exhibit 48**. During that interview, Dr. Dunn asked the defendant questions for the DSM-5 criteria for diagnosis of Opioid Use Disorder. Though Dr. Dunn's report does not identify the criteria, the Government appends the checklist and the entire DSM-5 section as **Exhibit 49**. Given the diagnostic criteria for OUD, it is almost impossible for even the lowest-level addict not to be diagnosed with OUD.

---

[10] There are certain situations in which future-dangerousness experts tend to testify, including federal death penalty cases. Dr. Hart has not testified in one. His appearances in the United States in the last decade appear to be limited to a half-dozen hearings in Iowa state court, involving future dangerousness of juveniles (in criminal cases) or sexual predators (in civil commitment cases). Though the Government does not have complete information from those cases, it appears the judges and juries hearing from Dr. Hart have not credited his testimony. *See, e.g.*, *State of Iowa v. Rene Zarate*, District Court of Iowa, Buena Vista County, 2018 (court sentenced defendant, who was juvenile at time of murder, to life imprisonment with the possibility of parole, though defense had asked for only 35 years); *In re the Detention of James Travis Baker*, District Court of Iowa, Monona County, 2016 (jury adjudicating sexual predator to civil commitment).

According to the DSM-5, OUD is "a problematic pattern of opioid use leading to clinically significant impairment or distress, as manifested by **at least two** of the following, occurring within a 12-month period." **Exhibit 49**.  Each of the criteria essentially shows that a person is an addict: the person takes more drugs than intended, the person unsuccessfully tries to stop taking drugs, the person has a strong desire to use drugs, the person spends a lot of time trying to get drugs, the person's work or family performance is affected by the use of drugs, the person builds up a tolerance to drugs over time, etc.  So a person who has "a strong desire or urge to use opioids" and "a persistent desire or unsuccessful efforts to cut down or control opioid use" automatically has OUD.  Again, this is the lay definition of addiction, regardless of any DSM-5 definition.

According to Dr. Dunn:

> I then evaluated each of the DSM-5 criteria with the defendant as they pertained to the 12 months leading up to his incarceration.  Each criterion can only be endorsed as Yes or No, and the defendant endorsed every criterion as "Yes."  His endorsement was consistent with his description of his use during that period, increasing my confidence in the authenticity of his endorsements. [ECF No. 100-5 at 4.[11]]

So, the defendant self-reported affirmative responses to every question asked.  Though the monosyllabic responses may have been sufficient for Dr. Dunn, they should not be entitled to much, if any, weight by this Court.  For example, there is no explanation for what "important social, occupational, or recreational activities" the defendant gave up due to opioid use, or what "major role obligations" the defendant failed to fulfill at "work, school, or home."  As described

---

[11] The defendant neither obtained nor produced Dr. Dunn's notes from her 90-minute session with the defendant, so the Government is unable to say if her printed record is as divergent as was Dr. Hart's typed description vice his handwritten notes, as described above.

throughout this brief, the defendant has reported misleading or false information to a variety of people, including his family, the Probation Officer, and Dr. Hart.[12]

    In addition to the defendant's faulty self-reporting, Dr. Dunn's conclusions rest on other information that does not stand up to scrutiny.  For example, Dr. Dunn supports her view that the defendant had OUD by relying on "[t]he fact that his family reported he always looked like he was sleeping during his period of active use," which "is consistent with the extreme somnolence that would be expected in someone who consumed high doses of opioids/tramadol."  ECF No. 100-5 at 4.  The Government is unaware of the provenance of this alleged "fact."  Dr. Dunn did not footnote or source this alleged fact, and the defendant neither obtained nor produced Dr. Dunn's notes to the Government.  Moreover, this "fact" is wholly inconsistent with his Coast Guard commendations the defendant glowingly references throughout the remainder of his sentencing memorandum.  To be clear, the defendant was in a "period of active use" virtually every single day while at work at Coast Guard Headquarters.  While there, he received excellent reviews, and never once was reprimanded for being asleep at work.  The defendant's entire argument attempts to portray him as an excellent soldier and a debilitated drug addict.  *See* ECF No. 100 at 11 ("Despite his drug use and other stressors, Chris also continued to excel at work.").  But he cannot have it both ways.

