```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MARYLAND
                      SOUTHERN DIVISION

- - - - - - - - - - - - - - - x
                               :
UNITED STATES OF AMERICA       :
                               :   Criminal No. 19-00096-GJH
     v.                        :
                               :
CHRISTOPHER PAUL HASSON,        :
                               :
          Defendant.           :
                               :
- - - - - - - - - - - - - - - x   May 7, 2019

                                  Greenbelt, Maryland


                    BAIL REVIEW HEARING


BEFORE:   THE MAGISTRATE JUDGE CHARLES B. DAY

APPEARANCES:                THOMAS PATRICK WINDOM, Esq.
                            Office of the United States Attorney
                            6406 Ivy Lane, Suite 800
                            Greenbelt, Maryland  20770
                              On Behalf of the Government

                            JENNIFER SYKES, Esq.
                            Office of the United States Attorney
                            6500 Cherrywood Lane
                            Greenbelt, Maryland  20770
                              On Behalf of the Government

                            ELIZABETH OYER, Esq.
                            Office of the Federal Public Defender
                            100 South Charles Street
                            Tower II, 9th Floor
                            Baltimore, MD  21201
                              On Behalf of the Defendant



Proceeding recorded by electronic sound recording, transcript
produced by transcription service.
```

*CompuScribe*
*301-577-5882*

```
Audio Operator:              Tahshia Singletary

Transcription Company:       CompuScribe
                             P.O. Box 789
                             Cheltenham, Maryland   20623-9998
                             (301) 577-5882
```

feb                                                                      3

I N D E X

                                                                      Page

Comments by Elizabeth Oyer, Esq.
On Behalf of the Defendant                                              4

Comments by Thomas Windom, Esq.
On Behalf of the Government                                             9

Rebuttal - Elizabeth Oyer, Esq.                                       12

Ruling - Judge Day                                                    14

Comments by Beverly McCabe
On Behalf of Pretrial Services                                        24

feb                                                                             4

 1                          P R O C E E D I N G S

 2          (Whereupon, at 1:58 p.m., the hearing began.)

 3               THE CLERK:  Calling the case the United States

 4     versus Christopher Paul Hasson, Criminal Action GJH-19-096.

 5     The matter now comes before the Court for a bail review

 6     hearing.  counsel, please identify yourselves for the record.

 7               MR. WINDOM:  Good afternoon, Your Honor.  Thomas

 8     Windom and Jennifer Sykes for the United States.

 9               THE COURT:  Good afternoon.  Welcome.

10               MS. SYKES:  Good afternoon, Your Honor.

11               MS. OYER:  Good afternoon.  Liz Oyer, for

12     Christopher Hasson, who is present to my left.

13               THE COURT:  Good afternoon and welcome.  Feel free

14     to be seated.

15               Okay.  I trust the parties have received the

16     proposal from the Defense.  I have reviewed that, and I will

17     give you further opportunity to expand upon anything you wish

18     to say.

19               MS. OYER:  Your Honor, I would like to note for the

20     Court that a lot of Mr. Hasson's family is present in court

21     today.  His parents have traveled here from Arizona to be

22     here, and they are among the third party custodians that I

23     have proposed to the Court.

24               In addition his father-in-law and his mother-in-law,

25     who are divorced and live separate in Virginia, have both

1    traveled here today.  His wife is present here today, and

2    Mr. Hasson's adult daughter is also present in court today to

3    show their support for him and also to participate in the

4    process of hopefully fashioning release conditions that will

5    satisfy the Court's concerns.

6            Your Honor, all of the family members that I have

7    mentioned, with the exception of his daughter, who is not in a

8    position to do so, are willing to serve as third party

9    custodians and are willing to accommodate Mr. Hasson at the

10   residences where they reside.

11           Mr. Hasson's parents are retired, and they live in

12   Arizona.  They are willing to post their home as a property

13   bond.  The home is valued at approximately $400,000 and has

14   only a loan of approximately $24,000 on that property.  So

15   there is a substantial amount of equity in that house, which

16   they have owned for 23 years.

17           And they are willing to offer that as a property

18   bond to show that they believe and are confident that their

19   son will comply with any release conditions that this Court

20   sets and that he will not let them down and not cost them the

21   home that they have owned for the last 23 years.

22           THE COURT:  Let me short circuit it and hopefully

23   give you some idea of what my views of your submission may be.

