**United States District Court for
the District of Maryland**

United States

v.

Christopher Hasson

No. 8:19-cr-96-GJH

**Motion to Vacate 18 U.S.C. § 922(g)(3) Conviction
Under 28 U.S.C. § 2255**

In 2019, Christopher Hasson pled guilty to violating 18 U.S.C. § 922(g)(3), which prohibits possession of a firearm while being "an unlawful user of or addicted to any controlled substance." He now moves, pursuant to 28 U.S.C. § 2255, to vacate his conviction as violative of the Second Amendment. Under the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), if a statute proscribes conduct covered by the Second Amendment's "plain text," the statute is unconstitutional unless the government shows that it is "consistent with this Nation's historical tradition of firearm regulation." Here, Hasson's possession of a firearm is protected by the plain text of the Second Amendment, and the government will be unable to demonstrate a robust tradition of founding-era firearms regulations that are sufficiently similar to § 922(g)(3). Hasson's § 922(g)(3) conviction must therefore be vacated.

1

## I.    Procedural background

On February 27, 2019, a grand jury returned an indictment charging Hasson with one count of possessing an unregistered firearm silencer, under 26 U.S.C. § 5861(d); one count of possessing a firearm silencer that was not identified by serial number, under 26 U.S.C. § 5861(i); one count of possessing firearms while "being an unlawful user and addict of a controlled substance," under 18 U.S.C. § 922(g)(3); and one misdemeanor count of possessing a Schedule IV controlled substance (tramadol), under 21 U.S.C. § 844(a). ECF 16. The government subsequently obtained a superseding indictment that was identical in all respects relevant to this motion. ECF 71. Relevant here, the superseding indictment alleged Hasson possessed firearms while "knowing he was an unlawful user of and addicted to a controlled substance." ECF 71 at 3.

On October 3, 2019, Hasson pled guilty to all four counts charged against him. ECF 93. The district court sentenced Hasson to a total of 160 months' imprisonment—40 months on each silencer count and 12 months on the misdemeanor drug count, all to run concurrent to one another and consecutive to 120 months on the § 922(g)(3) count. ECF 125 at 3.

Hasson appealed to the Fourth Circuit, which affirmed his convictions and sentence. *United States v. Hasson*, 26 F.4th 610, 612 (4th Cir. 2022). The Fourth Circuit denied a petition for rehearing en banc. ECF 147. On July 14, 2022, Hasson timely filed a petition for a writ of certiorari in the Supreme Court. The Court denied Hasson's petition on October 11, 2022. *Hasson v. United States*, 143 S. Ct. 310, 2022 WL 6572217 (2022).

## II.    Legal background

Under 28 U.S.C. § 2255(a), a federal prisoner may move "to vacate, set aside or correct [his] sentence" on "the ground that the sentence was imposed in violation of the Constitution or

laws of the United States."[1] Hasson's § 2255 motion is grounded in the Second Amendment, which provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

In *District of Columbia v. Heller*, 554 U.S. 570, 592, 624 (2008), the Supreme Court held the Second Amendment codified a pre-existing individual right to possess and carry weapons for lawful purposes. The Court therefore struck down District of Columbia statutes that prohibited the possession of handguns in the home and required that any other guns in the home be kept inoperable. *Id.* at 628-34.

Following *Heller*, the Fourth Circuit adopted "a two-part approach to Second Amendment claims." *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). The first step asked "whether the challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee," as it was understood "at the time of ratification." *Id.* If it did not, the challenge failed. *Id.* But if the statute did "burden[] conduct that was within the scope of the Second Amendment as historically understood," the Court then "appl[ied] an appropriate form of means-end scrutiny." *Id.* Courts typically applied intermediate scrutiny, which asked whether the government had shown "a reasonable fit between the challenged statute and a substantial governmental objective." *United States v. Chapman*, 666 F.3d 220, 226 (4th Cir. 2012).

In *Bruen*, however, the Supreme Court rejected this "means-end scrutiny" approach to Second Amendment claims and directed courts to apply a "text-and-history standard" instead. 142

---

[1] A § 2255 motion must be filed within one year of "the latest of" four triggering events, including, relevant here, "the date on which the judgment of conviction becomes final." § 2255(f)(1). Hasson's conviction became final on October 11, 2022, when the Supreme Court denied his petition for certiorari. *See United States v. Linder*, 552 F.3d 391, 396 (4th Cir. 2009). His motion is therefore timely.

S. Ct. at 2125, 2138. This standard begins by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does, then "the Constitution presumptively protects that conduct." *Id.*

Answering this preliminary question in *Bruen* was straightforward. At issue there was a New York law providing that to obtain a permit to carry a concealed handgun in public, an applicant had to demonstrate "proper cause," i.e., "a special need for self-protection distinguishable from that of the general community." *Id.* at 2122-23. The Court "ha[d] little difficulty concluding" that "the Second Amendment protect[ed] [the petitioners'] proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 2134. As the Court explained, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* The Second Amendment therefore "presumptively guarantee[d]" a right to carry firearms in public, and New York's "proper cause" requirement, which infringed that right, could pass constitutional muster only if the state overcame the presumption. *Id.* at 2129-30, 2135.

To rebut the presumption of unconstitutionality, *Bruen* held, the government must demonstrate that a challenged regulation "is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* at 2126. This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132.

The Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *Id.* at 2136 (emphasis in original). For that reason, the relevant "historical tradition" for purposes of a federal gun regulation is that which existed in

1791, when the Second Amendment was ratified. *Id.* Although courts may consult evidence predating 1791, they should do so cautiously. "English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution," and courts should disregard those practices "unless evidence shows that medieval law survived to become our Founders' law." *Id.* Because "linguistic or legal conventions" may have "changed in the intervening years," courts should not "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Id.*

Similarly, courts "must . . . guard against giving postenactment history more weight than it can rightly bear." *Id.* Post-enactment practice can "guide [courts'] interpretation of an ambiguous constitutional provision," but only if that practice "has been open, widespread, and unchallenged since the early days of the Republic." *Id.* at 2137. The farther forward in time one goes from 1791, the less probative historical evidence becomes. Because "post-Civil War" evidence dates to "75 years after the ratification of the Second Amendment, [it does] not provide as much insight into its original meaning as earlier sources." *Id.* The Court in *Bruen* therefore refused even to consider "any of the 20th-century historical evidence brought to bear by respondents or their amici," since it was too temporally remote. *Id.* at 2154 n.28. Courts should credit such post-War evidence only if it provides "confirmation" of earlier practice. *Id.* at 2137. After all, "to the extent later history contradicts what the text says, the text controls." *Id.*

*Bruen* held that because New York could not point to a robust tradition of regulations similar to the proper-cause requirement, the state's statute violated the Second Amendment. *Id.* at 2138-56. In reaching its conclusion, the Court staked certain guideposts for lower courts to follow in Second Amendment litigation.

A.   **Statutes addressing longstanding societal problems are subject to more rigorous scrutiny than statutes addressing historically "unprecedented" problems.**

To begin, the Court explained that the standard for reviewing historical evidence differs depending on what kind of problem a statute is intended to remedy—specifically, whether that problem is old or new. In "some cases," where "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the inquiry "will be fairly straightforward." *Id.* at 2131. To show that such a statute is constitutional, the government must point to "distinctly similar historical regulation[s] addressing that problem." *Id.* The Court described this approach as "straightforward" and "relatively simple." *Id.* at 2131-32.

But in "other cases," the Court wrote, a "more nuanced approach" may be required. *Id.* at 2132. This latter inquiry is appropriate when a challenged statute "implicat[es] unprecedented societal concerns or dramatic technological changes," "appl[ies] to circumstances beyond those the Founders specifically anticipated," or is geared toward "unprecedented" problems that "were unimaginable at the founding." *Id.* Rather than asking whether the challenged law and historical precursors are "*distinctly* similar," courts ask only whether they are "*relevantly* similar." *Id.* (emphasis added). The Court declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but it did identify "at least two metrics," which it called the "how and why." *Id.* at 2132-33. According to the Court, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [i.e., the 'how'] and whether that burden is comparably justified [i.e., the 'why'] are central considerations" under the "relevantly similar" test. *Id.* at 2133.