---

[12] Even if the defendant told the truth to Dr. Dunn, it would be of no moment.  Dr. Dunn reports common characteristics of OUD, including "continued use of tramadol despite the increased potential for consequences, his efforts to repeatedly procure tramadol via the internet and ensure he always had a viable supply available, and his inability to fully taper himself off of tramadol."  These are common symptoms of addiction of any kind, so it is unremarkable that the defendant—whose addiction is an element of his § 922(g)(3) conviction—suffered from these symptoms.  Moreover, while the defendant's addiction was serious, the Government notes that the defendant never fell to the level of many addicts, trolling the streets for a quick fix.  Rather, that was the fate of Individual A, to whom the defendant distributed narcotics in 2017, as outlined in the Government's original sentencing memorandum.  *See* **Exhibit 41**.  Nor did the defendant resort to committing crimes associated with needing to obtain drugs, like robbery or theft.

Based on Dr. Dunn's assessment, the defendant freelances in his memo that his OUD "impaired his clear thinking, judgment, and decision-making and caused him to behave in a way that was inconsistent with his true character." ECF No. 100 at 29. Yet contrary to the defendant's fanciful writing, in reality the defendant had none of these problems, at least ones attributable to tramadol. His Coast Guard performance evaluations, discussed extensively in the defendant's opening sentencing memorandum, refute this exculpatory self-reporting and the argument based on it.

Dr. Dunn also concluded, without foundation, that a "high probability" existed that the defendant suffered from serotonin syndrome, which is "characterized by mood disturbance that can include agitation and delirium." ECF No. 100 at 16. Dr. Dunn met with the defendant in December 2019, almost ten months after his last use of tramadol. She has no historical information on the defendant other than what the defendant self-reported, which—as discussed above and elsewhere—simply cannot be trusted. In any event, the Court should not read into Dr. Dunn's assessment what the defendant wants. At most, Dr. Dunn stated that certain symptoms of people with OUD might include a barely-defined "mood disturbance" and "there is a high probability that he was experiencing **some** serotonergically-mediated symptoms; this observation is premised upon his **self-reported** mood disruption and his aberrant and uncharacteristic behavior." ECF No. 100-5 at 5 (emphasis added). Dr. Dunn made no findings about any specific symptoms the defendant actually suffered, instead concluding generally that he probably experienced *some* symptoms, which elsewhere are defined in the report as ranging from "diarrhea, tremor, insomnia, and tachycardia" to "agitation and delirium" to "a life-threatening emergency that warrants immediate medical treatment." ECF No. 100-5 at 5.

Dr. Dunn also gave no medical opinion that OUD caused the defendant to stockpile weapons and target people.  She identified no psychosis or other symptoms that would approach such an opinion.  Indeed, given what the defendant claims is the prevalence of OUD, it is hard to fathom the defendant could even make such an argument.  According to the defendant, OUD "is a chronic illness that afflicted over two million Americans as of 2016."  ECF No. 100 at 14.  Only one of those afflicted Americans stands before the Court for sentencing in this case.

Finally, Dr. Dunn gives the underwhelming assessment that "I saw no evidence that the defendant would not have a good treatment prognosis if he underwent one" of a number of treatments, including "a combination of medications and behavioral counseling."  ECF No. 100-5 at 5.  While seemingly optimistic, the almost impenetrable passivity of this statement is explained by the fact that OUD is a chronic relapsing disease.  According to the DSM-5 (as reprinted by the American Psychiatric Association):

> Once opioid use disorder develops, it usually continues over a period of many years, even though brief periods of abstinence are frequent.  In treated populations, relapse following abstinence is common.  Even though relapses do occur, and while some long-term mortality rates may be as high as 2% per year, about 20%-30% of individuals with opioid use disorder achieve long-term abstinence.  [**Exhibit 49** at 4.]

Thus, if Dr. Dunn is correct that the defendant suffered from OUD, he has a 70 to 80% chance of relapse.  That statistic should give the Court no comfort, especially since the defendant now blames his toxic conduct on OUD.

## V.        The Defendant's Comparator Cases Are Inapposite.

The defendant asks this Court to consider two other cases in order to avoid unwarranted disparities under 18 U.S.C. § 3553(a)(6).  ECF No. 100 at 37.  Those two cases, described below, are inapposite.