24   I am thinking of all equity and all homes that are available.

25   That is Arizona, that is Virginia, that is the relatives who

 1  have offered to put their livelihood on the line for his

 2  temporary release until the Court says otherwise.

 3          I am thinking of third party custodians who are

 4  going to be with him at all times.  That is, it can be a

 5  combination of more than one.  But I have got to know where he

 6  lays his head every night.  I have got to be confident that in

 7  addition to the electronic surveillance that the Court will be

 8  imposing there is going to be a living, breathing responsible

 9  person there.

10          We have already discussed Arizona.  That is really

11  not an option.  I am considering the Virginia location.  And

12  to the extent that you have more than one third party

13  custodian, if they want to tag team in and out at different

14  times so that there is always someone there and always someone

15  with him wherever he decides he needs to go in compliance with

16  any other conditions of release, then we have got a starting

17  point.

18          MS. OYER:  Well, Your Honor, in terms of where he

19  would go, I will address that first.  If Arizona is not an

20  option, then I think that the next best option is Virginia,

21  and there are two residences in Virginia where he could go.

22          And I have spoken with Mrs. Coleman and Mr. Coleman,

23  who are Mr. Hasson's in-laws in Virginia, and they have agreed

24  that they could share the responsibilities of third party

25  custodian and that Mr. Hasson could be residing in either of

1    their residences.  And they have both agreed that they could

2    fill in for one another during any time that one needed to be

3    absent from the residence.

4          So currently, Mrs. Coleman works part-time three

5    days a week.  That is outlined in the pretrial services

6    report.  She has offered generously to take a leave of absence

7    from her work.  So she could, at least for the immediate

8    future, be at home around the clock supervising Mr. Hasson,

9    and she could call upon her ex-husband to come over and sit

10   with him if, for example, she needed to go out to the grocery

11   store or something like that.

12         And if she goes back to work at some point, again,

13   she could work out an arrangement with Mr. Coleman.  He is

14   willing to participate where he would sit with Mr. Hasson

15   during the time she needed to be out of the house.  She works

16   as a hair stylist, so her schedule is very flexible, and she

17   essentially is able to make her own hours.  So this is not a

18   situation where she would lose her a job as a result of this

19   or anything like that.

20         So she is in a position to have significant

21   flexibility, and Mr. Coleman is willing to assist her in being

22   able to do the supervision.  So they would be willing to

23   jointly sign as third party custodians.

24         Alternately, Mr. Coleman owns a home in Virginia,

25   and Mr. Hasson has lived with him there before.  They were

feb                                                                    8

1    compatible roommates and Mr. Coleman found him to be helpful

2    around the house.  So he would be willing to take him back

3    into his home.

4           Mr. Coleman has a garage on his property just

5    outside his house where he works repairing cars.  he is

6    retired, but he does that both as a hobby and to make some

7    occasional additional income to supplement his retirement.  He

8    would be on the premises, which I believe would be sufficient

9    to monitor Mr. Hasson.

10          He would not be necessarily inside the house with

11   him but, of course, Mr. Hasson would be outfitted with

12   monitoring equipment that would require that he remain in the

13   house.  And if, for any reason, Mr. Coleman needed to leave

14   the property, Mrs. Coleman has offered that she would be

15   willing to come over to the house and sit with him.

16          In addition, Mr. Hasson's wife, Marie Hasson, is

17   willing to provide additional assistance at either residence,

18   to the extent that that is necessary.  She could stay either

19   at her father's or at her mother's and could assist as needed.

20          So we certainly, among the three of them, and

21   probably just between the Colemans, could fashion an

22   arrangement where someone is present with Mr. Hasson at all

23   times.

24          In addition to that, Your Honor, I believe that

25   there are two properties that have equity in them.  One is the

feb                                                                                                     9

1    property that is jointly owned by Mr. Hasson and his wife.

2    That could obviously be posted to the Court as a property

3    bond.

4           But the property with more substantial equity is the

5    property owned by Mr. Hasson's parents in Arizona, and they

6    are willing to offer that as a property bond to the Court,

7    even if Mr. Hasson is not permitted to live with them Arizona

8    and even if he is living in Virginia with his in-laws.  They

9    would be comfortable with that.  So that would be my proposal,

10   Your Honor.

11          THE COURT:  Okay.  Thank you.  I will hear from the

12   Government.

13          MR. WINDOM:  Thank you, Your Honor.  I guess as a

14   starting point, as Your Honor knows, we reiterate our position

15   that there are no conditions that can reasonably assure the

16   safety of the community and that Mr. Hasson should be detained

17   and be in the custody of the United States Marshals.  Those

18   are the only folks who will be able to keep eyes on him at all

19   times.