This latter approach to *Bruen*'s historical inquiry—the "relevantly similar" standard—is less difficult for the government to satisfy. But courts may employ that approach only when the challenged statute is geared toward a societal problem that was "unimaginable at the founding." *Id.*

6

at 2132. It is not available when the challenged statute "addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131; *see, e.g.*, *Range v. Att'y Gen.*, 69 F.4th 96, 103 (3d Cir. 2023) (en banc) ("To be compatible with the Second Amendment, regulations targeting longstanding problems must be 'distinctly similar' to a historical analogue. But 'modern regulations that were unimaginable at the founding' need only be 'relevantly similar' to one."); *United States v. Marique*, 2023 WL 5338069, at *2 (D. Md. Aug. 18, 2023) (noting that "*Bruen* instructs courts to use different tests depending on the kind of problem a regulation addresses"—either a regulation that "'addresses a general societal problem that has persisted since the 18th century'" or one that "is aimed at 'unprecedented societal concerns or dramatic technological changes'"); *United States v. Gil*, 2023 WL 4356067, at *5 (W.D. Tex. July 5, 2023) ("*Bruen* charges courts with applying two distinct analyses depending on whether the regulation addresses a problem that existed at the nation's founding or whether it addresses an 'unprecedented societal concern.'").

*Bruen* provided examples of when each framework would apply. First, *Heller* and *Bruen* "exemplifie[d]" the "straightforward historical inquiry" for statutes aimed at longstanding problems. *Bruen*, 142 S. Ct. at 2131 The laws in those cases "concern[ed] the same alleged societal problem," namely, "handgun violence," "primarily in" "densely populated" "urban areas." *Id.* Because that problem existed around the time of the Second Amendment's ratification, "the Founders themselves could have adopted" laws like the District of Columbia's or New York's in an effort to "confront that problem." *Id.* The fact that they didn't established the laws' unconstitutionality. *Id.* Second, the Court wrote that a law prohibiting the carrying of firearms in "*new*" locations—i.e., those that did not exist in 1791—should be analyzed under the "more nuanced" rubric for statutes addressing "unprecedented" societal problems. *Id.* at 2133 (emphasis in original). The danger that guns might pose in those novel locations necessarily did not

7

"preoccup[y] the Founders in 1791." *Id.* at 2132. As a result, courts could use the "relevantly similar" test to analogize a modern law to historical regulations banning firearms in "sensitive places" that did exist at the founding. *See id.* at 2133.

At the threshold, therefore, courts faced with a *Bruen* challenge must identify the problem at which a statute is aimed, and then determine whether that problem existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes. *Id.* at 2132. The answer to this question dictates whether courts apply the "distinctly similar" test or the "relevantly similar" test. *See United States v. Daniels*, 77 F.4th 337, 343 (5th Cir. 2023) ("Before we decide whether § 922(g)(3) is consistent with our tradition of gun regulation, we must first ask a methodological question: What kind of similarity are we looking for? 'Distinct' similarity or a less precise 'relevant' similarity? That depends on whether § 922(g)(3) 'addresses a general societal problem that has persisted since the 18th century' or an 'unprecedented societal concern' that the Founding generation did not experience.").

### B.    The government must identify a "well-established and representative" tradition of comparable regulations.

Whether based on "distinctly similar" precursors or merely "relevantly similar" historical analogues, the "comparable tradition of regulation" must be robust. To carry its burden, the government must show that the historical tradition on which it relies is "well-established and representative." *Bruen*, 142 S. Ct. at 2133. A handful of "outlier[]" statutes or cases from a few "outlier jurisdictions" do not make out a historical tradition. *Id.* at 2153, 2156. The Court expressed "doubt," for instance, that statutes from only three of the original thirteen colonies would establish a relevant tradition. *Id.* at 2142. And in evaluating 19th-century "surety laws," which New York argued were precursors to its proper-cause requirement, the Court discounted two of those ten laws—which were most similar to New York's—as unrepresentative. *See id.* at 2148 n.24; *see also*

*Atkinson v. Garland*, 70 F.4th 1018, 1029 (7th Cir. 2023) (Wood, J., dissenting) ("[T]he historical analogues must be abundant, though they need not appear in every jurisdiction. Being able to point to three colonial regulations is not enough to demonstrate a regulatory 'tradition,' even if the three colonies in question represented nearly a quarter of the original 13 and accounted for almost half the country's population."); *Spencer v. Nigrelli*, 2022 WL 17985966, at *12 n.14 (W.D.N.Y. Dec. 29, 2022) ("[Amicus argues] that a small number of state laws is sufficient so long as there is not overwhelming evidence of an enduring tradition to the contrary. This turns the test and its burden on their heads. The <u>*Bruen*</u> Court itself rejected several outliers and was looking for a 'broad tradition' of states 'meaningfully restricting public carry.'").

## C.    The government bears the burden of demonstrating that a statute is consistent with the Nation's historical tradition.

Finally, *Bruen* emphasized that "the burden falls on [the government] to show that [a statute] is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2135. Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. In consequence, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." *Id.* at 2150.

And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11. Put differently, the tie goes to the Second Amendment claimant. *See also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend [a statute]").

### III.    Analysis

#### A.    The Court should ask whether proscribing gun possession by an "unlawful user" of drugs violates the Second Amendment.

Count three of the superseding indictment charged Hasson with violating 18 U.S.C.

§ 922(g)(3), which makes it "unlawful for any person . . . who is an unlawful user of *or* addicted to

any controlled substance" to possess a firearm (emphasis added). As the word "or" makes clear,

the government can secure a § 922(g)(3) conviction by showing either of two things: that the

defendant is an "unlawful user" of a controlled substance, or that he is "addicted to" a controlled

substance. The superseding indictment in this case alleged Hasson possessed firearms while

"knowing he was an unlawful user of *and* addicted to a controlled substance." ECF 71 at 3

(emphasis added). Despite the indictment's use of "and," the Court must assume Hasson pled

guilty only to the "unlawful user" prong of § 922(g)(3), and not to the "addicted to" prong.

In *Chapman*, which involved a Second Amendment challenge to a different subsection of

§ 922(g), the Fourth Circuit held that "when a defendant pleads guilty to a formal charge in an

indictment which alleges conjunctively the disjunctive components of a statute, the rule is that the

defendant admits to the least serious of the disjunctive statutory conduct." 666 F.3d at 228. The

statute in *Chapman* required the government to prove the defendant was subject to a court order

that *either* (1) "includes a finding that [the defendant] represents a credible threat to the physical

safety of [an] intimate partner or child," *or* (2) "by its terms explicitly prohibits the use, attempted

use, or threatened use of physical force against such intimate partner or child that would reasonably

be expected to cause bodily injury." *Id.* at 227 (quoting 18 U.S.C. § 922(g)(8)(C)(i)-(ii)). The

Fourth Circuit observed that the indictment properly alleged a violation of both § 922(g)(8)(C)(i)

and § 922(g)(8)(C)(ii), since "it is settled that a charging document must allege conjunctively the

disjunctive components of an underlying statute." *Id.* at 227-28. But for purposes of the defendant's

Second Amendment claim, the Court analyzed only § 922(g)(8)(c)(*ii*), which was "the least serious of the disjunctive statutory conduct," without considering § 922(g)(8)(c)(*i*). *Id.* at 228.

*Chapman* dictates that in this case, the Court limit itself to analyzing § 922(g)(3)'s "unlawful user" prong. For purposes of *Bruen*'s text-and-history analysis, that prong proscribes "the least serious of the disjunctive statutory conduct" in § 922(g)(3). *Id.* at 227. Because, as explained below, the statute's "unlawful user" modality violates the Second Amendment both on its face and as applied to Hasson, his conviction must be vacated.