In *United States v. Baynes*, No. 19-232-LO (E.D. Va.), Baynes came to the attention of law enforcement when agents searched someone else's phone and discovered drug-related discussions with Baynes; further research confirmed that Baynes owned firearms. *Baynes,* No. 19-232-LO, ECF No. 2.  The defendant was not detained, *id.*, ECF No. 15, and later pleaded guilty to an information charging him with violating 18 U.S.C. § 922(g)(3), *id.*, ECF No. 24.  The statement of facts appended to the plea agreement confirms that Baynes was a user, not a dealer, of marijuana. *Id.*, ECF No. 27.  At sentencing, and as agreed in the plea agreement, Baynes received a substantial reduction (to offense level 6) for the firearms being possessed for lawful sporting purposes, reflecting no indication of planned use, despite the recovery of white supremacist material from Baynes's residence.  *Id.*, ECF No. 26.  The defendant was sentenced to two years of probation. *Id.*, ECF No. 43.

In *United States v. Clark*, No. 18-338-TJK (D.D.C.), Clark had been "friends" on the social networking site Gab with the shooter of the Pittsburgh synagogue, had gone to the Charlottesville neo-Nazi rally, and his brother (who also was a Gab "friend" of Bowers) had just committed suicide.  *Id.*, ECF No. 1-1.  Clark was charged under 18 U.S.C. § 922(g)(3) because he smoked marijuana while possessing firearms.  He was detained and indicted, after which he entered a guilty plea.  *Id.*, ECF Nos. 6, 7, 16, 17.  There was no indication Clark intended to use his firearms for any purpose; indeed, Clark's sentencing memo argued that "[w]ith regard to the 'nature' of this offense, there is no evidence Mr. Clark possessed the firearm for any purpose other than self-protection."  *Id.*, ECF No. 23 at 6.  The base offense level was 12, and the Government did not seek a terrorism enhancement under U.S.S.G. § 3A1.4.  The Government, the defense, and Probation recommend a time-served (10-months) term of imprisonment, which the Court imposed. *Id.*, ECF No. 20, 23, 24.

- 17 -

The defendant's selected comparators do not involve any of the conduct the Government outlined throughout this case, including in its extensive opening sentencing memorandum. Thus, those cases are not valuable in assessing disparities.

## VI.        The Court Must Consider General Deterrence.

Under 18 U.S.C. § 3553(a)(2)(B), the Court must consider the need for the sentence to afford adequate deterrence to criminal conduct. The defendant contends that other would-be criminals will be deterred by a time-served sentence because "[m]ost individuals who consider making their own silencers at home, or unlawfully purchasing and using prescription drugs online, would be significantly deterred if they were made aware that they might be federally prosecuted as Mr. Hasson was here." ECF No. 100 at 28. The defendant's argument continues the pattern throughout his memo of eliding the actual reasons the defendant possessed the firearms and silencers.

In an odd confluence of events, we have in the District of Maryland another prosecution that directly refutes the defendant's deterrence argument. On January 16, 2020, federal agents arrested Brian Mark Lemley, Jr., Patrik Jordan Mathews, and William Garfield Bilbrough IV, on various weapons and alien-related charges. *See* 20-mj-192-CBD, 20-mj-193-CBD, and 20-mj-194-CBD. Each of these defendants was a member of a white supremacist organization called The Base. During early November 2019, in The Base's encrypted chatrooms, The Base's leader and other members—including Lemley—took note of law enforcement's crackdown on racially motivated violent extremists, ***including the defendant***. In the text messages appended below, "Roman" is the founder of the Base, and "Cantgoback" is Lemley; "AWD" is the white supremacist organization Atomwaffen Division. The defendant is described as "the coast guard guy" in the final image.











Further, according to oral communications intercepted through a Title III order, Lemley visited various stores in the Delaware area the day before his arrest in order to purchase parts to assemble a homemade suppressor.  This also directly refutes the defendant's argument that his mere arrest and minimal incarceration would deter other criminals.

The Court should be aware that this case is a rare one in which there is no question that general deterrence is a strong consideration, because the eyes of many await this Court's sentence.

The law-abiders await.   The potential victims await.   And white supremacists intending to perpetrate violent acts await, to see exactly how much federal time they may be looking at in assessing whether and how to act on their violent beliefs.

### Conclusion

For the reasons set forth above and in the Government's sentencing memorandum, the United States respectfully requests that the Court impose a term of imprisonment of 25 years.


Respectfully submitted,

Robert K. Hur
United States Attorney


/s/
Thomas P. Windom
Assistant United States Attorney