20          None of the various combinations of custodians that

21   have been offered up are able to do what the Court has

22   suggested would be required in order to release Mr. Hasson.

23   We have put forth in the sealed filing information which, if

24   Your Honor has questions, I think it is more fair for

25   everybody to approach on that.

1          But just generally speaking, each of those potential

2     custodians has substantial issues which make them not viable

3     options.  Moreover, this recent alternative that has been

4     proposed just now about a rotating band of custodians in a

5     residence and a location, and the Government has already set

6     forth its views as to the problems with that general locality;

7     this rotating band of custodians would present substantial

8     logistical challenges.  I don't see how that could possibly

9     work.

10          If the father-in-law wants to go to the grocery

11    store or needs to go to the auto parts store or needs to go to

12    the doctor, he is going to call his ex-wife in order to

13    arrange for her to come over and watch the Defendant like a

14    haw in a home where, as pretrial has noted, there are a number

15    of firearms.  And there would have to be that logistical

16    difficulty to deal with as well in order to remove those from

17    the home and insure that they are kept from the home.

18          And one part of this that is particularly troubling

19    to me is the property bond.  While I note that the Defendant

20    himself and the Defendant's parents have offered up their

21    properties as bond, the third party custodian should have skin

22    in the game.  And the third party custodian, the

23    father-in-law who has a property in which he has lived for

24    apparently 22 years, has not offered up his home as a third

25    party custodian for a property bond.

1           Now I see that the mother-in-law lives in an

2    apartment, a rental apartment, and so I anticipate that there

3    is no equity possibilities.  Not just with that, but with any

4    other property available.  But it is very concerning that the

5    person who is -- and I am not sure if the father-in-law is

6    here to be able to speak.

7           But the person who the Court would entrust primarily

8    to watch the Defendant at all times would not have any

9    property to put up or would not be willing to put up the

10   property.  At least on the current record.

11          And then finally, we touched on this some, and it

12   may be useful to hear from Pretrial if there is additional

13   information on this.  But obviously there are logistical

14   difficulties in going to Arizona, and we know that that is a

15   non-starter.

16          There are also very difficult logistical challenges

17   in monitoring the Defendant in the locations in Virginia that

18   have been offered.

19          They are quite distant from this courthouse, they

20   are quite distant from supervision of Pretrial Services and

21   there is no way to assure that the Defendant isn't going to

22   abscond, isn't going to run, isn't going to remove himself

23   from the view of his third party custodian, whether electronic

24   monitoring or the GPS or whatever, and go do all the things

25   that the Government has written extensively that he has wanted

1    to do.

2            So for those reasons, Your Honor, we believe that

3    detention remains appropriate, and to the extent that Your

4    Honor considers the Defendant releasable, none of the proposed

5    packages that have been put forth, either on paper or in court

6    today, would guarantee the safety of the community within the

7    mean of 3142.

8            THE COURT:  Okay.  Thank you.  Do you wish to be

9    heard further?

10           MS. OYER:  Yes, Your Honor.  I just wanted to

11   address briefly the points that Mr. Windom raised.  In terms

12   of the logistics of a shared third party custodian

13   arrangement, Mr. Coleman and Mrs. Coleman have a very cordial,

14   pleasant, friendly relationship and are willing to collaborate

15   with one another on this.

16           And Mr. Windom saying it would be an imposition,

17   that is their decision to make and they are willing to do it.

18   And they are both present in court today to address Your Honor

19   directly, if you wish to hear from them as to their

20   willingness to make those arrangements, because everybody in

21   the family wants to see Mr. Hasson released and wants to see

22   him at home with family, and they are willing to make their

23   decisions in a way that will facilitate that.  And that is why

24   they have all traveled to be present today.

25           Your Honor, in terms of the firearms in

1    Mr. Coleman's residence, he has spoken with another individual

2    who can take possession of the firearms immediately if

3    Mr. Hasson is released to his residence.  They would all be

4    removed from the residence and, of course, Pretrial Services

5    would be granted access to confirm that they have been removed

6    from the residence.