In the alternative, however, Hasson also argues below that both of the statute's prongs are unconstitutional, facially and as applied.

**B.      Hasson's conduct is covered by the Second Amendment's plain text.**

*Bruen* directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2126. Here, the answer is "yes."

The government has never disputed that the guns Hasson possessed were entirely legal to own, under both federal and Maryland law. *See* ECF 100 at 19 ("[A]ll of the firearms seized from Mr. Hasson's home were lawful to own."). Because those weapons are "in common use," they qualify as "Arms" for Second Amendment purposes. *Heller*, 554 U.S. at 624. Similarly, possession of a firearm, the conduct to which Hasson pled guilty, easily qualifies as "keep[ing]" arms. *Heller* defines "keep" as "to retain; not to lose," "to have in custody," and "to hold; to retain in one's power or possession"—in short, to "have weapons." *Id.* at 582.

Finally, Hasson is among "the people" protected by the Second Amendment. Construing the words "the people," *Heller* said "the term unambiguously refers to *all* members of the political community, *not an unspecified subset.*" *Id.* at 580 (emphasis added). It interpreted "the people" to encompass all "persons who are part of a national community or who have otherwise developed

11

sufficient connection with this country to be considered part of that community." *Id.* Thus the

Second Amendment right "is exercised individually and belongs to *all* Americans." *Id.* at 581

(emphasis added).

*Bruen* confirms this conclusion. There, the Court echoed *Heller*'s statement that the Second

Amendment guarantees the right to keep and bear Arms to "'all Americans.'" 142 S. Ct. at 2156.

And just as *Bruen* reasoned that "[n]othing in the Second Amendment's text draws a home/public

distinction with respect to the right to keep and bear arms," *id.* at 2134, so too, nothing in the

amendment's text draws a distinction between those who do and do not use drugs unlawfully, or

between those who are and are not addicted to drugs. It follows that unlawful drug users and addicts

are part of "the people" protected by the Second Amendment. *See Daniels*, 77 F.4th at 342-43

(holding § 922(g)(3) defendants are among "the people"); *United States v. Alston*, 2023 WL

4758734, at *6-8 (E.D.N.C. July 18, 2023) (same); *United States v. Harrison*, 2023 WL 1771138, at

*3-4 (W.D. Okla. Feb. 3, 2023) (same); *United States v. Connelly*, 2023 WL 2806324, at *4-5 (W.D.

Tex. Apr. 6, 2023) (same); *United States v. Lewis*, 2023 WL 4604563, at *4-6 (S.D. Ala. July 18,

2023) (same); *United States v. Grubb*, 2023 WL 5352000, at *2 (N.D. Iowa Aug. 21, 2023) (same);

*United States v. Okello*, 2023 WL 5515828, at *3 (D.S.D. Aug. 25, 2023) (same); *Gil*, 2023 WL

4356067, at *3-4 (same); *United States v. Espinoza-Melgar*, 2023 WL 5279654, at *3 (D. Utah Aug.

16, 2023) (same).

In addition, *Heller* explained that "the people" is a "term of art" that bears a uniform

meaning across the First, Second, Fourth, and Ninth Amendments. 554 U.S. at 580. The result is

that, if drug use or addiction deprives someone of his Second Amendment right to bear arms, it

would also deprive him of his First Amendment right to petition the government for redress of

grievances and his Fourth Amendment right to be free from warrantless searches of his home. Like

the en banc Third Circuit in *Range*, this Court should reject that untenable proposition. 69 F.4th at 102 ("Unless the meaning of the phrase 'the people' varies from provision to provision—and the Supreme Court in *Heller* suggested it does not—to conclude that Range is not among 'the people' for Second Amendment purposes would exclude him from those rights as well."); *see also, e.g.*, *United States v. Ware*, 2023 WL 3568606, at *5 (S.D. Ill. May 19, 2023) (holding even felons are included in "the people" because a contrary result would mean they also lack First and Fourth Amendment rights); *United States v. Williams*, 2022 WL 18285005, at *2 (N.D. Ga. Nov. 14, 2022) (same); *United States v. Gray*, 2022 WL 16855696, at *2 (D. Colo. Nov. 10, 2022) (same).

Notwithstanding this straightforward interpretation of the Second Amendment's "plain text," the government has argued in other cases that "the people" comprises only *law-abiding, responsible* people.[2] This argument traces back to *Heller*'s statement that, "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. But that passage does not support the government's position.

By beginning with "whatever else it leaves to future evaluation," the *Heller* Court made clear that its reference to "law-abiding, responsible citizens" established a Second Amendment floor, not a ceiling. The Court held that law-abiding, responsible citizens have a right to possess

_____

[2] In the § 922(g)(3) context, the government has argued the "law-abiding, responsible citizens" filter excludes "unlawful users" because their illegal use of drugs necessarily renders them non-law-abiding. *E.g.*, *United States v. Randall*, ___ F. Supp. 3d ___, 2023 WL 3171609, at *2-3 (S.D. Iowa Feb. 14, 2023). Even if that were true, it would not remove drug addicts from "the people." There is nothing unlawful about drug addiction, and being addicted to a controlled substance does not render one non-law-abiding. Indeed, the Supreme Court has "held that a state may not, consistent with the Eighth Amendment, punish an individual for being addicted to narcotics." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 279 (4th Cir. 2019) (en banc) (citing *Robinson v. California*, 370 U.S. 660 (1962)). Likewise, addiction does not mark one as irresponsible. Being addicted to drugs is a status, not a course of conduct; drug addicts can, and frequently do, abstain from drugs for many years—or even the rest of their lives.

firearms, but it expressly left "to future evaluation" the question whether other people enjoy that right as well. "It seems unlikely," to say the least, that the *Heller* Court, after concluding the Second Amendment right "'belongs to *all Americans*,'" "would then, *sub silentio*, pivot 180 degrees to a conclusion that 'the people' in the Second Amendment actually refers to an 'unspecified subset' of 'law-abiding, responsible' persons." *Lewis*, 2023 WL 4604563, at *5 (emphasis in *Lewis*). Indeed, excluding lawbreakers from "the people" "is precisely the sort of carving out of a subset from 'all Americans' that the *Heller* Court rejected." *Harrison*, 2023 WL 1771138, at *4; *see also, e.g.*, *Okello*, 2023 WL 5515828, at *3 ("[*Heller*] affirm[s] that law-abiding citizens are presumptively permitted to keep and bear Arms. But nowhere [does it] state that the converse is also true and that those who break the law, regardless of the severity of the violation, are presumptively stripped of Second Amendment protections."); *United States v. Gates*, 2023 WL 5748362, at *4 (N.D. Ill. Sept. 6, 2023) ("*Heller* decided only what it needed to decide. Each reference to 'law-abiding' citizens did not constitute part of a broader *holding* that [lawbreakers] are categorically not amongst the 'people' under the Second Amendment." (emphasis in original)).

To the extent *Heller*'s language was ambiguous, *Bruen* dispelled the ambiguity. The passage cited above references law-abiding, responsible citizens' right to use arms "in defense of hearth and home." If that passage were meant to mark off the outer edges of the Second Amendment right, then even law-abiding, responsible citizens would have no right to use firearms *outside* the home. But *Bruen* held the Second Amendment right does extend outside the home, and the Court in *Bruen* gave no hint that it believed it was contradicting *Heller* in that regard. Thus *Bruen* confirms that it would be a mistake to read *Heller*'s "law-abiding, responsible citizens" language as a limitation on the Second Amendment.

The government has argued elsewhere that other portions of *Bruen* demonstrate Second

14

Amendment rights are "limited" to law-abiding citizens. It is true that at several points, *Bruen* describes its holding by using the term "law-abiding." *See, e.g.*, 142 S. Ct. at 2156 ("New York's proper-cause requirement violates the [Second] Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms.").