7            Additionally, Mr. Windom has suggested that there is

8    no way to ensure that Lieutenant Hasson does not flee or

9    violate release conditions.  Well, the standard in the Bail

10   Reform Act is conditions that will reasonably assure his

11   appearance in court, and in every single case there is no way

12   to be 100 percent confident that nothing will go wrong.

13           But the standard is not 100 percent confidence.  It

14   is reasonably assure that the defendant appears in court as

15   required and is not a danger to the community, and I believe

16   that the conditions that we have proposed will reasonably

17   assure both of those things.

18           And regarding the property bond, Your Honor, I

19   haven't spoken with Mr. Coleman about the equity in his

20   property and whether he would be willing to add that to the

21   pot because we have a lot of equity on the table already as a

22   result of his parents offering their home and as a result of

23   the Hasson home on top of that.  But if that is something that

24   Your Honor would like to consider, I certainly will speak with

25   him about that and would ask for the Court to allow me a

1    moment to do so.

2            THE COURT:   Okay.  Well, I agree with both sides

3    with a number of points.  If I was the Government, I would be

4    standing here arguing for detention just as I have heard, but

5    I don't think in this case it is appropriate as the case

6    currently sits.

7            I do think a combination of third party custodians

8    will suffice.  I do think Virginia will suffice.  I agree with

9    the Government that there needs to be that extra skin in the

10   game, although I must applaud the Defendant's extended family

11   on their willingness to vet his appearance for future court

12   dates.

13           These people are putting up a lot.  It is not often

14   you see father-in-laws or mother-in-laws, extended family from

15   other states, saying this is my livelihood and I am willing to

16   throw it all on the table for you.  Well, you have got that,

17   and I think the Defense is correct that it is their call to

18   decide if they are willing to make those sacrifices, and they

19   are sacrifices.

20           No disrespect meant to Mr. Hasson's wife, but I do

21   not think she would be an appropriate third party custodian

22   here.  So we are really down to two players, in terms of the

23   mother and father-in-law.  We are down to three locations,

24   three homes, and the equity, all equity, associated with those

25   three homes.  That is, the mother and father in Arizona, the

1  property to which Mr. Hasson has an interest and I assume his

2  wife has an interest, and the third party custodian nominee

3  father-in-law.  If he doesn't, and I can't blame him if he

4  doesn't, then we won't satisfy the conditions in play.

5        While the Government wants a guarantee, the Defense

6  is correct.  The law does not require a guarantee.  The law

7  talks about reasonable conditions to be put in place.

8        And, of course, all of the conditions that I impose

9  will have to be in place before he is eligible for release

10  and, of course, I will build in an opportunity for the

11  Government to seek your appellate rights on this issue as

12  well.

13        So my thinking is one location, not two.  Figure out

14  which of the two will work because I don't know if this will

15  be a two-month stay or a one-year stay.  It may be extended to

16  some degree.

17        I would also want to make clear to whoever the third

18  party custodians and those with a financial interest in this

19  matter may be that at no time should this be a sentence upon

20  them.

21        That is, if at any time any one of them feels

22  uncomfortable, maybe because of interpersonal dynamics, maybe

23  because they no longer have faith in Mr. Hasson, maybe because

24  they are just tired of having their property with a cloud over

25  the title, if at any time any of them no longer want to be

1  co-sponsors, all I need is a phone call and we can take it

2  from there.

3          I appreciate the difficulties that may be imposed

4  upon Pretrial Services, but I envision that this supervision

5  will be custodial through the State of Virginia anyway.  Or

6  rather, I should say the federal pretrial services offices in

7  Virginia anyway, and I will give them an opportunity to advise

8  me of any unusual circumstances before this record closes.

9          But I am inclined to require the third party

10  custodian on the grounds with the Defendant at all times.  I

11  appreciate there may be a separate garage, and it is really no

12  different whether it was a single-family home and someone is

13  upstairs and he is downstairs.  Yes, there is a risk of

14  flight, but hopefully, that risk will be helped a little bit

15  by the monitoring, the electronic monitoring that I will

16  impose.

17          He will be on home detention 24/7 with preapproved

18  necessary medical treatment.  That is, preapproved by his

19  pretrial services officer.  And the same with respect to

20  meetings with counsel.  I understand it is a multi-hour trip

21  to get from there to here.  One of those custodians will have

22  to carry that water.