But "the criminal histories of the plaintiffs in [*Bruen*] were not at issue" in that case, and courts should therefore be "careful not to overread" *Bruen*'s use of "law-abiding." *Range*, 69 F.4th at 101. "[I]t is no surprise that [*Bruen*] used the term 'law-abiding' because that was the factual scenario the Court was considering." *United States v. Pierre*, No. 1:22-cr-20321-JEM, ECF 53 at 17 (S.D. Fla. Nov. 28, 2022). From the fact that "law-abiding, responsible citizens" *are* among "the people," it simply does not follow that non-law-abiding, irresponsible citizens are *not* among "the people." "Indeed, there would have been no reason for the Court in *Bruen* to address or even consider whether non-law-abiding citizens were part 'of the people.' It did not, and *Bruen*'s references to 'law abiding' do not support the Government's position." *Id.*; *see also, e.g.*, *Lewis*, 2023 WL 4604563, at *6 ("*Bruen* [did not] purport[] to confine the Second Amendment to law-abiding, responsible citizens. It had no need, and perhaps no ability, to issue such a holding, since the individual plaintiffs were undisputedly 'ordinary, law-abiding' adult citizens."); *Ware*, 2023 WL 3568606, at *5 ("The language 'law-abiding' as used in both *Heller* and *Bruen* does not alter who the Second Amendment applies to, but rather describes the individuals involved in those cases."); *United States v. Goins*, 2022 WL 17836677, at *5 (E.D. Ky. 2022) ("[T]he Supreme Court's determination that law-abiding status is sufficient to qualify for protection does not imply that only law-abiding citizens hold rights under the Second Amendment."); *United States v. Johnson*, 2023 WL 6049529, at *4 n.5 (W.D. Okla. Sept. 15, 2023) ("The issue of whether a non-law-abiding citizen qualifies for Second Amendment protection was not before the Court [in *Bruen*].").

In any event, the government's argument proves too much. *Bruen* held "that *ordinary*, law-abiding citizens have [the] right to carry handguns publicly for their self-defense." 142 S. Ct. at 2122 (emphasis added). If the word "law-abiding" in that sentence limits the Second Amendment's scope, then the word "ordinary" must do so, too. But surely the government does not believe *un*ordinary citizens lack Second Amendment rights. The Supreme Court cannot have meant to exclude anyone deemed abnormal (whatever that means) from exercising a fundamental, enumerated constitutional right.

Finally, "the phrase 'law-abiding, responsible citizens' is as expansive as it is vague." *Range*, 69 F.4th at 102. "It cannot mean that every American who gets a traffic ticket loses her Second Amendment rights." *United States v. Bullock*, 2023 WL 4232309, at *29 (S.D. Miss. June 28, 2023). But if traffic tickets do not separate the law-abiding from the non-law-abiding, or the responsible from the irresponsible, what does? There is no principled way to decide. *See Harrison*, 2023 WL 1771138, at *4 n.21 ("[A 'law-abiding' limitation is] an outright declaration of the federal government's belief that it can deprive practically *anyone* of their Second Amendment right. Who among us, after all, isn't a 'lawbreaker'?" (emphasis in original)); *Espinoza-Melgar*, 2023 WL 5279654, at *3 ("[L]imiting the right granted by the Second Amendment to apply only to law-abiding citizens would raise a host of questions regarding who qualifies as a 'law-abiding' citizen. . . . Would the Second Amendment protect an adult who owned a firearm if that individual had been convicted of a misdemeanor as a child?"); *United States v. Nordvold*, 2023 WL 5596623, at *4 (D.S.D. Aug. 1, 2023) ("[W]ho is a 'responsible' citizen? Americans are apt to have different views on th[is] question[], making the phrase difficult, if not impossible, to interpret and enforce."). As the Fifth Circuit has observed, the phrase "law-abiding, responsible citizens"

> admits to no true limiting principle. Under the Government's reading, Congress could remove "unordinary" or "irresponsible" or "non-law-abiding" people—

however expediently defined—from the scope of the Second Amendment. Could speeders be stripped of their right to keep and bear arms? Political nonconformists? People who do not recycle or drive an electric vehicle? One easily gets the point: Neither *Heller* nor *Bruen* countenances such a malleable scope of the Second Amendment's protections; to the contrary, the Supreme Court has made clear that "the Second Amendment right is exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 581.

*United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023). A term as pliant as "law-abiding and responsible" cannot demarcate those who do possess constitutional rights from those who don't.

Hasson, who is an American citizen, is part of the United States' "national community." *Heller*, 554 U.S. at 580. He is therefore among "the people" protected by the Second Amendment.

### C. The government will be unable to show that § 922(g)(3) is consistent with the United States' historical tradition of firearm regulation.

Because "the Second Amendment's plain text covers [Hasson's] conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. To rebut the presumption, the government must establish that § 922(g)(3) "is consistent with this Nation's historical tradition of firearm regulation." *Id.* The government will be unable to do so. Section 922(g)(3) is therefore unconstitutional, both on its face and as applied to Hasson.

#### 1. The "distinctly similar" test applies in a challenge to § 922(g)(3).

As explained above, the threshold question at *Bruen*'s second step is whether the problem a statute addresses is old or new. *See Daniels*, 77 F.4th at 343. Here, § 922(g)(3) is meant to address firearms' accessibility to those whose substance use might render them chronically intoxicated. *See Harrison*, 2023 WL 1771138, at *6 (describing "the societal problem addressed by § 922(g)(3)" as "possession of firearms by users of substances with the potential for abuse"). That problem "is not new." *Id.*

During the colonial period, "[p]eople in all regions and of all classes drank [alcohol] heavily"—wine at breakfast, bitters during mid-morning and late-afternoon work breaks, cider and

beer at lunch, and toddies with and after dinner. Paul Aaron & David Musto, Temperance and Prohibition in America: A Historical Overview 131 (1981).[3] Alcohol consumption at this time "was pervasive in American society; it crossed regional, sexual, racial, and class lines. Americans drank at home and abroad, alone and together, at work and at play, in fun and in earnest. They drank from the crack of dawn to the crack of dawn." W.J. Roraaugh, *The Alcoholic Republic: An American Tradition* 20-21 (1979).[4] Indeed, Americans in the colonies and early republic were on a "spectacular binge." *Id.* at 31. As consumption increased around the turn of the 19th century, "alcohol began to be widely perceived as a serious threat to social order." Aaron & Musto at 136. Prominent members of the founding generation "worried" about Americans' "excessive use" of alcohol. Roraaugh at 5. George Washington, for example, described distilled spirits as "the ruin of half the workmen in this Country," and John Adams considered it "mortifying" that Americans "exceed[ed] all other . . . people in the world in this degrading, beastly vice of intemperance." *Id.* at 6; *see also id.* ("The Founding Fathers, fearful that the American republic would be destroyed in a flood of alcohol, were anguished and perplexed."). And other members of the founding generation, too, "noted that drunkenness was 'everywhere prevalent,' and pronounced the quantity of alcohol consumed to be 'scandalous.'" *Id.* at 7.

That generation was familiar with the problem of addiction as well. In 1785, Benjamin Rush, a prominent physician and signer of the Declaration of Independence, published "an enormously influential tract" that "laid out an elaborate description of this disease syndrome and emphasized

---

[3] Available at
https://www.ncbi.nlm.nih.gov/books/NBK216421/pdf/Bookshelf_NBK216421.pdf.

[4] Available at
https://www.google.com/books/edition/The_Alcoholic_Republic/2AUH0vchHRIC?hl=en&kptab=overview&gbpv=1.

the moral as well as physical decay that alcohol brought on." Aaron & Musto at 138-39. According to Rush, "[h]ard liquor debilitated self-restraint and incited pathological excess. It changed people and induced compulsive behavior by short-circuiting natural mechanisms of self-control." *Id.* at 139. Rush's "analysis of the effects of drinking in terms of addiction had great explanatory appeal to Americans at the turn of the century." *Id.*; *see also id.* at 138 (noting Thomas Jefferson considered "[t]he concept of addiction" a public menace).