23          The Defendant will have to be subject testing and/or

24  treatment as deemed appropriate by the supervising agent,

25  including mental health evaluation and treatment.  Of course,

1    if I get wind of any use of controlled substances, that is an

2    easy ticket to a different place.

3            There should be no access to firearms.  There should

4    be no firearms or weapons of any kind in the residence that he

5    is to abide.  I appreciate that kitchen knives can be found in

6    every home, but anything stronger than that and we will have a

7    discussion.

8            The Defendant also should have no access to internet

9    devices.  So I have got to get some assurance through pretrial

10   services about how that can be accomplished in the home where

11   he may stay.

12           And the question I suspect that may come up is if he

13   is in the home with the third party custodian and some need

14   has arisen for that person to leave and they can't handoff,

15   they can't tag team the way they want to, well, that is the

16   obligation.  That is the major responsibility that I am

17   imposing upon the third party custodians.

18           If there is no handoff, then they cannot leave.  And

19   if the Government presents me with any information to suggest

20   that they are being derelict in that duty, then they are

21   automatically disqualified, and it may very well call into

22   question anything else that is in play.

23           So in short, the necessary documentation must be on

24   file in this courthouse before he is to be released.  The

25   necessary electronic surveillance materials must be in place

feb                                                                          18

1    before he is released.  I will leave it to Pretrial Services

2    to have the face-to-face conversation with the proposed third

3    party custodians as to their understanding of their

4    responsibilities.

5              Before I go to Pretrial Services for any additional

6    concerns, I want to give the Government the first opportunity.

7              MR. WINDOM:  Thank you, Your Honor.  A few items.

8    You mentioned no access to internet devices.  I would like to

9    expand that to no cell phone access, period.

10             THE COURT:  Are there not dumb phones?  I mean, if

11   he got a dumb phone, it may be very helpful.  He could make a

12   call to a friend in need or maybe there is a circumstance in

13   which the third party custodian's health may be at risk.  I

14   don't know.

15             MR. WINDOM:  I believe a landline would be useful

16   for that.

17             THE COURT:  I am with you there.  Yes.

18             MR. WINDOM:  So that is why we request no cell

19   phones.

20             THE COURT:  I will say no cell phone that has

21   internet capabilities.  So I will take that modification.

22             MR. WINDOM:  We would also request that there be no

23   visitors to the home except for, of course, the other third

24   party custodian.

25             THE COURT:  And I pondered about that, and I guess I

1  am still pondering.  I do want to know if he is exposing

2  himself to an element that puts all of this at risk, but I

3  don't want to necessarily infringe upon his right of

4  association.  But I will hear you further.

5          MR. WINDOM:  Your Honor, has reviewed the sealed

6  filing that we --

7          THE COURT:  Yes.

8          MR. WINDOM:  That would be one of the concerns that

9  we have with respect to other folks coming to the home, the

10 locality in which the residence is located.  I think I will

11 leave it at what is in the sealed filing.

12         THE COURT:  Okay.  Before we leave that point,

13 anything further from the Defense on that point?

14         MS. OYER:  Your Honor, I don't see a legitimate

15 reason to prevent Mr. Hasson from associating with anyone that

16 he currently regularly associates with, which is primarily his

17 family.  In addition, I don't see a basis to infringe upon the

18 right of the third party custodians to have their own extended

19 family members or friends in their homes without some specific

20 basis.

21         Now Mr. Windom has referenced a certain individual

22 with whom Mr. Hasson allegedly associated 25 years ago.  I

23 have no objection to a restriction on him associating with

24 anyone involved with that particular individual.  But in terms

25 of family and friends and people who the Government has no

feb                                                                          20

1   basis to believe are a threat or a harm in any way, I simply

2   don't see any basis for making that a condition of release,

3   and I think it would be really unprecedented to have that type

4   of requirement.

5          And I think that depriving Mr. Hasson of family and

6   social interaction would defeat one of the primary benefits of

7   getting him back into the community in some capacity, which is

8   the reason that the Bail Reform Act favors release over

9   detention prior to trial.

10          THE COURT:  Let's try it like this.  More to be said

11   from you?

12          MR. WINDOM:  Yes.  Just a little bit, Your Honor.

13   Obviously there would be the temptation with the Defendant's

14   wife living in proximity for her to come over to the home.  I

15   would note that in a typical case a defendant would not be

16   permitted contact with any witnesses.