In short, the combination of access to firearms and chronic intoxication is not an "unprecedented societal concern[]" that was "unimaginable at the founding." *Bruen*, 142 S. Ct. at 2132. Rather, that problem has "persisted since the 18th century," which means the government must point to a robust tradition of regulations "distinctly similar" to § 922(g)(3). *Id.* at 2131.

Hasson recognizes that in *Daniels*, where the defendant was an unlawful user of marijuana, the Fifth Circuit chose to assess § 922(g)(3)'s constitutionality using the "relevantly similar" standard. 77 F.4th at 343-44. The court reasoned that, although "the Founding generation was familiar with intoxication via alcohol," the Founders "were not familiar with widespread use of marihuana as a narcotic, nor the modern drug trade." *Id.* at 343. Marijuana and alcohol "might be comparable in some ways," the court wrote, but "merely by making the comparison we have moved past the hunt for a distinctly similar law and are engaged in analogical reasoning." *Id.* at 344. As a result, the court declined to apply the "distinctly similar" standard. *Id.*

This argument misconceives *Bruen*'s "distinctly similar"/"relevantly similar" dichotomy. In *Bruen*, the Court explained that the "distinctly similar" standard is appropriate when a statute addresses "a *general* societal problem that has persisted since the 18th century." 142 S. Ct. at 2131 (emphasis added). The key word is "general": courts should apply the "distinctly similar" test even if the problem that a modern legislature seeks to combat is not precisely identical, in every respect,

to a problem that existed in 1791. As long as those two problems are "general[ly]" the same, the "distinctly similar" analysis is required.

This much is clear from *Bruen*'s description of the problem that the statutes in *Heller* and *Bruen* sought to alleviate. According to *Bruen*, those statutes "concern[ed] the same alleged societal problem," i.e., "handgun violence" in "densely populated" "urban areas." *Id.* That problem is undoubtedly much different—and much worse—today than it was in 1791. As New York City explained in its *Bruen* amicus brief, the firearms that were accessible to New Yorkers in 1791 were mostly "single-shot muzzle-loading long guns" that "were bulky, largely unreliable, and relatively inaccurate." Brief for City of New York as Amicus Curiae 9.[5] But "[w]ith advances in firearms and manufacturing technology" beginning in the mid-19th century, "easily concealable and reliable handguns capable of being carried loaded and firing multiple shots became readily available." *Id.* at 12. These technological advances, coupled with a population boom, led to "a corresponding rise in gangs, violent crime, and urban riots" in New York City, which in turn caused "an acute rise in gun deaths." *Id.* at 13. It was these changes that prompted New York to enact its proper-cause requirement. *Id.* at 13-19. Yet despite the increased frequency and deadliness of gun crime in New York City, the *Bruen* Court applied the "distinctly similar" standard, not the more permissive "relevantly similar" standard. That's because, although urban gun violence in 2022 was not exactly the same as urban gun violence in 1791, it still represented the same "*general* societal problem." *Bruen*, 142 S. Ct. at 2131 (emphasis added).

Finally, the fact that a court must engage in "analogical reasoning," *Daniels*, 77 F.4th at 344, does not mean the "distinctly similar" standard does not apply. *Bruen* makes clear that even that

---

[5] Available at https://www.supremecourt.gov/DocketPDF/20/20-843/193294/20210921165715076_20-843bsacCityOfNewYork.pdf.

standard involves drawing analogies. *United States v. Lewis*, 2023 WL 187582, at *2 n.2 (W.D. Okla. Jan. 13, 2023) ("The [*Bruen*] majority opinion speaks of 'analogies' and 'analogues' in discussing *both* the 'distinctly similar' and 'relevantly similar' standards . . . , although that terminology is understandably used much more frequently in the discussion of the 'relevantly similar' standard." (emphasis in original)); *see Bruen*, 142 S. Ct. at 2131 (explaining that after surveying "'various restrictive laws in the colonial period,' and finding that none was *analogous* to the District's ban, *Heller* concluded that the handgun ban was unconstitutional" (emphasis added)); *id.* (elaborating standard for statutes addressing longstanding societal problems: "if some jurisdictions actually attempted to enact *analogous* regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality" (emphasis added)). The difference between "distinctly similar" and "relevantly similar" isn't that one involves analogizing while the other does not; it's that the former requires much tighter analogies than the latter.

The Court should analyze § 922(g)(3) under *Bruen*'s "distinctly similar" standard.

>    2.    **Under the "distinctly similar" test, § 922(g)(3) violates the Second Amendment both facially and as applied to Hasson.**

The government will be unable to bear its burden of establishing a robust tradition of historical regulations "distinctly similar" to § 922(g)(3). Although *Bruen* did not define "distinctly similar," it indicated the standard is a stringent one. *See Baird v. Bonta*, ____ F.4th ____, 2023 WL 5763345, at *8 (9th Cir. Sept. 7, 2023) ("Courts in our sister circuits have consistently recognized that the *Bruen* standard for identifying a closely analogous historical regulation is a demanding one."). Applying the "distinctly similar" test, *Bruen* identified only a single historical precursor that "support[ed] New York's proper-cause requirement": an 1871 Texas law "forb[idding] anyone from 'carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing

an unlawful attack on his person.'" 142 S. Ct. at 2153 (quoting 1871 Tex. Gen. Laws § 1). This "reasonable grounds" requirement was nearly identical to New York courts' interpretation of that state's proper-cause standard. *See id.* at 2123-24 & n.2.

In the context of § 922(g)(3), therefore, a "distinctly similar" regulation would be one that imposed a categorical ban on firearm possession based on chronic use of or addition to intoxicating substances, even at times when someone was not actively intoxicated. No such laws appeared in this country until 1931, when Pennsylvania passed a statute that criminalized "'deliver[ing] a firearm . . . to one who he has reasonable cause to believe . . . is a drug addict.'" *Alston*, 2023 WL 4758734, at *17 (quoting 1931 Pa. Laws 499, no. 158, § 8). Four more jurisdictions enacted similar laws over the next four years. *Id.*

Even these five statutes are not distinctly similar to § 922(g)(3). "While [§ 922(g)(3)] imposes criminal liability on drug users who receive, possess, or transfer a firearm, the 1930s laws only targeted individuals who transferred a firearm *to* a drug user." *Id.* at *17 n.16 (emphasis in original). In other words, § 922(g)(3) "targets the drug user himself," whereas the 1930s regulations criminalize the conduct of third parties. *Id.* But even if the 1930s laws were sufficiently similar to § 922(g)(3), they would not discharge the government's burden. The Court in *Bruen* refused even to "address any of the 20th-century historical evidence brought to bear by respondents or their *amici*," since it was too far removed from the Second Amendment's ratification in 1791. 142 S. Ct. at 2154 n.28. Evidence of such recent vintage "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence," i.e., when no similar statutes appear in the founding-era record. *Id.* Thus the 1930s statutes come too late in time to establish § 922(g)(3)'s constitutionality. *See Alston*, 2023 WL 4758734, at *17-18 (declining to consider 1930s statutes because they are too recent).

For the same reason, § 922(g)(3) cannot establish its own constitutionality. That statute "wasn't enacted by Congress until the Gun Control Act of 1968," which prohibited unlawful users and addicts from "receiving" a firearm. *Harrison*, 2023 WL 1771138, at *2. Congress did not make possession illegal until 1986. *Id.* Both dates are much too far removed from 1791 to be relevant. *See Lewis*, 2023 WL 4604563, at *9 ("[20th-century evidence] can be used to 'confirm' what earlier evidence suggests, but it cannot 'provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.' An implicit corollary to this rule is that 20th-century legislation cannot on its own establish the reach of an 18th-century constitutional provision." (quoting *Bruen*, 142 S. Ct. at 2137, 2154 n.28)).

Because the historical record reveals no "distinctly similar" regulations from the founding era, § 922(g)(3) violates the Second Amendment on its face. And as a result, it necessarily violates the Second Amendment as applied to Hasson as well.