17          In this case, as charged currently, which is, as I

18   said before, a search warrant case; guns, drugs, firearms,

19   silencers in a home in which the Defendant and his wife lived.

20   She is a witness to all of the charged conduct with

21   Mr. Hasson.  So that is a further basis.

22          In terms of infringing on association of rights, we

23   are in the position right now for the Defendant where there

24   need to be appropriate release conditions, and so it is

25   perfectly acceptable in order to fashion those conditions.

1              And then with respect to the third party custodians'

2      associational rights, if they want to undertake this

3      obligation, they must understand the duties and obligations.

4              THE COURT:  First I will impose no limitations on

5      the third party custodians, in terms of who they will have in

6      their home as their family, friends and guests.  However, I am

7      going to require a disclosure to Pretrial Services of those

8      persons who visit the home.

9              And I am going to give the Government an opportunity

10     to fashion, shall we say, a no-fly list.  That is, witnesses

11     that he should not have contact with.  There are no

12     co-defendants that I am aware of here.  But if there are such,

13     then you convey that in your written communication to the

14     Defense.

15             And if there are certain, shall we say, persons of a

16     certain profile that you are concerned about, you can spell

17     that out in some way in your communication with the Defense.

18     If there is a problem, you can bring it to my attention and I

19     will address that issue.

20             That is, the Government may say, "I don't want him

21     associating with any NBA players."  And you'll say, "What is

22     wrong with the NBA?"  And then I will have a hearing about the

23     NBA.  That is fine.

24             I am not going to restrict his conduct with his

25     wife; his interactions with his wife.  I appreciate the

1   concern about witnesses to this activity.  But if there is

2   some conversation or something you are concerned about that

3   you think I can govern, I will hear you out, in terms of the

4   relationship between Mr. Hasson and his wife.

5          I fully expect her to visit him on multiple

6   occasions.  I suspect she may be his most frequent friend to

7   come and see him.  But beyond that, I will hear you.

8          MR. WINDOM:  All right.  A few other kind of more

9   standard conditions.  No passport, no new bank lines, credit

10  lines, things of that nature.

11         THE COURT:  Absolutely.

12         MR. WINDOM:  I wanted to clarify the property bond.

13  Your Honor's ruling is that the Defendant's mother and father

14  must put up their home in its entirety, the Defendant must put

15  up his home in its entirety and the Defendant's father-in-law

16  must put up his home in its entirety?

17         THE COURT:  Clearly.

18         MR. WINDOM:  And then, I suspect we will hear from

19  Pretrial on this, but we would request GPS on the Defendant,

20  rather than electronic monitoring.  I believe that is the

21  preference of Pretrial.

22         THE COURT:  If that is your preference, I will go

23  with your preference.  That is fine.  As I have said before,

24  it makes me very nervous, but I don't think it justifies

25  detention.  But should he put his left foot out the front

feb                                                                      23

1    door, contrary to these orders, that is going to turn my

2    nervousness into action.

3            MR. WINDOM:  One thing that the Court sometimes does

4    in cases is bring the potential third party custodians up and

5    inquire of them and, you know, inform them directly so that

6    there are no misunderstandings as to exactly their

7    obligations.  And also, inform them directly that the

8    Government can make motions, if there are any violations of

9    the release conditions, that would end up in the third party

10   custodians no longer owning their homes.

11           So I wonder if Your Honor would be willing to do

12   that here, especially since we have no assurance in any way at

13   this point that the father-in-law would be willing to put up

14   his property.

15           THE COURT:  Well, if the father-in-law decides not

16   to put up his property, then we have a non-starter.  He never

17   gets out.  Two, I will make the statements generally here that

18   these third party custodians are expected to be the eyes and

19   ears of the Court.

20           If something is coming into their home or that home

21   that they think is inappropriate or there are communications

22   that they think are inappropriate or in any way inconsistent

23   with the orders that we are putting in place here now, all

24   they have to do is make a phone call.  And they are obligated

25   to make that phone call to Pretrial Services, and I will take

feb                                                                    24

1   it up.

2          They do not have to confront the accused.  They

3   don't have to restrain the accused.  But in order to protect

4   their property and comply with the orders of the Court, they

5   have got to act in good faith.

6          I won't do that on an individual basis as is my

7   custom, but I trust that they have ears to hear.  But I will

8   hear you further.