### 3. Even assuming the "relevantly similar" test applies, § 922(g)(3) is unconstitutional both on its face and as applied.

Assuming for sake of argument that the government can rely on the less rigorous "relevantly similar" test to carry its burden, § 922(g)(3) still violates the Second Amendment both facially and as applied to Hasson.

### a. Section 922(g)(3) is facially unconstitutional.

In other cases, the government has sought to defend § 922(g)(3) by citing (1) a handful of colonial intoxication-related firearms laws, (2) a small set of similar laws from the Reconstruction era, and (3) a supposed tradition of disarming "dangerous" groups. Hasson addresses these regulations in turn.

### i.   Colonial intoxication-related firearms laws

### (a)   New York and Virginia statutes

The government has previously cited a 1655 Virginia law that prohibited "'shooting any gunns at drinkeing (marriages and ffuneralls onely excepted)'" and a 1771 New York law that "prohibited the 'firing or discharge of any Gun, Pistol, Rocket, Cracker, Squib or other fire Work'" in certain areas between December 31 and January 2." *Connelly*, 2023 WL 2806324, at *6-7 (citations omitted). These laws fail to satisfy the "relevantly similar" test's metrics.

Start with the "why," i.e., whether historical analogues and a modern statute are "comparably justified." *Bruen*, 142 S. Ct. at 2133. The purpose of § 922(g)(3) is "to promote everyday public safety," *Alston*, 2023 WL 4758734, at *21, and to "fight against crime and violence generally," *Connelly*, 2023 WL 2806324, at *6. By contrast, the Virginia law "was explicitly passed to conserve gunpowder, which was at a premium, and because ill-timed gunshots might be mistaken for a signal that local Indians were attacking." *Daniels*, 77 F.4th at 345. The statute itself provided that "the misuse of weapons while intoxicated furthered 'that beastly vice[:] spending much powder in vaine' instead of 'reserve[ing] [it] against the comon enemie,' 'the Indians.'" *Id.* at 345 n.12 (citation omitted). And, the statute explained, "'the only means for the discovery of [Indian] plotts is by allarms, of which no certainty can be had in respect of the frequent shooting of gunns in drinking.'" *Id.* (same). Thus the Virginia law regulated firearms "for different reasons" than § 922(g)(3). *Connelly*, 2023 WL 2806324, at *6 (explaining Virginia statute "focused on protecting the colony from potential attacks by Native Americans" and "conserving military resources").

New York's law also "differs from § 922(g)(3) in why it burdens the Second Amendment right, albeit to a lesser extent" than Virginia's. *Connelly*, 2023 WL 2806324, at *7. The New York statute "addressed the 'great Damages [ ] frequently done on . . . New Years Days, by persons going

24

from House to House, with Guns and other Fire Arms and being often intoxicated with Liquor.'" *Id.* "To some degree," this purpose is similar to § 922(g)(3)'s: "maintaining public order and preventing firearm-related injuries." *Id.* But the justification is substantially narrower. Whereas "the New York law addressed the *specific* dangers posed by New Year's Eve partygoers in certain parts of the New York colony," § 922(g)(3) addresses "the *general* dangers posed by armed criminals across the country." *Id.* (emphasis in original).

Regardless, as to the "how," both the Virginia and New York laws imposed "a far narrower burden" on the right to keep and bear arms than § 922(g)(3). *Harrison*, 2023 WL 1771138, at *7; *see Bruen*, 142 S. Ct. at 2133 (directing courts to ask whether modern and historical regulations "impose a comparable burden on the right of armed self-defense"). The colonial laws "only applied while an individual was actively intoxicated or actively using intoxicants"; unlike § 922(g)(3), they did not restrict the right to armed self-defense based merely on general status as an addict or "a user of intoxicants." *Harrison*, 2023 WL 1771138, at *7; *see also Daniels*, 77 F.4th at 345-46 (finding laws disanalogous because they "applied only to those under the influence, not habitual drinkers"); *Baird*, ___ F.4th ___, 2023 WL 5763345, at *8 (citing this portion of *Daniels* with approval). That difference is a "considerable" one. *Daniels*, 77 F.4th at 347. Under § 922(g)(3), a drug addict can be disarmed even if he has been sober for many years, since addition is a status that can last a lifetime. And courts may infer unlawful-user status "from a positive drug test, conviction, or arrest for a controlled substance up to one year prior." *Gil*, 2023 WL 4356067, at *6 (citing 27 C.F.R. § 478.11).

The Virginia and New York laws were less burdensome in other ways, too. Rather than "prohibit[ing] the mere possession of a firearm," as § 922(g)(3) does, *Harrison*, 2023 WL 1771138, at *7, those laws "only criminalized *firing* weapons while drinking," *Alston*, 2023 WL 4758734, at *16 (emphasis added); *accord Connelly*, 2023 WL 2806324, at *7 ("And much like the Virginia law,

the New York law limited the regulated activity to gun use, rather than gun possession."). In addition, Virginia's and New York's laws applied only to "public places or activities," whereas § 922(g)(3) prohibits firearms possession everywhere, including "in the home for purposes of self-defense." *Harrison*, 2023 WL 1771138, at *7. Unlike § 922(g)(3), which was punishable by up to ten years in prison at the time of Hasson's guilty plea (and fifteen years today), the colonial statutes carried "no carceral penalty" and were punishable by only a fine or forfeiture of tobacco. *Alston*, 2023 WL 4758734, at *15; *see Heller*, 554 U.S. at 632 (distinguishing New York law and other colonial regulations from District of Columbia's modern handgun ban: "The District law, by contrast, far from imposing a minor fine, threatens citizens with a year in prison (five years for a second violation) for even obtaining a gun in the first place"). Finally, New York's law was "strikingly narrow," *Daniels*, 77 F.4th at 346: it "was in effect for only two years, applied to only certain places in one county and two towns, and restricted the discharge of firearms for only three days a year," *Harrison*, 2023 WL 1771138, at *9.

#### (b)    Militia statutes

The government has also previously cited to "statutes regulating militia service," such as a 1746 New Jersey law that provided "a soldier could be 'disarm[ed]' if he showed up for militia service . . . 'disguised in Liquor.'" *Daniels*, 77 F.4th at 346 (citation omitted). But these laws "are even less probative" than Virginia's and New York's. *Id.* Their "why"—"to ensure a competent military"—is different from § 922(g)(3)'s, *id.*, and so they are not "comparably justified," *Bruen*, 142 S. Ct. at 2133; *accord Alston*, 2023 WL 4758734, at *15 (finding New Jersey law not comparably justified as § 922(g)(3) because it "aimed to ensure the orderly functioning of the militia").

Militia statutes like New Jersey's also differed in terms of the "how." Like the Virginia and New York laws, New Jersey's statute did not prohibit mere *possession* of firearms, and it reached

only people who were actively intoxicated, thereby excluding alcoholics or habitual users of alcohol during times of sobriety. *Alston*, 2023 WL 4758734, at *16. Moreover, it "applied only to soldiers," not the general population, and only during training. *Id.* Finally, punishment consisted of nothing more than a fine or forfeiture of a firearm, not incarceration. *Id.* at *15-16. Militia statutes therefore did not "impose a comparable burden on the right of armed self-defense" relative to § 922(g)(3). *Bruen*, 142 S. Ct. at 2133; *see Daniels*, 77 F.4th at 336 ("[T]he limitations applied only to the militia; none of the laws spoke to the ability of militiamen to carry outside of their military service. At the Founding, as today, restrictions on the liberties of servicemen tell us little about the limits acceptable for the general public.").