9          MR. WINDOM:  No, sir.  I think the last thing would

10  just be on the property bond, in terms of that actually being

11  recorded.  The Defendant's parents would have to return to

12  Arizona and then, I guess, obtain the deeds and, I guess, pass

13  it back to this Court to show that it was registered in some

14  way and return receipt.

15         THE COURT:  Yes, sir.  Yes.

16         MR. WINDOM:  And that would be the same for the

17  Virginia location and the other location?

18         THE COURT:  Yes.

19         MR. WINDOM:  Thank you.  I don't believe that there

20  are any other conditions that we would request at this time.

21         THE COURT:  Thank you.  Let me hear from Pretrial

22  Services, if my officer is with me.

23         MS. McCABE:  Good afternoon, Your Honor.  Beverly

24  McCabe, from Pretrial Services.

25         THE COURT:  Welcome.  And thank you again for your

1   addendum.

2              MS. McCABE:  You are welcome, Your Honor.

3              Your Honor, Pretrial Services, as you know,

4   continues to recommend that the Defendant remain detained,

5   based on the factors outlined in our pretrial report and the

6   two addendums.

7              We would request in this instance, if Your Honor is

8   inclined to release the Defendant, that he remain detained

9   until we are able to verify the equity in the properties that

10  Your Honor outlined.

11             THE COURT:  Yes.

12             MS. McCABE:  And then additionally, as you noted,

13  confirm that they have been posted with the property

14  authorities.

15             Additionally, we would ask for time to do thorough

16  home inspections --

17             THE COURT:  Yes.

18             MS. McCABE:  -- of both of the residences in

19  Virginia and to also look into the issue of electronic

20  devices, access to those devices and then internet.

21             THE COURT:  Agreed.  And with respect to the

22  residences, understand that we are not going to play Ping-Pong

23  with the residences.  This is one or the other, and it is the

24  Defendant's election.

25             MS. McCABE:  I agree, Your Honor.  And we have

feb                                                                                            26

 1   reached out to our office in Virginia.

 2            With regard to the Defendant's father-in-law as a

 3   third party custodian, we are concerned, based on his medical

 4   issue that we outlined in our most addendum.  We have

 5   researched that and it gives us great pause.  We would not

 6   recommend the Defendant's father-in-law as a potential third

 7   party custodian.

 8            THE COURT:  Okay.

 9            MS. McCABE:  Additionally, with regard to location

10   monitoring, we would agree that the use of global positioning

11   equipment is absolutely necessary in this case.

12            THE COURT:  We will follow that lead then.

13            MS. McCABE:  Thank you, Your Honor.

14            THE COURT:  Thank you, ma'am.

15            Final comments from the Defense?

16            MS. OYER:  Your Honor, we have no objection to the

17   conditions as the Court has outlined.  I would ask, just in

18   terms of logistics, if it would be possible to complete the

19   paperwork that Mr. Hasson's parents and father-in-law would

20   need to complete regarding the properties today so that they

21   can do what they need to do while they are here and wouldn't

22   necessarily have to return to complete the paperwork at a

23   later date.

24            THE COURT:  I am sure we can accommodate that as

25   well.

1              Okay.  Back to the Government.  How much time do you

2    need?

3              MR. WINDOM:  Sir, we are going to ask you -- I

4    assume you are filling out the release paperwork today?

5              THE COURT:  Yes.

6              MR. WINDOM:  I guess we are kind of in an odd spot

7    because we don't know if it is even a viable release package,

8    considering the father-in-law.  But we would ask that you stay

9    the order and write in the release order that it is stayed

10   pending review; a Government motion for Judge Hazel to review

11   it under 18 USC 3145.

12             I will file that as soon as I get back to the

13   office, assuming that the Defendant's father-in-law will in

14   fact put up his property.

15             THE COURT:  Fair enough.

16             MR. WINDOM:  Thank you.

17             THE COURT:  Okay.  If there is nothing further,

18   thank you all.

19        (Whereupon, at 2:33 p.m., the hearing concluded.)

20

21

22

23

24

25

feb                                                                                                            28

# C E R T I F I C A T E

I hereby certify that the foregoing is a correct transcript from the duplicated electronic sound recording of the proceedings in the above-entitled matter.

*Fabiana E. Barham*   *8/16/2019*
Fabiana E. Barham            Date
Certified Transcriber, CompuScribe
Certification No.: CET**213