* * *

Even if the New York, Virginia, and militia statutes were sufficiently analogous, they would still fail to prove that § 922(g)(3) is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. To carry its burden, the government must identify historical analogues that are "well-established and *representative*." *Id.* at 2133 (emphasis added). A few "outliers" are not enough, *id.* at 2153, and the Court specifically "doubt[ed] that *three* colonial regulations could suffice" to establish a tradition, *id.* at 2142 (emphasis in original). Where, as here, "the government can point to only three statutes passed within a span of more than 100 years of colonial history regulating the use of firearms while intoxicated," "[s]uch a spotty historical tradition cannot form a firm foundation for § 922(g)(3)." *Alston*, 2023 WL 4758734, at *15.[6]

---

[6] *Daniels* notes that in 1780, Pennsylvania passed a militia statute similar to New Jersey's. 77 F.4th at 346. But even counting that statute, four regulations across 100 years, from thirteen colonies, falls well short of a "representative" tradition. *Bruen*, 142 S. Ct. at 2133.

### ii.    Reconstruction intoxication-related statutes

Between 1868 and 1883, three states passed laws that "prohibited carrying firearms while intoxicated." *Daniels*, 77 F.4th at 346. Mississippi and South Carolina also passed laws, in 1878 and 1899, respectively, that banned the sale of pistols to "people who were actively intoxicated" or barred "the '*discharge*'" of a gun "while 'under the influence[ ] of intoxicating liquors.'" *Id.* at 346 n.17 (emphasis in original) (citations omitted); *see Alston*, 2023 WL 4758734, at *17.

Broadly speaking, these laws and § 922(g)(3) share a common justification: preventing gun violence by people whose use of intoxicants may impair their judgment or self-control. But in terms of the "how," § 922(g)(3) is "substantially broader" than the Reconstruction laws. *Daniels*, 77 F.4th at 347. The latter laws "suffer from much the same problems as the colonial laws discussed above," *Connelly*, 2023 WL 2806324, at *8: (1) they "prohibit specific conduct *while* drunk," rather than "impose[] a total ban on firearm possession for those who drink" or are addicted, *Alston*, 2023 WL 4758734, at *17 (emphasis in original); (2) they banned only "the *carry* of firearms," *Daniels*, 77 F.4th at 347 (emphasis in original), and not "mere possession," *Harrison*, 2023 WL 1771138, at *7; (3) they did not prohibit any conduct "in the home," as § 922(g)(3) does, *Harrison*, 2023 WL 1771138, at *7; and (4) the punishment for violation—typically a fine or, at most, three months in jail—was not "nearly as severe as § 922(g)(3)," *Alston*, 2023 WL 4758734, at *17. Whereas the Reconstruction laws "took a scalpel to the right of armed self-defense—narrowly carving out exceptions but leaving most of the right in place—§ 922(g)(3) takes a sledgehammer to the right." *Harrison*, 2023 WL 1771138, at *8; *see also Connelly*, 2023 WL 2806324, at *8 ("These laws thus regulated firearms in a much less intrusive way than § 922(g)(3), making them relevantly dissimilar.").

Finally, the Reconstruction laws are deficient for two additional reasons.

*First,* the earliest of these laws was passed in 1868—nearly 80 years after ratification of the Second Amendment—and the latest in 1899. *Bruen* teaches that "mid- to late-19th-century" evidence, including "post-Civil War" developments, is relevant only insofar as it provides "confirmation" of prior practice. 142 S. Ct. at 2137. Such evidence "come[s] too late to provide insight into the meaning" of the Second Amendment in 1791. *Id.* For that reason, regulations from the last three decades of the 19th century have little, if any relevance, in understanding the Second Amendment's scope. *See Daniels*, 77 F.4th at 348 (discounting Reconstruction laws because "[a] tradition cannot inform the original meaning of the Bill of Rights if it emerges one hundred years later"); *Lewis*, 2023 WL 4604563, at *10 (dismissing Reconstruction statute because it was enacted "a century after ratification of the Second Amendment"). In fact, in this case "the Court has even less reason to consider Reconstruction-era evidence than the *Bruen* Court did." *Connelly*, 2023 WL 2806324, at *8. "*Bruen* involved a state firearm regulation, and states are bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second. But § 922(g)(3) is a federal law, and the Second Amendment has applied against the federal government since the ratification of the Bill of Rights in 1791." *Id.*; *accord Daniels*, 77 F.4th at 348 ("[T]he instant case involves a federal statute and therefore implicates the Second Amendment, not the Fourteenth. Even if the public understanding of the right to bear arms *did* evolve, it could not change the meaning of the Second Amendment, which was fixed when it first applied to the federal government in 1791." (emphasis in original)).

*Second,* even counting the Mississippi and South Carolina laws,[7] the Reconstruction statutes "are notably few"—at most five. *Daniels*, 77 F.4th at 347. To add up to a historical tradition,

---

[7] Those laws prohibited *sale* and *discharge* of a firearm, rather than *possession*, and one of them prohibited conduct by a third party, rather than by a consumer of alcohol.

analogues must be "well-established and representative." *Bruen*, 142 S. Ct. at 2133. By the time

South Carolina passed its statute in 1899, the Union consisted of 45 states. Five states out of 45 is

hardly "representative," and in fact represents a lower percentage of jurisdictions (11 percent) than

the three colonies out of thirteen that *Bruen* "doubt[ed]" would be sufficient (23 percent). *Id.* at

2142.

### iii.    Laws disarming "dangerous" groups

The final purported tradition on which the government has previously relied to defend

§ 922(g)(3) consists of "historical regulations preventing dangerous persons, such as felons and the

mentally ill, from possessing firearms." *E.g.*, *United States v. Danielson*, 2023 WL 5288049, at *5 (D.

Minn. Aug. 17, 2023) (upholding § 922(g)(3) on this basis). There are several problems with this

argument.

As an initial matter, the supposed tradition of disarming felons and the mentally ill is a

mirage. *Bruen* made clear that to carry its burden at step two, the government must point to actual,

in-force "regulations"—i.e., positive law, laid out in statute books or judicial decisions, that

proscribed certain conduct. *See, e.g.*, 142 S. Ct. at 2126 ("[T]he government must demonstrate that

the regulation is consistent with this Nation's historical tradition of firearm *regulation*."); *id.* at 2135

("[T]he burden falls on respondents to show that New York's proper-cause requirement is

consistent with this Nation's historical tradition of firearm *regulation*."). Yet no jurisdiction in this

country passed a felon-disarmament law until the 20th century. *See* Carlton F.W. Larson, *Four

Exceptions in Search of a Theory*, 60 Hastings L.J. 1371, 1376 (2009); C. Kevin Marshall, *Why Can't

Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009); Nelson Lund, *The Second

Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009). And in

previous cases, the government has failed to identify any pre-20th-century statutes that actually

authorized disarmament on the basis of mental illness. *See Alston*, 2023 WL 4758734, at \*12-14;

*Daniels*, 77 F.4th at 349 ("We note at the outset that there is not a clear set of positive-law statutes

concerning mental illness and firearms.").

But even putting aside the government's inability to substantiate its supposed tradition,[8]

"dangerousness" is an improper lens through which to parse the historical record. *Bruen* indicates

that in carving out exceptions to "the Second Amendment's unqualified command," 142 S. Ct. at

2126, courts should proceed cautiously, defining those exceptions as narrowly and concretely as

possible. To support its proper-cause requirement, New York relied on a number of English and

early American firearms regulations that, it asserted, demonstrated a general governmental power to

regulate the public carrying of firearms: (1) the Statute of Northampton and similar colonial and

early-republic "affray" laws, *id.* at 2139-45; (2) "early to mid-19th century . . . laws that proscribed

the concealed carry of pistols and other small weapons" in public, *id.* at 2146-47; and (3) mid-19th-

century "surety statutes," which required certain people to post a bond before carrying firearms in

public, *id.* at 2148-50. In New York's view, these various regulations, considered together, added up

to a "sweeping" power to enact "broad prohibitions on *all* forms of public carry," including

"ban[ning] public carry altogether." *Id.* at 2139, 2145-46 (emphasis added).

But the Supreme Court refused to treat New York's cited regulations as more than the sum

of their parts. Affray laws like the Statute of Northampton prohibited nothing more than "bearing

arms to terrorize the people" and carrying firearms before the king's ministers, *id.* at 2143; courts

had held the 19th-century concealed-carry bans "were constitutional only if they did not similarly

---

[8] To the extent the government's response brief attempts to prove such a tradition by
pointing to real-world founding-era firearms regulations, Hasson will address those regulations in his
reply.

prohibit *open* carry," *id.* at 2146 (emphasis in original); and surety statutes merely "provide[d] financial incentives for responsible arms carrying," *id.* at 2150. The Court's survey of "Anglo-American history" revealed certain "well-defined" restrictions on public carry: those that limited "the intent for which one could carry arms" (to terrorize the people), "the manner by which one carried arms" (concealed vs. open), and "the exceptional circumstances under which one could not carry arms" (e.g., before the king's ministers). *Id.* at 2156. But that's all. New York could not extrapolate, from these specifics, a general power to regulate public carry more broadly, in whatever way a legislature chooses.

Here, the government's argument aggregates (imagined) laws disarming specific groups historically considered dangerous (i.e., felons and the mentally ill), from which it derives the much broader principle that dangerous groups, in general, do not enjoy the right to keep and bear arms, even if a particular group was never disarmed at the founding. This is exactly the maneuver the Court rejected in *Bruen*: identify a few specific examples of conduct that historically has been constitutionally unprotected (e.g., carrying firearms "to terrorize the people," carrying concealed in states where open carry is permitted), move up the level-of-generality ladder to a descriptor that unites these discrete examples (e.g., "public carry"), and then apply that umbrella term to *all* conduct that (arguably) falls in the broader category (e.g., publicly carrying without "proper cause"). *Bruen* does not permit the government, or courts, to define a historical tradition at so high a level of generality.

It is for good reason that *Bruen* precludes that kind of impressionistic interpretation of the historical record. The word "dangerous" "ha[s] no true limiting principle," *Daniels*, 77 F.4th at 353, and is "far too broad" to guide courts in comparing groups disarmed today to groups disarmed at the founding, *Baird*, ___ F.4th at ___, 2023 WL 5763345, at *8. Given the term's "uncertainty"

and "obvious interpretive complexity," drawing the line at "dangerous" raises "concerns [about] the application of that standard." *Quailes*, ___ F. Supp. 3d ___, 2023 WL 5401733, at *12 (M.D. Pa. Aug. 22, 2023). In the felon-disarmament context, for example—where the government has also invoked dangerousness—can "a non-violent drug offender" be considered "dangerous" for Second Amendment purposes? *Id.* What about "those who launder money in order to conceal the proceeds of drug trafficking, or those who maintain a premises for the purpose of drug trafficking but are not otherwise involved in the drug trafficking activities directly?" *Id.* And in making this determination, do courts look at the facts of a Second Amendment claimant's prior conduct, or do they examine only statutory elements of a prior conviction? *See id.* A "dangerous" standard raises more questions than it answers.

Adopting such a vague, manipulable standard leaves courts with two options—neither desirable, and neither consistent with *Bruen*.

***First,*** courts could grant legislatures carte blanche to decide who is sufficiently "dangerous" to be stripped of their Second Amendment rights. The perils of that route are obvious. "Congress could claim that immigrants, the indigent, or the politically unpopular were presumptively 'dangerous' and eliminate their Second Amendment rights without judicial review." *Daniels*, 77 F.4th at 353. And giving legislatures "unchecked power to designate a group of persons as 'dangerous' and thereby disarm them" would "render the Second Amendment a dead letter." *Id.*; *see also Alston*, 2023 WL 4758734, at *21 n.22 ("[I]f 'dangerousness' is the sole metric, the government would have an arbitrary, near-limitless power to identify a disfavored group, declare it 'dangerous,' and revoke its constitutionally protected rights. Such an exception to the Second Amendment would swallow the rule."); *cf. Harrison*, 2023 WL 1771138, at *22 ("The purpose of enshrining a right into the Constitution is to limit the discretion of a legislature. But if the United

33

States' theory is correct and all a legislature must do to prohibit a group of persons from possessing arms is to declare that group 'untrustworthy,' then the Second Amendment would provide virtually no limit on Congress's discretion."). It was this danger that prompted the *Bruen* Court to warn that "judicial deference" to legislatures is not "appropriate" in the Second Amendment context. 142 S. Ct. at 2131; *see also id.* ("[I]t not deference that the Constitution demands here.").

**Second,** courts could scrutinize legislative classifications to determine whether they're reasonable, providing at least a limited constitutional backstop to protect against the worst abuses. Does the evidence validate Congress' view that a particular group of people is *actually* dangerous? Has Congress crafted that class so as to disarm as few non-dangerous people as reasonably possible? This mode of analysis, however, is no different from the "judge-empowering interest-balancing inquiry" that *Bruen* repudiated. *Id.* at 2129; *see, e.g.*, *Chapman*, 666 F.3d at 228 (in pre-*Bruen* case, asking whether there was a "reasonable fit" between § 922(g)(8) and "substantial government objective," keeping in mind "the fact that numerous features of § 922(g)(8)(A)-(B) and (C)(ii) keep its prohibitory sweep exceedingly narrow"). Thus a "dangerous" standard would leave courts to do exactly what *Bruen* forbade: "engage in independent means-end scrutiny under the guise of an analogical inquiry." 142 S. Ct. at 2133 n.7.

To overcome the presumption of unconstitutionality, the government cannot simply invoke amorphous terms like "dangerous"; it must descend into particulars.

### b.     Section 922(g)(3) is unconstitutional as applied.

Even assuming § 922(g)(3) is constitutional on its face, it violates the Second Amendment as applied to Hasson. The basis for this argument depends on the theory on which the Court (assumedly) finds the statute facially valid.

**First,** the Court may conclude § 922(g)(3) is facially constitutional because it is sufficiently

similar to the colonial and Reconstruction-era intoxication-related statutes described above. If so, then § 922(g)(3) still violates the Second Amendment as applied to someone , like Hasson, who uses or is addicted to tramadol. Hasson is unaware of any evidence that tramadol has as serious an effect as alcohol on a user's judgment, inhibition, motor skills, or any other quality that might make it unsafe to possess firearms while intoxicated. Tramadol is found in Schedule IV, which means it "has a currently accepted medical use in treatment in the United States," 21 U.S.C. § 812(b)(4)(B), and can be prescribed by a doctor.[9] The Drug Enforcement Administration describes Schedule IV substances as having "'a low potential for abuse and low risk of dependence.'" *Townsend v. Colvin*, 2016 WL 9776591, at *6 n.10 (D.N.M. Oct. 14, 2016) (quoting DEA website). Indeed, tramadol falls in the same schedule as widely used medications such as Xanax and Ativan. *Id.* at *6 nn.10, 11. By contrast, marijuana—the drug used by the defendants in several cases that have held § 922(g)(3) unconstitutional as-applied, *see Daniels*, 77 F.4th at 339; *Connelly*, 2023 WL 2806324, at *1; *Harrison*, 2023 WL 1771138, at *1—is a Schedule I substance, meaning it "has a high potential for abuse" and "has no currently accepted medical use in treatment in the United States." § 812(b)(1)(A)-(B).

  **Second,** the Court may conclude § 922(g)(3) is facially constitutional because it is consistent with a supposed tradition of disarming "dangerous" groups. But even if some scheduled drugs render a user or addict "dangerous," the government will be unable to show that tramadol is one of them. As just explained, tramadol is a prescription medication with currently accepted medical uses; it has a low potential for abuse and low risk of dependence; and federal law deems it substantially safer than marijuana. Hasson is unaware of any data or evidence suggesting that those who use or are

---

[9] The fact that Hasson did not have a prescription is irrelevant. His point here is that the government deems tramadol safe enough to use under certain circumstances.

addicted to tramadol become "dangerous" as a result.

## IV.    Conclusion

Section 922(g)(3) violates the Second Amendment, both on its face and as applied to

Hasson. The Court should therefore vacate Hasson's § 922(g)(3) conviction.


_____/s/_____
Cullen Macbeth
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 344-0600
cullen_macbeth@fd.org